**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————————————X

FUTURE COMMUNICATIONS CORPORATION          Civil Action No. 08-cv-1997 (JGK)
OF NEW YORK d/b/a VIRTUAL SERVICE

Plaintiff,

-against-                                  **FIRST AMENDED COMPLAINT**

AMERICAN SECURITY SYSTEMS, INC.,           **JURY DEMAND MADE**
and LAWRENCE T. DOLIN

Defendant

——————————————————————————————X

Plaintiff, Future Communications Corporation of New York d/b/a Virtual Service

("Plaintiff" or "Virtual Service"), by its attorney Zeynel Karcioglu, alleges on knowledge as to

its own acts and otherwise on information and belief as follows:

## Jurisdiction and Venue

1.      Plaintiff's claims arise under (i) the United States Trademark Act of 1946, as

amended, 15 U.S.C. § 1114 and 1125(a), and therefore jurisdiction in this Court is proper

pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 and 1338(a), and (ii) New York statutory

and/or common law, and are related and substantial to plaintiff's federal law claims, and

therefore jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1338(b) and on the basis of

supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).

## The Parties

3.      Plaintiff Future Communications Corporation of New York d/b/a Virtual Service

("Plaintiff" or "Virtual Service") is a corporation duly formed and existing under the laws of the

state of New York having a principal place of business at 104 W. 40th Street, 2nd Floor, New York, New York.

    4.    Virtual Service is engaged in the business of developing, customizing, installing and monitoring security and surveillance systems. Virtual Service has offered goods and services under its trademark VIRTUAL DOORMAN since at least as early as June 2001.

    5.    Upon information and belief, Defendant American Security Systems Inc. ("American Security Systems") is a corporation formed under the laws of New York, has a place of business at 5-44 50th Avenue, Long Island City, New York and regularly conducts business in New York City; it further markets and offers goods and services to potential customers and consumers within this judicial district.

    6.    Upon information and belief, Defendant Lawrence Dolin is the chief executive of American Security Systems Inc., and has knowingly directed and participated in all of the infringing acts of American Security Systems set forth herein.

    7.    American Security Systems is in the business of providing security and alarm systems, and offers certain goods and services that are similar to, or compete with, those of plaintiff under the designation or brand name: "Video Doorman."

## Facts Common to All Claims

    8.    Since 2001, Plaintiff Virtual Service has offered technologically advanced security, surveillance, alarm and remote access and monitoring systems and services under the VIRTUAL DOORMAN common law trademark and service mark. Its VIRTUAL DOORMAN security system has been developed over many years, and is based on plaintiff's proprietary software and systems. Plaintiff Virtual Service filed an application for registration of VIRTUAL DOORMAN on January 5, 2007 based on its extensive use of the mark in commerce since 2001.

9.    The VIRTUAL DOORMAN system and services are sold primarily to residential users, and are often marketed in connection with luxury buildings. The VIRTUAL DOORMAN system is a secure remote monitoring and control system that is integrated with other building-wide systems.

10.    Virtual Service provides secure remote monitoring and control of building-wide systems in connection with the VIRTUAL DOORMAN mark. The VIRTUAL DOORMAN security system also permits and restricts entry, delivery of packages, and other functions.

11.    Virtual Service uses the common-law trademarked slogans "TECHNOLOGY FOR EASY LIVING," "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST" and a stylized logo consisting of gloves and top hat, suggestive of a doorman (the "Doorman Logo") in connection with the VIRTUAL DOORMAN marks and security system. It further uses the slogans "TOTAL SECURITY INTEGRATION" and "TOTAL SECURITY SOLUTIONS" in its marketing materials, and in connection with its trademarks (collectively, all of the above slogans will be referred to as the "VIRTUAL DOORMAN Slogans")

12.    The relevant consumer market has come to identify the "VIRTUAL DOORMAN Slogans" individually and when used in connection with VIRTUAL DOORMAN with the goods and services offered by Virtual Service.

13.    Furthermore, the relevant market, public and trade have come to identify the Doorman Logo with the goods and services offered by Virtual Service.

14.    Over the more than six years since its first development and use in the marketplace, the VIRTUAL DOORMAN security system has been very successful. Virtual Service has spent hundreds of thousands of dollars marketing and advertising the VIRTUAL DOORMAN system; consumers and competitors in the security and surveillance market have

come to identify plaintiff, Virtual Service, as the source of the goods and services marketed under the VIRTUAL DOORMAN trademark.

15. In 2004, plaintiff attended an industry trade show that was also attended by Defendants. At that trade show, plaintiff Virtual Service prominently displayed the VIRTUAL DOORMAN product and services, as well as the slogans "TOTAL SECURITY SOLUTIONS," "TOTAL SECURITY INTEGRATION," "TECHNOLOGY FOR EASY LIVING," "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST," as well as the Doorman Logo.

16. At that trade show, representatives of Defendant American Security Systems approached plaintiff, discussed the VIRTUAL DOORMAN product and services, and sought to discuss the possibility that the two companies could work together in some fashion.

17. Nothing came of this meeting, and the parties did not enter into any agreement, contract, or joint venture of any kind, particularly regarding the VIRTUAL DOORMAN mark, the Doorman Logo, or the VIRTUAL DOORMAN Slogans used in connection with Plaintiff's trademarks.

18. In mid-2007, plaintiff attended another trade show where American Security Systems also had a booth. This time, American Security Systems was offering an alarm and security systems product called "Video Doorman."

19. Defendants also used a stylized logo of a doorman in advertising material, as well as Plaintiff's Slogans "total security solutions" and "total security integration" Defendant further indicated that the "Video Doorman" acts "just like an actual doorman, but for a fraction of the cost."

20. Defendants purposely used Plaintiff's marks and slogans in an effort to create consumer confusion between the Video Doorman product offered by American Security Systems, and the already established VIRTUAL DOORMAN goods and services offered by Plaintiff Virtual Service. Furthermore, Defendants' use of the VIRTUAL DOORMAN Slogans in connection with the "Video Doorman" designation and American Security Systems' doorman image creates a look-and-feel confusingly similar to that of Virtual Service.

21. It also was discovered that Defendant American Security Systems filed an application for registration of its "Video Doorman" designation in the United States Patent and Trademark Office based on its "Intent to Use" the designation in commerce. That application was filed December 19, 2006.

## Defendants' Infringing Trade Article

22. In 2007, Defendants caused a trade/marketing publication to print a commercial trade article (the "Article") portraying Defendants' alarm systems, but using Plaintiff's trademark "VIRTUAL DOORMAN." A copy of this Article is attached hereto as Ex. A.

23. In the Article, Defendant Dolin speaks about the products Defendants offer and their effectiveness; he touts Defendants' products as superior, and states that Defendants are "proving that [superiority] here in New York with central station companies like Statewide Central Station and products like *Virtual* Doorman."

24. The Article goes on to note that: "This was exactly the kind of service and technology Dolin was banking on when he decided to develop a high-end integrated video/access control product call[ed] *Virtual* Doorman™." Ex. A. Notably, Defendants even caused the use of the "™" symbol after VIRTUAL DOORMAN, furthering the false impression that the

VIRTUAL DOORMAN is Defendants' trademark, or that they or their goods and services are somehow affiliated with or sponsored by Plaintiff.

25.    Furthermore, Defendant's Article has a caption likely to confuse consumers entitled "VIRTUAL VISION," and the Article makes numerous references to "VIRTUAL" attendants and "VIRTUAL" escorts.

26.    Defendants knowingly and purposely intended and intend the trade Article to confuse the public into associating Plaintiff's well-known VIRTUAL DOORMAN systems and services with Defendants' confusingly similar "Video Doorman" alarm system that they are offering and marketing in the New York area.

27.    Plaintiff has received several inquiries from consumers, and potential customers who have expressed confusion as to the source of the Video Doorman system, and the source of the VIRTUAL DOORMAN system, and whether the two are the same.

### Plaintiff's Cease and Desist Letter

28.    In response to Defendants' actions, Plaintiff sent Defendant American Security Systems a "cease and desist" letter pointing out the consumer confusion it was causing through its unlawful acts. A copy of this cease and desist letter is attached hereto as Exhibit B.

29.    In response, Defendant's attorney indicated that VIRTUAL DOORMAN and Video Doorman were not confusingly similar. Exhibit C, attached, is a letter (without attachments) from Defendants' attorney responding to Plaintiff's cease and desist letter.

30.    Defendant claimed through their attorney that several entities used the words "virtual doorman," and attached several documents showing that use. In fact, many the uses pointed out by Defendant in its own defense were uses by Plaintiffs' licensees, and the services offered in several of those cases were actually Plaintiff's own services.

31.    Furthermore, in responding to the cease and desist letter, Defendant's attorney claimed that the marks were not confusingly similar.

32.    However, Defendant's own attorney confuses the marks in his response letter, confusing "video" and "VIRTUAL" and asserting that *Video* Doorman was used by *Plaintiff*. *See* Ex C. Presumably, the attorney meant to allege that *VIRTUAL* DOORMAN– as opposed to "Video" DOORMAN – is used by Plaintiff.

33.    Defendants' attorney thus confused the two marks while responding to Plaintiff's cease and desist letter, because the marks are confusingly similar.

34.    This confusion on the part of even Defendant's own attorney as to the two marks is demonstrative of the likelihood of consumer confusion in this instance.

35.    Moreover, many of the documents that Defendants provided to Plaintiff's attorney in response to its Cease and Desist Letter were dated prior to Defendants' application for federal trademark registration; thus, it is thus clear that Defendants were aware of Virtual Service's superior rights in and to the VIRTUAL DOORMAN trademark prior to applying for federal registration and adopting their infringing use.

### As and For a First Cause of Action
### Federal Unfair Competition (15 U.S.C. § 1114)

36.    Plaintiff Virtual Service repeats and realleges the allegations set forth in paragraphs 1 – 35, above, as if fully set forth here.

37.    Plaintiff's trademarks are highly distinctive, have acquired secondary meaning, and have been used in commerce continuously for more than six years throughout the United States.

38.    Consumers have contacted Virtual Service to express their confusion over Defendants' use of "Video Doorman."

44.    By reason of the foregoing, plaintiff is entitled to injunctive relief against
Defendants restraining further acts of trademark infringement, and after trial, to recover any
damages proved to have been caused by defendants' aforesaid acts of trademark infringement,
which damages are estimated to be no less than ONE MILLION ($1,000,000.00) Dollars.

### As and For a Second Cause of Action
### Federal Unfair Competition (15 U.S.C. § 1125(a))

45.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 44 above as
if fully set forth herein.

46.    Defendants have made or caused to be made advertisements and marketing
materials that are false and likely to mislead and/or confuse the trade and its consumers.

47.    Defendants' use of the designation "Video Doorman," alone, and in connection
with "total security solutions," "total security integration," "just like an actual doorman, but for a
fraction of the cost," and its doorman image is likely to cause and has caused consumers to
mistakenly believe that the Defendants have an affiliation with Plaintiff, or that Defendants are
otherwise associated with or have obtained permission from Plaintiff to use these designations.

48.    Defendants' unauthorized use of the "Video Doorman" designation on or in
connection with its alarm and security systems goods and services is likely to cause confusion, to
cause mistake, or to deceive consumers and the trade as to an association between Defendant
American Security Systems' goods and services and plaintiff, or as to the source or sponsorship
of Defendant American Security Systems' goods.

49.    Because of Defendants' adoption of marks that are confusingly similar to those of
Virtual Service, the public is likely to believe that American Security Systems or products and
services it offers under the designations "Video Doorman," total security solutions," "just like an

actual doorman, but for a fraction of the cost," VIRTUAL DOORMAN, and/or Defendant's doorman logo, either alone, or together, are associated with, sponsored by, approved by, or originate from Virtual Service, the Plaintiff in this Action.

50.     Specifically, Defendants have made or have caused to be made, false, deceptive and misleading statements and marketing materials constituting false representations and false advertising made in connection with goods and services distributed in interstate commerce in violation of the Lanham Act, 15 U.S.C. Sec. 1125(a), including without limitation, use, together or separately, of "Video Doorman," the American Security Systems doorman logo, "total security solutions," "just like an actual doorman, but for a fraction of the cost," and the "VIRTUAL DOORMAN" in its marketing and advertising materials, and causing such use in trade publications.

51.     Defendants' foregoing actions constitute a false designation of origin, false and misleading representations of fact, and they have caused and are likely to continue to cause confusion or to cause mistake or to deceive persons as to the affiliation, connection, or association of defendants with Virtual Service, in violation of 15 U.S.C. 1125(a).

52.     As a result of defendants' actions, Plaintiff Virtual Service has suffered and will continue to suffer great damage to its business, good will, reputation and profits.

53.     Plaintiff has no adequate remedy at law against this false advertising and unfair competition, and has suffered, and will continue to suffer irreparable harm because of Defendants acts.

54.    By reason of the Defendants acts alleged herein, Plaintiff is entitled to damages

in an amount to be determined at trial, but estimated to be no less than ONE MILLION

($1,000,000) Dollars.

55.    As Defendants have at all times acted willfully and knowingly, and as

Defendants' actions constitute "exceptional circumstances," under the meaning of the Lanham

Act, Plaintiff is entitled to three times Defendants' profits, or three times Plaintiff's damages,

whichever is greater, together with Plaintiff's reasonable attorneys fees under 15 U.S.C. Sec.

1117(a) and (b).

### As and For a Third Cause of Action
### Trademark Infringement and Unfair Competition
### Under New York State Law

56.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 55 above

as if fully set forth herein.

57.    The acts of defendants as described above constitute trademark infringement and

unfair competition in violation of Plaintiff's rights under the common law of the State of New

York and N.Y. General Business Law Sec. 360.

58.    By reason of the foregoing, Plaintiff is entitled injunctive relief and to recover

any damages proven to have been caused by reason of defendants' aforesaid acts of trademark

infringement and unfair competition, which damages are to be proven at trial, but at this time are

estimated to be no less than ONE MILLION ($1,000,000,00) Dollars.

### As and For a Fourth Cause of Action
### Dilution under New York State General Business Law

59.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 58 above

as if full set forth herein.

60.     The public has confused and is likely to confuse Defendants' goods and services marketed under each and all of the designations "Video Doorman" "total security solutions, "just like an actual doorman, but for a fraction of the cost," the American Security Systems doorman logo, and "VIRTUAL DOORMAN" with Plaintiff's trademarks and service marks.

61.     Plaintiff's VIRTUAL DOORMAN mark is inherently distinctive, and has acquired distinctiveness through Plaintiff's use in connection with its goods and services.

62.     VIRTUAL DOORMAN, used alone and in conjunction with the Plaintiff's other distinctive marks SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST, and the Doorman Logo, is recognized by the consuming public to identify Plaintiff as the source of the goods and services offered under those marks.

63.     Defendants' acts as described above are further likely to injure Plaintiff's reputation and cause dilution of the distinctive quality of VIRTUAL DOORMAN and the Plaintiff's marks SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST, and the Doorman Logo, in violation of the New York Anti Dilution Statute, NY Gen. Bus. Law Sec. 360-1.

64.     By reason of the foregoing, Plaintiff is entitled to a court-ordered injunction barring Defendants' use of "video doorman" or "VIRTUAL DOORMAN" in commerce.

**WHEREFOR,** Plaintiff requests this Court to render judgment:

i.      On the first claim against Defendants under the authority of 15 U.S.C. Sec. 1114, awarding injunctive relief against defendants restraining further acts of infringement;

ii. On the first claim against Defendants, under the authority of 15 U.S.C. Sec. 1114, awarding Plaintiff damages in the amount to be proven at trial, but which are currently believed to be no less than ONE MILLION ($1,000,000.00) Dollars.

iii. On the second claim against Defendants, under the authority of 15 U.S.C. Sec. 1125(a), awarding injunctive relief against defendants restraining further acts of infringement;

iv. On the second claim against Defendants, under the authority of 15 U.S.C. Sec. 1125(a), awarding Plaintiff damages in the amount to be proven at trial, but which are currently believed to be no less than ONE MILLION ($1,000,000.00) Dollars.

v. On the first and second claims against Defendants awarding Plaintiff three times Defendants' profits, or Plaintiff's damages, whichever is greater, together with Plaintiff's reasonable attorneys fees, under the authority of 15 U.S.C. Sec. 1117(a) and (b).

vi. On the third claim against Defendants, under authority of the common law of the State of New York and Gen. Bus. L. Sec. 360, awarding Plaintiff damages to be proven at trial, which are estimated at this time to be no less than ONE MILLION ($1,000,000.00) Dollars.

vii. On the fourth claim against Defendants, under authority of the common law of the State of New York and Gen. Bus. L. Sec. 360-1, awarding injunctive relief against defendants restraining further acts of infringement;

viii.    Striking Defendant American Security Systems' federal trademark

application for VIDEO DOORMAN, Ser. No. 77,067,418 from consideration on the

federal register.

ix.    Preliminary Injunctive relief as to all infringing acts of Defendants;

x.    Awarding Plaintiff its costs and expenses in this action, together with its

reasonable attorneys fees.

xi.    Any other relief that the Court deems just, equitable and/or proper.

Dated: New York, NY
        April 25, 2008

Respectfully Submitted,

ZEYNEL KARCIOGLU, ESQ.

Zeynel Karcioglu (ZK 7931)
Attorney for Plaintiff
36 East 20th Street, 6th Floor
New York, NY 10003
(212) 505-6933

# EXHIBIT A

Making a Change

 Security professionals find their new product needs, new technology and practical information regarding the integration of these products. RIGHT HERE. . . 

Magazine Subscription   About Us   Site Map

Home Page   Magazine   News   Products   Community   Resource Center   Classifieds   Services/Advertising

Search Site   

## HOT TOPICS

Access Control/Identity
Business Continuity
CCTV
Network-Centric Security
Dealers and Integrators
Fire/Life Safety
Government
Guard Services
Homeland/Urban Area
Integrated Home
IT/Corporate Info
International
Monitoring

## RESOURCE CENTER

Products
Buyers Guide
Vendor Catalogs
Classifieds

Resources
Newsletter Subscribe
Letter to the Editor

## MAGAZINE



**Subscribe Now!**

Subscribe
Current Edition
Archived Editions

Search Search Site

## ABOUT US

Contact Us
Editorial Calendar
Media Kit
Print Subscriptions
Newsletters



# Making a Change

*By Jeff Brummett · March 2007*

**Alarm verification -- a coming shift in the security industry**



THE security industry has gone through many paradigm shifts during the last 100 years. As is the case with every paradigm change, there are winners and losers. The security industry is no different. Business paradigm shifts seem to always create new opportunities. However, some of these opportunities leave a wake of destruction and demise in its path. Seeing and understanding a new paradigm before it happens can make or break any company, regardless how big or small the company might be. Never underestimate the power of a changing paradigm.

One of the most famous examples of the power found within a paradigm shift is the watch manufacturing industry. In the time/watch industry it quartz technology rewired the playing field and created a paradigm shift in how watches were made. It ultimately facilitated the rise of Timex as the reigning worldwide dominant watch maker. At the same time, this new paradigm in technology facilitated the fall of the once dominant Swiss watch manufacturing industry. People born in the last half of the 20th-century are not old enough to remember when the Swiss watch manufacturers controlled more than 90 percent of worldwide watch sales. Imagine trying to compete in an industry where one country controlled that much of the market. How could anyone ever foresee such a dominant competitor toppled? Let alone, toppled virtually overnight? It happened.

The irony behind the fall of Swiss watchmaker was the fact that the Swiss manufacturers had a first look at the technology that ultimately spelled doom for their businesses. Instead of seeing opportunity for expansion and increased revenues, all they could see was a watch that had no gears and didn't fit their existing business model. And that's not something that just watch manufacturers have seen. Security professionals have encountered a shift, as well. In fact, it's happening right now. It was outside their existing paradigm.

### Shifting Gears

In the world of security monitoring services, one could say the advent of the "free alarm" installation for residential customers was a paradigm shift. Most central monitoring stations prior to the free alarm saw the commercial monitoring market as the market of choice. Central station monitoring companies that embraced the radical idea of supporting low-cost, consumer alarm installations, and went on to create successful dealer programs, saw account bases skyrocket. Those who didn't were swallowed in the wake of change.

## PODCASTS

**Where Do We Go From Here?**

Download a podcast of Security Products' exclusive interview with Patrick Fiel Sr., Security consultant with ADT, and former chief of police for the Washington, D.C. School District as he discusses the state and future of campus security in the wake of the shootings at Virginia Tech.

**FREE**
ID Card
Design Guide »



**Poll**

What security application would be most beneficial to higher education campuses?

○ Biometrics
○ Access Control
○ IP Cameras
○ Video Analytics

Vote

View Results

Making a Change







**CPM Global Assurance is the one resource that offers it all. . .**

**Click Here To Start Your FREE Subscription!**

The next paradigm shift striking the security monitoring industry is the advent of verified alarms. False alarms have become a growing problem for security monitoring professionals. Today, nationwide alarm monitoring companies and installing security dealers are fearful. Companies are fearful of the impact that may result from a growing trend driven by a key partner in the business model—the police. Many law enforcement officials, weary from the drain that responding to a false alarm signal places upon the department's limited resources, have begun to push the idea of requiring onsite verification of emergency signals. Without verification, police believe responding to false alarms is a poor use of already overtaxed department resources.

The alarm industry as a whole has been very slow to embrace the idea of requiring onsite verification for alarm signals. While offering a variety of reasons—examples of lives saved or criminals caught—many believe the underlying fear comes down to who will pay for services when police fail to respond? Could it be those fearful of that question only see the business through its current paradigm? There may be a better paradigm. Two complimentary companies in the greater New York City area may already have put in operation.

**Opening the Box**

Larry Dolin is a 26-year security system veteran. He is the president and CEO of American Security Systems, a successful New York alarm company and systems integrator. While many of his peers spend their time trying to support efforts to slow the trend of verified alarms, Dolin's instincts told him to embrace the new paradigm.

"The way I see it, already some jurisdictions are already refusing to dispatch on unverified alarm signals. Police have a legitimate and reasonable concern. Some jurisdictions have enacted laws that result in highly punitive fines. Pandora's box is open. You can either fight Pandora or make her your ally," Dolin said. "Most security firms simply go on the daily routine of selling, installing and servicing. They read about these issues in industry magazines and hear it talked about at trade association events. Most don't like what they're reading or hearing. It represents a significant departure from the status quo. They feel helpless on the one hand, fearful on the other. The easiest thing to do is to support the status quo, and resist the change you fear. I'm just not so sure it's the most profitable thing to do."

"History tells us with change comes enormous opportunity. I see this as one of those opportunities. Video verification, I believe, is the coming staple service in professional security monitoring—especially among commercial properties that simply cannot afford police not to respond. That's why I began searching for companies who could provide that high level of service a few years ago."

After searching, Dolin said he realized few central stations were really equipped to provide efficient and meaningful video monitoring services.

"They're just not set up to do it without going through wholesale changes in both philosophy and personnel," Dolin said. "Most of them end up sticking their toe in the water without making the significant investments and wholesale changes they really need in order to do it well. I think that alone is the biggest reason you haven't seen this service explode. The service that's being offered to most customers today is a shell of the service that technology can deliver. We're proving that here in New York with central station companies like Statewide Central Station and products like Virtual Doorman™."

Dolin said a lot of barriers most central stations face revolve around the lack of technical proficiencies in existing personnel.

"They face the same challenges most security dealers face. Our technicians, like their operators, know very little about operating the sophisticated software these systems afford. The response to that

**Events**

CPM West
Global Gaming Expo (G2E)
FGW 8th Security Conference & Exhibition
Security Canada Expo
Digital ID World
View all Events



challenge by both sides has been: 'Well, if we're going to have to do this, lets use the simplest system with the easiest (or fewest) features to learn," Dolin said. "I think that's why you see so many frustrated people. In my mind, they are all frustrated for the same reason. Most central station companies do the same thing most installing dealers do. They end up dumbing down the equipment they use to help make it easier on employees, instead of increasing the quality of people to take full advantage of the improved product technology. At the end of the day, the result becomes a service offered that isn't all that impressive, even when it works."

That's why Dolin decided to invest and partner with a small central monitoring station in Staten Island, N.Y., Statewide Central Station, a full-service, UL-listed, FDNY-approved central station. It has the type of management, ownership and staffing Dolin believes executes high-end, customer-driven video monitoring services.

"These guys are some of the most driven, technology savvy, central station service providers I have ever seen. They saw changes on the horizon and got out ahead of the technology curve. New York is a tough, competitive market," Dolin said. "They have thrived in that market. Instead of fearing technology changes, they embraced those changes and staffed themselves to make the most of it. The only thing lacking was a great central station video product. Once we found American Sentry Guard and the POWERViZion central video monitoring product, we knew we had real, meaningful, high-performance video monitoring solutions and the ability to execute."

**Virtual Vision**
Today, Statewide Central Station has grown to provide UL-listed monitoring services to dealers and clients throughout the United States and the Caribbean.

Sayeed Zaman, director of product development at ASG, said he agrees with Dolin about the current state of video monitoring searvices.

"We got approached by central stations in this industry all the time about our integrated video monitoring product," Zaman said. "The fact is, when you sit down to talk, most of central stations just don't have the technical staff to pull it off, even fewer are willing to make the financial commitment it takes to make it work.

"Statewide was certainly different in that regard. They have people who got it, and they were willing to put their money where their mouth was. I believe they are defining what a true, full service central station video monitoring service will look like for years to come. I can't think of anyone who's doing all the things they do, certainly not at the level they're doing it. Dealers absolutely love them."

The application and benefits of POWERViZion's central station video product used by Statewide include real-time POS sales supervision, live streaming video with two-way audio, extended opening and closing services, customized programmed virtual guard tours, alarm verification and Dolin's Video Doorman. All systems include vital signs health monitoring, which notifies Statewide Central Station operators before hard drives fail, or become full, prior to the intended cycle use.

"Our operators even know when a camera goes out, or its view is blocked or changed. We can immediately notify the dealer and/or the end user," said Steven Coppola, director of technical services at Statewide.

That was exactly the kind of service and technology Dolin was banking on when he decided to develop a high-end integrated video/access control product call Virtual Doorman.

"Non-doorman buildings with this product can enjoy the same increased security peace of mind and conveniences of doorman buildings without the expense. In effect, the product gives equal rights to these tenants. The right to order on the Internet and receive UPS/FedEx, or local deliveries, such as flowers or laundry, that until now, simply wasn't possible," Dolin said.

Dolin has become a pioneer with the technology, working closely with his contacts in the NYC Housing Authority. Several of the building clients served by Dolin's company have already activated the system in buildings with positive results.

The system allows the operators at Statewide to serve as virtual attendants, interacting with delivery service people, allowing for the monitored entrance to a building or access to a particular part of the building such as a storage area for the delivery of packages or services. When a signal is transmitted to Statewide, the operator, is notified that someone is at the entrance of a participating building. The operator can visually see the person on a monitor. Not only can the central station see that person, personnel also can communicate via two-way audio. Monitoring personnel can then grant or deny access; follow the person through the building, tracking passage from point A to point B; allow access to point B; remotely lock point B as they leave; then track passage back to point A and consequent departure from the building, locking the entrance. The tenant is then e-mailed or called for notification

Making a Change

Page 4 of 4

that a package is awaiting them when they return home.

Since installing the first few systems, Dolin said building tenants have requested a "video escort," asking that operators at Statewide, when notified by the tenant upon entering the building, follow the tenant as a virtual escort to the appropriate floor.

Interactive, remote video monitoring promises customers a rapid response and safe supervised passage during sudden emergencies. Activated by the end user or security event, the response is immediate and verified. What started as a cry for help from law enforcement entities may end up in a paradigm shift, changing the way security monitoring services are delivered and managed.

$\boxed{\text{A}}$ **bout the author**

**Jeff Brummett**

Jeff Brummett is the president and COO of American Sentry Guard.

Sponsored Text Links

**School Security** Subscribe to your source for valuable and practical information.

Copyright 2007 1105Media Inc. See our **Privacy Policy**
Reproduction in whole or in part in any form or medium without express permission of 1105 Media Inc. is prohibited

**1105 MEDIA**

# EXHIBIT B

# Zeynel Karcioglu, Esq.

Attorney-at-Law

36 East 20th St. 6th Fl.
New York, New York 10003
Telephone: (212) 505 - 6933
Fax: (646) 219 - 4517

May 21, 2007

***Via Certified Mail and Facsimile Transmission***

Robert C. Faber, Esq.
Ostrolenk, Faber, Gerb & Soffen, LLP
1180 Avenue of the Americas FL 7
New York, NY 10036-8401

> Re:  *Infringement of Virtual Service's Intellectual Property Rights by*
> *Your Client American Security Systems, Inc.*

Dear Mr. Faber,

This firm represents Virtual Service; we are writing to demand that your client American Security Systems, Inc. ("American Security Systems") immediately stop selling, marketing and advertising services and products bearing the designation "Video Doorman" in the field of remote monitoring and security systems. Since at least as early as 2001, Virtual Service has used the trade and service mark VIRTUAL DOORMAN in the remote monitoring and security system industry, and has created strong brand recognition and goodwill in the VIRTUAL DOORMAN mark. Your client's use of "Video Doorman" and its doorman logo violates Virtual Service's intellectual property rights, and has created actual confusion as well as a likelihood of future consumer confusion.

It has further come to our attention that American Security Systems seeks to register the "Video Doorman," in the United States Patent and Trademark Office, has registered a domain name: www.videodoorman.com, and has copied *verbatim* content from Virtual Service's website and marketing materials in promoting and marketing its own products and services offered in connection with "Video Doorman" and the doorman logo. Given Virtual Service's strong brand recognition in the industry, and in light of the obvious similarities between VIRTUAL DOORMAN and "Video Doorman," as well as copying of the content from Virtual Service's web site, we believe that American Security Systems has willfully copied Virtual Service's marks and copyrighted materials.

The copying and infringement of Virtual Service's rights has very recently spurred several instances of consumer confusion, as customers and potential customers have inquired whether the goods and services offered under "Video Doorman" are related to Virtual Service's VIRTUAL DOORMAN goods and services, and whether the companies are somehow related. Furthermore, Virtual Service has encountered at least one trade publication that identified *your client* as offering VIRTUAL DOORMAN-branded goods and services. Your client's actions constitute violations of federal law, including copyright infringement, under 17 U.S.C. § 101 *et seq.*, unfair competition, and false advertising in violation of the U.S. Trademark Act, 15 U.S.C. § 1051 *et seq.* and other applicable state laws.

Virtual Service is prepared to take legal action if necessary to enforce its rights; however, it is willing to provide American Security Systems the opportunity to resolve this issue.

American Security Systems must immediately:

a)    cease and desist from any use of the trademark or service mark "Video Doorman," the "doorman logo," or any similar mark in connection with remote access and security systems sales, design, installation, monitoring, servicing, and other related services;

b)    immediately execute and file an express abandonment in the United States Patent and Trademark Office of the intent-to-use application for "Video Doorman" Ser. No. 77,067,418;

c)    surrender ownership of www.videodoorman.com;

d)    produce copies of all brochures, advertising and marketing materials for any goods and services bearing "Video Doorman" so that they may be destroyed;

e)    remove the "Video Doorman" mark from any goods and packaging in your client's possession;

f)    provide a complete list of all companies, entities or individuals who have been sent marketing materials or products bearing "Video Doorman" so that corrective advertising may be undertaken.

Kindly comply with our demand immediately so that no further steps need be taken in connection with your client's infringing use of "Video Doorman." In the absence of American Security Systems' full compliance by **June 5, 2007**, Virtual Service reserves all of its rights to take appropriate action against your client, including filing a lawsuit in federal court. If such a lawsuit is necessary, Virtual Service will seek all available relief under federal and New York state law, including injunctive relief, an accounting of profits, trebled damages, attorney's fees and court costs.

We look forward to American Security System's timely and complete response. The demands made herein are not made to the exclusion of other rights or remedies to which Virtual Service is entitled, and nothing in this letter, nor any act or omission by Virtual Service, shall be construed as a waiver of any right or remedy possessed by Virtual Service, all of which are expressly reserved.

Very truly yours,

Zeynel Karcioglu

cc: Cristine Morettin

# EXHIBIT C

# OSTROLENK, FABER, GERB & SOFFEN, LLP

1180 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10036-8403

TEL 212 382 0700  FAX 212 382 0888  FAX 212 398 0681

email@ostrolenk.com

**PARTNERS**

SAMUEL H. WEINER
ROBERT C. FABER
MAX MOSKOWITZ
JAMES A. FINDER
WILLIAM O. GRAY, III
LOUIS C. DUJMICH
CHARLES P. LAPOLLA
DOUGLAS A. MIRO

PETER S. SLOANE
KOUROSH SALEHI**

**ASSOCIATES**

JOEL J. FELDER**
DOUGLAS Q. HAHN
MICHAEL I. MARKOWITZ
KEITH J. BARKAUS
JEFF KIRSHNER
ART C. CODY
AIMEE M. ALLEN
DAVID J. TORRENTE

DODIVA N. GRANT
VICTOR A. GROSSMAN

**OF COUNSEL**

MARTIN PFEFFER
LAWRENCE A HOFFMAN
MARTIN J. BERAN
PAUL GRANDINETTI*
MARK A. FARLEY
GEORGE BRIEGER
BELLA KARAKIS
STEPHEN J. QUIGLEY

JOSPEH M. MANAK

WASHINGTON OFFICE
1725 K STREET, N. W.
WASHINGTON, D.C. 20006
TEL 202 457 7785
FAX 202 429 8919

*DC BAR
**CONNECTICUT BAR

June 1, 2007

Zeynel Karcioglu, Esq.
36 East 20th Street, 6th Floor
New York, New York 10003

> Re:    Claim of Infringement against American Securities Systems, Inc.
>         OFGS Ref: T/4366-3

Dear Mr. Karcioglu:

This responds to your letter of May 21, 2007 addressed to me as the attorney for American Security Systems Inc. You complain that my client's unique trademark VIDEO DOORMAN is an infringement of your client's alleged trademark VIRTUAL DOORMAN. Briefly, the two terms that you would describe as trademarks do not have the same spelling, do not have same appearance, do not have the same pronunciation, do not have the same meaning and anyone who claims confusion has not exercised the due care in reading the names that a reasonable customer of these important, expensive services is likely to exercise.

The primary reason why your claim is without merit, is that the term virtual doorman is not your client's exclusive property, nor can it be the property of anyone, because the term has become generic of the service your client is performing under that description. A name or term is generic when it is an apt name for the product or service and/or when it is used in that manner by more than one unrelated user.

Several enclosed entries from the Internet show wide use of the generic term virtual doorman by numerous different entities in a descriptive manner, showing thereby that the term is an apt description of the service or goods under that name. In these enclosures, no further description is provided as to the meaning of the virtual doorman services, as none is apparently deemed necessary by the many users of that generic term. Several entities claim to have

00844183.WPD

## OSTROLENK, FABER, GERB & SOFFEN, LLP

June 1, 2007
Page 2

developed or to have proprietary rights in a virtual doorman system including UPS and Mailboxes Etc.

Perhaps not surprisingly, Virtual Services, Inc. itself uses the term generically in promotion of its apartment security systems:

> Our virtual doorman and video monitor systems are
> essential for good apartment security.

Obviously, virtual doorman is sufficiently defined in itself to not have required any further noun, which is the essence of an apt description or generic term.

Further, the principal words VIRTUAL and VIDEO of your client's generic term and of my client's trademark have different meanings.

VIRTUAL is defined on www.dictionary.com as "being such in power, force, or effect, though not actually or expressly such" and "temporarily simulated or extended by computer software." There is no suggestion of video there.

VIDEO is defined in the same dictionary as "of or pertaining to the electronic apparatus for producing the television picture" or "pertaining to or employed in the transmission or reception of television pictures." There is nothing "virtual" in that.

Of course, the words "virtual" and "video" have neither the same appearance nor the same pronunciation and clearly do not have the same meaning.

DOORMAN is of course a descriptive word understood by everyone. Other parties offer an identical doorman service combining the word doorman with another adjective, including CYBERDOORMAN, and my client's unique combination VIDEO DOORMAN.

You claim that my client has copied content from your client's web site. You have not identified such protected content. As you know, information is not proprietary, only its precise expression is.

The instances you describe are not any evidence of consumer or customer confusion. If someone asks whether the services offered under the trademark VIDEO DOORMAN are related to your client's services under the term VIRTUAL DOORMAN, that shows such persons were not confused as they wanted to know. Clearly, the parties' goods and services are competitive, and it is not unreasonable for someone to ask if there is any relationship between two entities who are marketing a similar product or service? That a trade publication may have made a mistake is not evidence of confusion, but evidence of the fact that your client's term is generic and so that one would expect that a publication would use the generic term for any supplier in the same industry.

00844183.WPD

## OSTROLENK, FABER, GERB & SOFFEN, LLP

June 1, 2007
Page 3

   In view of all of the foregoing, there is no basis for any of your claims of infringement, nor for the demands made in your letter. Consequently, there is no reason to answer the demands.

   I note that from the Patent and Trademark Office database that your client's application to register the trademark VIRTUAL DOORMAN was filed only in January 2007, six years after your client claims its first use of that generic term. The delay in acting is evidence of your client's recognition that the term is generic. In addition, the Office Action mailed to you May 2, 2007 from the U.S. Patent and Trademark Office requires a response, affording you the opportunity to inform the Examiner of the wide unregulated uses of the term VIDEO DOORMAN by others as a name for your service and the wider generic use of that term. Any registration at all that your client may ultimately obtain should be based upon full disclosure to the Patent and Trademark Office. Failure to make such full disclosure will of course make your client's trademark registration, if any, invalid and may subject your client to sanctions for misleading the Patent and Trademark Office by not informing them of the relevant facts bearing on the registerability of the term virtual doorman as a trademark or for propounding an infringement claim based upon an unprotectable, apt name for the client's product and service.

         Very truly yours,

         OSTROLENK, FABER, GERB & SOFFEN, LLP


         Robert C. Faber

RCF:mjb
Enclosure

00844183.WPD

## CERTIFICATE OF SERVICE

I, Zeynel Karcioglu, Esq., attorney for the Plaintiff in this action hereby certify that a true and correct copy of the foregoing FIRST AMENDED COMPLAINT was served upon counsel for Defendants this 25th day of April, 2008, by First Class mail, postage prepaid, addressed as follows:

> ROBERT FABER, ESQ.
> Ostrolenk, Faber, Gerb & Soffen LLP
> 1180 Avenue of the Americas
> New York, New York 10036-8403

April 25, 2008

Zeynel Karcioglu