Robert C. Faber (RF 7020)
Sean P. McMahon (SM 1202)
Ostrolenk, Faber, Gerb & Soffen, LLP
1180 Avenue of the Americas
New York, New York  10036
Phone:  (212) 382-0700
Fax:  (212) 382-0888
E-mail:  rfaber@ostrolenk.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUTURE COMMUNICATIONS CORPORATION OF NEW YORK d/b/a VIRTUAL SERVICE,<br><br>     Plaintiff,<br><br>  vs.<br><br>AMERICAN SECURITY SYSTEMS, INC., and LAWRENCE T. DOLIN,<br><br>     Defendant | Case No.: Civil Action No. 08 CV 01997 (JGK) |

## DECLARATION OF SEAN P. McMAHON

I, SEAN P. McMAHON, hereby declare the following to be true and correct under penalty of perjury:

1.      I am an attorney with Ostrolenk, Faber, Gerb & Soffen, LLP ("Ostrolenk") attorneys for Defendants/Counterclaim-Plaintiffs American Security Systems, Inc. ("American Security") and Lawrence T. Dolin ("Dolin") (collectively referred to as "Defendants" unless otherwise specified) in this action.

2.      I make this declaration of my personal knowledge and upon the files maintained by Ostrolenk.

3.      Annexed hereto as Exh. A is a true and correct copy of the Complaint in this action.

4.      Annexed hereto as Exh. B is a true and correct copy of the First Amended Complaint in this action.

5.      Annexed hereto as Exh. C is a true and correct copy of Trademark Application Serial No. 77/067,418 filed by American Security with the United States Patent and Trademark Office ("USPTO") on December 19, 2006.

6.      Annexed hereto as Exh. D is a true and correct copy of Trademark Application Serial No. 77/076,929 filed by Plaintiff Future Communications Corporation of New York d/b/a Virtual Service ("Plaintiff") with the USPTO on January 5, 2007.

7.      Annexed hereto as Exh. E is a true and correct copy of an office action dated May 2, 2007 issued by the USPTO refusing registration of Plaintiff's purported trademark based on, *inter alia*, American Security's previously filed Application Serial No. 77/067,418.

8.      Annexed hereto as Exh. F is a true and correct copy of a cease and desist letter dated May 21, 2007 from counsel for Plaintiff to counsel for American Security alleging, *inter alia*, that American Security's use of the mark VIDEO DOORMAN is confusingly similar to Plaintiff's generic term and purported mark VIRTUAL DOORMAN.

9.    Annexed hereto as Exh. G is a true and correct copy of counsel for American Security's reply to Plaintiff's cease and desist letter dated June 1, 2007, denying the claims made by Plaintiff.

10.    Annexed hereto as Exh. H is a true and correct copy of Plaintiff's Notice of Opposition filed February 1, 2008 opposing American Security's Application Serial No. 77/067,418.

11.    Annexed hereto as Exh. I is a true and correct copy of an article, obtained from the LexisNexis computer database, located at www.lexis.com, titled *POSTINGS: At 61 North More Street in TriBeCa: Virtual Doorman for New Condos* from The New York Times dated April 22, 2001.

12.    Annexed hereto as Exh. J is a true and correct copy of an article, obtained from the internet web site of Businessweek at http://www.businessweek.com/technology/content/jun2007/tc20070611_945131.htm?ca mpaign_id=rss_daily, titled *It's Carlton, Your Cyber Doorman* dated June 12, 2007.

13.    Annexed hereto as Exh. K is a true and correct copy of an article, obtained from the internet web site of The COOPERATOR – The Co-op & Condo Monthly at http://cooperator.com/articles/1539/1/Technology-Greeting-You-at-Your-Door/Page1.html, titled *Technology Greeting You at Your* dated December, 2007.

14.    Annexed hereto as Exh. L is a true and correct copy of an article, obtained from the LexisNexis computer database, located at www.lexis.com, titled *Here's Looking At You* from The New York Times dated December 23, 2007.

15.    Annexed hereto as Exh. M is a true and correct copy of an article, obtained from the internet web site of the New York Post at

http://www.nypost.com/seven/03272008/realestate/just_sold__103650.htm, titled *JUST SOLD! The Latest Info About Recent Sales – In Your Back Yard and Beyond* dated March 27, 2008.

16.     Annexed hereto as Exh. N is a true and correct printout of an advertisement, obtained from the internet web site of the Corcoran Group at http://www.corcoran.com/property/listing.aspx?Region=NYC&ListingID=1139761, showing generic use of the term virtual doorman.

17.     Annexed hereto as Exh. O is a true and correct printout of an advertisement, obtained from the internet web site of the Corcoran Group at http://www.corcoran.com/property/listing.aspx?Region=NYC&ListingID=1199401, showing generic use of the term virtual doorman.

18.     Annexed hereto as Exh. P is a true and correct printout of an advertisement, obtained from the internet web site of the condominium "50 West" at http://www.50westcondominium.com/features.asp, showing generic use of the term virtual doorman.

19.     Annexed hereto as Exh. Q is a true and correct printout of an advertisement, obtained from the internet web site of Prudential Elliman Real Estate at http://www.prudentialelliman.com/Listings.aspx?ListingIP=963709, showing generic use of the term virtual doorman.

20.     Annexed hereto as Exh. R is a true and correct printout of an advertisement, obtained from the internet web site of Prudential Elliman Real Estate at http://www.prudentialelliman.com/Listings.aspx?ListingIP=798230, showing generic use of the term virtual doorman.

21.    Annexed hereto as Exh. S is a true and correct printout of an advertisement, obtained from the internet web site of Prudential Elliman Real Estate at http://www.prudentialelliman.com/MainSite/NHD/NHDInfo.aspx?id=183&loc=&PageName=amenities, showing generic use of the term virtual doorman.

22.    Annexed hereto as Exh. T is a true and correct printout of an advertisement, obtained from the internet web site of Core Group Marketing at http://coregroupnyc.net/listing,158, showing generic use of the term virtual doorman.

23.    Annexed hereto as Exh. U is a true and correct printout from the internet web site of the apartment building The Alycia at http://www.thealycia.com, showing generic use of the term virtual doorman.

24.    Annexed hereto as Exh. V is a true and correct printout of an advertisement, obtained from the internet web site "Craiglist" at http://newyork.craigslist.org/mnh/fee/662258045.html, showing generic use of the term virtual doorman.

25.    Annexed hereto as Exh. W is a true and correct printout from the internet web site of the apartment building The Commons in Lexington Center at http://thecommonsinlex.com/project.htm, showing generic use of the term virtual doorman.

26.    Annexed hereto as Exh. X is a true and correct printout of a press release, obtained from the internet web site of PR News Now at http://www.prnewsnow.com/TextNews/186426.html, showing generic use of the term virtual doorman in connection with an apartment complex named The Woods at Newtown.

27.    Annexed hereto as Exh. Y is a true and correct copy of an article, obtained from the LexisNexis computer database, located at www.lexis.com, titled *NEW YORKERS & CO.; 'Virtual Doormen' Who Accept Real Packages* from The New York Times dated July 7, 1996.

28.    Annexed hereto as Exh. Z is a true and correct printout of a press release, obtained     from     The     UPS     Store     internet     web     site     at http://www.theupsstore.com/about/030203_press_release.html,     announcing     the acquisition of Mail Boxes Etc. by United Parcel Service ("UPS").

29.    Annexed hereto as Exh. AA is a true and correct printout from the internet web site of The UPS Store located at 3906 W. Ina Road, Suite 200, Tucson, Arizona at http://www.upsstore-nwtucson.com/Virtualdoorman.html, showing third party use of the term virtual doorman.

30.    Annexed hereto as Exh. BB is a true and correct printout from the internet web site of the The UPS Store located at 401 E. Las Olas Boulevard, Fort Lauderdale, Florida at http://www.theupsstoreflorida.com/virtualdoorman.html, showing third party use of the term virtual doorman.

31.    Annexed hereto as Exh. CC is a true and correct printout from the internet web site of The UPS Store located at 2417 Welsh Road, Philadelphia, Pennsylvania at http://www.upsstorenephila.com/services, showing third party use of the term virtual doorman.

32.    Annexed hereto as Exh. DD is a true and correct printout from the internet web site of  The UPS Stores located at 3720 Spruce Street, Philadelphia, Pennsylvania

and 1735 Market Street, Philadelphia, Pennsylvania at http://www.ucnet.com/theupsstore, showing third party use of the term virtual doorman.

33.     Annexed hereto as Exh. EE is a true and correct printout from the internet web site of The UPS Store located at 2315 Pacific Avenue, Forest Grove, Oregon at http://www.forestgroveprinting.com/mailbox.html, showing third party use of the term virtual doorman.

34.     Annexed hereto as Exh. FF is a true and correct printout from the internet web site of The UPS Store located at 4100 W. El Dorado Parkway, Suite 100, McKinney, Texas at http://www.upsmckinney.com/services/virtual-doorman.htm, showing third party use of the term virtual doorman.

35.     Annexed hereto as Exh. GG is a true and correct printout from the internet web site of The UPS Store located at 1844 N. Nob Hill Road, Plantation, Florida at http://www.nobhillups.com/vdoorman.html, showing third party use of the term virtual doorman.

36.     Annexed hereto as Exh. HH is a true and correct printout from the internet web site of The UPS Stores located at 318 Indian Terrace, Weston, Florida and 12717 W. Sunrise Boulevard, Sunrise, Florida at http://www.upsweston.com/virtualdoorman.htm, showing third party use of the term virtual doorman.

37.     Annexed hereto as Exh. II is a true and correct printout from the internet web site of The UPS Store located at 10 Schalks Crossing Road, Plainsboro, New Jersey at http://www.upsstoreplainsboro.com/doorman.htm, showing third party use of the term virtual doorman.

38.    Annexed hereto as Exh. JJ is a true and correct printout from the internet web site of Mail Boxes Etc. located at 954 Lexington Avenue, New York, New York at http://www.uppereast.com/mailboxesetc.html, showing third party use of the term virtual doorman.

39.    Annexed hereto as Exh. KK is a true and correct printout from the internet web site of The UPS Stores located at 16057 Tampa Palms Boulevard West, Tampa, Florida, 1936 Bruce B. Downs Boulevard, Wesley Chapel, Florida, and 10006 Cross Creek Boulevard, Tampa Florida at http://www.tampaupsstore.com/virtualdoorman.html, showing third party use of the term virtual doorman.

40.    Annexed hereto as Exh. LL is a true and correct printout, obtained from a blog entry on the internet web site of the New York Post, at http://blogs.nypost.com/re/archive/2007/10/open_season_18.html, showing generic use of the term virtual doorman.

41.    Annexed hereto as Exh. MM is a true and correct printout, obtained from a blog entry on the internet web site engadget.com, at http://www.engadget.com/2007/12/29/virtual-doormen-becoming-more-ubiquitous, showing generic use of the term virtual doorman.

42.    Annexed hereto as Exh. NN is a true and correct printout, obtained from a blog entry on the internet web site marketing.fm, at http://www.marketing.fm/2008/01/01/virtual-doorman-better-or-worse, showing generic use of the term virtual doorman.

43.    Annexed hereto as Exh. OO is a true and correct printout of a biography of Professor John Illingwoth, obtained from the University of Surrey web site at http://personal.ee.surrey.ac.uk/Personal/J.Illingworth.

44.    Annexed hereto as Exh. PP is a true and correct printout of possible final year student projects for Professor John Illingworth, obtained from the University of Surrey web site at http://personal.ee.surrey.ac.uk/Personal/J.Illingworth/fyp/index.html, showing generic use of the term virtual doorman.

45.    Annexed hereto as Exh. QQ is a true and correct copy of an article, obtained from the LexisNexis computer database, located at www.lexis.com, titled *Gifts: Masterminding the Mazes of Package DeliverGifts:  Masterminding the Mazes of Package Delivery*, from The Wall Street Journal dated December 23, 1998.

46.    Annexed hereto as Exh. RR is a true and correct copy of an article, obtained from the LexisNexis computer database, located at www.lexis.com, titled *Gimme Shelter*, from the New York Post dated August 31, 2006.

47.    Annexed hereto as Exh. SS is a true and correct printout from the web site of the apartment building named Impluvium at http://impluvium.com/Features.html, showing generic use of the term virtual doorman.

48.    Annexed hereto as Exh. TT is a true and correct printout from the "about us" section of the web site Daily Candy at http://www.dailycandy.com/about.jsp.

49.    Annexed hereto as Exh. UU is a true and correct printout of an article dated    March    27,    2001    from    the    web    site    Daily    Candy    at http://www.dailycandy.com/new_york/article/15416/A+the+World+is+Not+a+Stage, showing generic use of the term virtual doorman.

50.    Annexed hereto as Exh. VV is a true and correct printout of from the "about us" section of the web site Brownstoner.com at http://www.brownstoner.com/about.

51.    Annexed hereto as Exh. WW is a true and correct printout of a posting dated October, 2007 from the web site Brownstoner.com at http://www.brownstoner.com/brownstoner/archives/2007/10/condo_of_the_da_71.php, that contains two messages posted on October 3, 2007 showing generic use of the term virtual doorman.

52.    Annexed hereto as Exh. XX is a true and correct printout of all of the October 2007 blog entries from the New York Post Real Estate Archives at http://blogs.nypost.com/re/archives/2007/06/index.html.

I swear under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

_____
Sean P. McMahon

Executed on:    May 7, 2008
                New York, New York

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing **DECLARATION OF SEAN P. McMAHON** was served upon counsel for Plaintiff/Counterclaim-Defendant by ECF and First Class mail, postage prepaid, on this 7th day of May, 2008, addressed as follows:

> Zeynel Memed Karcioglu
> Zeynel Karcioglu, Esq.
> 36 East 20th Street
> New York, New York  10003

_____
Sean P. McMahon



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

08 CV 01997

-----------------------------------------x

FUTURE COMMUNICATIONS CORPORATION          Civil Action No.
OF NEW YORK d/b/a VIRTUAL SERVICE

                        Plaintiff,

        -against-

AMERICAN SECURITY SYSTEMS, INC.,
and LAWRENCE T. DOLIN

                        Defendant

-----------------------------------------x



        Plaintiff, Future Communications Corporation of New York d/b/a Virtual Service

("Plaintiff" or "Virtual Service"), by its attorney Zeynel Karcioglu, alleges on knowledge as to

its own acts and otherwise on information and belief as follows:

### Jurisdiction and Venue

        1.      Plaintiff's claims arise under (i) the United States Trademark Act of 1946, as

amended, 15 U.S.C. § 1114 and 1125(a), and therefore jurisdiction in this Court is proper

pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 and 1338(a), and (ii) New York statutory

and/or common law, and are related and substantial to plaintiff's federal law claims, and

therefore jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1338(b) and on the basis of

supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

        2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).

### The Parties

        3.      Plaintiff Future Communications Corporation of New York d/b/a Virtual Service

("Plaintiff" or "Virtual Service") is a corporation duly formed and existing under the laws of the

state of New York having a principal place of business at 104 W. 40th Street, 2nd Floor, New York, New York.

  4. Virtual Service is engaged in the business of developing, customizing, installing and monitoring security and surveillance systems. Virtual Service has offered goods and services under its trademark VIRTUAL DOORMAN since at least as early as June 2001.

  5. Upon information and belief, Defendant American Security Systems Inc. ("American Security Systems") is a corporation formed under the laws of New York, has a place of business at 5-44 50th Avenue, Long Island City, New York and regularly conducts business in New York City; it further markets and offers goods and services to potential customers and consumers within this judicial district.

  6. Upon information and belief, Defendant Lawrence Dolin is the chief executive of American Security Systems Inc., and has knowingly directed and participated in all of the infringing acts of American Security Systems set forth herein.

  7. American Security Systems is in the business of providing security and alarm systems, and offers certain goods and services that are similar to, or compete with, those of plaintiff under the designation or brand name: "Video Doorman."

## Facts Common to All Claims

  8. Since 2001, Plaintiff Virtual Service has offered technologically advanced security, surveillance, alarm and remote access and monitoring systems and services under the VIRTUAL DOORMAN common law trademark and service mark. Its VIRTUAL DOORMAN security system has been developed over many years, and is based on plaintiff's proprietary software and systems. Plaintiff Virtual Service filed an application for registration of VIRTUAL DOORMAN on January 5, 2007 based on its extensive use of the mark in commerce since 2001.

9. The VIRTUAL DOORMAN system and services are sold primarily to residential users, and are often marketed in connection with luxury buildings. The VIRTUAL DOORMAN system is a secure remote monitoring and control system that is integrated with other building-wide systems.

10. Virtual Service provides secure remote monitoring and control of building-wide systems in connection with the VIRTUAL DOORMAN mark. The VIRTUAL DOORMAN security system also permits and restricts entry, delivery of packages, and other functions.

11. Virtual Service uses the common-law trademarked slogans "TECHNOLOGY FOR EASY LIVING," "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST" and a stylized logo consisting of gloves and top hat, suggestive of a doorman (the "Doorman Logo") in connection with the VIRTUAL DOORMAN marks and security system. It further uses the slogans "TOTAL SECURITY INTEGRATION" and "TOTAL SECURITY SOLUTIONS" in its marketing materials, and in connection with its trademarks (collectively, all of the above slogans will be referred to as the "VIRTUAL DOORMAN Slogans")

12. The relevant consumer market has come to identify the "VIRTUAL DOORMAN Slogans" individually and when used in connection with VIRTUAL DOORMAN with the goods and services offered by Virtual Service.

13. Furthermore, the relevant market, public and trade have come to identify the Doorman Logo with the goods and services offered by Virtual Service.

14. Over the more than six years since its first development and use in the marketplace, the VIRTUAL DOORMAN security system has been very successful. Virtual Service has spent hundreds of thousands of dollars marketing and advertising the VIRTUAL DOORMAN system; consumers and competitors in the security and surveillance market have

come to identify plaintiff, Virtual Service, as the source of the goods and services marketed under the VIRTUAL DOORMAN trademark.

15.     In 2004, plaintiff attended an industry trade show that was also attended by Defendants. At that trade show, plaintiff Virtual Service prominently displayed the VIRTUAL DOORMAN product and services, as well as the slogans "TOTAL SECURITY SOLUTIONS," "TOTAL SECURITY INTEGRATION," "TECHNOLOGY FOR EASY LIVING," "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST," as well as the Doorman Logo.

16.     At that trade show, representatives of Defendant American Security Systems approached plaintiff, discussed the VIRTUAL DOORMAN product and services, and sought to discuss the possibility that the two companies could work together in some fashion.

17.     Nothing came of this meeting, and the parties did not enter into any agreement, contract, or joint venture of any kind, particularly regarding the VIRTUAL DOORMAN mark, the Doorman Logo, or the VIRTUAL DOORMAN Slogans used in connection with Plaintiff's trademarks.

18.     In mid-2007, plaintiff attended another trade show where American Security Systems also had a booth. This time, American Security Systems was offering an alarm and security systems product called "Video Doorman."

19.     Defendants also used a stylized logo of a doorman in advertising material, as well as Plaintiff's Slogans "total security solutions" and "total security integration" Defendant further indicated that the "Video Doorman" acts "just like an actual doorman, but for a fraction of the cost."

20.    Defendants purposely used Plaintiff's marks and slogans in an effort to create consumer confusion between the Video Doorman product offered by American Security Systems, and the already established VIRTUAL DOORMAN goods and services offered by Plaintiff Virtual Service. Furthermore, Defendants' use of the VIRTUAL DOORMAN Slogans in connection with the "Video Doorman" designation and American Security Systems' doorman image creates a look-and-feel confusingly similar to that of Virtual Service.

21.    It also was discovered that Defendant American Security Systems filed an application for registration of its "Video Doorman" designation in the United States Patent and Trademark Office based on its "Intent to Use" the designation in commerce. That application was filed December 19, 2006.

## Defendants' Infringing Trade Article

22.    In 2007, Defendants caused a trade/marketing publication to print a commercial trade article (the "Article") portraying Defendants' alarm systems, but using Plaintiff's trademark "VIRTUAL DOORMAN." A copy of this Article is attached hereto as Ex. A.

23.    In the Article, Defendant Dolin speaks about the products Defendants offer and their effectiveness; he touts Defendants' products as superior, and states that Defendants are "proving that [superiority] here in New York with central station companies like Statewide Central Station and products like *Virtual* Doorman."

24.    The Article goes on to note that: "This was exactly the kind of service and technology Dolin was banking on when he decided to develop a high-end integrated video/access control product call[ed] *Virtual* Doorman™." Ex. A. Notably, Defendants even caused the use of the "™" symbol after VIRTUAL DOORMAN, furthering the false impression that the

VIRTUAL DOORMAN is Defendants' trademark, or that they or their goods and services are somehow affiliated with or sponsored by Plaintiff.

25.     Furthermore, Defendant's Article has a caption likely to confuse consumers entitled "VIRTUAL VISION," and the Article makes numerous references to "VIRTUAL" attendants and "VIRTUAL" escorts.

26.     Defendants knowingly and purposely intended and intend the trade Article to confuse the public into associating Plaintiff's well-known VIRTUAL DOORMAN systems and services with Defendants' confusingly similar "Video Doorman" alarm system that they are offering and marketing in the New York area.

27.     Plaintiff has received several inquiries from consumers, and potential customers who have expressed confusion as to the source of the Video Doorman system, and the source of the VIRTUAL DOORMAN system, and whether the two are the same.

### Plaintiff's Cease and Desist Letter

28.     In response to Defendants' actions, Plaintiff sent Defendant American Security Systems a "cease and desist" letter pointing out the consumer confusion it was causing through its unlawful acts. A copy of this cease and desist letter is attached hereto as Exhibit B.

29.     In response, Defendant's attorney indicated that VIRTUAL DOORMAN and Video Doorman were not confusingly similar. Exhibit C, attached, is a letter (without attachments) from Defendants' attorney responding to Plaintiff's cease and desist letter.

30.     Defendant claimed through their attorney that several entities used the words "virtual doorman," and attached several documents showing that use. In fact, many the uses pointed out by Defendant in its own defense were uses by Plaintiffs' licensees, and the services offered in several of those cases were actually Plaintiff's own services.

31.     Furthermore, in responding to the cease and desist letter, Defendant's attorney claimed that the marks were not confusingly similar.

32.     However, Defendant's own attorney confuses the marks in his response letter, confusing "video" and "VIRTUAL" and asserting that _Video_ Doorman was used by _Plaintiff._ _See_ Ex C. Presumably, the attorney meant to allege that _VIRTUAL_ DOORMAN– as opposed to "Video" DOORMAN – is used by Plaintiff.

33.     Defendants' attorney thus confused the two marks while responding to Plaintiff's cease and desist letter, because the marks are confusingly similar.

34.     This confusion on the part of even Defendant's own attorney as to the two marks is demonstrative of the likelihood of consumer confusion in this instance.

35.     Moreover, many of the documents that Defendants provided to Plaintiff's attorney in response to its Cease and Desist Letter were dated prior to Defendants' application for federal trademark registration; thus, it is thus clear that Defendants were aware of Virtual Service's superior rights in and to the VIRTUAL SERVICE trademark prior to applying for federal registration and adopting their infringing use.

### As and For a First Cause of Action
### Federal Unfair Competition (15 U.S.C. § 1114)

36.     Plaintiff Virtual Service repeats and realleges the allegations set forth in paragraphs 1 – 35, above, as if fully set forth here.

37.     Plaintiff's trademarks are highly distinctive, have acquired secondary meaning, and have been used in commerce continuously for more than six years throughout the United States.

38.     Consumers have contacted Virtual Service to express their confusion over Defendants' use of "Video Doorman."

39.     Defendants' unauthorized use of "Video Doorman," "total security solutions", "JUST LIKE AN ACTUAL DOORMAN, BUT FOR A FRACTION OF THE COST," and the American Security Solutions doorman image, each together and apart, in connection with their marketing materials, press releases, and goods, is likely to cause, and has caused confusion and mistake and has deceived consumers as to the source or origin of its products and services. Due to this consumer confusion, Plaintiff has lost sales and customers.

40.     Defendants unauthorized use of the term VIRTUAL DOORMAN in their promotional materials, and in trade and marketing publications is likely to cause, and has caused confusion and mistake and has deceived consumers as to the source or origin of its products and services. Due to this consumer confusion Plaintiff has been damaged, and has lost sales and customers.

41.     Defendants acts described above infringe Plaintiff's trademarks, VIRTUAL DOORMAN, "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST," and the Doorman Logo, in violation of the Lanham Act 15 U.S.C. Sec. 1114.

42.     Defendants' acts of trademark infringement have caused and are causing great and irreparable injury to Plaintiff, its trademarks, and to the business and goodwill represented thereby, in an amount that cannot be ascertained at this time, and unless restrained, will cause further irreparable injury.  Plaintiff has no adequate remedy at law.

43.     Defendants at all times relevant to this Complaint and prior to adopting use of the infringing marks, had actual notice of Plaintiff's rights in and to VIRTUAL DOORMAN, SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST, and the Doorman Logo, and have intentionally infringed upon Plaintiff's rights in order to damage Plaintiff, and trade off of Plaintiff's established reputation and goodwill.

44.   By reason of the foregoing, plaintiff is entitled to injunctive relief against
Defendants restraining further acts of trademark infringement, and after trial, to recover any
damages proved to have been caused by defendants' aforesaid acts of trademark infringement,
which damages are estimated to be no less than ONE MILLION ($1,000,000.00) Dollars.

### As and For a Second Cause of Action
### Federal Unfair Competition (15 U.S.C. § 1125(a))

45.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 44 above as
if fully set forth herein.

46.   Defendants have made or caused to be made advertisements and marketing
materials that are false and likely to mislead and/or confuse the trade and its consumers.

47.   Defendants' use of the designation "Video Doorman," alone, and in connection
with "total security solutions," "total security integration," "just like an actual doorman, but for a
fraction of the cost," and its doorman image is likely to cause and has caused consumers to
mistakenly believe that the Defendants have an affiliation with Plaintiff, or that Defendants are
otherwise associated with or have obtained permission from Plaintiff to use these designations.

48.   Defendants' unauthorized use of the "Video Doorman" designation on or in
connection with its alarm and security systems goods and services is likely to cause confusion, to
cause mistake, or to deceive consumers and the trade as to an association between Defendant
American Security Systems' goods and services and plaintiff, or as to the source or sponsorship
of Defendant American Security Systems' goods.

49.   Because of Defendants' adoption of marks that are confusingly similar to those of
Virtual Service, the public is likely to believe that American Security Systems or products and
services it offers under the designations "Video Doorman," total security solutions," "just like an

actual doorman, but for a fraction of the cost," VIRTUAL DOORMAN, and/or Defendant's doorman logo, either alone, or together, are associated with, sponsored by, approved by, or originate from Virtual Service, the Plaintiff in this Action.

50. Specifically, Defendants have made or have caused to be made, false, deceptive and misleading statements and marketing materials constituting false representations and false advertising made in connection with goods and services distributed in interstate commerce in violation of the Lanham Act, 15 U.S.C. Sec. 1125(a), including without limitation, use, together or separately, of "Video Doorman," the American Security Systems doorman logo, "total security solutions," "just like an actual doorman, but for a fraction of the cost." and the "VIRTUAL DOORMAN" in its marketing and advertising materials, and causing such use in trade publications.

51. Defendants' foregoing actions constitute a false designation of origin, false and misleading representations of fact, and they have caused and are likely to continue to cause confusion or to cause mistake or to deceive persons as to the affiliation, connection, or association of defendants with Virtual Service, in violation of 15 U.S.C. 1125(a).

52. As a result of defendants' actions, Plaintiff Virtual Service, has suffered and will continue to suffer great damage to its business, good will, reputation and profits.

53. Plaintiff has no adequate remedy at law against this false advertising and unfair competition, and has suffered, and will continue to suffer irreparable harm because of Defendants acts.

54. By reason of the Defendants acts alleged herein, Plaintiff is entitled to damages in an amount to be determined at trial, but estimated to be no less than ONE MILLION ($1,000,000) Dollars.

55. As Defendants have at all times acted willfully and knowingly, and as Defendants' actions constitute "exceptional circumstances," under the meaning of the Lanham Act, Plaintiff is entitled to three times Defendants' profits, or three times Plaintiff's damages. whichever is greater, together with Plaintiff's reasonable attorneys fees under 15 U.S.C. Sec. 1117(a) and (b).

### As and For a Third Cause of Action
### Trademark Infringement and Unfair Competition
### Under New York State Law

56. Plaintiff repeats and realleges the allegations in paragraphs 1 through 55 above as if fully set forth herein.

57. The acts of defendants as described above constitute trademark infringement and unfair competition in violation of Plaintiff's rights under the common law of the State of New York and N.Y. General Business Law Sec. 368 –e.

58. By reason of the foregoing, Plaintiff is entitled to recover any damages proven to have been caused by reason of defendants' aforesaid acts of trademark infringement and unfair competition, which damages are to be proven at trial, but at this time are estimated to be no less than ONE MILLION ($1,000,000.00) Dollars.

### As and For a Fourth Cause of Action
### Trademark Infringement under New York State Law

59. Plaintiff repeats and realleges the allegations in paragraphs 1 through 58 above as if full set forth herein.

60.     The public has and is likely to confuse Defendants' goods and services marketed under each and all of the designations "Video Doorman" "total security solutions, "just like an actual doorman, but for a fraction of the cost," the American Security Systems doorman logo, and "VIRTUAL DOORMAN" with Plaintiff's trademarks and service marks.

61.     Defendants' acts as described above have are likely to dilute and detract from the distinctiveness of Plaintiff's trademarks, with consequent damage to Plaintiff and its business and goodwill symbolized by such trademarks, in violation of the New York Anti Dilution Statute, NY Gen. Bus. Law Sec. 360-1.

62.     By reason of the foregoing, Plaintiff is entitled to recover any damages proven to have been caused by reason of Defendants' aforesaid acts of trademark dilution, which damages are to be proven at trial, but are estimated to be no less than ONE MILLION ($1,000,000.00) Dollars.

**WHEREFOR**, Plaintiff request this Court to render judgment:

i.      On the first claim against Defendants under the authority of 15 U.S.C. Sec. 1114, awarding injunctive relief against defendants restraining further acts of infringement;

ii.     On the first claim against Defendants, under the authority of 15 U.S.C. Sec. 1114, awarding Plaintiff damages in the amount to be proven at trial, but which are currently believed to be no less than ONE MILLION ($1,000,000.00) Dollars.

iii.      On the second claim against Defendants, under the authority of 15 U.S.C. Sec. 1125(a), awarding injunctive relief against defendants restraining further acts of infringement;

iv.      On the second claim against Defendants, under the authority of 15 U.S.C. Sec. 1125(a), awarding Plaintiff damages in the amount to be proven at trial, but which are currently believed to be no less than ONE MILLION ($1,000,000.00) Dollars.

v.      On the first and second claims against Defendants awarding Plaintiff three times Defendants' profits, or Plaintiff's damages, whichever is greater, together with Plaintiff's reasonable attorneys fees, under the authority of 15 U.S.C. Sec. 1117(a) and (b).

vi.      On the third claim against Defendants, under authority of the common law of the State of New York and Gen. Bus. L. Sec. 368-e, awarding Plaintiff damages to be proven at trial, which are estimated at this time to be no less than ONE MILLION ($1,000,000.00) Dollars.

vii.      On the fourth claim against Defendants, under authority of the common law of the State of New York and Gen. Bus. L. Sec. 360-1, awarding Plaintiff damages to be proven at trial, which are estimated at this time to be no less than ONE MILLION ($1,000,000.00) Dollars.

viii.      Striking Defendant American Security Systems' federal trademark application for VIDEO DOORMAN, Ser. No. 77,067,418 from consideration on the federal register.

ix.    Preliminary Injunctive relief as to all infringing acts of Defendants;

x.    Awarding Plaintiff its costs and expenses in this action, together with its

reasonable attorneys fees.

xi.    Any other relief that the Court deems just, equitable and/or proper.

Dated: New York, NY
     February 26, 2008

Respectfully Submitted,

ZEYNEL KARCIOGLU, ESQ.

Zeynel Karcioglu (ZK 7931)
Attorney for Plaintiff
36 East 20th Street, 6th Floor
New York, NY 10003
(212) 505-6933

# EXHIBIT A

Making a Change                                                    Page 1 of 4


Security professionals find their new product needs, new technology and practical information regarding the integration of these products.
RIGHT HERE. . .
*Security Products*

Magazine Subscription   About Us   Site Map

Home Page   Magazine   News   Products   Community   Resource Center   Classifieds   Services/Advertising

Search Site [_____] [Go]

**HOT TOPICS**

Access Control/Identity
Business Continuity
CCTV
Network-Centric Security
Dealers and Integrators
Fire/Life Safety
Government
Guard Services
Homeland/Urban Area
Integrated Home
IT/Corporate Info
International
Monitoring

**RESOURCE CENTER**

Products
Buyers Guide
Vendor Catalog
Classifieds

Resources
Newsletter Subscribe
Letter to the Editor

**MAGAZINE**

## Making a Change

*By Jeff Brummett · March 2007*

### Alarm verification -- a coming shift in the security industry



THE security industry has gone through many paradigm shifts during the last 100 years. As is the case with every paradigm change, there are winners and losers. The security industry is no different. Business paradigm shifts seem to always create new opportunities. However, some of those opportunities leave a wake of destruction and demise in its path. Seeing and understanding a new paradigm before it happens can make or break any company, regardless how big or small the company might be. Never underestimate the power of a changing paradigm.

One of the most famous examples of the power found within a paradigm shift is the watch manufacturing industry. In the time/watch industry if quartz technology leveled the playing field and created a paradigm shift in how watches were made. It ultimately facilitated the rise of Timex as the reigning worldwide dominant watch maker. At the same time, this new paradigm in technology facilitated the fall of the once dominant Swiss watch manufacturing industry. People born in the last half of the 20th-century are not old enough to remember when the Swiss watch manufacturers controlled more than 90 percent of worldwide watch sales. Imagine trying to compete in an industry where one country controlled that much of the market. How could anyone ever foresee such a dominant competitor toppled? Let alone, toppled virtually overnight? It happened.

The irony behind the fall of Swiss watchmaker was the fact that the Swiss manufacturers had a first look at the technology that ultimately spelled doom for their businesses. Instead of seeing opportunity for expansion and increased revenues, all they could see was a watch that had no gears and didn't fit their existing business model. And that's not something that just watch manufacturers have seen. Security professionals have encountered a shift, as well. In fact, it's happening right now it was outside their existing paradigm.

### Shifting Gears

In the world of security monitoring services, one could say the advent of the "free alarm" installation for residential customers was a paradigm shift. Most central monitoring stations prior to the free alarm saw the commercial monitoring market as the market of choice. Central station monitoring companies that embraced the radical idea of supporting low-cost, consumer alarm installations, and went on to create successful dealer programs, saw account bases skyrocket. Those who didn't were swallowed in the wake of change.


*Security Products*

**Subscribe Now!**

Subscribe
Current Edition
Archived Editions

Search [Search Site] [Go]

**ABOUT US**

Contact Us
Editorial Calendar
Media Kit
Print Subscriptions
Newsletters


FUJINON

**PODCASTS**

Where Do We Go From Here?

Download a podcast of Security Products' exclusive interview with Patrick Fiel Sr., Security consultant with ADT, and former chief of police for the Washington, D.C. School District as he discusses the state and future of campus security in the wake of the shootings at Virginia Tech.


**FREE**
ID Card
Design Guide >

**Poll**

What security application would be most beneficial to higher education campuses?

○ Biometrics
○ Access Control
○ IP Cameras
○ Video Analytics
[Vote]

View Results







The next paradigm shift striking the security monitoring industry is the advent of verified alarms. False alarms have become a growing problem for security monitoring professionals. Today, nationwide alarm monitoring companies and installing security dealers are fearful. Companies are fearful of the impact that may result from a growing trend driven by a key partner in the business model—the police. Many law enforcement officials, weary from the drain that responding to a false alarm signal places upon the department's limited resources, have begun to push the idea of requiring onsite verification of emergency signals. Without verification, police believe responding to false alarms is a poor use of already overtaxed department resources.

The alarm industry as a whole has been very slow to embrace the idea of requiring onsite verification for alarm signals. While offering a variety of reasons—examples of lives saved or criminals caught—many believe the underlying fear comes down to who will pay for service when police fail to respond? Could it be those fearful of that question only see the business through its current paradigm? There may be a better paradigm. Two complimentary companies in the greater New York City area may already have it in operation.

**Opening the Box**
Larry Dolin is a 26-year security system veteran. He is the president and CEO of American Security Systems, a successful New York alarm company and systems integrator. While many of his peers spend their time trying to support efforts to slow the trend of verified alarms, Dolin's instincts told him to embrace the new paradigm.

"The way I see it, already some jurisdictions are already refusing to dispatch on unverified alarm signals. Police have a legitimate and reasonable concern. Some jurisdictions have enacted laws that result in highly punitive fines. Pandora's box is open. You can either fight Pandora or make her your ally," Dolin said. "Most security firms simply go on the daily routine of selling, installing and servicing. They need about those issues in industry magazines and hear it talked about at trade association events. Most don't like what they're reading or hearing. It represents a significant departure from the status quo. They feel helpless on the one hand, fearful on the other. The easiest thing to do is to support the status quo, and resist the change you fear. I'm just not so sure it's the most profitable thing to do."

"History tells us with change comes enormous opportunity. I see this as one of those opportunities. Video verification, I believe, is the coming staple service in professional security monitoring—especially among commercial properties that simply cannot afford police not to respond. That's why I began searching for companies who could provide that high level of service a few years ago."

After searching, Dolin said he realized few central stations were really equipped to provide efficient and meaningful video monitoring services.

"They're just not set up to do it without going through wholesale changes in both philosophy and personnel," Dolin said. "Most of them end up sticking their toe in the water without making the significant investments and wholesale changes they really need in order to do it well. I think that alone is the biggest reason you haven't seen this service explode. The service that's being offered to most customers today is a shell of the service that technology can deliver. We're proving that here in New York with central station companies like Statewide Central Station and products like Virtual Doorman™."

Dolin said a lot of barriers most central stations face revolve around the lack of technical proficiencies in existing personnel.

"They face the same challenges most security dealers face. Our technicians, like their operators, know very little about operating the sophisticated software these systems afford. The response to that

**Security Products**
Magazine

**Events**

CPM West
Global Gaming Expo (G2E)
PCW 8th Security Conference &
Exhibition
Security Canada Expo
Digital ID World
View all Events



Making a Change

challenge by both sides has been: "Well, if we're going to have to do this, lets use the simplest system with the easiest (or fewest) features to learn," Dolin said. "I think that's why you see so many frustrated people. In my mind, they are all frustrated for the same reason. Most central station companies do the same thing most installing dealers do. They end up dumbing down the equipment they use to help make it easier on employees, instead of increasing the quality of people to take full advantage of the improved product technology. At the end of the day, the result becomes a service offered that isn't all that impressive, even when it works."

That's why Dolin decided to invest and partner with a small central monitoring station in Staten Island, N.Y., Statewide Central Station, a full-service, UL-listed, FDNY-approved central station. It has the type of management, ownership and staffing Dolin believes executes high-end, customer-driven video monitoring services.

"These guys are some of the most driven, technology savvy, central station service providers I have ever seen. They saw changes on the horizon and got out ahead of the technology curve. New York is a tough, competitive market," Dolin said. "They have thrived in that market. Instead of fearing technology changes, they embraced those changes and staffed themselves to make the most of it. The only thing lacking was a great central station video product. Once we found American Sentry Guard and the POWERViZion central video monitoring product, we knew we had real, meaningful, high-performance video monitoring solutions and the ability to execute."

**Virtual Vision**

Today, Statewide Central Station has grown to provide UL-listed monitoring services to dealers and clients throughout the United States and the Caribbean.

Sayeed Zaman, director of product development at ASG, said he agrees with Dolin about the current state of video monitoring services.

"We get approached by central stations in this industry all the time about our integrated video monitoring product," Zeman said. "The fact is, when you sit down to talk, most central stations just don't have the technical staff to pull it off, even fewer are willing to make the financial commitment it takes to make it work.

"Statewide was certainly different in that regard. They have people who get it, and they were willing to put their money where their mouth was. I believe they are defining what a true, full service central station video monitoring service will look like for years to come. I can't think of anyone who's doing all the things they do, certainly not at the level they're doing it. Dealers absolutely love them."

The application and benefits of POWERViZion's central station video product used by Statewide include real-time POS sales supervision, live streaming video with two-way audio, extended opening and closing services, customized programmed virtual guard tours, alarm verification and Dolin's Video Doorman. All systems include vital signs health monitoring, which notifies Statewide Central Station operators before hard drives fail, or become full, prior to the intended cycle use.

"Our operators even know when a camera goes out, or its view is blocked or changed. We can immediately notify the dealer and/or the end user," said Steven Coppola, director of technical services at Statewide.

That was exactly the kind of service and technology Dolin was banking on when he decided to develop a high-end integrated video/access control product call Virtual Doorman.

"Non-doorman buildings with this product can enjoy the same increased security-peace of mind and conveniences of doorman buildings without the expense. In effect, the product gives equal rights to these tenants. The right to order on the Internet and receive UPS/FedEx, or local deliveries, such as flowers or laundry, that until now, simply wasn't possible," Dolin said.

Dolin has become a pioneer with the technology, working closely with his contacts in the NYC Housing Authority. Several of the building clients served by Dolin's company have already activated the system in buildings with positive results.

The system allows the operators at Statewide to serve as virtual attendants, interacting with delivery service people, allowing for the monitored entrance to a building or access to a particular part of the building such as a storage area for the delivery of packages or services. When a signal is transmitted to Statewide, the operator is notified that someone is at the entrance of a participating building. The operator can visually see the person on a monitor. Not only can the central station see that person, personnel also can communicate via two-way audio. Monitoring personnel can then grant or deny access; follow the person through the building, tracking passage from point A to point B; allow access to point B; remotely lock point B as they leave; then track passage back to point A and consequent departure from the building, locking the entrance. The tenant is then e-mailed or called for notification

Making a Change

that a package is awaiting them when they return home.

Since installing the first few systems, Dolin said building tenants have requested a "video escort," asking that operators at Statewide, when notified by the tenant upon entering the building, follow the tenant to a virtual escort to the appropriate floor.

Interactive, remote video monitoring promises customers a rapid response and safe supervised passage during sudden emergencies. Activated by the end user or security event, the response is immediate and verified. What started as a cry for help from law enforcement entities may end up in a paradigm shift, changing the way security monitoring services are delivered and managed.

### About the author

Jeff Brummett

Jeff Brummett is the president and COO of American Sentry Guard.

Sponsored Text Links

School Security: Subscribe to your source for valuable and practical information.

Copyright 2007 1105Media Inc. See our Privacy Policy
Reproduction in whole or in part in any form or medium without express permission of 1105 Media Inc. is prohibited

1105 MEDIA

# EXHIBIT B

# Zeynel Karcioglu, Esq.

Attorney-at-Law

36 East 20th St. 6th Fl.
New York, New York 10003
Telephone: (212) 505 - 6933
Fax: (646) 219 - 4517

May 21, 2007

*Via Certified Mail and Facsimile Transmission*
Robert C. Faber, Esq.
Ostrolenk, Faber, Gerb & Soffen, LLP
1180 Avenue of the Americas FL 7
New York, NY 10036-8401

Re:   *Infringement of Virtual Service's Intellectual Property Rights by*
      *Your Client American Security Systems, Inc.*

Dear Mr. Faber,

This firm represents Virtual Service; we are writing to demand that your client American Security Systems, Inc. ("American Security Systems") immediately stop selling, marketing and advertising services and products bearing the designation "Video Doorman" in the field of remote monitoring and security systems. Since at least as early as 2001, Virtual Service has used the trade and service mark VIRTUAL DOORMAN in the remote monitoring and security system industry, and has created strong brand recognition and goodwill in the VIRTUAL DOORMAN mark. Your client's use of "Video Doorman" and its doorman logo violates Virtual Service's intellectual property rights, and has created actual confusion as well as a likelihood of future consumer confusion.

It has further come to our attention that American Security Systems seeks to register the "Video Doorman," in the United States Patent and Trademark Office, has registered a domain name: www.videodoorman.com, and has copied *verbatim* content from Virtual Service's website and marketing materials in promoting and marketing its own products and services offered in connection with "Video Doorman" and the doorman logo. Given Virtual Service's strong brand recognition in the industry, and in light of the obvious similarities between VIRTUAL DOORMAN and "Video Doorman," as well as copying of the content from Virtual Service's web site, we believe that American Security Systems has willfully copied Virtual Service's marks and copyrighted materials.

The copying and infringement of Virtual Service's rights has very recently spurred several instances of consumer confusion, as customers and potential customers have inquired whether the goods and services offered under "Video Doorman" are related to Virtual Service's VIRTUAL DOORMAN goods and services, and whether the companies are somehow related. Furthermore, Virtual Service has encountered at least one trade publication that identified *your client* as offering VIRTUAL DOORMAN-branded goods and services. Your client's actions constitute violations of federal law, including copyright infringement, under 17 U.S.C. § 101 *et seq.*, unfair competition, and false advertising in violation of the U.S. Trademark Act, 15 U.S.C. § 1051 *et seq.* and other applicable state laws.

Virtual Service is prepared to take legal action if necessary to enforce its rights; however, it is willing to provide American Security Systems the opportunity to resolve this issue.

American Security Systems must immediately:

a)   cease and desist from any use of the trademark or service mark "Video Doorman," the "doorman logo," or any similar mark in connection with remote access and security systems sales, design, installation, monitoring, servicing, and other related services;

b)   immediately execute and file an express abandonment in the United States Patent and Trademark Office of the intent-to-use application for "Video Doorman" Ser. No. 77,067,418;

c)   surrender ownership of www.videodoorman.com;

d)   produce copies of all brochures, advertising and marketing materials for any goods and services bearing "Video Doorman" so that they may be destroyed.

e)   remove the "Video Doorman" mark from any goods and packaging in your client's possession;

f)   provide a complete list of all companies, entities or individuals who have been sent marketing materials or products bearing "Video Doorman" so that corrective advertising may be undertaken.

Kindly comply with our demand immediately so that no further steps need be taken in connection with your client's infringing use of "Video Doorman." In the absence of American Security Systems' full compliance by **June 5, 2007**, Virtual Service reserves all of its rights to take appropriate action against your client, including filing a lawsuit in federal court. If such a lawsuit is necessary, Virtual Service will seek all available relief under federal and New York state law, including injunctive relief, an accounting of profits, trebled damages, attorney's fees and court costs.

We look forward to American Security System's timely and complete response. The demands made herein are not made to the exclusion of other rights or remedies to which Virtual Service is entitled, and nothing in this letter, nor any act or omission by Virtual Service, shall be construed as a waiver of any right or remedy possessed by Virtual Service, all of which are expressly reserved.

Very truly yours,

Zeynel Karcioglu

cc: Cristine Morettin

# EXHIBIT C

# OSTROLENK, FABER, GERB & SOFFEN, LLP

### 1180 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10036-8403
### TEL 212 382 0700  FAX 212 382 0888  FAX 212 398 0681
### email@ostrolenk.com

**PARTNERS**

SAMUEL H. WEINER
ROBERT C. FABER
MAX MOSKOWITZ
JAMES A. PINDER
WILLIAM O. GRAY, III
LOUIS C. DUJMICH
CHARLES P. LAPOLLA
DOUGLAS A. MIRO

PETER S. SLOANE
KOUROSH SALEHI**

**ASSOCIATES**

JOEL J. FELBER**
DOUGLAS Q. HAHN
MICHAEL I. MARKOWITZ
KEITH J. BARKAUS
JEFF KIRSHNER
ART C. CODY
AIMEE M. ALLEN
DAVID J. TORRENTE

DODIVA N. GRANT'
VICTOR A. GROSSMAN

**OF COUNSEL**

MARTIN PFEFFER:
LAWRENCE A HOFFMAN
MARTIN J. BERAN
PAUL GRANDINETTI'
MARK A. FARLEY
GEORGE BRIEGER
BELLA KARAKIS
STEPHEN J. QUIGLEY

JOSPEH M. MANAK

**WASHINGTON OFFICE**
1725 K STREET, N. W.
WASHINGTON, D.C. 20006
TBI. 202 457 7785
FAX 202 429 8919

*DC BAR
**CONNECTICUT BAR

June 1, 2007

Zeynel Karcioglu, Esq.
36 East 20th Street, 6th Floor
New York, New York 10003

> Re:    Claim of Infringement against American Securities Systems, Inc.
>        OFGS Ref: T/4366-3

Dear Mr. Karcioglu:

This responds to your letter of May 21, 2007 addressed to me as the attorney for American Security Systems Inc. You complain that my client's unique trademark VIDEO DOORMAN is an infringement of your client's alleged trademark VIRTUAL DOORMAN. Briefly, the two terms that you would describe as trademarks do not have the same spelling, do not have same appearance, do not have the same pronunciation, do not have the same meaning and anyone who claims confusion has not exercised the due care in reading the names that a reasonable customer of these important, expensive services is likely to exercise.

The primary reason why your claim is without merit, is that the term virtual doorman is not your client's exclusive property, nor can it be the property of anyone, because the term has become generic of the service your client is performing under that description. A name or term is generic when it is an apt name for the product or service and/or when it is used in that manner by more than one unrelated user.

Several enclosed entries from the Internet show wide use of the generic term virtual doorman by numerous different entities in a descriptive manner, showing thereby that the term is an apt description of the service or goods under that name. In these enclosures, no further description is provided as to the meaning of the virtual doorman services, as none is apparently deemed necessary by the many users of that generic term. Several entities claim to have

00844183.WPD

OSTROLENK, FABER, GERB & SOFFEN, LLP

June 1, 2007
Page 2

developed or to have proprietary rights in a virtual doorman system including UPS and Mailboxes
Etc.

Perhaps not surprisingly, Virtual Services, Inc. itself uses the term generically in
promotion of its apartment security systems:

> Our virtual doorman and video monitor systems are
> essential for good apartment security.

Obviously, virtual doorman is sufficiently defined in itself to not have required any further noun,
which is the essence of an apt description or generic term.

Further, the principal words VIRTUAL and VIDEO of your client's generic term
and of my client's trademark have different meanings.

VIRTUAL is defined on www.dictionary.com as "being such in power, force, or
effect, though not actually or expressly such" and "temporarily simulated or extended by
computer software." There is no suggestion of video there.

VIDEO is defined in the same dictionary as "of or pertaining to the electronic
apparatus for producing the television picture" or "pertaining to or employed in the transmission
or reception of television pictures." There is nothing "virtual" in that.

Of course, the words "virtual" and "video" have neither the same appearance nor
the same pronunciation and clearly do not have the same meaning.

DOORMAN is of course a descriptive word understood by everyone. Other
parties offer an identical doorman service combining the word doorman with another adjective,
including CYBERDOORMAN, and my client's unique combination VIDEO DOORMAN.

You claim that my client has copied content from your client's web site. You have
not identified such protected content. As you know, information is not proprietary, only its
precise expression is.

The instances you describe are not any evidence of consumer or customer
confusion. If someone asks whether the services offered under the trademark VIDEO
DOORMAN are related to your client's services under the term VIRTUAL DOORMAN, that
shows such persons were not confused as they wanted to know. Clearly, the parties' goods and
services are competitive, and it is not unreasonable for someone to ask if there is any relationship
between two entities who are marketing a similar product or service? That a trade publication
may have made a mistake is not evidence of confusion, but evidence of the fact that your client's
term is generic and so that one would expect that a publication would use the generic term for any
supplier in the same industry.

00844183.WPD

## OSTROLENK, FABER, GERB & SOFFEN, LLP

June 1, 2007
Page 3

In view of all of the foregoing, there is no basis for any of your claims of infringement, nor for the demands made in your letter. Consequently, there is no reason to answer the demands.

I note that from the Patent and Trademark Office database that your client's application to register the trademark VIRTUAL DOORMAN was filed only in January 2007, six years after your client claims its first use of that generic term. The delay in acting is evidence of your client's recognition that the term is generic. In addition, the Office Action mailed to you May 2, 2007 from the U.S. Patent and Trademark Office requires a response, affording you the opportunity to inform the Examiner of the wide unregulated uses of the term VIDEO DOORMAN by others as a name for your service and the wider generic use of that term. Any registration at all that your client may ultimately obtain should be based upon full disclosure to the Patent and Trademark Office. Failure to make such full disclosure will of course make your client's trademark registration, if any, invalid and may subject your client to sanctions for misleading the Patent and Trademark Office by not informing them of the relevant facts bearing on the registerability of the term virtual doorman as a trademark or for propounding an infringement claim based upon an unprotectable, apt name for the client's product and service.

Very truly yours,

OSTROLENK, FABER, GERB & SOFFEN, LLP

Robert C. Faber

RCF:mjb
Enclosure

00844183.WPD

B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————————x

FUTURE COMMUNICATIONS CORPORATION     Civil Action No. 08-cv-1997 (JGK)
OF NEW YORK d/b/a VIRTUAL SERVICE

                    Plaintiff,

        -against-                                    **FIRST AMENDED COMPLAINT**

AMERICAN SECURITY SYSTEMS, INC.,           **JURY DEMAND MADE**
and LAWRENCE T. DOLIN

                    Defendant

———————————————————————————x

        Plaintiff, Future Communications Corporation of New York d/b/a Virtual Service

("Plaintiff" or "Virtual Service"), by its attorney Zeynel Karcioglu, alleges on knowledge as to

its own acts and otherwise on information and belief as follows:

                            **Jurisdiction and Venue**

        1.      Plaintiff's claims arise under (i) the United States Trademark Act of 1946, as

amended, 15 U.S.C. § 1114 and 1125(a), and therefore jurisdiction in this Court is proper

pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 and 1338(a), and (ii) New York statutory

and/or common law, and are related and substantial to plaintiff's federal law claims, and

therefore jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1338(b) and on the basis of

supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

        2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).

                                **The Parties**

        3.      Plaintiff Future Communications Corporation of New York d/b/a Virtual Service

("Plaintiff" or "Virtual Service") is a corporation duly formed and existing under the laws of the

state of New York having a principal place of business at 104 W. 40th Street, 2nd Floor, New York, New York.

    4.     Virtual Service is engaged in the business of developing, customizing, installing and monitoring security and surveillance systems. Virtual Service has offered goods and services under its trademark VIRTUAL DOORMAN since at least as early as June 2001.

    5.     Upon information and belief, Defendant American Security Systems Inc. ("American Security Systems") is a corporation formed under the laws of New York, has a place of business at 5-44 50th Avenue, Long Island City, New York and regularly conducts business in New York City; it further markets and offers goods and services to potential customers and consumers within this judicial district.

    6.     Upon information and belief, Defendant Lawrence Dolin is the chief executive of American Security Systems Inc., and has knowingly directed and participated in all of the infringing acts of American Security Systems set forth herein.

    7.     American Security Systems is in the business of providing security and alarm systems, and offers certain goods and services that are similar to, or compete with, those of plaintiff under the designation or brand name: "Video Doorman."

### Facts Common to All Claims

    8.     Since 2001, Plaintiff Virtual Service has offered technologically advanced security, surveillance, alarm and remote access and monitoring systems and services under the VIRTUAL DOORMAN common law trademark and service mark. Its VIRTUAL DOORMAN security system has been developed over many years, and is based on plaintiff's proprietary software and systems. Plaintiff Virtual Service filed an application for registration of VIRTUAL DOORMAN on January 5, 2007 based on its extensive use of the mark in commerce since 2001.

9.    The VIRTUAL DOORMAN system and services are sold primarily to residential users, and are often marketed in connection with luxury buildings. The VIRTUAL DOORMAN system is a secure remote monitoring and control system that is integrated with other building-wide systems.

10.    Virtual Service provides secure remote monitoring and control of building-wide systems in connection with the VIRTUAL DOORMAN mark. The VIRTUAL DOORMAN security system also permits and restricts entry, delivery of packages, and other functions.

11.    Virtual Service uses the common-law trademarked slogans "TECHNOLOGY FOR EASY LIVING," "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST" and a stylized logo consisting of gloves and top hat, suggestive of a doorman (the "Doorman Logo") in connection with the VIRTUAL DOORMAN marks and security system. It further uses the slogans "TOTAL SECURITY INTEGRATION" and "TOTAL SECURITY SOLUTIONS" in its marketing materials, and in connection with its trademarks (collectively, all of the above slogans will be referred to as the "VIRTUAL DOORMAN Slogans")

12.    The relevant consumer market has come to identify the "VIRTUAL DOORMAN Slogans" individually and when used in connection with VIRTUAL DOORMAN with the goods and services offered by Virtual Service.

13.    Furthermore, the relevant market, public and trade have come to identify the Doorman Logo with the goods and services offered by Virtual Service.

14.    Over the more than six years since its first development and use in the marketplace, the VIRTUAL DOORMAN security system has been very successful. Virtual Service has spent hundreds of thousands of dollars marketing and advertising the VIRTUAL DOORMAN system; consumers and competitors in the security and surveillance market have

come to identify plaintiff, Virtual Service, as the source of the goods and services marketed under the VIRTUAL DOORMAN trademark.

15.  In 2004, plaintiff attended an industry trade show that was also attended by Defendants. At that trade show, plaintiff Virtual Service prominently displayed the VIRTUAL DOORMAN product and services, as well as the slogans "TOTAL SECURITY SOLUTIONS," "TOTAL SECURITY INTEGRATION," "TECHNOLOGY FOR EASY LIVING," "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST," as well as the Doorman Logo.

16.  At that trade show, representatives of Defendant American Security Systems approached plaintiff, discussed the VIRTUAL DOORMAN product and services, and sought to discuss the possibility that the two companies could work together in some fashion.

17.  Nothing came of this meeting, and the parties did not enter into any agreement, contract, or joint venture of any kind, particularly regarding the VIRTUAL DOORMAN mark, the Doorman Logo, or the VIRTUAL DOORMAN Slogans used in connection with Plaintiff's trademarks.

18.  In mid-2007, plaintiff attended another trade show where American Security Systems also had a booth.  This time, American Security Systems was offering an alarm and security systems product called "Video Doorman."

19.  Defendants also used a stylized logo of a doorman in advertising material, as well as Plaintiff's Slogans "total security solutions" and "total security integration" Defendant further indicated that the "Video Doorman" acts "just like an actual doorman, but for a fraction of the cost."

20.    Defendants purposely used Plaintiff's marks and slogans in an effort to create consumer confusion between the Video Doorman product offered by American Security Systems, and the already established VIRTUAL DOORMAN goods and services offered by Plaintiff Virtual Service. Furthermore, Defendants' use of the VIRTUAL DOORMAN Slogans in connection with the "Video Doorman" designation and American Security Systems' doorman image creates a look-and-feel confusingly similar to that of Virtual Service.

21.    It also was discovered that Defendant American Security Systems filed an application for registration of its "Video Doorman" designation in the United States Patent and Trademark Office based on its "Intent to Use" the designation in commerce. That application was filed December 19, 2006.

### Defendants' Infringing Trade Article

22.    In 2007, Defendants caused a trade/marketing publication to print a commercial trade article (the "Article") portraying Defendants' alarm systems, but using Plaintiff's trademark "VIRTUAL DOORMAN." A copy of this Article is attached hereto as Ex. A.

23.    In the Article, Defendant Dolin speaks about the products Defendants offer and their effectiveness; he touts Defendants' products as superior, and states that Defendants are "proving that [superiority] here in New York with central station companies like Statewide Central Station and products like *Virtual* Doorman."

24.    The Article goes on to note that: "This was exactly the kind of service and technology Dolin was banking on when he decided to develop a high-end integrated video/access control product call[ed] *Virtual* Doorman™." Ex. A. Notably, Defendants even caused the use of the "™" symbol after VIRTUAL DOORMAN, furthering the false impression that the

VIRTUAL DOORMAN is Defendants' trademark, or that they or their goods and services are somehow affiliated with or sponsored by Plaintiff.

25.     Furthermore, Defendant's Article has a caption likely to confuse consumers entitled "VIRTUAL VISION," and the Article makes numerous references to "VIRTUAL" attendants and "VIRTUAL" escorts.

26.     Defendants knowingly and purposely intended and intend the trade Article to confuse the public into associating Plaintiff's well-known VIRTUAL DOORMAN systems and services with Defendants' confusingly similar "Video Doorman" alarm system that they are offering and marketing in the New York area.

27.     Plaintiff has received several inquiries from consumers, and potential customers who have expressed confusion as to the source of the Video Doorman system, and the source of the VIRTUAL DOORMAN system, and whether the two are the same.

### Plaintiff's Cease and Desist Letter

28.     In response to Defendants' actions, Plaintiff sent Defendant American Security Systems a "cease and desist" letter pointing out the consumer confusion it was causing through its unlawful acts. A copy of this cease and desist letter is attached hereto as Exhibit B.

29.     In response, Defendant's attorney indicated that VIRTUAL DOORMAN and Video Doorman were not confusingly similar. Exhibit C, attached, is a letter (without attachments) from Defendants' attorney responding to Plaintiff's cease and desist letter.

30.     Defendant claimed through their attorney that several entities used the words "virtual doorman," and attached several documents showing that use. In fact, many the uses pointed out by Defendant in its own defense were uses by Plaintiffs' licensees, and the services offered in several of those cases were actually Plaintiff's own services.

31.   Furthermore, in responding to the cease and desist letter, Defendant's attorney claimed that the marks were not confusingly similar.

32.   However, Defendant's own attorney confuses the marks in his response letter, confusing "video" and "VIRTUAL" and asserting that *Video* Doorman was used by *Plaintiff*. *See* Ex C. Presumably, the attorney meant to allege that *VIRTUAL* DOORMAN– as opposed to "Video" DOORMAN – is used by Plaintiff.

33.   Defendants' attorney thus confused the two marks while responding to Plaintiff's cease and desist letter, because the marks are confusingly similar.

34.   This confusion on the part of even Defendant's own attorney as to the two marks is demonstrative of the likelihood of consumer confusion in this instance.

35.   Moreover, many of the documents that Defendants provided to Plaintiff's attorney in response to its Cease and Desist Letter were dated prior to Defendants' application for federal trademark registration; thus, it is thus clear that Defendants were aware of Virtual Service's superior rights in and to the VIRTUAL DOORMAN trademark prior to applying for federal registration and adopting their infringing use.

### As and For a First Cause of Action
### Federal Unfair Competition (15 U.S.C. § 1114)

36.   Plaintiff Virtual Service repeats and realleges the allegations set forth in paragraphs 1 – 35, above, as if fully set forth here.

37.   Plaintiff's trademarks are highly distinctive, have acquired secondary meaning, and have been used in commerce continuously for more than six years throughout the United States.

38.   Consumers have contacted Virtual Service to express their confusion over Defendants' use of "Video Doorman."

39.    Defendants' unauthorized use of "Video Doorman," "total security solutions", "JUST LIKE AN ACTUAL DOORMAN, BUT FOR A FRACTION OF THE COST," and the American Security Solutions doorman image, each together and apart, in connection with their marketing materials, press releases, and goods, is likely to cause, and has caused confusion and mistake and has deceived consumers as to the source or origin of its products and services. Due to this consumer confusion, Plaintiff has lost sales and customers.

40.    Defendants unauthorized use of the term VIRTUAL DOORMAN in their promotional materials, and in trade and marketing publications is likely to cause, and has caused confusion and mistake and has deceived consumers as to the source or origin of its products and services. Due to this consumer confusion Plaintiff has been damaged, and has lost sales and customers.

41.    Defendants acts described above infringe Plaintiff's trademarks, VIRTUAL DOORMAN, "SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST," and the Doorman Logo, in violation of the Lanham Act 15 U.S.C. Sec. 1114.

42.    Defendants' acts of trademark infringement have caused and are causing great and irreparable injury to Plaintiff, its trademarks, and to the business and goodwill represented thereby, in an amount that cannot be ascertained at this time, and unless restrained, will cause further irreparable injury. Plaintiff has no adequate remedy at law.

43.    Defendants at all times relevant to this Complaint and prior to adopting use of the infringing marks, had actual notice of Plaintiff's rights in and to VIRTUAL DOORMAN, SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST, and the Doorman Logo, and have intentionally infringed upon Plaintiff's rights in order to damage Plaintiff, and trade off of Plaintiff's established reputation and goodwill.

44. By reason of the foregoing, plaintiff is entitled to injunctive relief against Defendants restraining further acts of trademark infringement, and after trial, to recover any damages proved to have been caused by defendants' aforesaid acts of trademark infringement, which damages are estimated to be no less than ONE MILLION ($1,000,000.00) Dollars.

## As and For a Second Cause of Action
## Federal Unfair Competition (15 U.S.C. § 1125(a))

45. Plaintiff repeats and realleges the allegations in paragraphs 1 through 44 above as if fully set forth herein.

46. Defendants have made or caused to be made advertisements and marketing materials that are false and likely to mislead and/or confuse the trade and its consumers.

47. Defendants' use of the designation "Video Doorman," alone, and in connection with "total security solutions," "total security integration," "just like an actual doorman, but for a fraction of the cost," and its doorman image is likely to cause and has caused consumers to mistakenly believe that the Defendants have an affiliation with Plaintiff, or that Defendants are otherwise associated with or have obtained permission from Plaintiff to use these designations.

48. Defendants' unauthorized use of the "Video Doorman" designation on or in connection with its alarm and security systems goods and services is likely to cause confusion, to cause mistake, or to deceive consumers and the trade as to an association between Defendant American Security Systems' goods and services and plaintiff, or as to the source or sponsorship of Defendant American Security Systems' goods.

49. Because of Defendants' adoption of marks that are confusingly similar to those of Virtual Service, the public is likely to believe that American Security Systems or products and services it offers under the designations "Video Doorman," total security solutions," "just like an

actual doorman, but for a fraction of the cost," VIRTUAL DOORMAN, and/or Defendant's doorman logo, either alone, or together, are associated with, sponsored by, approved by, or originate from Virtual Service, the Plaintiff in this Action.

50.  Specifically, Defendants have made or have caused to be made, false, deceptive and misleading statements and marketing materials constituting false representations and false advertising made in connection with goods and services distributed in interstate commerce in violation of the Lanham Act, 15 U.S.C. Sec. 1125(a), including without limitation, use, together or separately, of "Video Doorman," the American Security Systems doorman logo, "total security solutions," "just like an actual doorman, but for a fraction of the cost," and the "VIRTUAL DOORMAN" in its marketing and advertising materials, and causing such use in trade publications.

51.  Defendants' foregoing actions constitute a false designation of origin, false and misleading representations of fact, and they have caused and are likely to continue to cause confusion or to cause mistake or to deceive persons as to the affiliation, connection, or association of defendants with Virtual Service, in violation of 15 U.S.C. 1125(a).

52.  As a result of defendants' actions, Plaintiff Virtual Service has suffered and will continue to suffer great damage to its business, good will, reputation and profits.

53.  Plaintiff has no adequate remedy at law against this false advertising and unfair competition, and has suffered, and will continue to suffer irreparable harm because of Defendants acts.

54. By reason of the Defendants acts alleged herein, Plaintiff is entitled to damages in an amount to be determined at trial, but estimated to be no less than ONE MILLION ($1,000,000) Dollars.

55. As Defendants have at all times acted willfully and knowingly, and as Defendants' actions constitute "exceptional circumstances," under the meaning of the Lanham Act, Plaintiff is entitled to three times Defendants' profits, or three times Plaintiff's damages, whichever is greater, together with Plaintiff's reasonable attorneys fees under 15 U.S.C. Sec. 1117(a) and (b).

### As and For a Third Cause of Action
### Trademark Infringement and Unfair Competition
### Under New York State Law

56. Plaintiff repeats and realleges the allegations in paragraphs 1 through 55 above as if fully set forth herein.

57. The acts of defendants as described above constitute trademark infringement and unfair competition in violation of Plaintiff's rights under the common law of the State of New York and N.Y. General Business Law Sec. 360.

58. By reason of the foregoing, Plaintiff is entitled injunctive relief and to recover any damages proven to have been caused by reason of defendants' aforesaid acts of trademark infringement and unfair competition, which damages are to be proven at trial, but at this time are estimated to be no less than ONE MILLION ($1,000,000.00) Dollars.

### As and For a Fourth Cause of Action
### Dilution under New York State General Business Law

59. Plaintiff repeats and realleges the allegations in paragraphs 1 through 58 above as if full set forth herein.

60.     The public has confused and is likely to confuse Defendants' goods and services marketed under each and all of the designations "Video Doorman" "total security solutions, "just like an actual doorman, but for a fraction of the cost," the American Security Systems doorman logo, and "VIRTUAL DOORMAN" with Plaintiff's trademarks and service marks.

61.     Plaintiff's VIRTUAL DOORMAN mark is inherently distinctive, and has acquired distinctiveness through Plaintiff's use in connection with its goods and services.

62.     VIRTUAL DOORMAN, used alone and in conjunction with the Plaintiff's other distinctive marks SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST, and the Doorman Logo, is recognized by the consuming public to identify Plaintiff as the source of the goods and services offered under those marks.

63.     Defendants' acts as described above are further likely to injure Plaintiff's reputation and cause dilution of the distinctive quality of VIRTUAL DOORMAN and the Plaintiff's marks SAME SERVICES AS A DOORMAN, AT A FRACTION OF THE COST, and the Doorman Logo, in violation of the New York Anti Dilution Statute, NY Gen. Bus. Law Sec. 360-1.

64.     By reason of the foregoing, Plaintiff is entitled to a court-ordered injunction barring Defendants' use of "video doorman" or "VIRTUAL DOORMAN" in commerce.

**WHEREFOR**, Plaintiff requests this Court to render judgment:

i.     On the first claim against Defendants under the authority of 15 U.S.C. Sec. 1114, awarding injunctive relief against defendants restraining further acts of infringement;

ii.     On the first claim against Defendants, under the authority of 15 U.S.C.

Sec. 1114, awarding Plaintiff damages in the amount to be proven at trial, but which are

currently believed to be no less than ONE MILLION ($1,000,000.00) Dollars.

iii.     On the second claim against Defendants, under the authority of 15

U.S.C. Sec. 1125(a), awarding injunctive relief against defendants restraining further acts

of infringement;

iv.     On the second claim against Defendants, under the authority of 15 U.S.C.

Sec. 1125(a), awarding Plaintiff damages in the amount to be proven at trial, but which

are currently believed to be no less than ONE MILLION ($1,000,000.00) Dollars.

v.     On the first and second claims against Defendants awarding Plaintiff

three times Defendants' profits, or Plaintiff's damages, whichever is greater, together

with Plaintiff's reasonable attorneys fees, under the authority of 15 U.S.C. Sec. 1117(a)

and (b).

vi.     On the third claim against Defendants, under authority of the common

law of the State of New York and Gen. Bus. L. Sec. 360, awarding Plaintiff damages to

be proven at trial, which are estimated at this time to be no less than ONE MILLION

($1,000,000.00) Dollars.

vii.     On the fourth claim against Defendants, under authority of the common

law of the State of New York and Gen. Bus. L. Sec. 360-1, awarding injunctive relief

against defendants restraining further acts of infringement;

    viii.    Striking Defendant American Security Systems' federal trademark

application for VIDEO DOORMAN, Ser. No. 77,067,418 from consideration on the

federal register.

    ix.    Preliminary Injunctive relief as to all infringing acts of Defendants;

    x.    Awarding Plaintiff its costs and expenses in this action, together with its

reasonable attorneys fees.

    xi.    Any other relief that the Court deems just, equitable and/or proper.

Dated: New York, NY
       April 25, 2008

                        Respectfully Submitted,

                        ZEYNEL KARCIOGLU, ESQ.

                        Zeynel Karcioglu (ZK 7931)
                        Attorney for Plaintiff
                        36 East 20th Street, 6th Floor
                        New York, NY 10003
                        (212) 505-6933

# EXHIBIT A

Making a Change                                                    Page 1 of 4

 

Security professionals find their new product needs, new technology and practical information regarding the integration of these products. RIGHT HERE. . .

Security Products

Magazine Subscription  About Us  Site Map

Home Page   Magazine   News   Products   Community   Resource Center   Classifieds   Services/Advertising

**HOT TOPICS**

Access Control/Identity
Business Continuity
CCTV
Network-Centric Security
Dealers and Integrators
Fire/Life Safety
Government
Guard Services
Homeland/Urban Area
Integrated Home
IT/Corporate Info
International
Monitoring

**RESOURCE CENTER**

Products
Buyers Guide
Vendor Catalogs
Classifieds

Resources
Newsletter Subscribe
Letter to the Editor

**MAGAZINE**



**Subscribe Now!**

Subscribe
Current Edition
Archived Editions

Search [Search Site]

**ABOUT US**

Contact Us
Editorial Calendar
Media Kit
Print Subscriptions
Newsletters



# Making a Change

*By Jeff Brummett · March 2007*

**Alarm verification -- a coming shift in the security industry**



THE security industry has gone through many paradigm shifts during the last 100 years. As is the case with every paradigm change, there are winners and losers. The security industry is no different. Business paradigm shifts seem to always create new opportunities. However, some of those opportunities leave a wake of destruction and demise in its path. Seeing and understanding a new paradigm before it happens can make or break any company, regardless how big or small the company might be. Never underestimate the power of a changing paradigm.

One of the most famous examples of the power found within a paradigm shift is the watch manufacturing industry. In the timewatch industry it quartz technology leveled the playing field and created a paradigm shift in how watches were made. It ultimately facilitated the rise of Timex as the reigning worldwide dominant watch maker. At the same time, this new paradigm in technology facilitated the fall of the once dominant Swiss watch manufacturing industry. People born in the last half of the 20th-century are not old enough to remember when the Swiss watch manufacturers controlled more than 90 percent of worldwide watch sales. Imagine trying to compete in an industry where one country controlled that much of the market. How could anyone ever foresee such a dominant competitor toppled? Let alone, toppled virtually overnight? It happened.

The irony behind the fall of Swiss watchmaker was the fact that the Swiss manufacturers had a first look at the technology that ultimately spelled doom for their businesses. Instead of seeing opportunity for expansion and increased revenues, all they could see was a watch that had no gears and didn't fit their existing business model. And that's not something that just watch manufacturers have seen. Security professionals have encountered a shift, as well. In fact, it's happening right now. It was outside their existing paradigm.

**Shifting Gears**

In the world of security monitoring services, one could say the advent of the "free alarm" installation for residential customers was a paradigm shift. Most central monitoring stations point to the free alarm saw the commercial monitoring market as the market of choice. Central station monitoring companies that embraced the radical idea of supporting low-cost, consumer alarm installations, and went on to create successful dealer programs, saw account bases skyrocket. Those who didn't were swallowed in the wake of change.

PODCASTS

**Where Do We Go From Here?**

Download a podcast of Security Products' exclusive interview with Patrick Fiel Sr., Security consultant with ADT, and former chief of police for the Washington, D.C. School District as he discusses the state and future of campus security in the wake of the shootings at Virginia Tech.



FREE
ID Card
Design Guide »



**Poll**

What security application would be most beneficial to higher education campuses?

○ Biometrics
○ Access Control
○ IP Cameras
○ Video Analytics

[Vote]

View Results







The next paradigm shift striking the security monitoring industry is the advent of verified alarms. False alarms have become a growing problem for security monitoring professionals. Today, nationwide alarm monitoring companies and installing security dealers are fearful. Companies are fearful of the impact that may result from a growing trend driven by a key partner in the business model—the police. Many law enforcement officials, weary from the drain that responding to a false alarm signal places upon the department's limited resources, have begun to push the idea of requiring onsite verification of emergency signals. Without verification, police believe responding to false alarms is a poor use of already overtaxed department resources.

The alarm industry as a whole has been very slow to embrace the idea of requiring onsite verification for alarm signals. While offering a variety of reasons—examples of lives saved or criminals caught—many believe the underlying fear comes down to who will pay for services when police fail to respond? Could it be those fearful of that question only see the business through its current paradigm? There may be a better paradigm. Two complimentary companies in the greater New York City area may already have it in operation.

**Opening the Box**

Larry Dolin is a 26-year security system veteran. He is the president and CEO of American Security Systems, a successful New York alarm company and systems integrator. While many of his peers spend their time trying to support efforts to slow the trend of verified alarms, Dolin's instincts told him to embrace the new paradigm.

"The way I see it, already some jurisdictions are already refusing to dispatch on unverified alarm signals. Police have a legitimate and reasonable concern. Some jurisdictions have enacted laws that result in highly punitive fines. Pandora's box is open. You can either fight Pandora or make her your ally," Dolin said. "Most security firms simply go on the daily routine of selling, installing and servicing. They read about these issues in industry magazines and hear it talked about at trade association events. Most don't like what they're reading or hearing. It represents a significant departure from the status quo. They feel helpless on the one hand, fearful on the other. The easiest thing to do is to support the status quo, and resist the change you fear. I'm just not so sure it's the most profitable thing to do."

"History tells us with change comes enormous opportunity. I see this as one of those opportunities. Video verification, I believe, is the coming staple service in professional security monitoring—especially among commercial properties that simply cannot afford police not to respond. That's why I began searching for companies who could provide that high level of service a few years ago."

After searching, Dolin said he realized few central stations were really equipped to provide efficient and meaningful video monitoring services.

"They're just not set up to do it without going through wholesale changes in both philosophy and personnel," Dolin said. "Most of them end up sticking their toe in the water without making the significant investments and wholesale changes they really need in order to do it well. I think that alone is the biggest reason you haven't seen this service explode. The service that's being offered to most customers today is a shell of the service that technology can deliver. We're proving that here in New York with central station companies like Statewide Central Station and products like Virtual Doorman."

Dolin said a lot of barriers most central stations face revolve around the lack of technical proficiencies in existing personnel.

"They face the same challenges most security dealers face. Our technicians, like their operators, know very little about operating the sophisticated software these systems afford. The response to that

**Events**

CPM West
Global Gaming Expo (G2E)
FGW 8th Security Conference & Exhibition
Security Canada Expo
Digital ID World
View all Events



Making a Change                                                     Page 3 of 4

challenge by both sides has been: "Well, if we're going to have to do this, lets use the simplest system with the easiest (or fewest) features to learn," Dolin said. "I think that's why you see so many frustrated people. In my mind, they are all frustrated for the same reason. Most central station companies do the same thing most installing dealers do. They end up dumbing down the equipment they use to help make it easier on employees, instead of increasing the quality of people to take full advantage of the improved product technology. At the end of the day, the result becomes a service offered that isn't all that impressive, even when it works."

That's why Dolin decided to invest and partner with a small central monitoring station in Staten Island, N.Y., Statewide Central Station, a full-service, UL-listed, FDNY-approved central station. It has the type of management, ownership and staffing Dolin believes executes high-end, customer-driven video monitoring services.

"These guys are some of the most driven, technology savvy, central station service providers I have ever seen. They saw changes on the horizon and got out ahead of the technology curve, New York is a tough, competitive market," Dolin said. "They have thrived in that market. Instead of fearing technology changes, they embraced those changes and staffed themselves to make the most of it. The only thing lacking was a great central station video product. Once we found American Sentry Guard and the POWERVIZion central video monitoring product, we knew we had real, meaningful, high-performance video monitoring solutions and the ability to execute."

**Virtual Vision**
Today, Statewide Central Station has grown to provide UL-listed monitoring services to dealers and clients throughout the United States and the Caribbean.

Sayeed Zaman, director of product development at ASG, said he agrees with Dolin about the current state of video monitoring services.

"We get approached by central stations in this industry all the time about our integrated video monitoring product," Zaman said. "The fact is, when you sit down to talk, most of central stations just don't have the technical staff to pull it off, even fewer are willing to make the financial commitment it takes to make it work.

"Statewide was certainly different in that regard. They have people who get it, and they were willing to put their money where their mouth was. I believe they are defining what a true, full service central station video monitoring service will look like for years to come. I can't think of anyone who's doing all the things they do, certainly not at the level they're doing it. Dealers absolutely love them."

The application and benefits of POWERVIZion's central station video product used by Statewide include real-time POS sales supervision, live streaming video with two-way audio, extended opening and closing services, customized programmed virtual guard tours, alarm verification and Dolin's Video Doorman. All systems include vital signs health monitoring, which notifies Statewide Central Station operators before hard drives fail, or become full, prior to the intended cycle use.

"Our operators even know when a camera goes out, or its view is blocked or changed. We can immediately notify the dealer and/or the end user," said Steven Coppola, director of technical services at Statewide.

That was exactly the kind of service and technology Dolin was banking on when he decided to develop a high-end integrated video/access control product call Virtual Doorman.

"Non-doorman buildings with this product can enjoy the same increased security-peace of mind and conveniences of doorman buildings without the expense. In effect, the product gives equal rights to these tenants. The right to order on the internet and receive UPS/FedEx, or local deliveries, such as flowers or laundry, that until now, simply wasn't possible," Dolin said.

Dolin has become a pioneer with the technology, working closely with his contacts in the NYC Housing Authority. Several of the building clients served by Dolin's company have already activated the system in buildings with positive results.

The system allows the operators at Statewide to serve as virtual attendants, interacting with delivery service people, allowing for the monitored entrance to a building or access to a particular part of the building such as a storage area for the delivery of packages or services. When a signal is transmitted to Statewide, the operator, is notified that someone is at the entrance of a participating building. The operator can visually see the person on a monitor. Not only can the central station see that person, personnel also can communicate via two-way audio. Monitoring personnel can then grant or deny access; follow the person through the building, tracking passage from point A to point B; allow access to point B; remotely lock point B as they leave, then track passage back to point A and consequent departure from the building, locking the entrance. The tenant is then e-mailed or called for notification



that a package is awaiting them when they return home.

Since installing the first few systems, Dolin said building tenants have requested a "video escort," asking that operators at Statewide, when notified by the tenant upon entering the building, follow the tenant as a virtual escort to the appropriate floor.

Interactive, remote video monitoring promises customers a rapid response and safe supervised passage during sudden emergencies. Activated by the end user or security event, the response is immediate and verified. What started as a cry for help from law enforcement entities may end up in a paradigm shift, changing the way security monitoring services are delivered and managed.

### About the author

**Jeff Brummett**

Jeff Brummett is the president and COO of American Sentry Guard.

Sponsored Text Links

**School Security**: Subscribe to your source for valuable and practical information.

Copyright 2007 1105Media Inc. See our Privacy Policy
Reproduction in whole or in part in any form or medium without express permission of 1105 Media Inc. is prohibited

**1105 MEDIA**

# EXHIBIT B

Case 1:08-cv-01997-JGK                        LAW OFFICES                              PAGE

# Zeynel Karcioglu, Esq.

Attorney-at-Law

36 East 20th St. 6th Fl.
New York, New York 10003
Telephone: (212) 505 - 6933
Fax: (646) 219 - 4517

May 21, 2007

*Via Certified Mail and Facsimile Transmission*
Robert C. Faber, Esq.
Ostrolenk, Faber, Gerb & Soffen, LLP
1180 Avenue of the Americas FL 7
New York, NY 10036-8401

Re:     *Infringement of Virtual Service's Intellectual Property Rights by
        Your Client American Security Systems, Inc.*

Dear Mr. Faber,

This firm represents Virtual Service; we are writing to demand that your client American Security Systems, Inc. ("American Security Systems") immediately stop selling, marketing and advertising services and products bearing the designation "Video Doorman" in the field of remote monitoring and security systems. Since at least as early as 2001, Virtual Service has used the trade and service mark VIRTUAL DOORMAN in the remote monitoring and security system industry, and has created strong brand recognition and goodwill in the VIRTUAL DOORMAN mark. Your client's use of "Video Doorman" and its doorman logo violates Virtual Service's intellectual property rights, and has created actual confusion as well as a likelihood of future consumer confusion.

It has further come to our attention that American Security Systems seeks to register the "Video Doorman," in the United States Patent and Trademark Office, has registered a domain name: www.videodoorman.com, and has copied *verbatim* content from Virtual Service's website and marketing materials in promoting and marketing its own products and services offered in connection with "Video Doorman" and the doorman logo. Given Virtual Service's strong brand recognition in the industry, and in light of the obvious similarities between VIRTUAL DOORMAN and "Video Doorman," as well as copying of the content from Virtual Service's web site, we believe that American Security Systems has willfully copied Virtual Service's marks and copyrighted materials.

The copying and infringement of Virtual Service's rights has very recently spurred several instances of consumer confusion, as customers and potential customers have inquired whether the goods and services offered under "Video Doorman" are related to Virtual Service's VIRTUAL DOORMAN goods and services, and whether the companies are somehow related. Furthermore, Virtual Service has encountered at least one trade publication that identified *your client* as offering VIRTUAL DOORMAN-branded goods and services. Your client's actions constitute violations of federal law, including copyright infringement, under 17 U.S.C. § 101 *et seq.*, unfair competition, and false advertising in violation of the U.S. Trademark Act, 15 U.S.C. § 1051 *et seq.* and other applicable state laws.

Virtual Service is prepared to take legal action if necessary to enforce its rights; however, it is willing to provide American Security Systems the opportunity to resolve this issue.

American Security Systems must immediately:

a)  cease and desist from any use of the trademark or service mark "Video Doorman," the "doorman logo," or any similar mark in connection with remote access and security systems sales, design, installation, monitoring, servicing, and other related services;

b)  immediately execute and file an express abandonment in the United States Patent and Trademark Office of the intent-to-use application for "Video Doorman" Ser. No. 77,067,418;

c)  surrender ownership of www.videodoorman.com;

d)  produce copies of all brochures, advertising and marketing materials for any goods and services bearing "Video Doorman" so that they may be destroyed;

e)  remove the "Video Doorman" mark from any goods and packaging in your client's possession;

f)  provide a complete list of all companies, entities or individuals who have been sent marketing materials or products bearing "Video Doorman" so that corrective advertising may be undertaken.

Kindly comply with our demand immediately so that no further steps need be taken in connection with your client's infringing use of "Video Doorman." In the absence of American Security Systems' full compliance by June 5, 2007, Virtual Service reserves all of its rights to take appropriate action against your client, including filing a lawsuit in federal court. If such a lawsuit is necessary, Virtual Service will seek all available relief under federal and New York state law, including injunctive relief, an accounting of profits, trebled damages, attorney's fees and court costs.

We look forward to American Security System's timely and complete response. The demands made herein are not made to the exclusion of other rights or remedies to which Virtual Service is entitled, and nothing in this letter, nor any act or omission by Virtual Service, shall be construed as a waiver of any right or remedy possessed by Virtual Service, all of which are expressly reserved.

Very truly yours,

Zeynel Karcioglu

cc: Cristine Morettin

# EXHIBIT C

# OSTROLENK, FABER, GERB & SOFFEN, LLP

1180 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10036-8403
TEL 212 382 0700  FAX 212 382 0888  FAX 212 398 0681
email@ostrolenk.com

**PARTNERS**

SAMUEL H. WEINER
ROBERT C. FABER
MAX MOSKOWITZ
JAMES A. PINDER
WILLIAM O. GRAY, III
LOUIS C. DUJMICH
CHARLES P. LAFOLLA
DOUGLAS A. MIRO

PETER S. SLOANE
KOUROSH SALEHI**

**ASSOCIATES**

JOEL J. FELBER**
DOUGLAS Q. HAHN
MICHAEL I. MARKOWITZ
KEITH J. BARKAUS
JEFF KIRSHNER
ART C. CODY
AIMEE M. ALLEN
DAVID J. TORRENTE

DODIVA N. GRANT
VICTOR A. GROSSMAN
.

**OF COUNSEL**

MARTIN PFEFFER
LAWRENCE A HOFFMAN
MARTIN J. BERAN
PAUL GRANDINETTI*
MARK A. FARLEY
GEORGE BRIEGER
BELLA KARAKIS
STEPHEN J. QUIGLEY

JOSPEH M. MANAK

WASHINGTON OFFICE
1725 K STREET, N. W.
WASHINGTON, D.C. 20006
TEL 202 457 7785
FAX 202 429 8919

*DC BAR
**CONNECTICUT BAR

June 1, 2007

Zeynel Karcioglu, Esq.
36 East 20th Street, 6th Floor
New York, New York 10003

> Re:  Claim of Infringement against American Securities Systems, Inc.
>       OFGS Ref: T/4366-3

Dear Mr. Karcioglu:

This responds to your letter of May 21, 2007 addressed to me as the attorney for American Security Systems Inc. You complain that my client's unique trademark VIDEO DOORMAN is an infringement of your client's alleged trademark VIRTUAL DOORMAN. Briefly, the two terms that you would describe as trademarks do not have the same spelling, do not have same appearance, do not have the same pronunciation, do not have the same meaning and anyone who claims confusion has not exercised the due care in reading the names that a reasonable customer of these important, expensive services is likely to exercise.

The primary reason why your claim is without merit, is that the term virtual doorman is not your client's exclusive property, nor can it be the property of anyone, because the term has become generic of the service your client is performing under that description. A name or term is generic when it is an apt name for the product or service and/or when it is used in that manner by more than one unrelated user.

Several enclosed entries from the Internet show wide use of the generic term virtual doorman by numerous different entities in a descriptive manner, showing thereby that the term is an apt description of the service or goods under that name. In these enclosures, no further description is provided as to the meaning of the virtual doorman services, as none is apparently deemed necessary by the many users of that generic term. Several entities claim to have

00844183.WPD

OSTROLENK, FABER, GERB & SOFFEN, LLP

June 1, 2007
Page 2

developed or to have proprietary rights in a virtual doorman system including UPS and Mailboxes Etc.

Perhaps not surprisingly, Virtual Services, Inc. itself uses the term generically in promotion of its apartment security systems:

> Our virtual doorman and video monitor systems are essential for good apartment security.

Obviously, virtual doorman is sufficiently defined in itself to not have required any further noun, which is the essence of an apt description or generic term.

Further, the principal words VIRTUAL and VIDEO of your client's generic term and of my client's trademark have different meanings.

VIRTUAL is defined on www.dictionary.com as "being such in power, force, or effect, though not actually or expressly such" and "temporarily simulated or extended by computer software." There is no suggestion of video there.

VIDEO is defined in the same dictionary as "of or pertaining to the electronic apparatus for producing the television picture" or "pertaining to or employed in the transmission or reception of television pictures." There is nothing "virtual" in that.

Of course, the words "virtual" and "video" have neither the same appearance nor the same pronunciation and clearly do not have the same meaning.

DOORMAN is of course a descriptive word understood by everyone. Other parties offer an identical doorman service combining the word doorman with another adjective, including CYBERDOORMAN, and my client's unique combination VIDEO DOORMAN.

You claim that my client has copied content from your client's web site. You have not identified such protected content. As you know, information is not proprietary, only its precise expression is.

The instances you describe are not any evidence of consumer or customer confusion. If someone asks whether the services offered under the trademark VIDEO DOORMAN are related to your client's services under the term VIRTUAL DOORMAN, that shows such persons were not confused as they wanted to know. Clearly, the parties' goods and services are competitive, and it is not unreasonable for someone to ask if there is any relationship between two entities who are marketing a similar product or service? That a trade publication may have made a mistake is not evidence of confusion, but evidence of the fact that your client's term is generic and so that one would expect that a publication would use the generic term for any supplier in the same industry.

00844183.WPD

## Ostrolenk, Faber, Gerb & Soffen, llp

June 1, 2007
Page 3

In view of all of the foregoing, there is no basis for any of your claims of infringement, nor for the demands made in your letter. Consequently, there is no reason to answer the demands.

I note that from the Patent and Trademark Office database that your client's application to register the trademark VIRTUAL DOORMAN was filed only in January 2007, six years after your client claims its first use of that generic term. The delay in acting is evidence of your client's recognition that the term is generic. In addition, the Office Action mailed to you May 2, 2007 from the U.S. Patent and Trademark Office requires a response, affording you the opportunity to inform the Examiner of the wide unregulated uses of the term VIDEO DOORMAN by others as a name for your service and the wider generic use of that term. Any registration at all that your client may ultimately obtain should be based upon full disclosure to the Patent and Trademark Office. Failure to make such full disclosure will of course make your client's trademark registration, if any, invalid and may subject your client to sanctions for misleading the Patent and Trademark Office by not informing them of the relevant facts bearing on the registerability of the term virtual doorman as a trademark or for propounding an infringement claim based upon an unprotectable, apt name for the client's product and service.

Very truly yours,

OSTROLENK, FABER, GERB & SOFFEN, LLP

Robert C. Faber

RCF:mjb
Enclosure

00844183.WPD

## CERTIFICATE OF SERVICE

I, Zeynel Karcioglu, Esq., attorney for the Plaintiff in this action hereby certify that a true and correct copy of the foregoing FIRST AMENDED COMPLAINT was served upon counsel for Defendants this 25ᵗʰ day of April, 2008, by First Class mail, postage prepaid, addressed as follows:

> ROBERT FABER, ESQ.
> Ostrolenk, Faber, Gerb & Soffen LLP
> 1180 Avenue of the Americas
> New York, New York 10036-8403

April 25, 2008

Zeynel Karcioglu

C

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 09/30/2008)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77067418**
**Filing Date: 12/19/2006**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77067418 |
| **MARK INFORMATION** | |
| *MARK | VIDEO DOORMAN |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | VIDEO DOORMAN |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | American Security Systems, Inc. |
| *STREET | 18 West 23rd Street |
| *CITY | New York |
| *STATE (Required for U.S. applicants) | New York |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 10010 |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | New York |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 042 |
| DESCRIPTION | Remote video monitoring system connected to a central station for monitoring or accepting deliveries of packages and other items |
| FILING BASIS | SECTION 1(b) |
| **ATTORNEY INFORMATION** | |
| NAME | Robert C. Faber |

| ATTORNEY DOCKET NUMBER | T/4366-3 V2226 |
|---|---|
| FIRM NAME | Ostrolenk, Faber, Gerb & Soffen, LLP |
| STREET | 1180 Avenue of the Americas |
| INTERNAL ADDRESS | 7th Floor |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10036 |
| PHONE | 212-382-0700 |
| FAX | 212-382-0888 |
| OTHER APPOINTED ATTORNEY | Samuel H. Weiner, Robert C. Faber, Max Moskowitz, James A. Finder, William O. Gray, III, Louis C. Dujmich, Charles P. LaPolla, Douglas A. Miro and Peter S. Sloane |

## CORRESPONDENCE INFORMATION

| NAME | Robert C. Faber |
|---|---|
| FIRM NAME | Ostrolenk, Faber, Gerb & Soffen, LLP |
| STREET | 1180 Avenue of the Americas |
| INTERNAL ADDRESS | 7th Floor |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10036 |
| PHONE | 212-382-0700 |
| FAX | 212-382-0888 |

## FEE INFORMATION

| NUMBER OF CLASSES | 1 |
|---|---|
| FEE PER CLASS | 325 |
| TOTAL FEE DUE | 325 |

## SIGNATURE INFORMATION

| SIGNATURE | /robert c faber/ |
|---|---|
| SIGNATORY'S NAME | Robert C. Faber |
| SIGNATORY'S POSITION | Attorney for Applicant |
| DATE SIGNED | 12/19/2006 |

| FILING INFORMATION SECTION | |
|---|---|
| SUBMIT DATE | Tue Dec 19 14:30:55 EST 2006 |
| TEAS STAMP | USPTO/BAS-216.195.203.66-20061219143055280063-7706 7418-360799167273e6fb5d64 089a770b97f7a62-CC-2194-2 0061219142224409980 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 09/30/2008)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77067418**
**Filing Date: 12/19/2006**

## To the Commissioner for Trademarks:

**MARK:** VIDEO DOORMAN (Standard Characters, see mark)
The literal element of the mark consists of VIDEO DOORMAN. The mark consists of standard characters, without claim to any particular font, style, size, or color.
The applicant, American Security Systems, Inc., a corporation of New York, having an address of 18 West 23rd Street, New York, New York, United States, 10010, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.
    International Class 042:  Remote video monitoring system connected to a central station for monitoring or accepting deliveries of packages and other items
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).
The applicant hereby appoints Robert C. Faber and Samuel H. Weiner, Robert C. Faber, Max Moskowitz, James A. Finder, William O. Gray, III, Louis C. Dujmich, Charles P. LaPolla, Douglas A. Miro and Peter S. Sloane of Ostrolenk, Faber, Gerb & Soffen, LLP, 7th Floor, 1180 Avenue of the Americas, New York, New York, United States, 10036 to submit this application on behalf of the applicant. The attorney docket/reference number is T/4366-3 V2226.
Correspondence Information:            Robert C. Faber
                                       7th Floor
                                       1180 Avenue of the Americas
                                       New York, New York 10036
                                       212-382-0700(phone)
                                       212-382-0888(fax)
A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).
### Declaration
The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.
Signature: /robert c faber/  Date Signed: 12/19/2006
Signatory's Name: Robert C. Faber
Signatory's Position: Attorney for Applicant
RAM Sale Number: 2194
RAM Accounting Date: 12/19/2006

Serial Number: 77067418
Internet Transmission Date: Tue Dec 19 14:30:55 EST 2006
TEAS Stamp: USPTO/BAS-216.195.203.66-200612191430552
80063-77067418-360799167273e6fb5d64089a7
70b97f7a62-CC-2194-20061219142224409980

# VIDEO DOORMAN

D

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 09/30/2008)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77076929**
**Filing Date: 01/05/2007**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77076929 |
| **MARK INFORMATION** | |
| *MARK | VIRTUAL DOORMAN |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | VIRTUAL DOORMAN |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Future Communications Corporation of New York d/b/a Virtual Service |
| *STREET | 104 W. 40th Street, 2nd Floor |
| *CITY | New York |
| *STATE (Required for U.S. applicants) | New York |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 10018 |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | New York |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 009 |
| DESCRIPTION | security and surveillance systems and software, including closed circuit cameras, audio and video equipment, biometrics equipment and devices, televisions, monitors, electronic monitoring, alarm monitoring, intercom devices, remote entry and locking equipment, access-control equipment and sensors, equipment used in connection with remote operation of HVAC, lighting, elevators and similar internal systems, alarms, sirens, lights, development of software and equipment related to the foregoing, installation, consulting, maintenance, monitoring, |

|  | and customization of the foregoing |
| --- | --- |
| FILING BASIS | SECTION 1(a) |
|    FIRST USE ANYWHERE DATE | At least as early as 04/01/2001 |
|    FIRST USE IN COMMERCE DATE | At least as early as 06/30/2001 |
| **ATTORNEY INFORMATION** | |
| NAME | Zeynel Karcioglu |
| FIRM NAME | Zeynel Karcioglu, Esq. |
| STREET | 36 East 20th Street, 6th Fl |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10003 |
| PHONE | 212-505-6933 |
| FAX | 646-219-4517 |
| EMAIL ADDRESS | zeynel@karcioglu-law.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Zeynel Karcioglu |
| FIRM NAME | Zeynel Karcioglu, Esq. |
| STREET | 36 East 20th Street, 6th Fl |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10003 |
| PHONE | 212-505-6933 |
| FAX | 646-219-4517 |
| EMAIL ADDRESS | zeynel@karcioglu-law.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 325 |
| TOTAL FEE DUE | 325 |

| SIGNATURE INFORMATION | |
|---|---|
| SIGNATURE | /zmk/ |
| SIGNATORY'S NAME | Zeynel Karcioglu |
| SIGNATORY'S POSITION | Attorney |
| DATE SIGNED | 01/05/2007 |
| **FILING INFORMATION SECTION** | |
| SUBMIT DATE | Fri Jan 05 15:13:01 EST 2007 |
| TEAS STAMP | USPTO/BAS-64.52.126.34-20 0701051513011804355-770769 29-36062c77c8c6573698dd8f c8ad783a8dc9-CC-41-200701 05144559653782 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 09/30/2008)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 77076929**
**Filing Date: 01/05/2007**

## To the Commissioner for Trademarks:

**MARK:** VIRTUAL DOORMAN (Standard Characters, see mark)
The literal element of the mark consists of VIRTUAL DOORMAN. The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Future Communications Corporation of New York d/b/a Virtual Service, a corporation of New York, having an address of 104 W. 40th Street, 2nd Floor, New York, New York, United States, 10018, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.

International Class 009:  security and surveillance systems and software, including closed circuit cameras, audio and video equipment, biometrics equipment and devices, televisions, monitors, electronic monitoring, alarm monitoring, intercom devices, remote entry and locking equipment, access-control equipment and sensors, equipment used in connection with remote operation of HVAC, lighting, elevators and similar internal systems, alarms, sirens, lights, development of software and equipment related to the foregoing, installation, consulting, maintenance, monitoring, and customization of the foregoing

Use in Commerce: The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, or the applicant's predecessor in interest used the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended.

In International Class 009, the mark was first used at least as early as 04/01/2001, and first used in commerce at least as early as 06/30/2001, and is now in use in such commerce. The applicant is submitting or will submit one specimen for *each class* showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services.

The applicant hereby appoints Zeynel Karcioglu of Zeynel Karcioglu, Esq., 36 East 20th Street, 6th Fl, New York, New York, United States, 10003 to submit this application on behalf of the applicant.

Correspondence Information:　　　　　　　Zeynel Karcioglu
36 East 20th Street, 6th Fl
New York, New York 10003
212-505-6933(phone)
646-219-4517(fax)
zeynel@karcioglu-law.com (authorized)

A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /zmk/   Date Signed: 01/05/2007
Signatory's Name: Zeynel Karcioglu
Signatory's Position: Attorney
RAM Sale Number: 41
RAM Accounting Date: 01/08/2007
Serial Number: 77076929
Internet Transmission Date: Fri Jan 05 15:13:01 EST 2007
TEAS Stamp: USPTO/BAS-64.52.126.34-20070105151301180
435-77076929-36062c77c8c6573698dd8fc8ad7
83a8dc9-CC-41-20070105144559653782

# VIRTUAL DOORMAN

F

# Zeynel Karcioglu, Esq.

Attorney-at-Law

36 East 20th St. 6th Fl.
New York, New York 10003
Telephone: (212) 505 - 6933
Fax: (646) 219 - 4517

May 21, 2007

*Via Certified Mail and Facsimile Transmission*
Robert C. Faber, Esq.
Ostrolenk, Faber, Gerb & Soffen, LLP
1180 Avenue of the Americas FL 7
New York, NY 10036-8401

Re:    *Infringement of Virtual Service's Intellectual Property Rights by*
       *Your Client American Security Systems, Inc.*

Dear Mr. Faber,

This firm represents Virtual Service; we are writing to demand that your client American Security Systems, Inc. ("American Security Systems") immediately stop selling, marketing and advertising services and products bearing the designation "Video Doorman" in the field of remote monitoring and security systems. Since at least as early as 2001, Virtual Service has used the trade and service mark VIRTUAL DOORMAN in the remote monitoring and security system industry, and has created strong brand recognition and goodwill in the VIRTUAL DOORMAN mark. Your client's use of "Video Doorman" and its doorman logo violates Virtual Service's intellectual property rights, and has created actual confusion as well as a likelihood of future consumer confusion.

It has further come to our attention that American Security Systems seeks to register the "Video Doorman," in the United States Patent and Trademark Office, has registered a domain name: www.videodoorman.com, and has copied *verbatim* content from Virtual Service's website and marketing materials in promoting and marketing its own products and services offered in connection with "Video Doorman" and the doorman logo. Given Virtual Service's strong brand recognition in the industry, and in light of the obvious similarities between VIRTUAL DOORMAN and "Video Doorman," as well as copying of the content from Virtual Service's web site, we believe that American Security Systems has willfully copied Virtual Service's marks and copyrighted materials.

The copying and infringement of Virtual Service's rights has very recently spurred several instances of consumer confusion, as customers and potential customers have inquired whether the goods and services offered under "Video Doorman" are related to Virtual Service's VIRTUAL DOORMAN goods and services, and whether the companies are somehow related. Furthermore, Virtual Service has encountered at least one trade publication that identified *your client* as offering VIRTUAL DOORMAN-branded goods and services. Your client's actions constitute violations of federal law, including copyright infringement, under 17 U.S.C. § 101 *et seq.*, unfair competition, and false advertising in violation of the U.S. Trademark Act, 15 U.S.C. § 1051 *et seq.* and other applicable state laws.

Virtual Service is prepared to take legal action if necessary to enforce its rights; however, it is willing to provide American Security Systems the opportunity to resolve this issue.

American Security Systems must immediately:

a)    cease and desist from any use of the trademark or service mark "Video Doorman," the "doorman logo," or any similar mark in connection with remote access and security systems sales, design, installation, monitoring, servicing, and other related services;

b)    immediately execute and file an express abandonment in the United States Patent and Trademark Office of the intent-to-use application for "Video Doorman" Ser. No. 77,067,418;

c)    surrender ownership of www.videodoorman.com;

d)    produce copies of all brochures, advertising and marketing materials for any goods and services bearing "Video Doorman" so that they may be destroyed.

e)    remove the "Video Doorman" mark from any goods and packaging in your client's possession;

f)    provide a complete list of all companies, entities or individuals who have been sent marketing materials or products bearing "Video Doorman" so that corrective advertising may be undertaken.

Kindly comply with our demand immediately so that no further steps need be taken in connection with your client's infringing use of "Video Doorman." In the absence of American Security Systems' full compliance by June 5, 2007, Virtual Service reserves all of its rights to take appropriate action against your client, including filing a lawsuit in federal court. If such a lawsuit is necessary, Virtual Service will seek all available relief under federal and New York state law, including injunctive relief, an accounting of profits, trebled damages, attorney's fees and court costs.

We look forward to American Security System's timely and complete response. The demands made herein are not made to the exclusion of other rights or remedies to which Virtual Service is entitled, and nothing in this letter, nor any act or omission by Virtual Service, shall be construed as a waiver of any right or remedy possessed by Virtual Service, all of which are expressly reserved.

Very truly yours,

Zeynel Karcioglu

cc: Cristine Morettin

G

# OSTROLENK, FABER, GERB & SOFFEN, LLP

1180 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10036-8403
TEL 212 382 0700  FAX 212 382 0888  FAX 212 398 0681
email@ostrolenk.com

**PARTNERS**

SAMUEL H. WEINER
ROBERT C. FABER
MAX MOSKOWITZ
JAMES A. FINDER
WILLIAM O. GRAY, III
LOUIS C. DUJMICH
CHARLES P. LAPOLLA
DOUGLAS A. MIRO

PETER S. SLOANE
KOUROSH SALEHI**

**ASSOCIATES**

JOEL J. FELBER**
DOUGLAS Q. HAHN
MICHAEL I. MARKOWITZ
KEITH J. BARKAUS
JEFF KIRSHNER
ART C. CODY
AIMEE M. ALLEN
DAVID J. TORRENTE

DODIVA N. GRANT*
VICTOR A. GROSSMAN

**OF COUNSEL**

MARTIN PFEFFER
LAWRENCE A. HOFFMAN
MARTIN J. BERAN
PAUL GRANDINETTI*
MARK A. FARLEY
GEORGE BRIEGER
BELLA KARAKIS
STEPHEN J. QUIGLEY

JOSPEH M. MANAK

**WASHINGTON OFFICE**
1725 K STREET, N. W.
WASHINGTON, D.C. 20006
TEL 202 457 7785
FAX 202 429 8919

*DC BAR
**CONNECTICUT BAR

June 1, 2007

Zeynel Karcioglu, Esq.
36 East 20th Street, 6th Floor
New York, New York 10003

Re:   Claim of Infringement against American Securities Systems, Inc.
OFGS Ref: T/4366-3

Dear Mr. Karcioglu:

This responds to your letter of May 21, 2007 addressed to me as the attorney for American Security Systems Inc. You complain that my client's unique trademark VIDEO DOORMAN is an infringement of your client's alleged trademark VIRTUAL DOORMAN. Briefly, the two terms that you would describe as trademarks do not have the same spelling, do not have same appearance, do not have the same pronunciation, do not have the same meaning and anyone who claims confusion has not exercised the due care in reading the names that a reasonable customer of these important, expensive services is likely to exercise.

The primary reason why your claim is without merit, is that the term virtual doorman is not your client's exclusive property, nor can it be the property of anyone, because the term has become generic of the service your client is performing under that description. A name or term is generic when it is an apt name for the product or service and/or when it is used in that manner by more than one unrelated user.

Several enclosed entries from the Internet show wide use of the generic term virtual doorman by numerous different entities in a descriptive manner, showing thereby that the term is an apt description of the service or goods under that name. In these enclosures, no further description is provided as to the meaning of the virtual doorman services, as none is apparently deemed necessary by the many users of that generic term. Several entities claim to have

00844183.WPD

## OSTROLENK, FABER, GERB & SOFFEN, LLP

June 1, 2007
Page 2

developed or to have proprietary rights in a virtual doorman system including UPS and Mailboxes Etc.

Perhaps not surprisingly, Virtual Services, Inc. itself uses the term generically in promotion of its apartment security systems:

> Our virtual doorman and video monitor systems are essential for good apartment security.

Obviously, virtual doorman is sufficiently defined in itself to not have required any further noun, which is the essence of an apt description or generic term.

Further, the principal words VIRTUAL and VIDEO of your client's generic term and of my client's trademark have different meanings.

VIRTUAL is defined on www.dictionary.com as "being such in power, force, or effect, though not actually or expressly such" and "temporarily simulated or extended by computer software." There is no suggestion of video there.

VIDEO is defined in the same dictionary as "of or pertaining to the electronic apparatus for producing the television picture" or "pertaining to or employed in the transmission or reception of television pictures." There is nothing "virtual" in that.

Of course, the words "virtual" and "video" have neither the same appearance nor the same pronunciation and clearly do not have the same meaning.

DOORMAN is of course a descriptive word understood by everyone. Other parties offer an identical doorman service combining the word doorman with another adjective, including CYBERDOORMAN, and my client's unique combination VIDEO DOORMAN.

You claim that my client has copied content from your client's web site. You have not identified such protected content. As you know, information is not proprietary, only its precise expression is.

The instances you describe are not any evidence of consumer or customer confusion. If someone asks whether the services offered under the trademark VIDEO DOORMAN are related to your client's services under the term VIRTUAL DOORMAN, that shows such persons were not confused as they wanted to know. Clearly, the parties' goods and services are competitive, and it is not unreasonable for someone to ask if there is any relationship between two entities who are marketing a similar product or service? That a trade publication may have made a mistake is not evidence of confusion, but evidence of the fact that your client's term is generic and so that one would expect that a publication would use the generic term for any supplier in the same industry.

00844183.WPD

OSTROLENK, FABER, GERB & SOFFEN, LLP

June 1, 2007
Page 3

In view of all of the foregoing, there is no basis for any of your claims of infringement, nor for the demands made in your letter. Consequently, there is no reason to answer the demands.

I note that from the Patent and Trademark Office database that your client's application to register the trademark VIRTUAL DOORMAN was filed only in January 2007, six years after your client claims its first use of that generic term. The delay in acting is evidence of your client's recognition that the term is generic. In addition, the Office Action mailed to you May 2, 2007 from the U.S. Patent and Trademark Office requires a response, affording you the opportunity to inform the Examiner of the wide unregulated uses of the term VIDEO DOORMAN by others as a name for your service and the wider generic use of that term. Any registration at all that your client may ultimately obtain should be based upon full disclosure to the Patent and Trademark Office. Failure to make such full disclosure will of course make your client's trademark registration, if any, invalid and may subject your client to sanctions for misleading the Patent and Trademark Office by not informing them of the relevant facts bearing on the registerability of the term virtual doorman as a trademark or for propounding an infringement claim based upon an unprotectable, apt name for the client's product and service.

Very truly yours,

OSTROLENK, FABER, GERB & SOFFEN, LLP

Robert C. Faber

RCF:mjb
Enclosure

00844183.WPD

H

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number: **ESTTA190318**

Filing date: **02/01/2008**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

## Notice of Opposition

Notice is hereby given that the following party opposes registration of the indicated application.

## Opposer Information

| | |
|---|---|
| Name | Future Communications Corporation of New York d/b/a Virtual Service |
| Granted to Date of previous extension | 02/02/2008 |
| Address | 104 W. 40th Street 2nd Floor<br>New York, NY 10018<br>UNITED STATES |

| | |
|---|---|
| Attorney information | Zeynel Karcioglu<br>Zeynel Karcioglu, Esq.<br>36 East 20th Street<br>New York, NY 10003<br>UNITED STATES<br>zeynel@karcioglu-law.com Phone:212.505.6933 |

## Applicant Information

| | | | |
|---|---|---|---|
| Application No | 77067418 | Publication date | 12/04/2007 |
| Opposition Filing Date | 02/01/2008 | Opposition Period Ends | 02/02/2008 |
| Applicant | American Security Systems, Inc.<br>5-44 50th Avenue<br>Long Island City, NY 11101<br>UNITED STATES | | |

## Goods/Services Affected by Opposition

Class 045. First Use: 2007/04/00 First Use In Commerce: 2007/04/00
All goods and services in the class are opposed, namely: electronic monitoring of building entry ways for security purposes, namely, remote video monitoring through a system connected to a central station for monitoring or accepting deliveries of packages and other items

## Grounds for Opposition

| | |
|---|---|
| Priority and likelihood of confusion | Trademark Act section 2(d) |

## Mark Cited by Opposer as Basis for Opposition

| | | | |
|---|---|---|---|
| U.S. Application No. | 77076929 | Application Date | 01/05/2007 |
| Registration Date | NONE | Foreign Priority Date | NONE |
| Word Mark | VIRTUAL DOORMAN | | |
| Design Mark | | | |

| Description of Mark | "VIRTUAL" |
|---|---|
| Goods/Services | Class 009. First use: First Use: 2001/04/01 First Use In Commerce: 2001/06/30 |
| | Security and surveillance systems, namely, audio and video equipment in the nature of video monitors, surveillance cameras, video intercoms, modems and routers, video code cards, speakers, microphones, intercoms, software for operating and interacting with surveillance systems; security and surveillance computer programs for the enabling or prevention of building access; biometrics equipment, namely, biometrics scanners for locking and unlocking entryways and permitting use of systems; remote entry and locking equipment in the nature of biometric locks and locks controlled over IP; proximity sensors; security and surveillance systems, namely, electronic regulating and control devices for remote operation of HVAC, lighting, elevators, alarms, sirens, gates, locks, audio video equipments, such as televisions, stereos, computers, telephones, all for residential buildings and homes; security and surveillance systems, namely, electronic regulating and control devices for the same; none of the above for use with vehicles |
| | Class 037. First use: First Use: 2001/04/01 First Use In Commerce: 2001/06/30 |
| | Installation and maintenance of security systems |
| | Class 045. First use: First Use: 2001/04/01 First Use In Commerce: 2001/06/30 |
| | Monitoring security and surveillance systems |

| Attachments | 77076929#TMSN.jpeg ( 1 page )( bytes ) |
|---|---|
| | Notice of Opposition - VIDEO DOORMAN.pdf ( 7 pages )(214545 bytes ) |

# Certificate of Service

The undersigned hereby certifies that a copy of this paper has been served upon all parties, at their address record by First Class Mail on this date.

| Signature | /zk/ |
|---|---|
| Name | Zeynel Karcioglu |
| Date | 02/01/2008 |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

In the matter of Application Serial No. 77/067,418 for the
Mark VIDEO DOORMAN
Published in the Official Gazette December 4, 2007

_____x

FUTURE COMMUNICATIONS CORPORATION
OF NEW YORK d/b/a VIRTUAL SERVICE

                    Opposer,

        v.

AMERICAN SECURITY SYSTEMS, INC.

                    Applicant

_____x

NOTICE OF OPPOSITION

Future Communications Corporation of New York, d/b/a/ VIRTUAL SERVICE, a New

York Corporation, having a place of business at 104 W. 40th Street, 2nd Floor New York, New

York 10018 ("Opposer" or "Virtual Service") believes that it will be damaged by the registration

of the application for VIDEO DOORMAN, Serial Number 77/067,418, published in the Official

Gazette December 4, 2007, and hereby opposes said application.

As grounds for its opposition, Opposer, by its attorney, Zeynel Karcioglu, Esq., an

attorney in good standing admitted to practice in the State of New York, alleges, upon its own

knowledge, or otherwise upon information and belief, as follows:

1.      Commencing long prior to Applicant's filing date of December 19, 2006, Opposer

has continuously and consistently used the mark VIRTUAL DOORMAN in connection with the

advertising, promotion and sale of its security and surveillance systems, hardware and software

related to these systems, as well installation and monitoring services in connection with the
same.

    2.      Opposer has expended large sums of money and great time and effort in
developing, using, advertising and promoting the VIRTUAL DOORMAN mark and the products
and services associated with that mark across the United States.

    3.      Opposer's mark is distinctive, and further, as a result of the Opposer's
expenditures, promotion, and use of the mark, has acquired even greater distinctiveness,
tremendous strength, goodwill, as well as purchaser recognition among the public, relevant
consumers, and competitors in Opposer's industry and market.

    4.      The relevant consuming public has come to know and associate Opposer's
security and surveillance systems, and  installation and monitoring services with the VIRTUAL
DOORMAN mark.

    5.      Opposer applied for registration of VIRTUAL DOORMAN January 5, 2007
based on actual use in commerce long before Applicant's filing date.

    6.      Opposer's Application, Serial No. 77/076,929 for VIRTUAL DOORMAN covers
International Classes 009 for "Security and surveillance systems, namely, audio and video
equipment in the nature of video monitors, surveillance cameras, video intercoms, modems and
routers, video code cards, speakers, microphones, intercoms, software for operating and
interacting with surveillance systems; security and surveillance computer programs for the
enabling or prevention of building access; biometrics equipment, namely, biometrics scanners
for locking and unlocking entryways and permitting use of systems; remote entry and locking
equipment in the nature of biometric locks and locks controlled over IP; proximity sensors;
security and surveillance systems, namely, electronic regulating and control devices for remote

operation of HVAC, lighting, elevators, alarms, sirens, gates, locks, audio video equipments, such as televisions, stereos, computers, telephones, all for residential buildings and homes; security and surveillance systems, namely, electronic regulating and control devices for the same; none of the above for use with vehicles;" Class 037 for "Installation and maintenance of security systems," and 045 for "Monitoring security and surveillance systems," with dates of first use in commerce listed at least as early as June 30, 2001.

7.      Applicant seeks to register the mark VIDEO DOORMAN in International Class 045 in connection with "electronic monitoring of building entry ways for security purposes, namely, remote video monitoring through a system connected to a central station for monitoring or accepting deliveries of packages and other items." All of these goods and services listed in Applicant's application are opposed.

8.      The VIDEO DOORMAN mark that Applicant seeks to register is confusingly similar to Opposer's VIRTUAL DOORMAN mark in appearance, pronunciation and overall impression.

9.      Furthermore, the services recited in Applicant's application are in the same International Class as certain of Opposer's goods, namely Class 045; moreover, Applicant's claimed services are substantially similar and related in nature to Opposer's aforesaid goods and services, and are likely to be promoted through the same and/or similar media, similar and/or overlapping channels of trade, and are likely to be directed at the same, or similar consumers.

10.     Applicant initially filed its application for VIDEO DOORMAN on an "Intent to Use in Commerce" Basis in December 2006, and has since claimed use in commerce as of April 2007.

11.    Applicant's filing date and claimed date of first use in commerce are subsequent to Opposer's date of first use of VIRTUAL DOORMAN.

12.    Applicant's filing date and claimed date of first use in commerce are also long after Opposer's VIRTUAL DOORMAN mark became well-known and recognized in the industry, among both consumers and competitors in the relevant market.

13.    Applicant had actual knowledge of Opposer's superior rights in VIRTUAL DOORMAN. In 2004, Opposer attended an industry trade show that was also attended by Applicant. At that trade show, Opposer Virtual Service prominently displayed the VIRTUAL DOORMAN product and services.

14.    At the 2004 trade show, representatives of Applicant approached Opposer, discussed the VIRTUAL DOORMAN product and services, and sought to discuss the possibility that the two companies could work together in some fashion.

15.    Nothing came of this meeting, and the parties did not enter into any agreement, contract, or joint venture of any kind, particularly regarding the VIRTUAL DOORMAN mark.

16.    Since that time, however, Applicant has sought to register VIDEO DOORMAN in Class 045, which application's entire goods and services recital is the subject of this Opposition.

17.    Upon information and belief, Applicant had actual knowledge of Opposer's prior rights in and to VIRTUAL DOORMAN before adopting and seeking to register VIDEO DOORMAN for competing services, and seeks to harm Opposer by doing so.

18.    Furthermore, Opposer is likely to be harmed by registration of Applicant's application, as the Examining Attorney for Opposer's application has indicated that, if Applicant's application proceeds to registration, registration may be refused Opposer's

VIRTUAL DOORMAN due to a likelihood of confusion with Applicant's mark under Section 2(d).

19.     When applied to Applicant's goods and services, Applicant's VIDEO DOORMAN mark is likely to cause confusion or mistake, or to deceive persons and consumers by creating the erroneous impression that Applicant's goods and services originate with, or come from the same source as Opposer's goods and services, or that they are endorsed by, sponsored by or connected in some way with Opposer, resulting in a likelihood of confusion under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

20.     Since long before Applicant's application, Opposer Virtual Service has used trademarked slogans in connection with its VIRTUAL DOORMAN mark, such as being a "TOTAL SECURITY SOLUTIONS" Provider; Opposer also uses the trademarked slogans "TECHNOLOGY FOR EASY LIVING," "SAME SERVICES AS A DOORMAN, BUT FOR A FRACTION OF THE COST," as well as a Doorman Logo it uses in connection with its products.

21.     Applicant, in addition to its bad faith application for VIDEO DOORMAN, has also mimicked the use of slogans and logos confusingly similar to Opposer's, including adopting a similar doorman logo and similar slogans, claiming that its product functions just like an actual "DOORMAN, BUT FOR A FRACTION OF THE COST."

22.     In fact, Applicant's specimen submitted in connection with its application contains not only the confusingly similar, junior VIDEO DOORMAN designation, but also the Opposer's slogan "TOTAL SECURITY SOLUTIONS PROVIDER" at the bottom of the page.

23.     Applicant's use, as described above, further increases the likelihood of confusion, and harm to Opposer if Applicant's application is permitted to register.

24.    Opposer has superior rights of a prior user in the mark VIRTUAL DOORMAN, and if the Application is granted, Opposer would be wrongly damaged as Applicant would be granted rights inconsistent with Opposer's rights.  Furthermore, Opposer, who possesses superior rights,  will be wrongly damaged if its own, senior, mark is not permitted to register due to Applicant's registration.

25.    By reason of the foregoing, Opposer will likely to be harmed by registration of Application Serial No. 77/067,418 for the mark VIDEO DOORMAN for use in connection with the goods and services set forth in its application in Class 045, and also any and all goods or services directly competing with, or closely related to goods and services used and sought to be registered by Opposer.

WHEREFORE, in light of the foregoing, Opposer respectfully requests that this opposition be sustained and that the registration sought by Applicant in Application Serial No. 77/067,418 be denied in its entirety.

Dated: February 1, 2008

ZEYNEL KARCIOGLU, ESQ.

By:    _____/s/_____.

Zeynel Karcioglu
Attorney for Opposer Virtual Service
36 East 20th Street
New York, NY 10003
(212) 505 - 6933

**CERTIFICATE OF SERVICE**

I hereby certify that this 1st day of February, 2008, a copy of the foregoing was served by First Class mail and overnight courier upon Registrant, to the attention of :

> **ROBERT C. FABER**
> **OSTROLENK, FABER, GERB & SOFFEN, LLP**
> **1180 AVENUE OF THE AMERICAS FL 7**
> **NEW YORK, NY 10036-8401**

Dated:  New York, NY
        February, 1, 2008

_____/s/_____
Zeynel Karcioglu, Esq.

E

| To: | Future Communications Corporation of New ETC. (zeynel@karcioglu-law.com) |
| Subject: | TRADEMARK APPLICATION NO. 77076929 - VIRTUAL DOORMAN - N/A |
| Sent: | 5/2/2007 7:49:44 PM |
| Sent As: | ECOM113@USPTO.GOV |
| Attachments: | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |
| | Attachment - 21 |
| | Attachment - 22 |
| | Attachment - 23 |
| | Attachment - 24 |
| | Attachment - 25 |
| | Attachment - 26 |
| | Attachment - 27 |
| | Attachment - 28 |
| | Attachment - 29 |
| | Attachment - 30 |
| | Attachment - 31 |
| | Attachment - 32 |
| | Attachment - 33 |
| | Attachment - 34 |
| | Attachment - 35 |
| | Attachment - 36 |
| | Attachment - 37 |
| | Attachment - 38 |
| | Attachment - 39 |
| | Attachment - 40 |
| | Attachment - 41 |
| | Attachment - 42 |
| | Attachment - 43 |
| | Attachment - 44 |

### [Important Email Information]
## UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:**    77/076929

**APPLICANT:**    Future Communications Corporation of New ETC.

# *77076929*

**CORRESPONDENT ADDRESS:**
>      ZEYNEL KARCIOGLU
>      ZEYNEL KARCIOGLU, ESQ.
>      36 EAST 20TH STREET, 6TH FL
>      NEW YORK, NY 10003

**RETURN ADDRESS:**
Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451

**MARK:**    VIRTUAL DOORMAN

**CORRESPONDENT'S REFERENCE/DOCKET NO:**  N/A

**CORRESPONDENT EMAIL ADDRESS:**
>      zeynel@karcioglu-law.com

Please provide in all correspondence:

1. Filing date, serial number, mark and
   applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and
   Law Office number.
4. Your telephone number and e-mail address.

# OFFICE ACTION

**RESPONSE TIME LIMIT**:  TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE MAILING OR E-MAILING DATE.

**MAILING/E-MAILING DATE INFORMATION:**  If the mailing or e-mailing date of this Office action does not appear above, this information can be obtained by visiting the USPTO website at http://tarr.uspto.gov/, inserting the application serial number, and viewing the prosecution history for the mailing date of the most recently issued Office communication.

Serial Number  77/076929

The assigned trademark examining attorney has reviewed the referenced application and has determined the following:

### Section 2(d) - Likelihood of Confusion Refusal

Registration of the proposed mark is refused because of a likelihood of confusion with the marks in U.S. Registration Nos. 1429983 and 2971488.  Trademark Act Section 2(d), 15 U.S.C. §1052(d); TMEP §§1207.01 *et seq*.  See the enclosed registrations.

Trademark Act Section 2(d) bars registration where an applied-for mark so resembles a registered mark that it is likely, when applied to the goods and/or services, to cause confusion, mistake or to deceive the potential consumer as to the source of the goods and/or services. TMEP §1207.01. The Court in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973), listed the principal factors to consider in determining whether there is a likelihood of confusion. Among these factors are the similarity of the marks as to appearance, sound, meaning and commercial impression, and the relatedness of the goods and/or services. The overriding concern is to prevent buyer confusion as to the source of the goods and/or services. *In re Shell Oil Co.*, 992 F.2d 1204, 1208, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993). Therefore, any doubt as to the existence of a likelihood of confusion must be resolved in favor of the registrant. *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463, 6 USPQ2d 1025 (Fed. Cir. 1988); *Lone Star Mfg. Co. v. Bill Beasley, Inc.*, 498 F.2d 906, 182 USPQ 368 (C.C.P.A. 1974).

As to U.S. Registration No. 1429983:

The applicant's mark, VIRTUAL DOORMAN, is highly similar to the registered mark, THE DOORMAN. The marks share the identical dominant wording "DOORMAN."

Although, the marks are compared in their entireties under a Section 2(d) analysis, one feature of a mark may be recognized as more significant in creating a commercial impression. Greater weight is given to that dominant feature in determining whether there is a likelihood of confusion. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985); *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693 (C.C.P.A. 1976). *In re J.M. Originals Inc.*, 6 USPQ2d 1393 (TTAB 1987); TMEP §1207.01(b)(viii).

Disclaimed matter is typically less significant or less dominant when comparing marks. Although a disclaimed portion of a mark certainly cannot be ignored, and the marks must be compared in their entireties, one feature of a mark may be more significant in creating a commercial impression. *In re Dixie Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997); *In re National Data Corporation*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985); and *In re Appetito Provisions Co. Inc.*, 3 USPQ2d 1553 (TTAB 1987). *See also Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ 2d 1001 (Fed. Cir. 2002); *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693 (C.C.P.A. 1976); *In re El Torito Rests. Inc.*, 9 USPQ2d 2002 (TTAB 1988); *In re Equitable Bancorporation*, 229 USPQ 709 (TTAB 1986). In this case, the word "virtual" in the applicant's mark is descriptive and, therefore, less significant. Applicant will be required to disclaim the descriptive wording "virtual," as discussed below.

Regarding the issue of likelihood of confusion, the question is not whether people will confuse the marks, but whether the marks will confuse people into believing that the goods they identify come from the same source. *In re West Point-Pepperell, Inc.*, 468 F.2d 200, 175 USPQ 558 (C.C.P.A. 1972). For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison. The question is whether the marks create the same overall impression. *Recot, Inc. v. M.C. Becton*, 214 F.2d 1322, 54 USPQ2d 1894, 1890 (Fed. Cir. 2000); *Visual Information Inst., Inc. v. Vicon Indus. Inc.*, 209 USPQ 179 (TTAB 1980). The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks. *Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b). Here, it is the dominant identical wording "DOORMAN" in the marks that creates the same commercial impression making it likely that consumers would believe that the goods come from the same source. The addition of the article "the" in the registrant's mark fails to obviate the similarity between the marks.

Turning to a comparison of the applicant's goods and services and registrant's goods, if the goods or services of the respective parties are closely related, the degree of similarity between marks required to support a finding of likelihood of confusion is not as great as would apply with diverse goods or services. *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992), *cert. denied* 506 U.S. 1034 (1992); *In re J.M. Originals Inc.*, 6 USPQ2d 1393 (TTAB 1987); *ECI Division of E-Systems, Inc. v. Environmental Communications Inc.*, 207 USPQ 443 (TTAB 1980); TMEP §1207.01(b).

In this case the applicant's goods are "security and surveillance systems and software, including closed circuit cameras, audio and video equipment, biometrics equipment and devices, televisions, monitors, intercom devices, remote entry and locking equipment, access-control equipment and sensors, equipment used in connection with remote operation of HVAC, lighting, elevators and similar internal systems, alarms, sirens, lights." Applicant's services are "electronic monitoring, alarm monitoring, development of software and equipment related to the foregoing, installation, consulting, maintenance, monitoring, and customization of the foregoing."

The registrant's goods are "electronic coded access and security system for vehicles which comprises a touchpad assembly, and electronic programmable control unit, with wire harness and accessories associated therewith including relays, impact sensors, display unit, beeper, etc."

Likelihood of confusion is determined on the basis of the goods or services as they are identified in the application and the registration. *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 n.4 (Fed. Cir. 1993); *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991); *Octocom Systems Inc. v. Houston Computer Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990). Since the identification of the applicant's goods and services is very broad, it is presumed that the application encompasses all goods and services of the type described, including those goods in the registrant's more specific identification, that they move in all normal channels of trade and that they are available to all potential customers. TMEP §1207.01(a)(iii).

Applicant's security systems may include access and security systems for vehicles. Moreover, applicant's services related to monitoring, development, installation, maintenance and consulting in the field of security might include monitoring, development, installation, maintenance and consulting in the field of security systems used with vehicles.

Please also note the attached copies of printouts from the USPTO X-Search database, which show third-party registrations of marks used in connection with the same or similar goods and/or services as those of applicant and registrant in this case. These printouts have probative value to the extent that they serve to suggest that the goods and services listed therein are of a kind that may emanate from a single source. *See In re Infinity Broad. Corp.*, 60 USPQ2d 1214, 1217-1218 (TTAB 2001); *In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993); *In re Mucky Duck Mustard Co., Inc.*, 6 USPQ2d 1467, 1470 at n.6 (TTAB 1988).

<u>As to U.S. Registration No. 2971488</u>:

The applicant's mark, VIRTUAL DOORMAN, is highly similar to the registered mark, DIGITAL DOORMAN.

As previously discussed, although, the marks are compared in their entireties under a Section 2(d) analysis, one feature of a mark may be recognized as more significant in creating a commercial impression. Greater weight is given to that dominant feature in determining whether there is a likelihood of confusion. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985); *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693 (C.C.P.A. 1976). *In re J.M.*

*Originals Inc.*, 6 USPQ2d 1393 (TTAB 1987); TMEP §1207.01(b)(viii).

Disclaimed matter is typically less significant or less dominant when comparing marks. Although a disclaimed portion of a mark certainly cannot be ignored, and the marks must be compared in their entireties, one feature of a mark may be more significant in creating a commercial impression. *In re Dixie Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997); *In re National Data Corporation*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985); and *In re Appetito Provisions Co. Inc.*, 3 USPQ2d 1553 (TTAB 1987). *See also Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ 2d 1001 (Fed. Cir. 2002); *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693 (C.C.P.A. 1976); *In re El Torito Rests. Inc.*, 9 USPQ2d 2002 (TTAB 1988); *In re Equitable Bancorporation*, 229 USPQ 709 (TTAB 1986).   In this case, the word "virtual" in the applicant's mark is descriptive and, therefore, less significant.  Applicant will be required to disclaim the descriptive wording "virtual," as discussed below.  The registrant has disclaimed the descriptive wording "digital."

Regarding the issue of likelihood of confusion, the question is not whether people will confuse the marks, but whether the marks will confuse people into believing that the goods they identify come from the same source. *In re West Point-Pepperell, Inc.*, 468 F.2d 200, 175 USPQ 558 (C.C.P.A. 1972).  For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison.  The question is whether the marks create the same overall impression. *Recot, Inc. v. M.C. Becton*, 214 F.2d 1322, 54 USPQ2d 1894, 1890 (Fed. Cir. 2000); *Visual Information Inst., Inc. v. Vicon Indus. Inc.*, 209 USPQ 179 (TTAB 1980).  The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks. *Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b).  Here, it is the dominant identical wording "DOORMAN" in the marks that creates the same commercial impression making it likely that consumers would believe that the goods come from the same source.

Again, turning to a comparison of the applicant's goods and services and registrant's goods, if the goods or services of the respective parties are closely related, the degree of similarity between marks required to support a finding of likelihood of confusion is not as great as would apply with diverse goods or services. *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992), *cert. denied* 506 U.S. 1034 (1992); *In re J.M. Originals Inc.*, 6 USPQ2d 1393 (TTAB 1987); *ECI Division of E-Systems, Inc. v. Environmental Communications Inc.*, 207 USPQ 443 (TTAB 1980); TMEP §1207.01(b).

Likelihood of confusion is determined on the basis of the goods or services as they are identified in the application and the registration. *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 n.4 (Fed. Cir. 1993); *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991); *Octocom Systems Inc. v. Houston Computer Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990).  Since the identification of the applicant's goods and services is very broad, it is presumed that the application encompasses all goods and services of the type described, including those goods in the registrant's more specific identification, that they move in all normal channels of trade and that they are available to all potential customers. TMEP §1207.01(a)(iii).

The applicant's goods and services are listed above.  The registrant's goods are, in part, "computer hardware for data collection, verification, signature capture and communication; computer software for reading and verifying age, identity and other information from identification cards, obtaining consumer consent to the use of consumer information; computer software for managing parking maintenance and control, monitoring the security of premises, and cataloguing and managing the inventory of assets for the maintenance of facilities."

Applicant's security and surveillance systems may include computer hardware and software for data collection, verification, signature capture and communication, as well as for managing parking and inventory and monitoring security of premises. Moreover, applicant's services related to the monitoring, development, installation, maintenance and consulting in the field of security might include monitoring, development, installation, maintenance and consulting in connection with the computer hardware and software of the registrant.

Please again refer to the attached copies of printouts from the USPTO X-Search database, which show third-party registrations of marks used in connection with the same or similar goods and/or services as those of applicant and registrant in this case which support the determination that the goods and services listed therein are of a kind that may emanate from a single source. *See In re Infinity Broad. Corp.,* 60 USPQ2d 1214, 1217-1218 (TTAB 2001); *In re Albert Trostel & Sons Co.,* 29 USPQ2d 1783, 1785-86 (TTAB 1993); *In re Mucky Duck Mustard Co., Inc.,* 6 USPQ2d 1467, 1470 at n.6 (TTAB 1988).

In sum, the applicant's mark is highly similar to the registered marks, creating the same commercial impression. Applicant's goods and services are identical or closely related to the registrants' goods. Any doubt regarding a likelihood of confusion is resolved in favor of the prior registrant. *Hewlett-Packard Co. v. Packard Press Inc.,* 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002); *In re Hyper Shoppes (Ohio), Inc.,* 837 F.2d 463, 6 USPQ2d 1025 (Fed. Cir. 1988); TMEP §§1207.01(d)(i). Accordingly, registration must be refused under Trademark Act Section 2(d), 15 U.S.C. §1052(d); TMEP §§1207.01 *et seq.*

Although the trademark examining attorney has refused registration, applicant may respond to the refusal to register by submitting evidence and arguments in support of registration.

Notwithstanding the foregoing refusal, applicant should also note the following information regarding a potentially conflicting mark in a prior-filed pending application that may present a bar to registration.

## Possible Conflicting Mark – Prior Pending Application

Information regarding pending Application Serial No. 77067418 is enclosed. The filing date of the referenced application precedes applicant's filing date. There may be a likelihood of confusion under Trademark Act Section 2(d) between applicant's mark and the referenced mark. If the referenced application registers, registration may be refused in this case under Section 2(d). 37 C.F.R. §2.83; TMEP §§1208 *et seq.* Therefore, upon entry of a response to this Office action, action on this case may be suspended pending final disposition of the earlier-filed application.

If applicant believes that there is no potential conflict between this application and the earlier-filed application, then applicant may present arguments relevant to the issue in a response to this Office action. The election not to submit arguments at this time in no way limits applicant's right to address this issue at a later point.

If applicant chooses to respond to the refusal to register, then applicant must also respond to the following requirements.

## Identification and Classification of Goods and Services

The wording "security and surveillance systems and software, including, audio and video equipment, biometrics equipment and devices, monitors, electronic monitoring, alarm monitoring, remote entry and locking equipment, access-control equipment and sensors, and equipment used in connection with remote operation of HVAC, lighting, elevators and similar internal systems, alarms, sirens, lights" in the identification of goods needs clarification because it is indefinite. The

identification of goods must be clarified because it includes the open-ended wording "including." The identification must be specific and all-inclusive. Therefore, this wording should be deleted and replaced with "namely." Additionally, applicant must use the common commercial names for the goods and avoid indefinite words such as "devices" and "equipment" unless the wording is following by a sufficient explanation of the nature of the goods.

Applicant may adopt any or all of the following suggestions, if accurate. TMEP §1402.01.

"Security and surveillance systems, namely, audio and video equipment in the nature of [*specify goods, e.g., speakers, microphones, etc.*]" in International class 9;

"Security and surveillance computer programs for the enabling of access or entrance control" in International class 9;

"Security and surveillance systems, namely, biometrics equipment and devices in the nature of [*specify goods, e.g., biometric fingerprint door lock, entry/exit security portal comprised of an electronic passageway equipped with biometric devices for identification verification and detection of impermissible items being carried through, etc.*]" in International class 9;

"Security and surveillance systems, namely, [*specify goods, e.g., television monitors, video monitors, computer monitors, etc.*]" in International class 9;

"Security and surveillance systems, namely, remote entry and locking equipment in the nature of [*specify goods, e.g., motorized door locks, etc.*]" in International class 7; [Applicant should note that locks may be classified in multiple International classes depending upon their material composition and use]

"Security and surveillance systems, namely, remote entry and locking equipment in the nature of [*specify goods, e.g., biometric fingerprint door lock, etc.*]" in International class 9;

"Security and surveillance systems, namely, access-control and alarm monitoring systems and sensors in the nature of [*specify goods, e.g., proximity sensors, temperature sensors, etc.*]" in International class 9;

"Security and surveillance systems, namely, electronic regulating and control devices for the remote operation of HVAC, lighting, elevators, alarms, sirens and lights" in International class 9; [Applicant should delete the indefinite wording "and similar internal systems"]

The wording "electronic monitoring, alarm monitoring, and development of software and equipment related to the foregoing, installation, consulting, maintenance, monitoring and customization of the foregoing" are services and, therefore, must be classified as such. The identification of services must also be clarified to explain what the wording "related to the foregoing" means as presented in the separate identification of services.

Applicant may adopt any or all of the following suggestions, if accurate. TMEP §1402.01.

"Installation and maintenance of security systems" in International class 37;

"Remote electronic and alarm monitoring services of heating, ventilating and air conditioning apparatus" in International class 42;

"Computer software development in the fields of security, surveillance and the remote operation of building systems" in International class 42;

"Custom design of computer software and hardware in the field of security and surveillance" in International class 42;

"Consulting in the field of security and surveillance systems" in International class 42;

"Monitoring security systems" in International class 45;

"Monitoring security and surveillance alarms" in International class 45;

The wording "security and surveillance systems, namely, closed circuit cameras, televisions, and intercom devices" is acceptable as written in International class 9.

Please note that, while the identification of goods and services may be amended to clarify or limit the goods and services, adding to the goods and services or broadening the scope of the goods and services is not permitted. 37 C.F.R. §2.71(a); TMEP §1402.06. Therefore, applicant may not amend the identification to include goods and services that are not within the scope of the goods and services set forth in the present identification.

For assistance with identifying and classifying goods and/or services in trademark applications, please see the online searchable *Manual of Acceptable Identifications of Goods and Services* at http://tess2.uspto.gov/netahtml/tidm.html.

If applicant prosecutes this application as a combined, or multiple-class application, then applicant must comply with each of the requirements below for those goods and services based on actual use in commerce under Trademark Act Section 1(a):

    (1)  Applicant must list the goods and services by international class with the classes listed in ascending numerical order;

    (2)  Applicant must submit a filing fee for each international class of goods and services not covered by the fee already paid (current fee information should be confirmed at http://www.uspto.gov); and

    (3)  For each additional class of goods and services, applicant must submit:

    (a)  dates of first use of the mark anywhere and dates of first use of the mark in commerce, or a statement that the dates of use in the initial application apply to that class; the dates of use, both anywhere and in commerce, must be at least as early as the filing date of the application;

    (b)  one specimen showing use of the mark for each class of goods and services; the specimen must have been in use in commerce at least as early as the filing date of the application;

(c)  a <u>statement</u> that "the specimen was in use in commerce on or in connection with the goods and services listed in the application at least as early as the filing date of the application;" and

(d)  <u>verification</u> of the statements in 3(a) and 3(c) in an affidavit or a signed declaration under 37 C.F.R. §2.20. (NOTE:  Verification is *not* required where (1) the dates of use for the added class are stated to be the same as the dates of use specified in the initial application, or (2) the original specimens are acceptable for the added class.)

37 C.F.R. §§2.6, 2.34(a), 2.59, 2.71(c), and 2.86(a); TMEP §§810, 904.09, 1403.01 and 1403.02(c).

The applicant has paid for one (1) International class.

The filing fee for adding classes to an application is as follows:

(1)  $325 per class, when the fees are submitted with a response filed online via the Trademark Electronic Application System (TEAS) at http://www.uspto.gov/teas/index.html; and

(2)  $375 per class, when the fees are submitted with a paper response.

37 C.F.R. §§2.6(a)(i) and (ii); TMEP §810.

### Specimen of Use Required for Each Class of Goods and Services

This application does not include a specimen for any of the identified classes of goods and services.  A specimen showing use of the mark in commerce for each class of goods and services is required for an application based on use of the mark in commerce under Trademark Act Section 1(a), 15 U.S.C. §1051(a).  TMEP §904.

Applicant must submit (1) a specimen (i.e., an example of how applicant actually uses its mark in commerce for the goods listed in the application) for each class of goods and services showing the mark as it is used in commerce, and, (2) a statement that "the specimen was in use in commerce at least as early as the filing date of the application," verified with an affidavit or signed declaration under 37 C.F.R. §2.20.  37 C.F.R. §2.56(a); TMEP §§904.01 *et seq.* and 904.09.

Examples of acceptable specimens for goods are tags, labels, instruction manuals, containers, photographs that show the mark on the goods or packaging, or displays associated with the goods at their point of sale.  TMEP §§904.04 *et seq.*

Examples of acceptable specimens for services are signs, photographs, brochures, website printouts or advertisements that show the mark used in the sale or advertising of the services.  TMEP §§1301.04 *et seq.*

### Disclaimer

Applicant must disclaim the descriptive wording "VIRTUAL" apart from the mark as shown because it merely describes the applicant's goods and services, namely, "security and surveillance systems and software, including closed circuit cameras, audio and video equipment, biometrics equipment and devices, televisions, monitors, electronic monitoring, alarm monitoring, intercom devices, remote entry and locking equipment, access-control equipment and sensors, equipment used in connection with remote operation of HVAC, lighting, elevators and similar internal systems, alarms, sirens, lights, development of software and equipment related to the foregoing, installation, consulting, maintenance, monitoring, and customization of the foregoing." Trademark Act Section 6, 15 U.S.C. §1056; TMEP §§1213 and 1213.03(a).

The word "virtual" is defined as "created, simulated, or carried on by means of a computer or computer network." See attached definition. The applicant's goods and services involve the use of computers or computer networks in providing security and surveillance systems and services as shown in applicant's identification of goods and services. As such, the wording "virtual" must be disclaimed.

Please also note the disclaimer statements in the attached third party registrations from the Office's X-SEARCH database which indicate that it is Office practice to treat the word "VIRTUAL" as descriptive or generic for the types of goods and services listed in the present application.

The computerized printing format for the Office's *Trademark Official Gazette* requires a standardized format for a disclaimer. TMEP §1213.08(a)(i). The following is the standard format used by the Office:

No claim is made to the exclusive right to use "VIRTUAL" apart from the mark as shown.

*See In re Owatonna Tool Co.*, 231 USPQ 493 (Comm'r Pats. 1983).

If the applicant has any questions or needs assistance responding to this Office action, please telephone the assigned examining attorney.

Christine H. Cooper /chc/

Trademark Attorney

United States Patent & Trademark Office

Law Office 113

(571) 272-9844

(571) 273-9113 fax

**NOTICE OF NEW PROCEDURE FOR E-MAILED OFFICE ACTIONS**: In late spring 2007, for any applicant who authorizes e-mail communication with the USPTO, the USPTO will no longer directly e-mail the actual Office action to the applicant. Instead, upon issuance of an Office action, the USPTO will e-mail the applicant a notice with a link/web address to access the Office action using Trademark Document Retrieval (TDR), which is located on the USPTO website at http://portal.uspto.gov/external/portal/tow. The Office action will <u>not</u> be attached to the e-mail notice. Upon receipt of the notice, the applicant can then view and print the actual Office action and any evidentiary attachments using the provided link/web address. TDR is available 24 hours a day, seven days a week, including holidays and weekends. This new process is intended to eliminate problems associated with e-mailed Office actions that contain numerous attachments.

**HOW TO RESPOND TO THIS OFFICE ACTION:**
- ONLINE RESPONSE: You may respond using the Office's Trademark Electronic Application System (TEAS) Response to Office action form available on our website at http://www.uspto.gov/teas/index.html. If the Office action issued via e-mail, you must wait 72 hours after receipt of the Office action to respond via TEAS. **NOTE: Do not respond by e-mail. THE USPTO WILL NOT ACCEPT AN E-MAILED RESPONSE.**
- REGULAR MAIL RESPONSE: To respond by regular mail, your response should be sent to the mailing return address above, and include the serial number, law office number, and examining attorney's name. **NOTE: The filing date of the response will be the *date of receipt in the Office*,** not the postmarked date. To ensure your response is timely, use a certificate of mailing. 37 C.F.R. §2.197.

**STATUS OF APPLICATION:** To check the status of your application, visit the Office's Trademark Applications and Registrations Retrieval (TARR) system at http://tarr.uspto.gov.

**VIEW APPLICATION DOCUMENTS ONLINE:** Documents in the electronic file for pending applications can be viewed and downloaded online at http://portal.uspto.gov/external/portal/tow.

**GENERAL TRADEMARK INFORMATION:** For general information about trademarks, please visit the Office's website at http://www.uspto.gov/main/trademarks.htm

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT THE ASSIGNED EXAMINING ATTORNEY SPECIFIED ABOVE.**

**Note:**

**In order to avoid size limitation constraints on large e-mail messages, this Office Action has been split into 2 smaller e-mail messages.  The Office Action in its entirety consists of this message as well as the following attachments that you will receive in separate messages:**

Email 1 includes the following 9 attachments
1. 76435016P001OF003
2. 76435016P002OF003
3. 76435016P003OF003
4. 77067418P001OF002
5. 77067418P002OF002
6. 73595432P001OF001
7. Virtual-1
8. Virtual-2
9. Virtual-3

Email 2 includes the following 35 attachments
1. Virtual-4
2. 74349121P001OF001
3. 74404023P001OF001
4. 74679996P001OF001
5. 75143752P001OF002
6. 75143752P002OF002
7. 75431962P001OF003
8. 75431962P002OF003
9. 75431962P003OF003
10. 75701354P001OF002
11. 75701354P002OF002
12. 75789391P001OF003
13. 75789391P002OF003
14. 75789391P003OF003
15. 75891411P001OF003
16. 75891411P002OF003
17. 75891411P003OF003
18. 76332379P001OF003
19. 76332379P002OF003
20. 76332379P003OF003
21. 76609961P001OF002

22. 76609961P002OF002
23. 78058419P001OF002
24. 78058419P002OF002
25. 78301880P001OF002
26. 78301880P002OF002
27. 78535846P001OF003
28. 78535846P002OF003
29. 78535846P003OF003
30. 78648089P001OF003
31. 78648089P002OF003
32. 78648089P003OF003
33. 78754288P001OF003
34. 78754288P002OF003
35. 78754288P003OF003

Please ensure that you receive all of the aforementioned attachments, and if you do not, please contact the assigned-examining attorney.

Print: May 2, 2007                          76435016

## DESIGN MARK

**Serial Number**
76435016

**Status**
REGISTERED

**Word Mark**
DIGITAL DOORMAN

**Standard Character Mark**
No

**Registration Number**
2971488

**Date Registered**
2005/07/19

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
2045448 ONTARIO LIMITED CORPORATION CANADA 101 FREDERICK STREET SUITE
810 KITCHENER ONTARIO N2H 6R2

**Goods/Services**
Class Status -- ACTIVE. IC 009. US 021 023 026 036 038. G & S:
Computer hardware for data collection, verification, signature capture
and communication; computer software for reading and verifying age,
identity and other information from identification cards, obtaining
consumer consent to the use of consumer information; computer software
for drafting electronic contracts and collecting electronic signatures
verifying agreement to such contracts; computer software for managing
parking maintenance and control, monitoring the security of premises,
and cataloguing and managing the inventory of assets for the
maintenance of facilities. First Use: 2002/08/22. First Use In
Commerce: 2004/02/03.

**Foreign Country Name**
CANADA

**Foreign Priority**
FOREIGN PRIORITY CLAIMED

-1-

**Print: May 2, 2007**                    **76435016**

**Foreign Application Number**
1147070

**Foreign Filing Date**
2002/07/16

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "DIGITAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
2002/07/26

**Examining Attorney**
LAMOTHE, LESLEY

**Attorney of Record**
D. Michael Bean

-2-

# DIGITAL DOORMAN

**Print: May 2, 2007**                    **77067418**

**DESIGN MARK**

**Serial Number**
77067418

**Status**
EXAMINER'S AMENDMENT/PRIORITY ACTION MAILED

**Word Mark**
VIDEO DOORMAN

**Standard Character Mark**
Yes

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
American Security Systems, Inc. CORPORATION NEW YORK 5-44 50th Avenue
Long Island City NEW YORK 11101

**Goods/Services**
Class Status -- ACTIVE.  IC 042.  US  100 101.  G & S: Remote video
monitoring system connected to a central station for monitoring or
accepting deliveries of packages and other items.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE VIDEO APART FROM THE
MARK AS SHOWN.

**Filing Date**
2006/12/19

**Examining Attorney**
HALMEN, KATHERINE E.

**Attorney of Record**
Robert C. Faber

VIDEO DOORMAN

Print: May 2, 2007                    73595432

**TYPED DRAWING**

**Serial Number**
73595432

**Status**
SECTION 8 & 15-ACCEPTED AND ACKNOWLEDGED

**Word Mark**
THE DOORMAN

**Standard Character Mark**
No

**Registration Number**
1429983

**Date Registered**
1987/02/24

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
SKY-TOP SUNROOFS, LTD. CORPORATION MISSOURI P.O. BOX 11385 CLAYTON
MISSOURI 63105

**Goods/Services**
Class Status -- ACTIVE.  IC 009.  US  019 021 026.  G & S: ELECTRONIC
CODED ACCESS AND SECURITY SYSTEM FOR VEHICLES WHICH COMPRISES A
TOUCHPAD ASSEMBLY, AND ELECTRONIC PROGRAMMABLE CONTROL UNIT, WITH WIRE
HARNESS AND ACCESSORIES ASSOCIATED THEREWITH INCLUDING RELAYS, IMPACT
SENSORS, DISPLAY UNIT, BEEPER, ETC.  First Use: 1985/12/23.  First Use
In Commerce: 1985/12/23.

**Filing Date**
1986/04/28

**Examining Attorney**
STINE, DAVID

**Attorney of Record**
ANNETTE P. HELLER

http://dictionary.reference.com/browse/virtual    05/02/2007 06:12:51 PM



Psych Test
I SAY: SDFYEWRHDBV
YOU THINK OF: [____] SUBMIT
ADVERTISEMENT

Top Web Results for "virtual"

Free download! Get instant dictionary, thesaurus, and encyclopedia access from your Windows programs with CleverKeys.

# 7 results for: *virtual*

[ Nearby Entries ]

View results from: Dictionary | Thesaurus | Encyclopedia | All Reference | the Web

Dictionary.com Unabridged (v 1.1) – Cite This Source

**vir·tu·al** 🔊 [vur-choo-uhl] Pronunciation Key - Show IPA Pronunciation

–*adjective*

1. being such in power, force, or effect, though not actually or expressly such: *a virtual dependence on charity.*
2. *Optics.*
   a. noting an image formed by the apparent convergence of rays geometrically, but not actually, prolonged, as the image formed by a mirror (opposed to REAL).
   b. noting a focus of a system forming virtual images.
3. temporarily simulated or extended by computer software: *a virtual disk in RAM; virtual memory on a hard disk.*

[Origin: 1350–1400; ME < ML *virtuālis,* equiv. to L *virtu(s)* VIRTUE + *-ālis* -AL]

—*Related forms*
**vir·tu·al·i·ty,** *noun*

Dictionary.com Unabridged (v 1.1)
Based on the Random House Unabridged Dictionary, © Random House, Inc. 2006.

American Heritage Dictionary – Cite This Source

**vir·tu·al** 🔊 /vûr'chōō-əl/ Pronunciation Key



Psych Test
I SAY: WARDROBE MALFUNCTION
YOU THINK OF:
[____]
SUBMIT

http://dictionary.reference.com/browse/virtual        05/02/2007 06:12:51 PM

**vir·tu·al** 🔊 🔊 (vûr′chōō-əl) Pronunciation Key
*adj.*
1. Existing or resulting in essence or effect though not in actual fact, form, or name: *the virtual extinction of the buffalo.*
2. Existing in the mind, especially as a product of the imagination. Used in literary criticism of a text.
3. *Computer Science* Created, simulated, or carried on by means of a computer or computer network: *virtual conversations in a chatroom.*

[Middle English virtuall, *effective,* from Medieval Latin virtualis, from Latin virtus, *excellence;* see virtue.]

**vir′tu·al′i·ty** (–ăl′i-tē) *n.*

*Usage Note:* When *virtual* was first introduced in the computational sense, it applied to things simulated by the computer, like *virtual memory*—that is, memory that is not actually built into the processor. Over time, though, the adjective has been applied to things that really exist and are created or carried on by means of computers. *Virtual conversations* are conversations that take place over computer networks, and *virtual communities* are genuine social groups that assemble around the use of e-mail, webpages, and other networked resources. · The adjectives *virtual* and *digital* and the prefixes *e–* and *cyber–* are all used in various ways to denote things, activities, and organizations that are realized or carried out chiefly in an electronic medium. There is considerable overlap in the use of these items: people may speak either of *virtual communities* or of *cybercommunities* and of *e-cash* or *cybercash.* To a certain extent the choice of one or another of these is a matter of use or convention (or in some cases, of finding an unregistered brand name), but there are certain tendencies. *Digital* is the most comprehensive of the words, and can be used for almost any device or activity that makes use of or is based on computer technology, such as a *digital camera* or a *digital network. Virtual* tends to be used in reference to things that mimic their "real" equivalents. Thus a *digital library* would be simply a library that involves information technology, whether a brick-and-mortar library equipped with networked computers or a library that exists exclusively in electronic form, whereas a *virtual library* could only be the latter of these. The prefix *e–* is generally preferred when speaking of the commercial applications of the Web, as in *e-commerce, e-cash,* and *e-business,* whereas *cyber–* tends to be used when speaking of the computer or of networks from a broader cultural point of view, as in *cybersex, cyberchurch,* and *cyberspace.* But like everything else in this field, such usages are evolving rapidly, and it would be rash to try to predict how these expressions will be used in the future.

(Download Now or Buy the Book)
The American Heritage® Dictionary of the English Language, Fourth Edition
Copyright © 2006 by Houghton Mifflin Company.
Published by Houghton Mifflin Company. All rights reserved.

Online Etymology Dictionary – Cite This Source
**virtual**
1398, "influencing by physical virtues or capabilities," from M.L. *virtualis,* from L. *virtus* "excellence, potency, efficacy," lit. "manliness, manhood" (see virtue). The meaning of "being something in essence or fact, though not in name" is first recorded 1654, probably via sense of "capable of producing a certain effect" (1432). Computer sense of "not physically existing but made to appear by software" is attested from 1959. *Virtually* (c.1430) originally meant "as far as essential qualities or facts are concerned;" sense of "in effect, as good as" is


ADVERTISEMENT

**Related ads:**
- Virtual Pet Fish
- Virtual Studio
- Virtual Office
- Virtual Dog
- Virtual Cat

🅿 Indicates premium content, which is available only to subscribers.

recorded from c.1600.

*Online Etymology Dictionary. © 2001 Douglas Harper*

---

WordNet - *Cite This Source*
**virtual**

*adjective*
1. being actually such in almost every respect; "a practical failure"; "the once elegant temple lay in virtual ruin"
2. existing in essence or effect though not in actual fact; "a virtual dependence on charity"; "a virtual revolution"; "virtual reality"

*WordNet® 3.0, © 2006 by Princeton University.*

---

Kernerman English Multilingual Dictionary (Beta Version) - *Cite This Source*
**virtual** ['ve:(r)tjuəl] *adjective.*
   almost (as described), though not exactly in every way
   Example: *a virtual collapse of the economy*

| | |
|---|---|
| *Arabic:* غْبِلُ فِعْلِيّ | *Latvian:* virtuāls |
| *Chinese (Simplified):* 事实上的 | *Lithuanian:* beveik visiškas |
| *Chinese (Traditional):* 事實上的 | *Norwegian:* nesten. så å si |
| *Czech:* praktický | *Polish:* pozorny |
| *Danish:* reel | *Portuguese (Brazil):* virtual |
| *Estonian:* virtuaalne | *Romanian:* virtual |
| *French:* quasi-total(e); virtuel, *-elle | *Russian:* фактический |
| *Greek:* εικονικός | *Slovak:* skutočný; možný |
| *Hungarian:* majdnem teljes | *Slovenian:* navidezen |
| *Indonesian:* hampir | *Spanish:* virtual |
| *Italian:* virtuale | *Swedish:* verklig, faktisk, egentlig |
| *Korean:* 사실상의, 실질적인 | *Turkish:* uygulamada, gerçekte, olası |

See also: virtual reality

*Kernerman English Multilingual Dictionary (Beta Version), © 2000-2006 K Dictionaries Ltd.*

---

Free On-line Dictionary of Computing - *Cite This Source*
**virtual** *jargon, architecture*
(Via the technical term virtual memory, probably from the term "virtual image" in optics) 1. Common alternative to logical; often used to refer to the artificial objects (like addressable virtual memory larger than physical memory) created by a computer system to help the system control access to shared resources.
2. Simulated; performing the functions of something that isn't really there. An imaginative child's doll may be a virtual playmate.
Opposite of real or physical.

Opposite of real or physical.
[The Jargon File]
(1994-11-30)

*The Free On-line Dictionary of Computing, © 1993-2007 Denis Howe*

*Jargon File* - Cite This Source
**virtual**

adj. [via the technical term `virtual memory', prob. from the term `virtual image' in optics] 1. Common alternative to logical; often used to refer to the artificial objects (like addressable virtual memory larger than physical memory) simulated by a computer system as a convenient way to manage access to shared resources. 2. Simulated; performing the functions of something that isn't really there. An imaginative child's doll may be a virtual playmate. Oppose real.

*Jargon File 4.2.0*



ADVERTISEMENT

Perform a new search, or try your search for "virtual" at:

- Amazon.com – Shop for books, music and more
- Reference.com   Encyclopedia Search
- Reference.com – Web Search powered by Google
- Thesaurus.com – Search for synonyms and antonyms

Get the Dictionary.com Toolbar for your browser – FREE download! From the makers of Dictionary.com

About Dictionary.com | Privacy Policy | Terms of Use | Link to Us | Contact Us
Copyright © 2007, Lexico Publishing Group, LLC. All rights reserved.

**Print: May 2, 2007**                      **74349121**

**TYPED DRAWING**

**Serial Number**
74349121

**Status**
REGISTERED AND RENEWED

**Word Mark**
VIRTUAL GIBBS

**Standard Character Mark**
No

**Registration Number**
1792465

**Date Registered**
1993/09/14

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
Gibbs System, Inc. DBA Gibbs and Associates CORPORATION CALIFORNIA 323
Science Drive Moorpark CALIFORNIA 93021

**Goods/Services**
Class Status -- ACTIVE.  IC 009.  US  038.  G & S: computer software
for computer-assisted design and computer-aided manufacturing.  First
Use: 1992/11/04.  First Use In Commerce: 1992/11/04.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
1993/01/15

**Examining Attorney**
TINGLEY JOHN C

**Attorney of Record**
Kathryn A. Heiberg

-1-

**Print: May 2, 2007**                    **74404023**

## TYPED DRAWING

**Serial Number**
74404023

**Status**
SECTION 8 & 15-ACCEPTED AND ACKNOWLEDGED

**Word Mark**
VIRTUAL RENDEZVOUS

**Standard Character Mark**
No

**Registration Number**
2091540

**Date Registered**
1997/08/26

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
Perkins, Charles L. INDIVIDUAL UNITED STATES 430 Broadway Cambridge
MASSACHUSETTS 02138

**Goods/Services**
Class Status -- ACTIVE.  IC 009.  US  021 023 026 036 038.  G & S:
computer software for interactive computer mediated communication in
virtual environments and user's manuals sold together therewith as a
unit.  First Use: 1997/01/09.  First Use In Commerce: 1997/01/09.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
1993/06/17

**Examining Attorney**
SANTOMARTINO, MARTHA

**Attorney of Record**
Heidi A. Schiller,

-1-

**Print: May 2, 2007**                               **74679996**

**TYPED DRAWING**

**Serial Number**
74679996

**Status**
SECTION 8 & 15-ACCEPTED AND ACKNOWLEDGED

**Word Mark**
VIRTUAL HOLD TECHNOLOGY

**Standard Character Mark**
No

**Registration Number**
2137640

**Date Registered**
1998/02/17

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
VIRTUAL HOLD TECHNOLOGY, LLC LTD LIAB CO DELAWARE 137 HERITAGE WOODS
DRIVE AKRON OHIO 44321

**Goods/Services**
Class Status -- ACTIVE.  IC 009.  US  021 023 026 036 038.  G & S:
automated telephone call-back systems comprised of computer software
and computers with telephony control cards.  First Use: 1997/01/02.
First Use In Commerce: 1997/10/28.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
1995/05/25

**Examining Attorney**
BILLINGS, JESSIE B.

**Attorney of Record**
James M. Moore

-1-

**Print: May 2, 2007**                          **75143752**

**TYPED DRAWING**

**Serial Number**
75143752

**Status**
REGISTERED

**Word Mark**
VIRTUAL MENTOR

**Standard Character Mark**
No

**Registration Number**
2432449

**Date Registered**
2001/03/06

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
EATON CORPORATION CORPORATION OHIO Eaton Center 1111 Superior Avenue
Cleveland OHIO 441142584

**Goods/Services**
Class Status -- ACTIVE.  IC 009.  US  021 023 026 036 038.  G & S:
electronic software for assisting in decision making by simplifying
computer diagnostics, performing prescribed computer operations and
reducing computer programming requirements.  First Use: 1996/05/21.
First Use In Commerce: 1996/05/21.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
1996/08/01

**Examining Attorney**
THOMPSON, LAVERNE

**Attorney of Record**

-1-

**Print: May 2, 2007**                    **75143752**

DANIEL S KALKA

**Print: May 2, 2007**                    **75431962**

**DESIGN MARK**

**Serial Number**
75431962

**Status**
REGISTERED

**Word Mark**
VIRTUAL POWER PLANT

**Standard Character Mark**
No

**Registration Number**
2489748

**Date Registered**
2001/09/18

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(3) DESIGN PLUS WORDS, LETTERS AND/OR NUMBERS

**Owner**
ENCORP OLDCO, INC. CORPORATION DELAWARE 9351 EASTMAN PARK DRIVE
WINDSOR COLORADO 80550

**Goods/Services**
Class Status -- ACTIVE.  IC 009.  US  021 023 026 036 038.  G & S:
COMPUTER HARDWARE AND COMPUTER SOFTWARE FOR THE CONTROL AND MANAGEMENT
OF GAS POWER, ELECTRICAL POWER AND ENERGY FOR USE IN ON-SITE POWER
GENERATION.  First Use: 1998/01/26.  First Use In Commerce:
1998/01/26.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL POWER PLANT"
APART FROM THE MARK AS SHOWN.

**Filing Date**
1998/02/10

**Examining Attorney**
BROWN, BARBARA

**Attorney of Record**

-1-

**Print: May 2, 2007**                    **75431962**

David Seeley



**Print: May 2, 2007**                          **75701354**

**TYPED DRAWING**

**Serial Number**
75701354

**Status**
REGISTERED

**Word Mark**
VIRTUAL TECHNICIAN

**Standard Character Mark**
No

**Registration Number**
2793211

**Date Registered**
2003/12/09

**Type of Mark**
SERVICE MARK

**Register**
SUPPLEMENTAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
Helius, Inc. CORPORATION UTAH 333 South 520 West Suite 330 Lindon UTAH
84042

**Goods/Services**
Class Status -- ACTIVE. IC 042. US 100 101. G & S: configuration
and maintenance services for computer software communications
products. First Use: 1999/02/00. First Use In Commerce: 1999/02/00.

**Goods/Services**
Class Status -- ACTIVE. IC 037. US 100 103 106. G & S:
configuration and maintenance services for computer hardware
communications products. First Use: 1999/02/00. First Use In
Commerce: 1999/02/00.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
1999/05/10

-1-

**Print: May 2, 2007**                    **75701354**

**Amended Register Date**
2002/01/09

**Examining Attorney**
FERRAIUOLO, DOMINIC J.

**Attorney of Record**
Bradley D. Blanche

-2-

**Print: May 2, 2007**                    **75789391**

**DESIGN MARK**

**Serial Number**
75789391

**Status**
REGISTERED

**Word Mark**
VIRTUAL TRUCK

**Standard Character Mark**
No

**Registration Number**
2383058

**Date Registered**
2000/09/05

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
BroadJump, Inc CORPORATION TEXAS 9715 Burnet Road Building 6, Suite
500 Austin TEXAS 78758

**Goods/Services**
Class Status -- ACTIVE. IC 009. US 021 023 026 036 038. G & S:
Computer software for use by global computer network service providers
to configure computer systems and enable access service to a global
computer information network. First Use: 1999/03/05. First Use In
Commerce: 1999/04/04.

**Goods/Services**
Class Status -- ACTIVE. IC 042. US 100 101. G & S: Computer
services, namely computer configuration, enabling access service,
technical support and consultation to global computer network services
providers. First Use: 1999/03/05. First Use In Commerce: 1999/04/04.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**

-1-

**Print: May 2, 2007**                    **75789391**

1999/08/31

**Examining Attorney**
MICHELI, ANGELA M.

**Attorney of Record**
Orlesia Duren

# VIRTUAL TRUCK

**Print: May 2, 2007**                    **75891411**

**DESIGN MARK**

**Serial Number**
75891411

**Status**
REGISTERED

**Word Mark**
VRA VIRTUAL RESEARCH ASSOCIATES

**Standard Character Mark**
No

**Registration Number**
2595133

**Date Registered**
2002/07/16

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(3) DESIGN PLUS WORDS, LETTERS AND/OR NUMBERS

**Owner**
Virtual Research Associates, Inc. CORPORATION MASSACHUSETTS 22
Georgian Road Weston MASSACHUSETTS 02493

**Goods/Services**
Class Status -- ACTIVE.  IC 009.  US  021 023 026 036 038.  G & S:
COMPUTER SOFTWARE FOR AUTOMATICALLY EXTRACTING INFORMATION REGARDING
EVENTS WORLDWIDE FROM ELECTRONIC NEWS, MESSAGE TRAFFIC, NEWS WIRE
REPORTS, FIELD SITUATION REPORTS AND INTELLIGENCE REPORTS, FOR
COMPILING THE EXTRACTED INFORMATION INTO EVENT DATA MATRICES IN
REAL-TIME, AND FOR INTERACTIVELY REPORTING, ANALYZING AND DISPLAYING
THE RESULTS IN TABLES, GRAPHS, TEXT AND MAPS.  First Use: 1999/10/00.
First Use In Commerce: 1999/10/00.

**Goods/Services**
Class Status -- ACTIVE.  IC 042.  US  100 101.  G & S: RESEARCH AND
ANALYSIS SERVICES, NAMELY, THE DEVELOPMENT AND ANALYSIS OF DATA
REGARDING EVENTS WORLDWIDE.  First Use: 1999/10/00.  First Use In
Commerce: 1999/10/00.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL RESEARCH

**Print: May 2, 2007**                    **75891411**

ASSOCIATES" APART FROM THE MARK AS SHOWN.

**Filing Date**
2000/01/07

**Examining Attorney**
WAHLBERG, STACY

**Attorney of Record**
Jean M. Tibbetts



virtual
research
associates

**Print: May 2, 2007**                    **76332379**

## DESIGN MARK

**Serial Number**
76332379

**Status**
REGISTERED

**Word Mark**
VIRTUAL CARE PROVIDER

**Standard Character Mark**
No

**Registration Number**
2878259

**Date Registered**
2004/08/31

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
Virtual Care Provider, Inc. CORPORATION WISCONSIN 111 West Michigan
Street Milwaukee WISCONSIN 53203

**Goods/Services**
Class Status -- ACTIVE.  IC 042.  US 100 101.  G & S: computer
services, namely, information technology consulting services, targeted
to the health care profession that focuses on creating appropriate IT
solutions for each client.  First Use: 2001/01/01.  First Use In
Commerce: 2001/01/01.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
2001/10/31

**Examining Attorney**
DUBOIS, SUSAN LESLIE

**Attorney of Record**

-1-

**Print: May 2, 2007**                    **76332379**

Carl R. Schwartz

VIRTUAL CARE PROVIDER

**Print: May 2, 2007**                      **76609961**

**DESIGN MARK**

**Serial Number**
76609961

**Status**
REGISTERED

**Word Mark**
VIRTUAL SENTRY

**Standard Character Mark**
Yes

**Registration Number**
3031252

**Date Registered**
2005/12/20

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Visentry, LLC LIMITED LIABILITY CORPORATION DELAWARE 17 Arcadian
Avenue, Suite 108 Paramus NEW JERSEY 07652

**Goods/Services**
Class Status -- ACTIVE. IC 045. US 100 101. G & S: MONITORING OF
SECURITY AND SURVEILLANCE SYSTEMS. First Use: 2004/08/23. First Use
In Commerce: 2004/08/23.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VIRTUAL" APART FROM
THE MARK AS SHOWN.

**Filing Date**
2004/08/30

**Examining Attorney**
BOULTON, KELLY

**Attorney of Record**
E. Page Wilkins

-1-

# VIRTUAL SENTRY

**Print: May 2, 2007**                    **78058419**

**TYPED DRAWING**

**Serial Number**
78058419

**Status**
REGISTERED

**Word Mark**
BE THERE. EVEN WHEN YOU'RE NOT.

**Standard Character Mark**
No

**Registration Number**
2631806

**Date Registered**
2002/10/08

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
Xanboo, Inc. CORPORATION NEW YORK 115 West 30th Street 6th Floor New
York NEW YORK 10001

**Goods/Services**
Class Status -- ACTIVE. IC 009. US 021 023 026 036 038. G & S:
Computer hardware; Internet management and automation system, namely,
computer software for remotely commanding or controlling any type of
device or appliance for homes and businesses over the Internet, and
the software features plug-and-play detectors and sensors as well as
remote command control devices; video and digital cameras; video and
digital cameras with built -in motion detectors; accessories with
control modules for alarms, appliances, doors, locks, thermostats,
windows and water, namely, electronic controlled modules for use un
alarms, appliances, doors, locks, thermostats, windows, and water;
electric and electronic sensors for detecting acoustic, temperature,
water, motion, contact, and power on/off changes. First Use:
2000/07/01. First Use In Commerce: 2001/02/10.

**Goods/Services**
Class Status -- ACTIVE. IC 042. US 100 101. G & S: Technical
support, namely, monitoring of network systems via a global computer

-1-

**Print: May 2, 2007**                    **78058419**

network an Internet management and automation system for homes and
businesses which features plug-and-play detectors and sensors as well
as remote command control devices, namely computer hardware and
software.  First Use: 2000/07/01.  First Use In Commerce: 2001/02/10.

**Filing Date**
2001/04/13

**Examining Attorney**
HAN, DAWN

**Attorney of Record**
Adriana E. Kierszenbaum

**Print: May 2, 2007**                    **78301880**

## TYPED DRAWING

**Serial Number**
78301880

**Status**
REGISTERED

**Word Mark**
BUY IT TODAY, BE PROTECTED TONIGHT

**Standard Character Mark**
No

**Registration Number**
3083477

**Date Registered**
2006/04/18

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(1) TYPED DRAWING

**Owner**
Lasershield Systems, Inc. CORPORATION NEVADA Suite 114 5931 Sea Lion
Place Carlsbad CALIFORNIA 92008

**Goods/Services**
Class Status -- ACTIVE. IC 009. US 021 023 026 036 038. G & S:
Security equipment, namely anti-theft alarms for residences, offices
and other buildings. First Use: 2004/10/17. First Use In Commerce:
2004/11/28.

**Goods/Services**
Class Status -- ACTIVE. IC 045. US 100 101. G & S: Monitoring
security systems, namely monitoring and surveillance of anti-theft
alarms for residences, offices, and other buildings. First Use:
2004/10/17. First Use In Commerce: 2004/11/28.

**Filing Date**
2003/09/17

**Examining Attorney**
DUBOIS, SUSAN LESLIE

-1-

**Print: May 2, 2007**                          **78301880**

**Attorney of Record**
Stephen R. Soden

**Print: May 2, 2007**                    **78535846**

## DESIGN MARK

**Serial Number**
78535846

**Status**
REGISTERED

**Word Mark**
SAFESCOUT

**Standard Character Mark**
Yes

**Registration Number**
3160383

**Date Registered**
2006/10/17

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Sentinel Vision, Inc. CORPORATION DELAWARE 1000 Elwell Court, Suite
200 Palo Alto CALIFORNIA 94303

**Goods/Services**
Class Status -- ACTIVE. IC 009. US 021 023 026 036 038. G & S:
security alarm and event notification systems comprised of monitors,
cameras, sirens, key fobs, and panic buttons for use in detecting,
monitoring, and alerting subscribers of building entry, building
intrusions, and building exits, and emergencies; intruder detection,
access control, and alarm monitoring systems; monitors for use in
detecting motion and in obtaining and sending image, audio, and text
alert information; battery chargers; sirens; batteries. First Use:
2006/01/27. First Use In Commerce: 2006/03/18.

**Goods/Services**
Class Status -- ACTIVE. IC 020. US 002 013 022 025 032 050. G & S:
non-metal key fob; non-metal security alarm and event notification
systems wall and ceiling mounts. First Use: 2006/01/27. First Use In
Commerce: 2006/03/18.

**Goods/Services**

-1-

**Print: May 2, 2007**                    **78535846**

Class Status -- ACTIVE.  IC 045.  US  100 101.  G & S: security alarm
and event notification services, namely monitoring alarms, and
detecting, monitoring, and alerting subscribers of building entry,
building intrusions, and building exits and emergencies; electronic
monitoring services of physical premises for security and emergency
purposes; notification services for emergency and physical premises
security purposes; home and business entry and exit notification
services, namely, monitoring alarms and alerting subscribers when
someone enters or leaves a building.  First Use: 2006/01/27.  First
Use In Commerce: 2006/03/18.

**Filing Date**
2004/12/20

**Examining Attorney**
EULIN, INGRID

**Attorney of Record**
Linda G. Henry

SAFESCOUT

**Print: May 2, 2007**                          **78648089**

**DESIGN MARK**

**Serial Number**
78648089

**Status**
REGISTERED

**Word Mark**
PROTECTION ONE

**Standard Character Mark**
No

**Registration Number**
3093237

**Date Registered**
2006/05/16

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(3) DESIGN PLUS WORDS, LETTERS AND/OR NUMBERS

**Owner**
Protection One Alarm Monitoring, Inc. CORPORATION DELAWARE 4221 WEST
JOHN CARPENTER FREEWAY IRVING TEXAS 75063

**Goods/Services**
Class Status -- ACTIVE. IC 009. US 021 023 026 036 038. G & S:
SECURITY ALARM SYSTEMS, NAMELY THEFT ALARMS NOT FOR USE ON VEHICLES,
ANTI-INTRUSION ALARMS, TEMPERATURE SENSORS, SMOKE DETECTORS, CARBON
MONOXIDE ALARMS, ELECTRONIC CONTROL PANELS AND VIDEO SURVEILLANCE
EQUIPMENT CONSISTING OF SECURITY CAMERAS AND CLOSED CIRCUIT
TELEVISIONS; ACCESS CONTROL AND ALARM MONITORING SYSTEMS CONSISTING OF
MAGNETIC ENCODED CARD READERS AND MAGNETIC IDENTIFYING CARDS. First
Use: 1992/06/30. First Use In Commerce: 1992/06/30.

**Goods/Services**
Class Status -- ACTIVE. IC 037. US 100 103 106. G & S:
INSTALLATION, REPAIR, AND MAINTENANCE OF SECURITY ALARMS, FIRE ALARMS,
CARBON MONOXIDE ALARMS, ELECTRONIC CONTROL PANELS AND VIDEO
SURVEILLANCE EQUIPMENT CONSISTING OF SECURITY CAMERAS AND CLOSED
CIRCUIT TELEVISIONS; INSTALLATION, REPAIR, AND MAINTENANCE OF ACCESS
CONTROL AND ALARM MONITORING SYSTEMS CONSISTING OF MAGNETIC ENCODED
CARD READERS AND MAGNETIC IDENTIFYING CARDS. First Use: 1992/06/30.

-1-

**Print: May 2, 2007**                          **78648089**

First Use In Commerce: 1992/06/30.

### Goods/Services
Class Status -- ACTIVE.  IC 045.  US  100 101.  G & S: ELECTRONIC
MONITORING SERVICES FOR SECURITY PURPOSES IN THE FIELD OF INTRUSION
DETECTION, FIRE DETECTION, AND CARBON MONOXIDE DETECTION; SECURITY
ALARM RESPONSE SERVICES; MONITORING TELEPHONE CALLS FROM SUBSCRIBERS
AND NOTIFYING EMERGENCY FACILITIES; ONLINE MONITORING, NAMELY VIDEO
MONITORING OF FACILITIES VIEWABLE THROUGH A GLOBAL COMPUTER NETWORK;
CONTROL OF BUILDING ENVIRONMENTAL ACCESS AND SECURITY SYSTEMS, NAMELY
REMOTE ADMINISTRATION OF MAGNETIC ENCODED CARD READERS AND MAGNETIC
IDENTIFYING CARDS VIA A GLOBAL COMPUTER NETWORK.  First Use:
1992/06/30.  First Use In Commerce: 1992/06/30.

### Prior Registration(s)
1541841;1686181;2091397

### Description of Mark
The mark consists of CIRCLE WITH SIGNAL WAVES.

### Filing Date
2005/06/10

### Examining Attorney
MILLER, MONIQUE

### Attorney of Record
CHRISTY L.E.  HUBBARD



**Print: May 2, 2007**      **78754288**

**DESIGN MARK**

**Serial Number**
78754288

**Status**
REGISTERED

**Word Mark**
SECURITY IN A BOX

**Standard Character Mark**
Yes

**Registration Number**
3158139

**Date Registered**
2006/10/17

**Type of Mark**
TRADEMARK; SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Lasershield Systems, Inc. CORPORATION NEVADA 277 E. Amador Suite 304
Las Cruces NEW MEXICO 88001

**Goods/Services**
Class Status -- ACTIVE. IC 009. US 021 023 026 036 038. G & S:
Security equipment, namely anti-theft alarms for residences, offices
and other buildings. First Use: 2005/11/08. First Use In Commerce:
2005/11/11.

**Goods/Services**
Class Status -- ACTIVE. IC 045. US 100 101. G & S: Monitoring
security systems, namely monitoring and surveillance of anti-theft
alarms for residences, offices, and other buildings. First Use:
2005/11/08. First Use In Commerce: 2005/11/11.

**Disclaimer Statement**
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SECURITY" APART FROM
THE MARK AS SHOWN.

**Filing Date**
2005/11/15

-1-

**Print: May 2, 2007**                    **78754288**

**Examining Attorney**
SOUDERS,MICHAEL

**Attorney of Record**
Stephen R. Soden

# SECURITY IN A BOX

I

FOCUS - 6 of 13 DOCUMENTS


Copyright 2001 The New York Times Company
The New York Times

April 22, 2001 Sunday
Late Edition - Final

**SECTION:** Section 11; Column 1; Real Estate Desk; Pg. 1

**LENGTH:** 398 words

**HEADLINE:** POSTINGS: At 61 North Moore Street in TriBeCa;
Virtual Doorman for New Condos

**BODY:**

Deliveries were nothing like this back in 1897 when 61 North Moore Street in TriBeCa -- soon to be marketed as 10 luxury condominium apartments -- was a fruit warehouse: a "virtual doorman" allowing an operator at an off-site alarm company to accept that Federal Express package, even when the resident is not at home.

Then there's the resident's ability to keep an eye on the baby sitter -- from his or her office.

"This whole building is wired," said William Fegan, the architect who designed the renovation, and the addition of two penthouse floors on what had been a six-story building. "We've installed a spine of cable through the building: fiber-optic lines, coaxial cable, multiple phone lines to each apartment."

Much has changed at the old building one block from the Hudson River; much has not. "It's an 1897 burnt-orange brickfront structure with large windows," Mr. Fegan said. "We've replaced the double-hung windows with wooden replicas of the originals. Where possible, we've kept all of the wood beams that rest on the cast-iron columns. We have retained the 10-foot high ceilings where possible, exposing the wood joists."

But the kitchens are "very modern," Mr. Fegan continued, "minimalist in design. This is no country kitchen, but it has everything: dual ovens, built-in stoves with a griddle in the middle. There are spacious bathrooms with stone-clad tubs."

The 10 apartments -- two floor-throughs, six duplexes and the two triplex penthouses -- range from 1,782 to 3,500 square feet and are priced between $1.5 million and $4 million, said Michael Chapman, vice president of Stribling Marketing Associates. "Each unit has a balcony or a terrace," he said, "and each penthouse has three terraces."

The developer, Tribeach Holdings L.L.C. of TriBeCa, bought the building in March 2000 from a private family, Mr. Chapman said, adding, "It was the Starbolin Electric Company, which sold used electrical parts." The purchase price was $6.7 million, and construction costs were about $6 million.

The cost of the virtual doorman, Mr. Fegan said, was $80,000. "If you forget your keys," he said, "you call the operator, who can see you and identify you from a picture in the computer. He'll ask for your password and let you in, all the way into your apartment. And you can add cameras in your apartment so that you can watch the baby sitter while you're at your office."

**URL:** http://www.nytimes.com

POSTINGS: At 61 North Moore Street in TriBeCa; Virtual Doorman for New Condos The New York Times April 22, 2001 Sunday

**GRAPHIC:** Drawing Two added floors make a triplex penthouse atop 19th century warehouse building. (Kiernan O'Brien)

**LOAD-DATE:** April 22, 2001

K



# The COOPERATOR
### The Co-op & Condo Monthly

Home | Current Issue | Archives | Directory | Expo | Contact Us

Home | 2007 | 2007 Dec | Technology Greeting You at Your Door
Home | Security | Technology Greeting You at Your Door

## Technology Greeting You at Your Door
Futuristic Doormen
By Keith Loria



When it comes to living in New York City, having a doorman in your condo or co-op is a luxury that almost everyone wishes they could have. A doorman has many functions, among them providing a sense of security and collecting packages for residents when they aren't home.

Istockphoto.com

A doorman building can be expensive though, and many smaller and mid-sized co-ops and condos can't afford to hire a full-time staff to monitor their entrance all day. Experts say that the cost of providing a 24/7 service runs between $70,000-$100,000 per year because at least three full-time workers are needed, as well as some part time help.

In many of these buildings it's not uncommon to see missed delivery stickers plastered all over the door or signs warning residents not to buzz strangers into the building. But when it comes to the latter, it's hard to feel safe when your neighbors can let anyone in at any time of day.

Luckily, modern technology has begun to offer a few more economical solutions. Many buildings in the city have taken advantage of automated doorman systems, which can replicate some of the doorman's most important functions.

"Having a virtual doorman adds value to a location because they provide a sense of security and more," says Jeffrey Bennett, a principal of R&B Development, which has used video doorman services in several of their New York condo projects. "People are starting to hear about virtual doormen and know what it offers. It gives the projects that much more and makes them more desirable."

## I See You
A "virtual" doorman basically can acknowledge and respond to a visitor or delivery person 24 hours a day, seven days a week, via an electronic intercom and live video feed that is manned at a central station.

With most of these systems, there is an intercom that is connected to a home base that allows or enables visitors, residents or delivery people to press a button and talk directly to an operator at the remote site.

An example of this would be if a UPS deliveryman buzzes tenant John Doe. Perhaps John's not home or doesn't want to answer; the call is then forwarded to the monitoring center and the request is handled from there. The UPS carrier may then be allowed into the building and guided towards the package room.

"By following the people, no one is going to steal anything," says Colin Foster, vice president of sales and marketing for Virtual Security Service, which produces the trademarked Virtual Doorman. "The systems allow for greater security and safety."

Thanks to the technology that these services offer, a resident will be informed of a delivery

### Building Operations
Management
Maintenance
Finance
Security
Insurance
Design
Communications
Energy Conservation

### On The Board
Board Operations
Board/Shareholder
Board/Management
Law & Legislation

### NYC Living
Neighborhoods
Buildings
Organizations
Real Estate Trends
Buying & Selling



Article Options
Email to Friend
Print Article
Remove from Favorites
Add to 'Articles to Read'

Comments

### Newspaper subscription



### Subscribe FREE
Subscribe to 'The Cooperator' newspaper - it is FREE.
Manage my subscriptions

### E-Mail Newsletter
Would you prefer receiving the summary of new articles by e-mail? Your E-Mail:

Sign Up

Manage my newsletter settings

### Poll

immediately by the operators, who can send an e-mail to the resident informing them about the delivery. Most services also keep a log of everyone who comes and goes into the building for the day. This allows the cable guy, locksmiths and service people into the building without needing someone on the staff present to let them in.

Some of the virtual doorman systems also allow residents to submit photographs of regular or future guests to be stored in the system's memory. If one of those people shows up when a tenant isn't home, they will be recognized and may then be allowed into the building.

"Access can be given to people from the remote site," Foster says. "It's something that people may not think about, but it saves so much hassle when you don't need to be home when a friend or family member arrives and they can still get into your building."

## Feeling Secure

It's not only deliveries that the video doormen are used for. They also provide residents with a greater sense of safety and security. Since someone is always there if needed, an operator can help someone coming home late get to their door without the fear or trepidation of having someone follow them.

"It's security with a live interface," says Larry Dolin, president of Manhattan-based American Securities Systems, Inc., which has trademarked the name Video Doorman for their service. "It's not there to be intrusive. If you don't want to be bothered, then don't press the button. But if a young woman is coming back from a date and wants to know that she is safe, the systems can monitor her all the way until she gets inside her door."

## Gaining Steam

Both new condo developments and older ones already in place are finding that the systems are very popular. They are an added amenity that has helped raise sales prices of the homes.

According to Dolin, his company's customer base is comprised of co-ops and condos too small to maintain the cost of a doorman year-round.

"The sweet spot is five to 40 apartments where they don't have the budgets to afford the doormen, but they want the doormen services," he says. "Mostly newer condos being developed add this in. As a matter of fact, it really adds value to a building." Dolin says that developers have told him they are getting 15 percent more for their properties by installing automated doorman technology from the outset.

"We have found that people are familiar with [the video doormen systems] today and it helps in attracting buyers," says Ross Berman, a partner with NY Citiwise LLC, a small development company in Manhattan that uses the Virtual Doorman product in three of their buildings. Citiwise specializes in boutique residential development, including condos with a small number of units where the buyers expect amenities typically associated with large-scale buildings. "We no longer have to pass the extra hundreds or thousand-plus dollars to our buyers to maintain a doorman," says Berman, "but we can still offer them the same, if not better, level of security and attention."

## But They Can't Say Good Morning

While it's true that an electronic doorman can't carry out some of the everyday functions of a human doorman, such as helping to carry packages or simply providing a friendly smile each day, the new automated and remote services aren't really designed to replace doormen outright.

"There is no replacement for a doorman," says Mason Wilson, vice president of Mount Vernon-based Apple Intercom and Electronics Inc. which offers a system called Virtual Concierge, "but our research has shown if you had to replace a doorman, the two things you would miss is convenience and security. That's why people are looking into them now. More and more people are seeing them around New York City, and co-ops and condos are inquiring about what's out there."

"It's really for people who never planned on having a doorman—this is an affordable option for them," adds Dolin.

Plus, when the holiday season rolls around, you don't need to tip a virtual doorman—and you don't have to worry about a doorman knowing (and possibly sharing) your business. Virtual systems can offer security while still maintaining the anonymity that you can't get with a human doorman watching every time you come and go.

## Money Matters

One major perk of virtual or automated doorman systems is that their operating costs can be up to 90 percent cheaper than a regular doorman. Initial installation and set-up costs run anywhere from a modest $12,500 to $60,000 for a system with all the bells and whistles.

While the building owns the equipment after installation, "There's a subscription [price] on top of that," Foster explains. Those subscription prices vary, but they are much cheaper than the cost of paying a live doorperson. According to the professionals, a ballpark price for virtual doorman monitoring service would be a few hundred dollars a month.

Included in that price is the cost of upkeep and maintenance of the system, meaning that automated doorman systems don't generally require any maintenance from a building's staff. It's usually all part of the monthly subscription, and if something should break, the call centers will know about it right away and dispatch someone to fix the problem.

Of course, nothing is likely to replace the iconic New York City doorman, in his or her crisp uniform, welcoming residents home and keeping an eye on things. But for buildings that find themselves wanting that security but lacking the capital to bring a full-time door staff aboard, going electronic might be a workable compromise.

*Keith Loria is a freelance writer and sports reporter living in Larchmont, New York.*

## Comments

No Comments Found.

| Write your comment |
| --- |

Your name
(optional):

**Your Comment**
(required):

Verification
(required):

z8q6z q

Please copy the characters from the image above into the text field below. Doing this helps us prevent automated submissions.

Submit

Please allow up to 1 business day for your comment to be approved.

L

FOCUS - 2 of 13 DOCUMENTS


Copyright 2007 The New York Times Company
The New York Times

December 23, 2007 Sunday
Late Edition - Final

**SECTION:** Section 11; Column 0; Real Estate Desk; Pg. 1

**LENGTH:** 2117 words

**HEADLINE:** Here's Looking At You

**BYLINE:** By VIVIAN S. TOY

**BODY:**

JIM CRAWFORD lives in an apartment building where he doesn't need a key to get past the locked front door. He presses a button on a key fob.

But when he lost that fob recently, all he had to do was walk up to the building, and before he reached the door a voice cheerfully boomed from the intercom, "Hey Jim, go right ahead," and the door buzzed quietly until he was safely inside.

The idea of a formless voice coming out of the ether to welcome him home didn't faze Mr. Crawford one bit. "I thought it was great," he said. "It means they recognize me immediately, and they're watching the building carefully."

"They" are the operators at Cyberdoorman, a virtual-doorman service based in the South Bronx. While monitoring the building from a remote location, virtual doormen can receive packages for residents by giving delivery people access to a locked package closet in the lobby, and they can also help keep out unwanted visitors, like the nanny who was just fired or the boyfriend who was just dumped.

Since virtual-doorman services first appeared in New York about seven years ago, the technology they use has improved significantly, making them more reliable and more widely accepted, especially by developers of new buildings. Using cameras and an Internet connection that sends the images to a monitoring center, a virtual doorman can see and talk to someone at the door, but the doorman can only be heard.

Virtual-doorman services have been installed mainly at buildings with fewer than 40 apartments, where a real doorman would be prohibitively expensive. Residents at some of the dozens of buildings that use these systems say that over time, they have developed friendly relationships with their virtual doormen. And like real doormen, the people who watch the monitors -- mostly women, in another twist on the profile of conventional doormen -- say that they too feel as though they've gotten to know some of their tenants.

Even though Kristen Drewry, who lives in an 11-unit building in Greenwich Village, has never met or even seen Jenneile Bonet, an operator who works the day shift at Cyberdoorman -- one of two established virtual-doorman services in the city -- the two speak to each other almost every day. Usually, Ms. Bonet is calling to tell Ms. Drewry about a package or is opening the door because Ms. Drewry can't find her key card, a plastic tag that she taps on an electronic reader to open the door.

"Jenneile is great," Ms. Drewry said. "I love her. She always knows who I am." She said she was actually surprised at how personal the service could be. "Considering it's just a computer and people on a phone, they're friendly and they know all the residents," she said.

People who are used to a doorman who can physically open the door, say "Good morning" and flag a taxi for them will be unimpressed, Ms. Drewry said. "If you need that personal touch, this isn't for you," she said. "But if you're not high maintenance and you don't want to worry about tips, then this is just right."

Ms. Drewry was not the only resident who felt relief at being freed from the anxiety-ridden exercise of holiday tipping. That is not to say, though, that virtual doormen are forgotten at holiday time. Nilka Dutton, who has been with Cyberdoorman since 2001, said that over the years, she and other operators had received Starbucks gift cards, personal checks and boxes of chocolate -- all from residents they had never met. "We don't expect it, but it's nice," she said.

Ms. Bonet, who has been a Cyberdoorman operator for three years, said: "Most of the tenants are really awesome people, and we talk to everybody as if they're a friend or someone you work with. But we have our favorite tenants, people who we have a lot in common with."

There's the insurance adjuster who has an office in a mixed-use building in Yonkers who is named Evan, just like Ms. Bonet's 9-month old son. "He'll say what a great name it is," Ms. Bonet said. And then there's Sabrina Smith, a Greenwich Village resident whom Ms. Bonet speaks to regularly and who also has a young child. "She's such a lovely woman," Ms. Bonet said.

For her part, Ms. Smith said that she had used Cyberdoorman in a variety of ways and that Ms. Bonet had been one of the most familiar and most friendly voices there. Aside from receiving packages, Ms. Bonet has also received dining room chairs for her by directing deliverymen to leave the chairs outside Ms. Smith's apartment door.

Cyberdoorman also helped Ms. Smith and her husband entertain one night when they had a party for about 70 people. With the guest list in hand, Cyberdoorman screened and let in all the guests, leaving the couple to concentrate on the party.

Ms. Smith recalled one instance where Cyberdoorman made her feel particularly well cared for. It was in the middle of the night, shortly after she had moved into the building last summer. The building's fire alarm went off, and Ms. Smith was home alone with her baby daughter. She stood in the lobby pondering whether it might be another false alarm, when her cellphone rang. "It was someone from Cyberdoorman, and she said, 'Ms. Smith, you look really worried; it'll be all right,'" she said, adding that it was a virtual pat on the shoulder that came at the perfect moment.

Still, while a virtual doorman can be close to the real thing, the system is vulnerable in an extended power failure or Internet disruption. Either occurrence would be the equivalent of an unexpected and fully enforced doorman strike. And if a building had only electronically controlled doors and none with keyed locks, residents could be completely locked out.

Colin Foster, a vice president at Virtual Doorman, another New York-based system, said his company, which has its monitoring center in Maine, recently had to dispatch a locksmith to drill holes in a front door lock after a leak shorted out all the equipment. "There was no one in the building to come down and open the door, and no one that we reached had a key," he said. "No question, a blackout is a weakness in the system."

Virtual-doorman systems can range from very basic services with a few cameras and an Internet connection that allow the operators to watch a front door and accept packages, to space-age operations with biometric readers that scan fingerprints for entry or electronic tags that don't even have to be taken out of a pocket to open a door -- an E-ZPass, of sorts, for humans. Depending on the level of sophistication and the number of cameras, the services cost $10,000 to $70,000 for installation and $6,000 to $30,000 in annual maintenance.

Here's Looking At You The New York Times December 23, 2007 Sunday

When not dealing with residents or delivery people they know, Cyberdoorman operators will answer a buzz at the front door with a reference to the building like: "Welcome to Folio House; how may I help you?" And Virtual Doorman operators respond with, "This is your Virtual Doorman; how may I help you?"

In addition to being a convenience for tenants, virtual-doorman services can increase property values. Jonathan Miller, an executive vice president of Radar Logic and its director of research, said apartments with an attended lobby could expect about a 12 percent premium on sale prices over comparable apartments in nondoorman buildings.

"A virtual doorman is probably about halfway between not having a doorman and having a fully tended lobby," Mr. Miller said, "because you don't have a human being physically there, but you do get human interaction."

Timothy Crowley, the managing director of FLAnk, a development group that specializes in smaller buildings and that has used Cyberdoorman in its projects, said having enough employees for full-time doorman service would cost more than $250,000 a year, which "in a small building would be a crushing expense, so this is a neat solution for what otherwise would be a nondoorman building."

But Matthew Nerzig, a spokesman for the doormen's union, Local 32BJ of the Service Employees International Union, argued that "while cyberdoormen offer building managers a way to cut costs, they obviously can't compete with actual doorman when it comes to providing professional service and security to tenants."

For most buildings, a doorman -- either real or virtual -- gives residents a sense of safety. But Mr. Crowley of FLAnk said he believed that in some ways, a virtual doorman could make a building safer than a real doorman. "Whatever a virtual doorman lacks in arms and legs, it makes up for in security," he said. "If someone's up to no good, a virtual doorman can lock down a building."

Ross Berman, a principal at New York Citiwise, a developer using Virtual Doorman in some of its projects, said a virtual doorman could immediately notify a resident of a delivery by phone, e-mail or text message, "but a real doorman couldn't do that without leaving his station."

Twenty-four-hour surveillance cameras can also provide visual records of any criminal wrongdoing. Both Cyberdoorman and Virtual Doorman have provided the police with video to help in investigations.

Seth Barcus, a systems designer at Best Monitoring, the security company that created Cyberdoorman, said the company had provided video of break-ins in garages and of vandalism. "There was also a case where someone had broken into something like 40 buildings, and we had cameras in four of those buildings," he said. "This was a pro, and he got into a door within four seconds and looked like he used a key."

Donna Lieberman, executive director of the New York Civil Liberties Union, said video from building surveillance cameras could be helpful in criminal investigations, but she also said that buildings should have protocols for when video is released, to protect residents from wrongful disclosure. "The concern is that videotapes might be turned over to government to reveal innocent comings and goings of people that are inappropriately a target -- say political opponents, for example," she said.

In many buildings, co-op boards have requested cameras in places like elevators, hallways and garages, but Cyberdoorman does not monitor those cameras constantly. "We want to avoid being Big Brother," Mr. Barcus said, "and we try not to look at the cameras that might intrude on people's private lives."

Video images, however, are kept for up to 100 days. Co-op boards have on occasion asked Cyberdoorman to retrieve incriminating video for things of a less than criminal nature, like a broken garage gate, a lobby Christmas tree that kept mysteriously getting moved and "things of a sexual nature happening inside an elevator." Mr. Barcus said that the offender often "winds up being a resident in the building, and if we have to speak to them about it, they'll say: 'Wow, I didn't even know there was a camera there. That was stupid, wasn't it?'"

Here's Looking At You The New York Times December 23, 2007 Sunday

Toby A. Ten Eyck, a sociologist at Michigan State University, said the growing acceptance of virtual-doorman services says something about urban living. "We're always in crowds in the city," he said, "so people are always watching us at a certain level. Now technology allows us to have cameras everywhere watching what we do, and what's interesting is we've gotten to the point where we don't care that we're being watched. We actually like it."

Which is why residents can find it reassuring when a virtual doorman they have never met calls them by name and opens the door for them, he said. "It's the 'Cheers' mentality of being somewhere where everybody knows your name," he said, referring to the television show about a Boston bar and its regular customers. "Especially in a city where you're pretty much an anonymous figure, you just feel good when people know who you are."

As to whether virtual doormen can replace real doormen, Ms. Bonet's husband, Kevin, who is a doorman on Park Avenue, gives a vehement no. "It's better when there's somebody at the door and not someone sitting in a building somewhere else," he said.

He is quick to add, though, that he has watched his wife at work and is awed by the way she effortlessly monitors up to 17 buildings on four plasma screens.

The couple live in a nondoorman building, and when asked if they would rather live in a building with a doorman or a virtual doorman, both voted for the virtual one. She said she liked the reliability of video surveillance records. And he said, given all the comings and goings he sees, a virtual doorman offers more privacy. "With people watching your door, they tend to know your business more," he said.

He figures not knowing and not having to face the person behind the camera can be a real plus.

**URL:** http://www.nytimes.com

**GRAPHIC:** PHOTOS: ON CALL: Jenneile Bonet, an operator at Cyberdoorman, has struck up relationships with a number of the residents in the buildings she monitors. She knows them by sight, and they recognize her voice. Virtual-doorman technology can include biometric readers that scan fingerprints, below left, or a key fob for entry to buildings. (PHOTOGRAPHS BY MARILYNN K. YEE/THE NEW YORK TIMES) (pg. RE8)
LONG ISLAND CITY, QUEENS: A deliveryman awaits entry. WINGATE, BROOKLYN: An independent-living center is one client. YONKERS: The package room is under observation. GREENWICH VILLAGE: Cyberdoorman watches the mail room. (PHOTOGRAPHS OF SECURITY COMPANY MONITORS BY MARILYNN K. YEE/THE NEW YORK TIMES
DOORMAN PHOTOGRAPH BY RUTH FREMSON/THE NEW YORK TIMES) (pg. RE1)

**LOAD-DATE:** December 23, 2007

M





NYC Weather
62° CLOUDY

Tuesday, April 01, 2008
Last Update: 04:49 PM EDT

CARS
JOBS
REAL ESTATE
DATING

Recent

CLASSIFIEDS

Real Estate Home Property Search Dream Homes Houses of the Week Real Estate Blog



Get the Best Value in Broadband
Verizon High Speed Internet    $12.99 per month*
First Month FREE                * for months 2-6 with 1-year agreement

Get Connected

Prudential Douglas Elliman
A COLLECTION
OF PROPERTIES

Thousands of
fine properties
on the market in
New York City,
Long Island,
and the Hamptons

# JUST SOLD!

THE LATEST INFO ABOUT RECENT SALES - IN YOUR
BACK YARD AND BEYOND

March 27, 2008 —

**Manhattan**

CHELSEA $3,175,000

135 W. 14th St.

Two-bedroom, two-bath, full-floor condo, 2,050 square feet with automated lighting and shades, Toto Neorest toilets, Bulthaup kitchen and outdoor space; Loft 14 building features virtual doorman and keyed elevator. Common charges $1,171, taxes $966. Asking price $3,175,000, on market four weeks. Broker: David Gergely, Core Group Marketing

GRAMERCY $740,000

305 E. 24th St.

Two-bedroom, one-bath corner co-op, 950 square feet, with renovated bath, windowed kitchen with dishwasher and N/E exposures; building features doorman, garage and laundry. Maintenance $1,148, 51 percent tax-deductible. Asking price $799,000, on market 30 weeks. Broker: Jay Moldshever, Citi Habitats

MIDTOWN EAST $2,505,000

250 E. 53rd St.

Three-bedroom, three-bath condo, 1,915 square feet, with dining room, office, renovated eat-in kitchen, renovated bath, washer/dryer, central AC and Chrysler Building views; Veneto building features doorman, concierge, gym and laundry. Common charges $1,770, taxes $1,080. Asking price $2,505,000, on market 18 weeks. Broker: Bijan Amini, Bellmarc

UPPER EAST SIDE $805,000

200 E. 90th St.

Two-bedroom, two-bath co-op, 880 square feet, with central AC and eastern exposure; Whitney House features doorman, garage, roof deck and laundry. Maintenance $1,102, 66 percent tax-deductible. Asking price $799,000, on market 99 days. Broker: Linda Chipurnoi, The Corcoran Group

UPPER WEST SIDE $2,050,000

565 West End Ave.

Prewar three-bedroom, three-bath co-op, 1,850 square feet, with dining area, windowed kitchen, high ceilings and two exposures; building features doorman, gym and laundry. Maintenance $1,917, 40 percent tax-deductible. Asking price $2,150,000, on market 11 weeks. Brokers: Ed Cruz and John Tamerin, Bellmarc and Lauren Wagner, JC DeNiro & Associates

**Brooklyn**

HOMECREST $471,000

806 Quentin Road

Four-bedroom, two-bath brick duplex on a 20-foot-by-35-foot property, with dining room, basement and porch. Taxes $1,994. Asking price $549,000, on market four months. Broker: Charles D'Alessandro, Fillmore Real Estate

PROSPECT HEIGHTS $535,000

457 Prospect Place

Two-bedroom, two-bath condo, 1,080 square feet, with whirlpool bath, high ceilings and washer/dryer; building features roof deck. Common charges $250, taxes $321. Asking price $549,000, on market four weeks. Broker: Stephen Winterrowd, The Developers Group

**Queens**

FOREST HILLS GARDENS $1,300,000

6 Seasongood Road

Prewar three-bedroom, 2½-bath semidetached brick and stucco center-hall townhouse, 2,070 square feet, with living room with fireplace, formal dining room, sunroom, office, eat-in kitchen, finished basement, off-street parking and garden. Taxes $6,398. Asking price $1,575,000, on market three months. Broker: Terrace Realty

**The Bronx**

RIVERDALE $500,000

3530 Henry Hudson Parkway

PRINT
EMAIL TO A FRIEND
DIGG IT
REDDIT
PERMALINK

MOST EMAILED
• ATLANTIC CURRENT
• RECORD RENT
• STAGE MOM
• MORE


Only at coldwellbanker.com
The online tools you want
The experienced agents you need

GO HOME SHOPPING >

We never stop moving*

COLDWELL BANKER



NYP
Home Page
News, Current Events and Design Tips

ALL CLASSIFIEDS

| DATING | JOBS | AUTOS | REAL ESTATE |

| New Cars | Used Cars |
|---|---|
| Select a Year | Select a Make |
| Select a Make | Select a Model |
| Select a Model | SUBMIT |
| SUBMIT | |

**Staten Island**

MARINERS HARBOR $315,000

332 Netherland Ave.

Three-bedroom, 2½-bath Colonial, 1,554 square feet, with dining room, eat-in kitchen with
dishwasher and sliding doors to patio, basement with laundry room and summer kitchen,
walk-in closet and front and back yards. Taxes $1,799. Asking price $329,000, on market 72
days. Broker: Scott Dobrin, Exit Home Realty.

| News | Sports | Gossip | Entertainment | Post Opinion | Classifieds | User Services |
|---|---|---|---|---|---|---|
| Local News | Yankees | Page Six | Movies | Editorials | Cars | Contact Us |
| National News | Mets | Cindy Adams | Movies Blog | Oped Columnists | Dating | FAQ |
| International News | Giants | Liz Smith | Oscars | Letters | Jobs | Daily Newsletter |
| News Columnists | Jets | Braden Keil | Food | Books | Real Estate | Home Delivery |
| Weird But True | Knicks | Michael Riedel | Fashion | Ramirez Cartoons | Marketplace | Avant Go |
| NYPD Daily Blotter | Nets | Celebrity Photos | Fashion Blog | Send a Letter | Place an Ad | E-Edition |
| Liberty Medals | Rangers | Celebrity Sightings | Music | | | Archives |
| Traffic & Transit | Islanders | Page Six Magazine | Theater | | | Back Issues |
| Lottery | Devils | Delonas Cartoons | Health | **TV** | **Miscellaneous** | Reprints |
| Classroom Extra | Sports Blogs | | Travel | Linda Stasi | Sweeps/Contests | Story Index |
| | Columnists | | Travel Blog | Starr Report | Coupons | Last 30 Days |
| | Editor's Guide | **Business** | Horoscope | Adam Buckman | Media Kit | |
| | Horse Racing Picks | Business Columnists | Weddings | Reviews | Parade Magazine | |
| | Post Line | Real Estate | Dating | TV Listings | RSS | |
| | | Stock Quotes | Weekend Guide | LIVE: The TV Blog | Special Sections | |
| | | | Comics & Games | | Privacy Policy | |
| | | | Post Game Report | | Terms of Use | |
| | | | Tempo | | Video | |

SIGN IN    SUBSCRIBE    PRIVACY POLICY    TERMS OF USE    RSS

NEW YORK POST is a registered trademark of NYP Holdings, Inc. NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.COM are trademarks of NYP Holdings, Inc.

Copyright 2008 NYP Holdings, Inc. All rights reserved.

N



All information furnished regarding property for sale, rental or financing is from sources deemed reliable, but no warranty or representation is made as to the accuracy thereof and same is submitted subject to errors, omissions, change of price, rental or other conditions, prior sale, lease or financing or withdrawal without notice. All dimensions are approximate. For exact dimensions, you must hire your own architect or engineer.

## My Recently Viewed Properties

$3,995,000
4 Rooms



2 Bedrooms
2.5 Bathrooms

3,187 Sq.Ft

133 West 4th Street
West Village

**see all properties**

Site Map | Manhattan/Brooklyn | Palm Beaches | Hamptons/Shelter Island/North Fork | Agents | Relocation | My Corcoran | Careers | Guides & Reports | About Us

Search for apartments, rentals, homes for sale, condos, co-ops, townhouses, open houses and realtors, only with The Corcoran Group.
Find luxury New York real estate in Manhattan & Brooklyn, in addition to exclusive properties in The Hamptons, Shelter Island & North Fork, and Palm Beaches.

Copyright © 2008 The Corcoran Group, Inc. All Rights Reserved. | Suggestions / Feedback | Privacy Policy | Terms and Conditions of USE | Our Fair Housing Policy
660 Madison Ave New York, NY 10065 | 800.544.4055, 212.355.3650, fax: 212.223.6361 | Owned and operated by NRT LLC.





All information furnished regarding property for sale, rental or financing is from sources deemed reliable, but no warranty or representation is made as to the accuracy thereof and same is submitted subject to errors, omissions, change of price, rental or other conditions, prior sale, lease or financing or withdrawal without notice. All dimensions are approximate. For exact dimensions, you must hire your own architect or engineer.

## My Recently Viewed Properties

$1,850,000
0 Rooms

$3,995,000
4 Rooms



2 Bedrooms
2 Bathrooms

1,602 Sq.Ft

19-21 WARREN
TriBeCa



2 Bedrooms
2.5 Bathrooms

3,187 Sq.Ft

133 West 4th Street
West Village

see all properties

Site Map | Manhattan/Brooklyn | Palm Beaches | Hamptons/Shelter Island/North Fork | Agents | Relocation | My Corcoran | Careers | Guides & Reports | About Us

Search for apartments, rentals, homes for sale, condos, co-ops, townhouses, open houses and realtors, only with The Corcoran Group.
Find luxury New York real estate in Manhattan & Brooklyn, in addition to exclusive properties in The Hamptons, Shelter Island & North Fork, and Palm Beaches.

Copyright © 2008 The Corcoran Group, Inc. All Rights Reserved. | Suggestions / Feedback | Privacy Policy | Terms and Conditions of USE | Our Fair Housing Policy
660 Madison Ave New York, NY 10065 | 800.544.4055, 212.355.3550, fax: 212.223.6381 | Owned and operated by NRT LLC.

P

 Home        Photos & Floorplans        Residence Features        Neighborhood        Listings        Contact Us

# Residence Features



### THE LOOK
Pristine limestone façade and striking mahogany framed
tilt-and-turn window frames made in Germany
Dramatic double-height lobby finished in porcelain and dark
wood
Sleek, gourmet kitchens
Spa-like marble master bathrooms
Solid oak flooring throughout

### THE EXTRAS
Private fitness center
Private parking with 10 spaces available for purchase
7-day-a-week doorman (afternoons to evenings)
Virtual doorman for added convenience and security
(at all times when doorman is not on duty)
Bang & Olufsen pre-wiring for multi-room
audio and home theater
Washer and dryer in every residence
Private backyards and dens in select
homes, terraced penthouses
Low voltage lighting throughout



### THE KITCHEN AND BATHS
Italian kitchen cabinetry by Poliform
Marble countertops
Sub-Zero stainless steel refrigerator
Viking stainless steel dual fuel range and Viking hood
Miele dishwasher
InSinkErator disposer
Spacious bathrooms with Kohler fixtures and custom vanities
Five-fixture master baths with cast iron soaking tubs and
separate showers (in most units)



Home | Photos and Floorplans | Residence Features | Neighborhood | Listings | Contact Us

THE COMPLETE OFFERING TERMS ARE IN AN OFFERING PLAN AVAILABLE FROM SPONSOR. File No. CD 05-0416.

Q



**Prudential Douglas Elliman** Real Estate

BEAUTIFUL INVESTMENTS

My Account: **Sign In**

Recently Viewed Listings
Translate to French | Spanish | German | Italian | Portuguese
Contact Us by Email
Talk to us Right Now

| HOME | NEW YORK CITY | LONG ISLAND | HAMPTONS & NORTH FORK | HELP ME FIND MY DREAM HOME | FIND AN AGENT |
| REAL ESTATE RESOURCES & GUIDES | INFORMATION FOR SELLERS | MORTGAGE & LATEST RATES | MEDIA | ABOUT US |

## Property Information:

Quick Search: [Web#, Addr or Neighborhood] **GO**

**283 West Broadway**  View Map
TriBeCa
cross street: Canal & Lispenard Streets
Web ID: 963709
Community Info | Community News | Local Amenities
Citywide School Reports | Local School Reports

Rooms: 6
Bedrooms: 2*
Bathrooms: 2.5
Pet Friendly: Yes
Approx SqFT: 2,250

Type: Condo

**Price: $2,500,000**
Maint/CC: $965
Taxes (Per Month): $1,864
Percent Down: 10%

Monthly Costs Calculator

Get Rate Updates from Prefered Empire

Pre-Approve Me for This Home & Evaluate my Credit Report FREE



Unprecedented Luxury & Style New Development where SoHo and TriBeCa meet! Magnificent full floor residences housed in a 19th-century masterfully restored & architecturally splendid building that has 21st-century flair and function. Each 2,250 floor plate residence boast expansive layout, brilliant light & grand views. Beautiful floors, super high ceilings, latest hi end appliances and fixtures, large windows on three sides offer uncompromised luxury in downtown living at its finest. Be one of a privileged few to enjoy a desirable West Broadway address, European-inspired living, intelligent design and an unprecedented level of services and amenities. A one-of-a kind rooftop great room showcases panoramic views of Manhattan s famous skyline. The security and privacy of a virtual doorman system, exclusive access to the world-class services of Abigail Michaels Concierge, and his/her very own generously sized storage unit all at no additional cost. Low common charges make owning at Tribeca Five a solid investment.



**Roland Levin**
(212) 891-7114
(646) 258-0755 C

▸ Email Me
▸ My Listings
▸ Download vCard

   

Photos: Page ‹ 1 of 2 ›

### Building Specifics

Full-Time Doorman
Roof Deck
Storage
Garden

**MORE DETAILS**
View All Photos

**MORE LISTINGS**
More listings like this
Compare Listings

**LISTING TOOLS**
Email this Listing to Me
Email this Listing to a Friend
Request More Information
Save this listing
Schedule a Viewing
Send this listing to my phone
Printer-Friendly Version

**Prudential Douglas Elliman**

| About Us | Find a Home | Resources & Guides | Departments & Partners |
| Prudential Douglas Elliman | Search by Location | Information for Sellers | Relocation |
| About Us | New York City | Real Estate Resources | New Developments |
| Company News | Hamptons & North Fork | MyPDE | Division Hispana |
| Careers | New Home Developments | Profile Magazine | Douglas Elliman Property Management |
| PDE Management Team | Long Island | Market Reports | Preferred Empire Mortgage Company |

| | | | |
|---|---|---|---|
| DottieHerman.com | Global | New York City Guide | PDE Title |
| | My Dream Home | Long Island Guide | Villas of the World |
| **Contact Us** | Search by Map | Neighborhoods | Retail and Commercial |
| Contact PDE | Video Gallery | Home Value Estimator | Long Island Retail |
| Find an Agent | The Orphalese | NYC School Reports | |
| Find an Office | Villas of the World | Manhattan Community News | |
| | | Real Estate for Dummies | |

---

© 2006 Prudential Douglas Elliman. All Rights Reserved
Call Toll-Free: 1.800.355.4626 or Click here to contact us

HOME | NEW YORK CITY | LONG ISLAND | HAMPTONS & NORTH FORK | RETAIL & COMMERCIAL | NEW DEVELOPMENTS
RESOURCES & GUIDES | AGENTS | MY DREAM HOME | MY ACCOUNT | SELL YOUR HOME | ABOUT US | SITE MAP

All information regarding a property for sale, rental or financing is from sources deemed reliable. No representation is made as to the accuracy thereof, and such information is subject to errors, omission, change of price, rental, commission, prior sale, lease or financing, or withdrawal without notice. All square footage and dimensions are approximate. Exact dimensions can be obtained by retaining the services of a professional architect or engineer.

An independently Owned and Operated Member of Prudential Real Estate Affiliates, Inc.

* The number of bedrooms listed above is not a legal conclusion. Each person should consult with his/her own attorney, architect or zoning expert to make a determination as to the number of rooms in the unit that may be legally used as a bedroom.

R



# Prudential Douglas Elliman Real Estate
## BEAUTIFUL INVESTMENTS

My Account: Sign In

★ Recently Viewed Listings
Translate to French | Spanish | German | Italian | Portuguese
✉ Contact Us by Email
☎ Talk to us Right Now

HOME | NEW YORK CITY | LONG ISLAND | HAMPTONS & NORTH FORK | HELP ME FIND MY DREAM HOME | FIND AN AGENT
REAL ESTATE RESOURCES & GUIDES | INFORMATION FOR SELLERS | MORTGAGE & LATEST RATES | MEDIA | ABOUT US

## Property Information:

Quick Search: [Web#, Addr or Neighborhood] GO

Back To Results | Previous Listing | Next Listing

**479 West 152nd Street** [View Map]
Hamilton Heights
cross street: Amsterdam and St. Nicholas
Web ID: 798230
Community Info | Community News | Local Amenities
Citywide School Reports | Local School Reports
[IN CONTRACT]

Rooms: 4
Bedrooms: 2*
Bathrooms: 1.5
Pet Friendly: Yes
Approx SqFT: 714

Type: Condo

Price: $435,000
Maint/CC: $425
Percent Down: 5%

[Monthly Costs Calculator]
[Get Rate Updates from Preferred Empire]
[Pre-Approve Me for This Home & Evaluate my Credit Report FREE]



  

Photos: Page < 1 of 3 >

80% SOLD!!! ONLY 5 UNITS AVAILABLE! AQUEDUCT COURT: A Classic Retold. Across the street from the famous Dance Theatre of Harlem, AIA award winning architect Michael Schmitt has transformed two Renaissance Revival buildings into the residences of Aqueduct Court. After restoring the stunning exteriors, Michael designed luxurious one, two, three bedroom and full floor condominium residences in a modern yet classic style. The gourmet kitchens feature glossy white lacquer cabinets, quartz granite countertops, and stainless steel Bosch and Electrolux appliances. Relaxing baths, clad in Italian ceramic tile, have been completed with Duravit fixtures and Grohe hardware. Along with high ceilings and bamboo floors, each home boasts personally controlled HVAC, the security and convenience of a state of the art virtual doorman, a washer and dryer, and access to a roof terrace with stunning views of Manhattan. The Sponsor has secured 5% down financing for qualified purchasers. Aqueduct Court is truly a classic retold. SALES OFFICE in 469 W 152 St., 2nd fl., by appointment.



**Mary Cedeno**
(212) 727-6108
▶ Email Me
▶ My Listings
▶ Download vCard



**Linda Fenn**
(212) 727-6110
▶ Email Me
▶ My Listings
▶ Download vCard



**Amanda Jhones**
(212) 769-9982
▶ Email Me
▶ My Listings
▶ Download vCard

[HAVE A QUESTION? Click to Talk Home Now]

**MORE DETAILS**
⊞ View All Photos

**MORE LISTINGS**
⊟ More listings like this
⊟ Compare Listings

**LISTING TOOLS**
✉ Email this Listing to Me
✉ Email this Listing to a Friend
ⓘ Request More Information
▶ Save this listing
Schedule a Viewing
Send this listing to my phone
Printer-Friendly Version

## Prudential Douglas Elliman

**About Us**
Prudential Douglas Elliman
About Us
Company News
Careers
PDE Management Team

**Find a Home**
Search by Location
New York City
Hamptons & North Fork
New Home Developments
Long Island

**Resources & Guides**
Information for Sellers
Real Estate Resources
MyPDE
Profile Magazine
Market Reports

**Departments & Partners**
Relocation
New Developments
Division Hispana
Douglas Elliman Property Management
Preferred Empire Mortgage Company

| DottieHerman.com | Global | New York City Guide | PDE Title |
| | My Dream Home | Long Island Guide | Villas of the World |
| Contact Us | Search by Map | Neighborhoods | Retail and Commercial |
| Contact PDE | Video Gallery | Home Value Estimator | Long Island Retail |
| Find an Agent | The Orphalese | NYC School Reports | |
| Find an Office | Villas of the World | Manhattan Community News | |
| | | Real Estate for Dummies | |

© 2006 Prudential Douglas Elliman. All Rights Reserved
Call Toll-Free: 1.800.355.4626 or Click here to contact us

HOME | NEW YORK CITY | LONG ISLAND | HAMPTONS & NORTH FORK | RETAIL & COMMERCIAL | NEW DEVELOPMENTS
RESOURCES & GUIDES | AGENTS | MY DREAM HOME | MY ACCOUNT | SELL YOUR HOME | ABOUT US | SITE MAP

All information regarding a property for sale, rental or financing is from sources deemed reliable. No representation is made as to the accuracy thereof, and such information is subject to errors, omission, change of price, rental, commission, prior sale, lease or financing, or withdrawal without notice. All square footage and dimensions are approximate. Exact dimensions can be obtained by retaining the services of a professional architect or engineer.

An independently Owned and Operated Member of Prudential Real Estate Affiliates, Inc.

* The number of bedrooms listed above is not a legal conclusion. Each person should consult with his/her own attorney, architect or zoning expert to make a determination as to the number of rooms in the unit that may be legally used as a bedroom.

S

**Prudential** **Douglas Elliman** Real Estate
BEAUTIFUL INVESTMENTS

My Account: Sign In

Translate to French | Spanish | German | Italian | Portuguese
Contact Us by Email
Talk to us Right Now | 1.800.355.4626

| HOME | NEW YORK CITY | LONG ISLAND | HAMPTONS & NORTH FORK | HELP ME FIND MY DREAM HOME | FIND AN AGENT |
| REAL ESTATE RESOURCES & GUIDES | | INFORMATION FOR SELLERS | | MORTGAGE & LATEST RATES | MEDIA | ABOUT US |

**New Developments**

Quick Search: [Web#, Addr or Neighborhood]  GO

Back to New Home Developments

| HOME | RESIDENCES | BUILDING | SALES |

## BUILDING AMENITIES

Along with high ceilings and bamboo floors, each home boasts personally controlled HVAC, the security and convenience of a state of the art virtual doorman, a washer and dryer, and access to a roof terrace with stunning views of Manhattan. The Sponsor has secured 5% down financing for qualified purchasers. Aqueduct Court is truly a classic retold.



AQUEDUCT COURT

<<  >>

**Prudential Douglas Elliman**

**About Us**
Prudential Douglas Elliman
About Us
Company News
Careers
PDE Management Team
DottieHerman.com

**Contact Us**
Contact Us
Contact PDE
Find an Agent
Find an Office

**Find a Home**
Search by Location
New York City
Hamptons & North Fork
New Home Developments
Long Island
Global
My Dream Home
Search by Map
Video Gallery
The Orphalese
Villas of the World

**Resources & Guides**
Information for Sellers
Real Estate Resources
MyPDE
Profile Magazine
Market Reports
New York City Guide
Long Island Guide
Neighborhoods
Home Value Estimator
NYC School Reports
Manhattan Community News
Real Estate for Dummies

**Departments & Partners**
Relocation
New Developments
Division Hispana
Douglas Elliman Property Management
Preferred Empire Mortgage Company
PDE Title
Villas of the World
Retail and Commercial
Long Island Retail

© 2006 Prudential Douglas Elliman. All Rights Reserved
Call Toll-Free: 1.800.355.4626 or Click here to contact us

HOME | NEW YORK CITY | LONG ISLAND | HAMPTONS & NORTH FORK | RETAIL & COMMERCIAL | NEW DEVELOPMENTS
RESOURCES & GUIDES | AGENTS | MY DREAM HOME | MY ACCOUNT | SELL YOUR HOME | ABOUT US | SITE MAP

All information regarding a property for sale, rental or financing is from sources deemed reliable. No representation is made as to the accuracy thereof, and such information is subject to errors, omission, change of price, rental, commission, prior sale, lease or financing, or withdrawal without notice. All square footage and dimensions are approximate. Exact dimensions can be obtained by retaining the services of a professional architect or engineer.

An independently Owned and Operated Member of Prudential Real Estate Affiliates, Inc.

T



PROPERTY DETAILS
OPEN HOUSE
Return to Listings

# 135 West 14th Street



Click on image to enlarge





ABOUT THE PROPERTY
From the distinctive cantilevered facade to the stunning interior design, no detail has been overlooked at Loft 14. The intimate lobby, complete with a virtual doorman, offers unique finishes including bamboo, Brazilian slate and cherry wood. As the elevator opens directly into your private loft, you are greeted by soaring ceilings, a cozt fire place and elegant wide planks of Brazilian Grapia wood flooring. The outstanding gourmet kitchen features Bulthaup cabinetry, Miele and Sub-Zero appliances, Grohe fixtures and honed Basaltina countertops. Every unit comes with outdoor space.
June 03, 01:00 - 03:00

LOCATION
135 WEST 14TH STREET
Neighborhood: Downtown
DETAILS

| | |
|---|---:|
| Type | Condo |
| Price | $3,150,000 |
| Common Chgs | $1,650 |
| RET | $2,113 |
| Bedrooms | 2 |
| Baths | 2 |
| Approx SF | 2,320 |

BUILDING SPECIFICS
Loft
Schedule a viewing
Add to calendar
View Map

# **David Gergely** 

Phone: 212-726-0709

Email Me
Schedule a viewing
Download vCard
Email to a friend
Printer friendly listing



Terms & Conditions, Copyright © 2007, CORE Group Marketing

U





new york craigslist > manhattan > apts broker fee          email this posting to a friend

*Stating a discriminatory preference in a housing post is illegal - please flag discriminatory posts as prohibited*

**Avoid scams and fraud by dealing locally!** Beware any arrangement involving Western Union, Moneygram, wire transfer, or a landlord/owner who is out of the country or cannot meet you in person. *More info*

please flag with care:

miscategorized

prohibited

spam/overpost

best of craigslist

# $2295 Steal this deluxe studio! Guess what it's real!! (West Village) (map)

Reply to: hous-662258045@craigslist.org
Date: 2008-04-30, 12:56PM EDT

This has got to be the best deal in the village! Gut renovated spacious studio with a complete renovation! The kitchen has a window, granite counter tops, cherrywood cabinets and ceramic tile floor! All new bathroom with subway tiles and large vanity. This is simply a pristine studio at an unbelievable price!

The building has a virtual doorman, roof deck, gym and laundry and of course an elevator!!

Call me to see this today...I have a key.Keith 917 770 4951 And again this is real!




Steal this deluxe studio! Guess what it's real!! Page 2 of 2

Case 1:08-cv-01997-JGK    Document 14-23    Filed 05/07/2008    Page 3 of 3



Jane street at Greenwich    google map    yahoo map

- cats are OK- purrr
- dogs are OK- wooof
- it's NOT ok to contact this poster with services or other commercial interests
- Fee Disclosure: 12% negotiable Listed By: Keith Associate Broker

PostingID: 662258045

---

Copyright © 2008 craigslist, inc.    terms of use    privacy policy    feedback forum

X



# 55+ Homebuyers Are Drawn to Newtown for Location and to The Woods at Newtown for Lifestyle

Kathryn Negele is an attractive professional woman in her 50's who has lived in Spain, Chicago and Washington State, as well as in Stamford, Southbury and currently in Danbury. Kathryn has been looking at 55+ communities for the past six years, and she is enthusiastic about her "next best move" to The Woods at Newtown in Newtown, Connecticut (http://woodsatnewtown.com).

"For me the Newtown location is big," Kathryn explained. "Shopping and activities are close by, and it's easy on and off I-84, so I can get up to Boston and Maine and in to Manhattan."

**Best Places to Retire**
Discover hidden retirement paradise You can afford. RLTV Inspiring 55+
www.rl.tv

**Retirement Communities**
Find Retirement Communities. Search In Your Local Area Now.
Justclicklocal.com

**Southbury Homes For Sale**
Buying/Selling in CT? We can help Listings, photos, maps & more
www.c21tristate.com

**Candlewood Lakefront**
New Luxury Condos & Marina on Connecticut's Largest Lake.
Poets-Landing.com

Ads by Google

It's all about convenience and lifestyle for Kathryn Negele.

"At The Woods, I'm close to everything, yet I will have the solitude of 50 acres of woods around me. With the covered walkways, I can walk in any weather. I will be on the top floor, where I can look out my window and enjoy nature, and whenever I want to take off on a trip, I just lock my door and go."

Bill and Marilyn McCarthy sold their house on three acres in Newtown seven months ago. The McCarthys had put a down payment on another single family home in Newtown, but then they started to have second thoughts about single family living.

"I am a hands on guy, and I used to think it was great to fix up houses," Bill remarked. "But now I'm more interested in attending Veterans meetings and playing golf. I still have a snow blower or two, but I can see those being sold too."

The McCarthy's are living temporarily in Southbury, but they keep returning to Newtown.

"We end up in Newtown at least five days out of the week," said Bill. "Everything we are interested in is here. We are seriously considering purchasing a home at The Woods.

I always look at real estate for re-sale value, and this has it."

Location is also important for Susan Westrell, another Woods homebuyer. Susan has lived in Southbury for the past three years, but she works at Amica Insurance, which is just one mile from The Woods.

"I have always lived close to where I work," said Susan, "so I am really looking forward to moving to Newtown."

Donna and Dan Kiah own a home in Bethel and a second home in Venice, Florida. She has been a realtor for twenty-five years, and he is a program manager at Northrop Gruman.

"I was showing The Woods to a client, and I fell in love with it myself," recalled Donna. "I am thrilled that it's the first of its kind with concierge services."

According to consumer research expert, Barbara Kleger, "The 55+ leading edge boomers are looking for location and lifestyle."

A Certified Active Adult Specialist in Housing (CAASH) and founding member of the NAHB 50+ Housing Council, Ms. Kleger conducted a series of focus groups with Fairfield County leading edge boomers to determine what was important to them in a new home.

Location - In Fairfield County, as in the rest of the country, 50 and 60-somethings prefer to stay close to the people and places that are important to them. They want to continue to enjoy their social networks and be close to cultural attractions.

Lifestyle - As empty nesters, they want a clubhouse community where they can socialize and exercise.

Natural Recreational Areas--Fairfield County boomers in their 50's and 60's love walking and biking, and prefer to live in a community with open space and nature trails.

Maintenance-free Living--Otherwise known as "zoomers", leading edge boomers want somebody else to take care of their home so that they can zoom from one activity to another and pursue their many interests.

"We learned that being near children and grandchildren is another major motivator and value is a key factor," said Kleger. "These homebuyers want to have money left over from the sale of their current home to travel and enjoy life."

With 60% of the first phase sold, condominium homes at The Woods are currently selling in the mid $300,000's, while the median price of a single family home in Fairfield County in 2007 was $575,000 and in Newtown it was $501,000 according to the 2007 CT Real Estate Market Report.

Lifestyle not real estate

"People at this stage of their lives are looking for lifestyle not just real estate," says Leonard Kohl, developer of The Woods at Newtown (http://woodsatnewtown.com).

Forty years ago, Leonard Kohl completed building Rossmoor, the first 55+ community in New Jersey. Kohl is recognized nationally for having changed the nature of retirement living with Rossmoor, Clearbrook and The Ponds.

"Even in the '60's, people didn't expect to trade in their active lives for a rocking chair when they hit 60 or 65 years old," said Kohl. "Today, boomers in their 50,'s and 60's are beginning new jobs or still working at the one they've got. The time spent on maintaining a home has become a drag on their lives, and they are looking for as little maintenance and as much convenience as they can get in a new home."

Kohl went on to explain why he chose Newtown for his first Connecticut community.

"We conducted market research on Connecticut, and found that Newtown was a perfect spot because of the area demographics and its convenient location. We designed The Woods at Newtown as an innovative community offering an easy, enjoyable lifestyle."

The Woods offers condominiums with single level living and covered parking, and townhomes with attached garages. Enclosed walkways connect the condominiums to a stunning 8,500 square foot clubhouse with caf, fitness center, indoor swimming pool and spa.

(more)

A cyber or virtual doorman system will work as a remote attendant by connecting with a central monitoring center. It will control access and homeowners will receive notification of package delivery.

On Saturday, February 9th, over thirty people from towns throughout Fairfield County and New York attended a New Neighbor gathering at The Woods Information Center.

"In June, we're taking our first phase homebuyers on a cruise," said Leonard Kohl, "because we're selling lifestyle not real estate."



autos.yahoo.com

Feedback - Ads by Google

W



The Commons
in Lexington Center

**About the Project**   **Drawings**   **Floorplans**   **The Team**   **Contact**

## About the Project

The Commons in Lexington Center is located where the Battle Green Inn now stands on an L-shaped piece of land between Massachusetts Avenue and Waltham Street. It consists of 30 condominiums and 5843 square feet of retail space on the first floor, an increase of 1000 square feet over the current retail area.

### The Building Design

The building design continues the two-story cornice line of the abutting Windspeed building and Vinny Testa's with dormers similar to the ones that now exist on the Massachusetts Avenue façade of the Battle Green Inn. As the building is entirely 3 stories with the roof line starting at 2 ½ stories, the elevation toward the Cohoe parking lot is now also consistent with the street elevations. In addition, there is a 23 ft setback toward Cohoe's, providing for a substantial tree-lined buffer and landscaped terrace area. The design provides 2 one-bedroom, 3 three-bedroom, and 25 two-bedroom condominiums, most with a patio or balcony. The condominiums are generous, sunny and designed for elegant simplicity. They range in size from 900 to 2000 square feet. All are on a single level and accessible by elevator from both the lobby and parking garage. Three affordable units will be provided to the Town.

### One, Two and Three Bedroom Units

The Commons' entry will be from Waltham Street. The lobby faces south and features a common garden courtyard for residents to gather.

### Conveniences and Comforts

The proposed condominiums will offer residents many conveniences and comforts. Buyers can choose from various sizes, orientations and options to customize their new home. A common living room/library with "tea kitchen" will allow for daily enjoyment and private gatherings. Living accommodations are connected by an elevator to a heated, secure garage - assuring accessibility for all. The entrance will be secure with the assistance of a "virtual doorman," and the building will be managed by professionals who will emphasize service.

**THE COMMONS IN LEXINGTON CENTER GAINED TOWN MEETING APPROVAL!**

**On November 7th, 80 percent of the Town Meeting members voted in favor of the revised plans. The approved plans include 30 condominiums over expanded Mass Avenue and Waltham Street retail space.**

**The entry to the condominiums and their garage below will be sunlit and graciously accessed from Waltham St. The BGI-Commons team is very pleased with the result and wishes to express our gratitude to all the Lexington Community; it has been so involved and supportive of the project.**

**At this time, we are planning the next steps in the process of getting the project ready for final approvals and permits.**

**The plans shown in this web site are generally accurate, but there will be refinements made to the interiors of the condos. We will be tending this web page, with updates in our plans and other information people might be interested in.**

**You are also welcome to call us with any inquiries you may have; our information is provided on the Contact page of this site. We look forward to completing The Commons in Lexington Center, and are confident it will live up to the high expectations we have fostered over the last two years of permitting.**

**On-site Parking and Smoother Flow of Traffic**

Because we are relocating the parking entrance to Waltham Street from Mass. Ave., the impact of traffic will be reduced and an uninterrupted band of retail is created along Massachusetts Avenue. The Commons provides all its own parking on-site. Parking will expand from 64 to 75 spaces, provide for guest, service, and retail employee parking, as well as conform to code. A 33 ft dedicated loading space will be near the entry on Waltham Street to assure smooth traffic flow during deliveries and move-ins.

**Preserving Lexington's Character**

As with all of Oaktree's residences, the proposed design offers a fresh, clean design and environmentally sustainable construction. Considerable care has been taken to produce a high quality design and architecture that fits Lexington's unique character and history.

©Copyright 2005 Oaktree Development
Web site by www.kimdowney.com

Y

FOCUS - 13 of 13 DOCUMENTS

Copyright 1996 The New York Times Company
The New York Times

July 7, 1996, Sunday, Late Edition - Final

**SECTION:** Section 13;  Page 4;  Column 2;  The City Weekly Desk

**LENGTH:** 1117 words

**HEADLINE:** NEW YORKERS & CO.;
'Virtual Doormen' Who Accept Real Packages

**BYLINE:** By CONSTANCE L. HAYS

**BODY:**

MAYBE it was all the birthday presents from his parents that had to be delivered to his office, or the Eddie Bauer lamp he had to drag home on the subway. Or maybe it was those trips to Federal Express, mailing apartment keys overnight to friends who would be arriving in town while he was at work. Somehow, Mike Rataczak thought, he had to get around the problem of not having a doorman.

It's an affliction for many New Yorkers who work long hours and live alone. Chances are, when the U.P.S. delivery person rings or the Airborne Express van pulls up, no one is home.

"It's just an incredible hassle," said Mr. Rataczak, who works in Jersey City as a human-resources consultant, far from his charming but unattended apartment in a town house on West 105th Street. "There's a doorman at the end of my block, but I don't think he likes taking anybody else's stuff. I tried leaving keys with him once, but he wouldn't do it."

So Mr. Rataczak paid a $15 startup fee and a monthly charge of $30, to obtain a "Virtual Doorman" last month at a branch of Mail Boxes Etc., a national chain of mailbox-rental companies, that opened recently on Broadway near 96th Street. It lets him direct his deliveries there, and the small ones can go into the locked mailbox.

"It's very convenient to have a place near my house where I can pick up packages and leave things for people who are trying to get into my apartment," Mr. Rataczak said, "rather than having to strategize for hours about how I'm going to do it."

But who could really replicate the doorman, who is a peculiar cog in the urban dynamic -- a few parts convenience, a few parts annoyance? Doormen stand sentry and open the door. They are also privy to your life and become integral parts of it. They know births, deaths, events in between. Like family, on the 3-to-11 shift.

They exist in many other cities, but New Yorkers at a certain socio-economic level seem to be particularly reliant on them -- whether or not they live in doorman buildings. They solicit other people's doormen to help them with U.P.S. They fashion doormen from local shop owners.

In "The Death and Life of Great American Cities," published in 1961, Jane Jacobs told of how people in her Greenwich Village neighborhood left keys with a deli owner named Joe Cornacchia. (She also called doormen part of a "hired neighborhood" along otherwise desolate Park Avenue. Without them, she wrote, "it would undoubtedly become a woefully dangerous street.")

NEW YORKERS & CO.;'Virtual Doormen' Who Accept Real Packages The New York Times July 7, 1996, Sunday, Late Edition - Final

Though lacking some of the cachet of a flesh-and-blood doorman, the Virtual Doorman, dreamed up by Greg Hund, owner of the Mail Boxes Etc. branch at 96th and Broadway, fulfills many of the functions.  The services are essentially those offered to anyone renting a mailbox at the store but aimed at people -- experiencing a void in their lives -- who might not have thought they needed a mailbox service.

"We're marketing to people who are painfully aware that they don't have a doorman," says Tripp Singer, the company's manager of development for Manhattan.  Mail Boxes Etc., which was originally aimed at suburbanites who were dissatisfied with the United States Postal Service, has 28 other branches.

The charge of $30 a month is the basic price for renting a mailbox. For either a mailbox or Virtual Doorman, there is a one-time $15 fee that covers changing the locks on the mailbox, Mr. Hund said. His store is open from 8:30 A.M. till 7 P.M., Monday through Friday, and from 11 A.M. to 5 P.M. on Saturday. It is closed on Sunday. It has a plethora of ancillary offerings -- fax machine, photocopier, packing and mailing, padded envelope sales. Some of its sister branches in the city have expanded to include birthday cards and computer rooms.

In its first few weeks of service, the Virtual Doorman has attracted half a dozen people like David Roth, an editor of travel guides at Random House, who grew weary of the routine with U.P.S. at his small building on the Upper West Side. He would get not the package, but a series of little yellow stickers telling him that U.P.S. had tried to deliver a package, but no one was home.

"I'm just ridiculous in my need for convenience," said Mr. Roth, who signed up for the Virtual Doorman last month. "My job is really demanding, and the amount of time I spend here takes up most of the day. I don't want to have to worry about calling up and saying, 'Please re-deliver this package.'

"I never would have thought to go to a place like that," he said of the Mail Boxes Etc. store. "It always seemed to me to be a place for people who worked out of their homes, who didn't want to have their own address on stuff."

The delivery routine can be frustrating for those who bring the packages as well.

"It's hard for us to bring the package back to the hub and keep coming back day after day," said Jesus Cortorreal, a U.P.S. man.

That had been Mr. Hund's feeling, too. A financial-data salesman for Knight-Ridder until three months ago, he used to live in a brownstone on West 105th Street, he said, where there was no doorman, no resident super, and a continual sense of frustration as he tried to get merchandise delivered from J. Crew.

"It was a nightmare," Mr. Hund said, adding that he has since moved to a doorman building in Chelsea. "It never dawned on me that a mailbox rental could solve the problem." He hopes to start a delivery service as well, he said, that would run until 8 P.M., bringing people their J. Crew fixes and other essentials.

Delivery does seem to be a key issue. "If they don't bring it to your house," said Sylvie Anapol, who lives in a doormanless brownstone on West 75th Street, "what's the difference? It's not the heaviness of the package that's the problem. It's arranging your time to go pick it up."

Unlike most doormen, who have to wear uniforms with ties, Mr. Hund runs a casual-looking operation. He is often found behind the counter in a tank top. Also unlike most doormen, he isn't actually in one's building, gathering intelligence. It could be a relief.

Some tenants tell of doormen monitoring their social lives, examining their mail, inquiring about their weight, talking too long while holding the elevator door open. Still, the relationship seems mostly affectionate. Doormen develop distinct on-the-job personalities -- one may be a font of political wisdom, another of sports trivia. Sometimes they serenade tenants dragging themselves home after another long workday.

NEW YORKERS & CO.;'Virtual Doormen' Who Accept Real Packages The New York Times July 7, 1996, Sunday, Late Edition - Final

Can a virtual doorman ever keep up? Here's Patrick Clarke, a doorman at the Columbia, a condominium tower at 275 West 96th Street, on the subject. "Whatever the virtual does," he said, "I'd like to see it come after a taxi."

**GRAPHIC:** Photo: Greg Hund, left, who has marketed the Virtual Doorman concept, dresses more casually than the traditional model, right. (Jim Estrin/The New York Times)

Chart: "TASKMASTER: Doormen: Virtual vs. Traditional"

What a "Virtual Doorman" will do:

Sign for a U.P.S. package.

Hand over keys to friends visiting from New Jersey.

Provide easy access to a fax machine.

Collect the dry cleaning when it's delivered.

Call to say a package has arrived.

What "Virtual Doorman" will not do:

Provide an umbrella in the rain.

Provide surveillance reports on your teen-age children.

Disappear as the car is being unloaded after vacation.

Enhance building security simply by standing there.

Hail a taxi.

**LOAD-DATE:** July 7, 1996

Z

Site Guide | Search:

The UPS Store®

Home | **About The UPS Store** | Customer Service

**Locations** | **Calculate Cost** | **Tracking** | **Products & Services** | **Franchise Opportunities**

**About The UPS Store**

→ History
→ Leadership
→ Center Careers
→ Pressroom
  > **Archive**
→ Toys for Tots



**Computer Services.**
Find out if your nearest
location offers
computer services.

## Pressroom

### UPS To Acquire MAIL BOXES ETC. In Cash Transaction

*Provides Platform for New Products and Services For A Growing Market Segment*

ATLANTA and SAN DIEGO, March 2, 2001 - UPS (NYSE: UPS) and MAIL BOXES ETC. today jointly announced that UPS has agreed to acquire MBE. MBE, a subsidiary of US Office Products (OTC BB: OFIS), is the world's largest franchisor of independently owned and operated business, communication and shipping centers worldwide.

The transaction will allow UPS and MBE to develop new opportunities in such areas as small business services, e-commerce and financial services. It also strengthens the important physical link UPS has to a growing segment of retail customers, such as Internet consumers, SOHO (small office/home office) owners and an increasingly mobile, technology-connected society.

The transaction is structured as an acquisition of the assets of MBE. The parties expect to close as soon as practicable.

"This is a strategic fit that complements UPS's existing access channels and underscores the common vision MBE and its franchisees share with UPS to meet the changing needs of customers," said Jim Kelly, UPS chairman and CEO. "The alignment of our brands and the retail expertise MBE and its franchisees bring to UPS will open doors of opportunity for us to better serve small businesses and consumers around the world."

UPS and MBE have had a strong relationship for more than two decades. In recent years, both companies have unveiled industry-leading solutions for small businesses and for shipping and returning goods sold and purchased over the Internet by businesses and consumers. In addition, UPS and MBE have complementary portfolios of business-focused financial services.

"In joining the UPS organization, we intend for our franchisees - the backbone of the MBE family - to maintain the entrepreneurial spirit and independence they need to run their businesses and provide world-class service options to their customers, while benefiting from the mutually innovative thinking of these two great companies," said Jim Amos, president and CEO of MBE.

MBE business will be conducted through a subsidiary of UPS under the guidance of Amos, who this week was named chairman of the International Franchise Association. MBE franchisees will continue to offer a broad array of business services, products and shipping alternatives.

Kelly emphasized the importance of the entire global network of more than 11,500 UPS Authorized Shipping Outlets that includes other franchisors, independent retail shipping and packaging stores and alliances with other office product suppliers. UPS will continue to provide a range of programs to support all other valued channels to provide convenient access to UPS services.

MBE is comprised of more than 4,300 retail locations, including nearly 900 centers in 29 countries around the world. Headquartered in San Diego, Ca., MBE is located on the Web at www.mbe.com.

UPS is the world's largest express carrier and largest package delivery company, serving more than 200 countries and territories around the world, with 2000 revenues of $29.7 billion. Headquartered in Atlanta, Ga., the company is located on the Web at www.ups.com.

### #

Except for historical information contained herein, the statements made in this release constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements, including statements regarding the intent, belief or current expectations of UPS and its management regarding the company's strategic directions, prospects and future results, involve certain risks and uncertainties. Certain factors may cause actual results to differ materially from those contained in the forward-looking statements, including economic and other conditions in the markets in which we operate, governmental regulations, our competitive environment, strikes, work stoppages and slowdowns (or customer behavior in anticipation of such events), increases in aviation and motor fuel prices, cyclical and seasonal fluctuations in our operating results, and other risks discussed in the company's Form 10-K and other filings with the Securities and Exchange Commission, which discussions are incorporated herein by reference.

For more information, contact:

- UPS Public Relations
  pr@ups.com
  404-828-7123

Back to Top

MBE is a UPS® company. The UPS Store® locations are independently owned and operated by franchisees of Mail Boxes Etc., Inc. in the USA and by its international master licensees and their franchisees outside of the USA. Services and hours of operation may vary by location. Copyright © 1994-2007 United Parcel Service of America, Inc.  All rights reserved.

AA

# The UPS Store
*of Northwest Tucson, AZ*

*Helping you do your business, outside of the box.*

- Shipping
- Packaging
- Copy & Print
- Mailbox Services
- US Postal Services
- Fax Services
- Virtual Doorman
- Personal/Business Services
- FAQ
- Business Connections
- Shop Online
- Send Out Cards
- Mini-Helmets

# Virtual Doorman Service

**What is the Virtual Doorman Service?**
By signing up for this service, The UPS Store will safely sign for and hold your packages and Messenger drop-offs for you. You will be notified every time a package or drop off is received for you. You can then pick up the package at your convenience.

**What are the advantages of this service?**
The main advantage is that you no longer need to re-arrange your schedule to be home for a package delivery, particularly when delivery windows cover a number of hours.
Another advantage is not having to deal with missed delivery attempts and the disappointment of finding another Yellow "Delivery Missed" stickie on your door.

**What are the fees for this service?**
There is a $5 fee per package received, payable when you pick up your package.
If we receive more than one package in a single day, the fee for the additional packages drops to $2
Storage fees of $2/day apply to packages starting on the 7th day after we received the package.

**What types of packages does The UPS Store accept?**
We can receive packages up to 75 lbs. in weight w/o size limitations.
We can accept packages delivered by common carriers (but not limited to) such as UPS, FedEx, DHL, Airborne as well Messenger drop-offs and private deliveries (dry-cleaners, flowers, etc.)
This service does not include deliveries of the US Postal Service (Mail). Rental of a mailbox and completion of a Mailbox Service Agreement is required for US Mail receipt.

**How does it work?**
After you have contacted us, please have your packages sent to the following address (or our other address if being sent to the Cortaro & Thornydale location). Please provide us with your phone # so that we can contact you upon arrival of your package.

Ship to: Your Name
        c/o The UPS Store
        3906 W Ina Rd, Ste 200
        Tucson, AZ 85741

**What happens if a package gets lost or damaged?**
All claims for loss or damage prior to the receipt at The UPS Store must be addressed to the sender or to the carrier involved in the transport. The UPS Store does not accept responsibility for damages to packages received as The UPS Store does not evaluate the condition of a package at the time of delivery. Only packages that represent an obvious safety hazard will be refused delivery (i.e. leaking fluids or other substances, jagged edges, etc.)



**Tired of waiting for the delivery of your package?**



**Don't want your valuable important packages left on the doorstep?**

Copyright 2006 The UPS Store, Tucson, AZ  All Rights Reserved

BB



The UPS Store
Fort Lauderdale / Wilton Manors
401 E Las Olas Blvd
Located Just off Las Olas Blvd on SE 4th Ave
Fort Lauderdale, FL 33301
954-463-0444

Home   Store Directions   Track a Package   Pay By Credit Card   Claims   Contact Us



Packing
& Shipping
Services



Send Your
Douments
Online



Copy
Center



Mailbox
Services



Virtual
Doorman
Services

To upload files to our FTP
site click here

## Virtual Doorman



By signing up for this service, The UPS Store will safely sign for and hold your packages and Messenger drop-offs for you. You will be notified every time a package or drop off is received for you. You can then pick up the package at your convenience. **Sign up here!**

**What are the advantages of this service ?**

The main advantage is that you no longer need to re-arrange your schedule to be home for a package delivery, particularly when delivery windows cover a number of hours. Another advantage is not having to deal with missed delivery attempts and the disappointment of finding another Yellow "Delivery Missed" sticky on your door.

**What are the fees for this service?**

There is a $5 fee per package received, per day. Payable when you pick up your package.

**What types of packages does The UPS Store accept?**

We can receive packages up to 75 lbs. in weight w/o size limitations.

We can accept packages delivered by common carriers such as UPS, FedEx, DHL, Airborne as well Messenger drop-offs and private deliveries (dry-cleaners, flowers, etc.)

This service does not include deliveries of the US Postal Service (Mail). Rental of a mailbox and completion of a Mailbox Service Agreement is required for US Mail receipt.

**How does it work?**

Once you fill out the virtual doorman sign-up form you can go ahead and start having your boxes shipped. Make sure your address states:

Examples:
Virtual Doorman "Joe Smith"
C/O The UPS Store
401 E. Las Olas Blvd. #130
Ft. Lauderdale, FL 33301

There is a $5 fee per package received, per day. Payable when you pick up your package.

**Sign up here!**

**What happens if a package gets lost or damaged?**

All claims for loss or damage prior to the receipt at The UPS Store must be addressed to the sender or to the carrier involved in the transport.

The UPS Store does not accept responsibility for damages to packages received as The UPS Store does not evaluate the condition of the packages at the time of delivery. Only packages that represent an obvious safety hazard will be refused delivery (i.e. leaking fluids or other substances, jagged edges, etc.)

The UPS Store Ft. Lauderdale | The UPS Store Wilton Manors                                                                      © 2007 The UPS Store 4356.
All Rights Reserved.

CC



**Quick Tools >>>   Shipping Form – Package Tracking – Shipping Estimates**

FAQ
Packing
Ship it· Mail it
Copy Services
Mailboxes
Virtual Doorman
Fax Services
Shredding
Other Services
Coupons
Home

Email us
**2417 Welsh Rd**
**Phila PA 19114**
**Blue Grass**
**Plaza**
**Near Shop'N**
**Bag & Casino**
**Deli**
**215-464-1877**
Directions
**Hours**
**Mon-Fri:**
**8:30 – 6:30**
**Sat:**
**9:00 – 3:00**

On Duty:
**John**
**Tevis**
**Doug**
**Steve**

## Copy Services

- Color & B&W copies at the lowest prices in the NE
- Full service available
- Print your documents from email or disk
- Blueprint copies
- Binding & Laminating
- High-speed folding and stapling

## Shredding Service

- Secure shredding at an affordable cost
- Protect your identity from thieves

## Mailbox Rentals/Virtual Doorman

- 24 hour access
- Street address, not a PO#
- Receive from any shipper: UPS, FedEx, postal service
- Call in mailcheck
- *Virtual Doorman* allows you to receive almost anything, from packages to dry cleaning, without renting a mailbox

## Packing & Shipping

- Same UPS rates as the UPS counter and on-line, not a penny more!!!
- We'll pack it for you - the right way!
- Packing supplies for do-it-yourselfers
- Postal services (why stand in line at the post office?)

## Computer Services

- Computer rental with internet access
- Scan and email documents

## Other Stuff

- Fax service, sending and receiving
- Package receiving service (no waiting at home for your package)
- Passport photos

## March 2008

**NEW! Our annual mailbox promotion**
Rent a mailbox at the UPS Store and always know your mail and packages are safe. And, get up to 3 months free

**NEW! Shredding Services**
Your sensitive documents need not fall into the wrong hands. Protect your identity, and that of your customers. The UPS Store Northeast Philadelphia provides an easy, safe, and affordable way to shred your documents via the PROSHRED system.

## Save time with our on-line shipping form
In the comfort of your home, 24 hours-a-day. Fill out the on-line form, print it, and bring it in with your package. And if you have a House Account with us (not a UPS account) you can just drop it off.

## Non-Profits qualify for a free mailbox rental
That's right, no strings attached. Bring in proof of your non-profit status.



The UPS Store is an independently owned franchise. It's not owned by UPS, it's owned by your neighbor. When you shop at our store, you support a local business. We thank you for your support.

# DD



## The UPS Store is here to help you with all of your Packing, Shipping, Copying, Mail and Package Receiving needs.

| 3720 Spruce St. 215.222.2840 |  *The UPS Store* | 1735 Market St. 215.567.6006 |

**The UPS Store**

**Are you getting all of your letters and packages?**
Receive your mail and shipments in our secure location.
**Mailbox Special: Get our 1 year University Special**
**(Students, Faculty & Staff) for 20% off.**
**For $150 per year, receive all of your items securely!**
(Not good with any other offer or promotion)

Secure a mailbox with benefits.
20% OFF Mailbox Service

**3720 Spruce Street**
Phila. PA 19104-3602
**TEL: 215.222.2840**
FAX: 215.222.3902
store2473@theupsstore.com
**M-F: 8am - 7pm**
**Sat: 9am - 5pm**
**Sun: 12pm-5pm**

**1735 Market Street**
Phila. PA 19104-3602
**TEL: 215.567.6006**
FAX: 215.567.0669
store3263@theupsstore.com
**M-F: 8am - 6pm**
**Sat: 9am - 5pm**



# MAIL RECEIVING SERVICES
## VIRTUAL DOORMAN™ MAILBOX SERVICE

- **24 hour** - Mailbox Service with Suite and Street Address
- Mail Forwarding - Holding
- Call-in Mailcheck Service
- Parcel Receiving

# COPY SERVICES

## 59 Cent Color Copies!!!





## 5¢ B&W Copies ALL THE TIME!

- Quality Konica Self-Service Copies
- High Speed Full Service Copies
- Pre-Paid Copy Cards
- Colored and Resume Paper
- Full Color Copies



**The UPS Store**

## SHIPPING SERVICES

- UPS Authorized Shipping Outlet
- Worldwide Shipping
- Professional Packing Service
- Boxes, Bubble and Fill for Moving and shipping



## BUSINESS COMMUNICATION SERVICES

- Business Cards and Stationery
- Rubber Stamps and Labels
- FAX sending and receiving



## ETC. ETC. ETC.

- **FREE** Scheduled Pickup & Delivery
- Office/Mailing Supplies
- **Just Ask Us!**



**37120 Spruce Street**

Phila. PA 19104-3602
TEL: 215.222.2840
FAX: 215.222.3902
store2473@theupsstore.com
M-F: 8am - 7pm
Sat: 9am - 5pm
Sun: 12pm-5pm



**The UPS Store**

**1735 Market Street**
Ground floor, JFK entrance
Phila. PA 19103-7502
TEL: 215.567.6006
FAX: 215.567.0669
M-F: 8am - 6pm
Sat: 9am - 5pm



**The University City Network**

Receive E-mail Coupons & Specials from this merchant and many more when you join UCnet.com . . .

Get Your FREE E-mail Coupons » Here «

Comments regarding this website: info@ucnet.com
Copyright © 1997 - 2007 UCnet.com All rights reserved.

UCnet.com Privacy Policy

EE



# Forest Grove, OR

Home    Email Copy Jobs Contact Us

Packing
Shipping
Copying
Mailboxes
U.S. Postal
Pricing
Faxing
Services

2315 Pacific Ave
Forest Grove,
OR 97116

Next to
Pacific University

**TEL**
503-992-0121
**FAX**
503-992-0380

**MAP & DIRECTIONS**

Store Hours
**Mon-Fri**
9 AM - 6 PM
**Saturday**
9 Am - 3 PM

Mailbox Services



We offer our customers secure 24-hour access to their mail and postal deliveries. All mail is sorted and in your mailbox daily by noon.

When you get a mailbox with us, you have a street address, access to delivery of large packages, and receive all packages from carriers (e.g. UPS, DHL, FedEx, etc.). You no longer have to wait at home for a package delivery or risk having valuable shipments left on your doorstep. We can receive packages from any carrier and hold them in a secure location for pick-up at your convenience.

We also provide additional services such as mail forwarding, fax receiving and the ability to call-in and check for new mail.
Interested in opening a mailbox? Contact us for more information.

| MAILBOX RENTALS | | | |
|---|---|---|---|
| Size | 3 Months | 6 Months | 12 Months |
| Small (Personal Only) | $53.10 $0.59 a day | $75.60 $0.42 a day | $120.45* $0.33 a day |
| Medium (Personal or Business) | $72.00 $0.80 a day | $111.60 $0.62 a day | $178.85* $0.49 a day |
| Large (Personal or Business) | $99.00 $1.10 a day | $178.20 $0.99 a day | $288.35* $0.79 a day |

There is a $10 key deposit refundable when you leave and turn in the key and a $15 one time set up fee. *3 months free with 12 month contract, every time you renew!! Cannot use free months for payment if you cancel early.

Prices are only valid at the Forest Grove OR location.
The UPS Store is independently owned and operated
by licensed franchisees. Pricing & services may vary by location.

What is the difference between a mailbox with
The UPS Store versus the US Post Office?

**Interested in opening a mailbox?**
You can come in person or we can fax or mail you the necessary paperwork.

## Virtual Doorman

The Virtual Doorman Service is a service whereby we act as your *Personal Doorman* and for which you **must sign up!**
Without having a mailbox, we will accept packages from all messengers, private deliveries (i.e., flowers & dry cleaners) and all carriers *except* postal (mailbox service agreement and rental is required).
We will accept packages up to 75 lbs with no size limit and will notify you immediately.

Fees:
$5.00 for 1st package/day
$3.00 for each one delivered the same time with the first/day

$3.00 per package per day for storage after one week

FF

**The UPS Store™**
McKinney, Texas
El Dorado: (972) 540-2615
Stone Bridge: (972) 540-5755

HOME     SERVICES     EMPLOYMENT     LOCATIONS     CONTACT US

PRODUCTS & SERVICES

Document & Copy

Mailbox

Packaging

Moving Supplies

Shipping

Postal

House Account Program

See Our Other Services:

## VIRTUAL DOORMAN

The UPS Store will safely sign for and hold your packages and Messenger drop-offs for you. You will be notified every time a package or drop off is received for you. You can then pick up the package at your convenience.

**What are the advantages of this service?**

The main advantage is that you no longer need to re-arrange your schedule to be home for a package delivery, particularly when delivery windows cover a number of hours. Another advantage is not having to deal with missed delivery attempts and the disappointment of finding another "Delivery Missed" sticky on your door.

**What are the fees for this service?**

There is a $5 fee per package received, payable when you pick up your package.

Additional storage fees of $5/day apply to packages starting on the 4th day after we received the package, and additional fees may apply to oversize pakages.

**What types of packages does The UPS Store accept?**

We can receive packages up to 50 lbs. in weight and under (100–20x20x20) inches.

We can accept packages delivered by common carriers such as UPS, FedEx, DHL, Airborne and commercial delivery services.

This service does not include deliveries of the US Postal Service (Mail). Rental of a mailbox and completion of a Mailbox Service Agreement is required for US Mail receipt.

**How does it work?**

As soon as you sign up for this service, we will provide you with detailed instructions as to how packages need to be addressed.

*Ship to: Your Name*
*C/O The UPS Store*
*4100 W El Dorado Pkwy*
*Suite 100*
*McKinney , TX 75002*

By signing up for this service, the McKinney UPS Store will sign for your packages, which you can pickup at your earliest convenience.

HOME | SERVICES | EMPLOYMENT | LOCATION | CONTACT US

GG

The UPS Store.



**Nob Hill UPS Store #2537**

1844 N NOB HILL RD
PLANTATION, FL 33322-6548

Home

Locations

Document Services

Packaging and Shipping

Mailbox Services

Virtual Doorman

Package Tracking

Contact

## Get Better Rates!

PAYING TOO MUCH TO SHIP
OVERSEAS?

Try out our competitive
rates that beat those of
other courier services in
the USA.



We are
shipping experts.

# Virtual Doorman

By signing up for this service, The UPS Store will safely sign for and hold your packages and Messenger drop-offs for you. You will be notified every time a package or drop off is received for you. You can then pick up the package at your convenience.
**Sign up here!**

### What are the advantages of this service ?

The main advantage is that you no longer need to re-arrange your schedule to be home for a package delivery, particularly when delivery windows cover a number of hours. Another advantage is not having to deal with missed delivery attempts and the disappointment of finding another Yellow "Delivery Missed" stickie on your door.

### What are the fees for this service?

There is a $5 fee per package received, payable when you pick up your package. If we receive more than one package in a single day, the fee for the additional packages drops to $2. Storage fees of $2/day apply to packages starting on the 15th day after we received the package.

### What types of packages does The UPS Store accept?

We can receive packages up to 75 lbs. in weight w/o size limitations.

We can accept packages delivered by common carriers such as UPS, FedEx, DHL, Airborne as well Messenger drop-offs and private deliveries (dry-cleaners, flowers, etc.)

This service does not include deliveries of the US Postal Service (Mail). Rental of a mailbox and completion of a Mailbox Service Agreement is required for US Mail receipt.

### How does it work?

As soon as you sign up for this service, we will provide you, via mail, e-mail or fax, with detailed instructions as to how packages need to be addressed.

Example:

Ship to:

Virtual Doorman # xxxxx
c/o The UPS Store
1844 N NOB HILL RD
PLANTATION, FL 33322-6548

### What happens if a package gets lost or damaged?

All claims for loss or damage prior to the receipt at The UPS Store must be addressed to the sender or to the carrier involved in the transport.

The UPS Store does not accept responsibility for damages to packages received as The UPS Store does not evaluate the condition of the packages at the time of delivery. Only packages that represent an obvious safety hazard will be refused delivery (i.e. leaking fluids or other substances, jagged edges, etc.)

All packages received are insured by The UPS Store against loss for up to $10,000 per package.

Copyright © 2007 Nob Hill UPS | Contact | Login

HH

  

The UPS Store # 2540 and # 3200

Weston Lakes Plaza         Sawgrass Plaza
318 Indian Trace           12717 W. Sunrise Blvd
Weston, FL 33326           Sunrise, FL 33323
954-349-1628               954-845-6822

Home    Store Directions    Track a Package    Apply for a Job    Contact Us

 
Packaging & Shipping Services

## Virtual Doorman

 
Coupons Savings



By signing up for this service, The UPS Store will safely sign for and hold your packages and Messenger drop-offs for you. You will be notified every time a package or drop off is received for you. You can then pick up the package at your convenience. **Sign up here!**

 
Copy Center

**What are the advantages of this service ?**

The main advantage is that you no longer need to re-arrange your schedule to be home for a package delivery, particularly when delivery windows cover a number of hours. Another advantage is not having to deal with missed delivery attempts and the disappointment of finding another Yellow "Delivery Missed" stickie on your door.


Send Your Documents Online!

**What are the fees for this service?**

There is a $5 fee per package received, payable when you pick up your package. If we receive more than one package in a single day, the fee for the additional packages drops to $2

Storage fees of $2/day apply to packages starting on the 15th day after we received the package.

**What types of packages does The UPS Store accept?**


Mailbox Services

We can receive packages up to 75 lbs. in weight w/o size limitations.

We can accept packages delivered by common carriers such as UPS, FedEx, DHL, Airborne as well Messenger drop-offs and private deliveries (dry-cleaners, flowers, etc.)


Virtual Doorman Services

This service does not include deliveries of the US Postal Service (Mail). Rental of a mailbox and completion of a Mailbox Service Agreement is required for US Mail receipt.

**How does it work?**

As soon as you sign up for this service, we will provide you, via mail, e-mail or fax, with detailed instructions as to how packages need to be addressed.

Example:

Other Services

Ship to:

- Virtual Doorman # xxxxx
  c/o The UPS Store
  318 Indian Trace
  Weston, FL 33326

  or
- Virtual Doorman # xxxxx
  c/o The UPS Store
  12717 W. Sunrise Blvd
  Sunrise, FL 33323

**What happens if a package gets lost or damaged?**

All claims for loss or damage prior to the receipt at The UPS Store must be addressed to the sender or to the carrier involved in the transport.

The UPS Store does not accept responsibility for damages to packages received as The UPS Store does not evaluate the condition of the packages at the time of delivery. Only packages that represent an obvious safety hazard will be refused delivery (i.e. leaking fluids or other substances, jagged edges, etc.)

All packages received are insured by The UPS Store against loss for up to $10,000 per package.

© 2003 The UPS Store Las Olas
All Rights Reserved.

II



**The UPS Store™**

**10 Schalks Crossing Rd**
**Plainsboro, NJ 08536**
**609-275-9UPS**

**Low UPS Rates**

### Products and Services

Packaging Services

Shipping Services

Copy Services

MailBox Services

Mail Forwarding

US Postal Services

Fax Services

Business Services

Personal Services

Virtual Doorman Service

**The UPS Store**

10 Schalks Crossing Road
Plainsboro, NJ 08536

609.275.9UPS Tel
609.275.9897 Fax

Hours:
M-F 8-6:30
Sat 9-3
Sun Closed

Map and Directions

## Frequently Asked Questions

**What is Virtual Doorman Service?**
By signing up for this service, The UPS Store will safely sign for and hold your packages and Messenger drop-offs for you. You will be notified every time a package or drop off is received for you. You can then pick up the package at your convenience.

**What are the advantages of this service ?**
The main advantage is that you no longer need to re-arrange your schedule to be home for a package delivery, particularly when delivery windows cover a number of hours.
Another advantage is not having to deal with missed delivery attempts and the disappointment of finding another Yellow "Delivery Missed" stickie on your door.

**What are the fees for this service?**
There is a $5 fee per package received, payable when you pick up your package.

If we receive more than one package in a single day, the fee for the additional packages drops to $2.

Storage fees of $2/day apply to packages starting on the 15th day after we received the package.

**What types of packages does MBE accept?**
We can receive packages up to 75 lbs. in weight w/o size limitations.
We can accept packages delivered by common carriers such as UPS, FedEx, DHL, Airborne as well Messenger drop-offs and private deliveries (dry-cleaners, flowers, etc.)
This service does not include deliveries of the US Postal Service (Mail). Rental of a mailbox and completion of a Mailbox Service Agreement is required for US Mail receipt.

**How does it work?**
As soon as you sign up for this service, we will provide you, via mail, e-mail or fax, with detailed instructions as to how packages need to be addressed.

**Custom Calendars**
Now available for 2004





Small or big. We have boxes for your many needs.

Example:

Ship to: Virtual Doorman # xxxxx
      c/o The UPS Store
      10 Schalks Crossing Road
      Plainsboro, NJ 08536

What happens if a package gets lost or damaged?
All claims for loss or damage prior to the receipt at The
UPS Store must be addressed to the sender or to the
carrier involved in the transport.
The UPS Store does not accept responsibility for damages
to packages received as The UPS Store does not evaluate
the condition of the packages at the time of delivery.
Only packages that represent an obvious safety hazard
will be refused delivery (i.e. leaking fluids or other
substances, jagged edges, etc.)
All packages received are insured by The UPS Store
against loss for up to $10,000 per package

Home | Shipping | Packaging | Copy | Mailbox | USPS | Fax I Business I Personal

Copyright 2003 The UPS Store, Plainsboro, NJ All rights reserved

# JJ

# New York's Upper East Side Megasite

## Mail Boxes Etc

**Uppereast.com**
**NY's Web Megasite**

- About Uppereast.com
- Advertising
- Art, Galleries & Museums
- Beauty, Health & Fitness
- Clothing & Accessories
- Community & Learning
- Computing & Technology
- Entertainment & Events
- Family & Relationships
- Finance & Business
- Food, Dining & Nightlife
- Home, Living & Real Estate
- Medical & Dental
- Shopping
- Spiritual Side
- Sports, Games & Toys
- Travel & Getting Around
- Upper East Side Hotels
- Upper East Side Avenues
- Upper East Side Streets
- Upper East Side Articles
- Upper East Side Events
- Upper East Side Videos
- Upper East Side Photos
- New York Links

- Email
- Search



Mail Boxes Etc
954 Lexington Ave (69th & 70th)
New York, NY 10021
212-288-4425
E-mail
Open Mon-Fri: 9am-7pm; Sat: 10am-5pm

Since 1990, our family owned franchise has been providing thousands of busy Upper Eastsider's with "the best" of shipping and packaging services. By offering a wide choice of shipping providers this busy little shop offers Fedex, UPS, DHL, and the United States Postal Service as the everyday solution for small package shipping. Utilizing years of experience and a powerful on-line system, we offer the widest range of shipping services and the most economical options into today's marketplace.

Besides the wide array of shipping services, this Mail Boxes Etc. has been designated by UPS, Fedex, and DHL as an Authorized Shipper, meaning that every employee has been thoroughly trained to carefully wrap and pack anything, from Grandma's antique dishes to Fido's dog bowl and everything in between.





In fact, many of the top Upper Eastside auction houses recommend us to their clients knowing that we'll do what ever it takes to make sure their parcel makes it to its destination safely.

International Shipping – NO PROBLEM. Tax, Duties, Custom Forms, Tackable, Insured, NO PROBLEM; we simplify the process. Be confident, we'll cut the red tape and get your package to its destination safely, securely, and on-time.

But we're not only about packaging and shipping.

- Supplies - We carry a complete inventory of packaging and shipping supplies.
  - Boxes – Small or large we have 1000's of boxes in stock, with 30 different sizes and styles.
    - Book Boxes
    - Wardrobe Boxes
    - Garment Boxes
    - Picture / Mirror Boxes
    - Luggage Boxes
    - Golf Club Boxes
  - Mailing Tubes
  - Bubble Wrap
  - Peanuts / Air Bags
  - Packaging Tapes
  - Padded Envelopes
  - Plain Envelopes

- Mail Box Services - Need a great street address? How about your name or your company name followed by 954 Lexington Ave, New York, NY 10021 for all your incoming mail and parcels. No Problem. We'll gladly receive your mail and any packages that can fit through our door. That's right UPS, Fedex, DHL, messenger, (even your cleaners); we'll gladly accept them all on your behalf. But the service doesn't end there; waiting for the "check is in the mail" or your sons' acceptance letter from Harvard, no need to run over and check your mail every day. We'll gladly check your mail upon your phone request, it's that easy! Now that the check has finally arrived and you're already on your way to

the Hampton's for the weekend, no need to turn around in all that traffic. We'll forward to you and gladly follow you around the globe if you wish.

- **Virtual Doorman Service** - You don't really need a mailbox, but you live in a brownstone and never seem to be home when UPS wants to deliver. No Problem, use our Virtual Doorman Service. With a little advance planning we'll gladly accept almost anything on your behalf.

- Other Services:
  - Home or Office Pickup Always Available
  - Luggage Shipping
  - Messenger Service
  - Fax Services
  - B/W Copies
  - Mail Forwarding
  - US Postage Stamps
  - Metered Mail
  - Certified Mail
  - Priority Mail
  - Express Mail
  - Prepaid Dropoffs: USP, USPS, FedEx, DHL

---

**FEATURED SPECIAL: Overnight Flat Rate Envelopes**
Anywhere in the US*

**$15.95**

Trackable. Guaranteed.

*Continental US only
*Rural & remote location may be 2-day delivery.

---

[ Search ]

Uppereast.com is the top information source for New York's Upper East Side. Please send your suggestions or inquiries to us via e-mail.

Join Our Email List [        ] [Join]

Articles  Apartments  Art  Bars & Restaurants
Children's Boutiques  Clothing  Churches  Community
Electronics  Entertainment  Family  Finance  UES Hotels  Manhattan Hotels
Real Estate  Medical & Dental  Nightlife  Personal Care  Pets
Restaurant Menus  Shopping  Toys  Travel
View our Privacy Policy

[ BOOKMARK ]

J



**TECHNOLOGY** June 12, 2007, 12:01AM EST

# It's Carlton, Your Cyber Doorman

A startup has created a virtual doorman to replace the welcoming smile and cost of a person in the lobby

by Catherine Holahan

In Manhattan, the modern interpretation of "luxury building" probably just means there's enough living space for a couch and a dining room table. This is not to be confused with a "modern luxury building" like the one being developed by the architects at Flank in the ultra-exclusive Sutton Place neighborhood.

The plans call for a glistening glass tower composed of eight spacious townhomes—each with conveniences one might expect for a $3 million price tag. Think a personal car and driver at your disposal.

Noticeably absent from the drawings, however, is a well-dressed man stationed in the lobby. Instead, the plans call for a cyber doorman—an interactive service programmed to handle everything from unlocking your apartment door for the dog walker to accepting packages and turning away solicitors. "It is the way new developments are going to be structured," says Jennifer Bell, Flank's director of global marketing. "The clientele tend to seek privacy and anonymity. They don't really like conversation when they come in the door....At the same time, they want the convenience and safety of knowing someone is there."

## VIRTUAL SUBSTITUTES

Improbable as it seems, even the smiling doorman isn't immune to being replaced by technology. Rather than pay someone to stand there in uniform, dozens of small and midsize buildings in Manhattan already rely on a combination of video cameras, computers and remote watchmen that spring to action only when a resident has a request or the cameras alert them to trouble.

On June 11, a company named Virtual Service announced an upgrade to its "Virtual Doorman" that enables users to interact with these systems via the Web. A tenant could, for example, go online to accommodate a change in schedule for the dog walker, who usually shows up at 3 p.m., but needs the door opened half an hour earlier.

To ensure the visitor is the dog walker, the tenant can upload a photograph for the human on the other end of the camera or maybe require more exact identification like a fingerprint scan. A hidden camera in the home can then be activated when the dog walker arrives to ensure that the dog is, in fact, taken for a walk. If the dog walker does not return at the appointed time, the owner can be alerted.

## FILLING A NICHE

The Web-based service is expected to launch later this year. Colin Foster, one of the co-founders of Virtual Service, says the technology has begun to take off as young, tech-savvy users enter New York's real-estate market. "Younger, hip Wall Streeters are buying luxury apartments and they want a small building with all the amenities," says Foster. By next spring, the company plans to introduce the virtual doorman in other cities such as Boston and Washington.

Small and midsize luxury buildings are considered a prime market, says Foster. One reason is privacy. The people who move into smaller buildings don't necessarily want to be on a first-name basis with the guy who monitors the door. "You don't have to deal with a doorman every day—I definitely think there is an appeal to that," says Ross Berman, a principal in NY Citiwise, a boutique real estate firm that's installing Virtual Doorman in a building in Manhattan's Chelsea neighborhood.

## FINANCE ISSUES

A bigger reason for a virtual doorman is money. For smaller buildings with fewer owners to cover shared expenses, even a single doorman working a daytime shift can be cost-prohibitive. A $30,000-plus salary in addition to health-care coverage and other benefits can add up to hundreds of dollars per month in maintenance fees for each apartment. "The doorman is really doing nothing for 80% of the day," says Foster.

Of course, doormen and the people they serve may disagree. After all, a human can be called upon to let the dog out in a pinch. Or, where a live doorman might recognize a regular delivery, a virtual attendant can become a chore.

"If someone is in the middle of a business meeting," says Michael Goldenberg, executive director of sales for Halstead Property, a New York brokerage, "they do not want to have to stop what they are doing to decide whether they want to let someone in."

*Holahan is a writer for BusinessWeek.com in New York.*

Copyright 2000-2008 by The McGraw-Hill Companies Inc. All rights reserved.

**The McGraw·Hill Companies**

KK

| **Tampa UPS Stores** | Tampa Palms #0904<br>16057 Tampa Palms Blvd W<br>Tampa, FL 33647<br>813-971-2345 | Wesley Chapel #4071<br>1936 Bruce B. Downs Blvd<br>Wesley Chapel, FL 33543<br>813-994-1777 | Cross Creek #4513<br>10006 Cross Creek Blvd<br>Tampa, FL 33647<br>813-907-7200 |

Home    Store Directions    Track a Package    Download Brochure    Contact Us


Packaging & Shipping Services


Send Your Documents Online!



Copy Center

Mailbox Services





Virtual Doorman Services

Can't find a place to park?
Dont' want to come in?
Now offering...
Curb-Side Package Pickup!
Click here for details

# Virtual Doorman

By signing up for this service, The UPS Store will safely sign for and hold your packages and Messenger drop-offs for you. You will be notified every time a package or drop off is received for you. You can then pick up the package at your convenience.

### What are the advantages of this service ?

The main advantage is that you no longer need to re-arrange your schedule to be home for a package delivery, particularly when delivery windows cover a number of hours. Another advantage is not having to deal with missed delivery attempts and the disappointment of finding another Yellow "Delivery Missed" sticky on your door.

### What are the fees for this service?

There is a $10 fee per package received, payable when you pick up your package. If we receive more than one package in a single day, the fee for the additional packages drops to $5

Storage fees of $5/day apply to packages starting on the 3rd day after we received the package.

### What types of packages does The UPS Store accept?

We can receive packages up to 75 lbs. in weight w/o size limitations.

We can accept packages delivered by common carriers such as UPS, FedEx, DHL, Airborne as well Messenger drop-offs and private deliveries (dry-cleaners, flowers, etc.)

This service does not include deliveries of the US Postal Service (Mail). Rental of a mailbox and completion of a Mailbox Service Agreement is required for US Mail receipt.

### How does it work?

As soon as you sign up for this service, we will provide you, via mail, e-mail or fax, with detailed instructions as to how packages need to be addressed.

Examples:  (for the 2 participating)

Ship to: Virtual Doorman (Your Name)
C/O The UPS Store
1936 Bruce B. Downs Blvd
Wesley  Chapel, FL 33543

Ship to: Virtual Doorman (Your Name)
C/O The UPS Store
10006 Cross Creek Blvd
Tampa, FL 33647

### What happens if a package gets lost or damaged?

All claims for loss or damage prior to the receipt at The UPS Store must be addressed to the sender or to the carrier involved in the transport.

The UPS Store does not accept responsibility for damages to packages received as The UPS Store does not evaluate the condition of the packages at the time of delivery. Only packages that represent an obvious safety hazard will be refused delivery (i.e. leaking fluids or other substances, jagged edges, etc.)

© 2007 MAC Distribution, Inc.
All Rights Reserved.

LL

Advertisement

Prudential Douglas Elliman

A COLLECTION
OF PROPERTIES

Thousands of
fine properties
on the market now



March 2008
Su M T W Th F S
1
2 3 4 5 6 7 8
9 10 11 12 13 14 15
16 17 18 19 20 21 22
23 24 25 26 27 28 29
30 31

Tuesday, April 01, 2008
Last Update: 05:25 PM EDT

NYC Weather
62 ° CLOUDY



# NYP HOME: REAL ESTATE

Real Estate Home | Property Search | Dream Homes | Houses of the Week

Jump to: Just Sold | Braden Keil | More stories | Neighborhood Profiles

« This week's calendar | Blog Home | This week's calendar »

October 26, 2007

## Open season

Our favorite open houses this week:



**220 W. 111th St.,** Harlem, **$551,000**
*Sunday, 1 p.m. to 2 p.m.*

When you say you "live just off the park," 111th Street isn't typically the first place that comes to mind. This two-bedroom sits just one block away from Central Park, though, and is available for the sort of price you're never going to find at The Dakota. The restored, century-old building comes with a bike room, laundry room and virtual doorman. The apartment itself has maple floors and crown moldings throughout.

**4 N. 5th St.,** Williamsburg, **$761,990**
*Saturday, 1 p.m. to 4 p.m.*

Buy a condo, annoy a hipster. No, that's not the official slogan for Toll Brothers' Northside Piers development, but it probably could be. Such is life in an up-and-coming (as Williamsburg seems perpetually to be) neighborhood. This one-bedroom comes with high-end kitchen equipment like a Sub-Zero refrigerator and a bathroom decked out with a marble vanity and Kohler soaking tub. The building itself counts among its perks a fitness center, massage room, rooftop terrace and 24-hour concierge.

**312 E. 23rd St.,** Gramercy, **$995,000**
*Sunday, 2 p.m. to 4 p.m.*

This two-bedroom in Gramercy's Foundry building is a condop, meaning that while you'll have to come up with 20 percent down to buy, you can sublet your place after you've owned it for a year. At just over $800 a square foot, that doesn't sound like too bad a setup. The 12-foot vaulted ceilings and living room with exposed brick walls sound pretty good, as well.

**135 W. 89th St.,** Upper West Side, **$329,000**
*Sunday, 12:30 p.m. to 2 p.m.*

"Deal Fell," says the online listing for this recently renovated Upper West Side one-bedroom. In other words, it's back on the market and ready for the taking. The pet-friendly building has common storage, and the apartment itself comes with new kitchen appliances and a new windowed bath. Add to that the fact that it's priced at under $600 a square foot, and it's hard to see why the original buyer backed off. Credit problems? An unfriendly co-op board? Extraordinary rendition? Count us intrigued.

**154 Attorney St.,** Lower East Side, **$5,995 a month**
*Sunday, noon to 2 p.m.*

How do you afford your rock 'n' roll lifestyle? Easy -- you turn the rec room of this two-story Lower East Side apartment into a bedroom and rent it to some starry-eyed kid fresh in from Kankakee. Show him the open kitchen

Advertisement



Sometimes
help is right
at your fingertips.

Call 1-866-NY-QUITS
1-866-697-8487
or click here

New York State Department of Health

ARCHIVES   LAST 10

- Full-service storage
- The weekly wrap-up
- This week's calendar
- Table the motion
- The weekly wrap-up
- This week's calendar
- Earth mothering
- The weekly wrap-up
- This week's calendar
- Czech it out

SERIOUSLY, THIS GUY ISN'T FUNNY

HEAT ON 'HATCHET SQUAD'

SHE LOOKS LIKE PARIS, BUT BEWARE

ROCK CHICK

LOONY (B)INN

'CLYDE' TO THE RESCUE

AMAZIN' JOHAN OPENS & SHUTS

WHIP IT! WHIP IT GOOD!

JACKO MAY BE BACKO

SHAQ, RILEY: 2 OF AN UNKIND

Sponsored Links

**Trex Dream Decks.**
Spend Less Time Working On Your Deck And More Time Relaxing On It.
www.Trex.com

**I Had High Blood Pressure**
Now it's down to 120/75. Find out how I did it without drugs
www.resperate.com

**Rocket Stock Alert - OXFD**
Make Big Bucks in Bad Loans. Profit from Mortgage Meltdown.
Invest Now
www.OxfordFunding.com

Buy a link here

Syndicate this site

and the in-building laundry and storage. Then take him out for a look at your 700-square-foot private garden -- after that, he'll pay you pretty much whatever you ask. **-- Adam Bonislawski**

Posted by Adam Bonislawski on October 26, 2007 09:05 AM

# Comments
## Post a comment

Name:

Email Address:

Comments:

By submitting these comments, I agree to the NYPOST.COM Terms of Use and Rules for Discussion. I understand and agree that content I post becomes the property of NYPOST.COM.

[ Preview ]  [ Post ]

Powered by: Movable Type 3.17
NEW YORK POST is a registered trademark of NYP Holdings, Inc.
NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.COM
are trademarks of NYP Holdings, Inc.
Copyright 2008 NYP Holdings, Inc. All rights reserved.

Sponsored Links

**Rocket Stock Alert - OXFD**
Make Big Bucks in Bad Loans. Profit from Mortgage Meltdown. Invest Now
www.OxfordFunding.com

**Trex Dream Decks.**
Spend Less Time Working On Your Deck And More Time Relaxing On It.
www.Trex.com

**I Had High Blood Pressure**
Now it's down to 120/75. Find out how I did it without drugs
www.resperate.com

**What's Your Credit Score?**
View All 3 Credit Scores and Credit Reports Online Now. See it for $0.
freecreditreportinstantly.com

Buy a link here

MM

WoW players: we have all your patch 2.4 news!



Tip us on news!
RSS Feed | Category Feeds

Engadget in: Español | 繁體字 | 简体字 | 日本語

Search

# engadget

## Virtual doormen becoming more ubiquitous

Posted Dec 29th 2007 1:48AM by Darren Murph
Filed under: Mac, Gadgets

Amazingly enough, virtual doormen aren't
exactly new, but it seems that they're becoming
entirely more ubiquitous (and accepted) in
today's society. Increasingly, more and more
apartment dwellers are coming home to voices
in the wall rather than a physical life form, but
virtual doormen can still let tenants into their
room, allow deliveries to be made and keep
disgruntled in-laws out. As you'd expect, these
firms rely primarily on an internet connection, a
webcam and a couple of microphones, and while

typical services can range from "$10,000 to $70,000 for installation and $6,000 to
$30,000 in annual maintenance," that still beats the $250,000 or so it would purportedly
take for a small building to be staffed with full-time, on-site doormen. The next
evolutionary step? Androids answering the buzz, and subsequent hacks to gain entry
into any room you please.

[Via ChipChick]

**Tags:** apartment, cyberdoorman, doorman, interaction, social, virtual, virtual doorman,
VirtualDoorman

Read | Permalink | Email this | Comments [20]

### Guaranteed:

The return on a High Yield CD.
Now combined with the tax
advantages of a No Fee IRA.

## High Yield CD IRA

Bank of America
Bank of Opportunity            Learn More
MEMBER FDIC


### RELEVANT POSTS

- Texting generation carrying spelling habits to birth certificates? (19 days ago - 111 Comments)
- Posey makes playing with snap-together blocks okay for adults (52 days ago - 16 Comments)
- Wable graphically represents web activity, ain't much of a table (53 days ago - 13 Comments)

## Reader Comments (Page 1 of 1)          Subscribe to these comments

Invisiblemoose                                    Neutral
@ Dec 29th 2007 1:57AM

Honestly, I don't think I'd want to stay at place that couldn't splurge for real
employees...

---

### BREAKING NEWS »


**ASUS' 9-inch Eee PC 900 hits the FCC with full teardown, gets multi-finger gesture support**


**Motorola splits in two: Mobile Devices, and Broadband and Mobility Solutions**


**Official: ASUS 8.9-inch Eee PC will include touchscreen, possibly GPS**


**PS3 2.20 update is out, get your BD-Live while it's fresh**


**XM / Sirius merger approved!**

### FEATURED STORIES »


Motorola insider tells all about the fall of a technology icon


SanDisk Sansa Fuze hands-on



How would you change the outcome of the 700MHz auction?


Movie Gadget Friday: 2001: A Space Odyssey

---

### Upgrade to Mac.

The world's most advanced operating
system is here. Take a guided tour
and learn all about Mac OS X Leopard.

Take the guided tour ›



 Mac

Click to Replay

latest cellphone and mobile news from

## engadget mobile

The Motorola Z9's amazing, exciting accessories in the
wild

Move over, Opera Mini: TeaShark to offer desktop-
quality browsing, too

LG KF300: the Wine Phone goes global

Windows Mobile 6.1 gets tweaked, mildly integrated into
Windows Live

Motorola insider tells all about the fall of a technology
icon

latest high definition and home theater news from

## engadget HD

HDTV Listings for March 26, 2008

More HD Major League Baseball than anyone can
possibly watch

Format war's end to propel Blu-ray into 29 million
homes this year

AT&T's U-verse headed to San Antonio's Vidorra
Condominiums

WWE preps Wrestlemania XXIV on Blu-ray

### FEATURED GALLERIES

FCC auction aftermath





SPONSORED LINKS

We'd love to know about your electronics purchasing habits. Please take this brief marketing survey.

There's so much more you can do when your phone runs Windows. See it all at StartDoingMore.com...



Reply

**thethirdmoose**
@ Dec 29th 2007 2:09AM    Neutral

What if you don't want to pay for real doormen?

**Invisiblemoose**
@ Dec 29th 2007 2:28AM    Highly Ranked

I do... I do want to pay for a real doorman. That's my point. It's worth it to me. We have the technological potential to automate most of the simple jobs in the world. In the future, nearly all jobs could be done without people.

But then what would be the point of people? Are we obsolete? Should we be phased out? Or should we be lined up in huge lines of capsules, eternally kept alive in dream state, with the world run by machines?

**johnnychipface**
@ Dec 29th 2007 4:07AM    Neutral

I can see where you're coming from; I've been to a few supermarkets with self service supermarkets and I don't really like them (pointless anyway since some people take 10 minutes to work out what's going on and they still have to pay people to stand and watch them).

**Drkmstr104**
@ Dec 29th 2007 2:54AM    Neutral

O_o if my last name were "Bates" , I would hire a butler to say , "Welcome home, Master Bates!"

A virtual doorman voice would become irritating after a while.

"Stephen Hawking's voice" "Welcome home, Master Bates."

Reply

**NovaLand**
@ Dec 29th 2007 3:07AM    Neutral

I'd settle for Douglas Fargos female-inspired voice

**John M**
@ Dec 29th 2007 3:25AM    Neutral

Sorry but a disembodied voice isn't even close to the same thing that the personal relationship that you form with your doorman, there is no way that I would ever come close to comparing the smiling face that greeted me tonight when I came home to an anonymous voice over a speaker.

Reply

**johnnychipface**
@ Dec 29th 2007 4:09AM    Neutral

Won't be long before computers have personalities (some pc's already seem to have them) and can form relationships though (I give it 2 to 2000 years).

**601210**
@ Dec 29th 2007 4:20AM    Neutral

@johnnychipface

Personality doesn't equal personal relations. Normal people can't have the same relationships with computers because a computer doesn't have a life. It is a bunch of electronic parts that only exist for a certain purpose. You can't invite a computer over for dinner. You can't give it a Christmas present.

**ocelot67**
@ Dec 29th 2007 4:34AM    Neutral

If ubiquitous means existing or being everywhere, how can something be "more" ubiquitous?

Reply

**mkhall**
@ Dec 29th 2007 10:45AM    Neutral

Thank you. I wanted to say the same thing, but was hoping someone else would point it out first.

**Loopy**
@ Dec 29th 2007 5:25AM    Neutral

So this is kind of like the Lisa Server project Scrs is making? I think there

---



Get the Best Value
in Broadband

**Verizon High
Speed Internet**

First Month FREE

**$12.99**
per month*

*for months 2-6 with
1year agreement

[Get Connected]

## SECTIONS

Announcements
Ask Engadget
Cellphones
CES
Desktops
Digital Cameras
Displays
Features
Gaming
GPS
Handhelds
HDTV
Home Entertainment
Household
Interviews
Laptops
Media PCs
Meta
Misc. Gadgets
Networking
Peripherals
Podcasts
Portable Audio
Portable Video
Robots
Storage
Tablet PCs
Transportation
Wearables
Wireless

## RESOURCES

About / Masthead
Media / Press / PR
FAQ
Engadget Software
Contact Us
Corrections

---

## MOST COMMENTED ON (7 DAYS)

Lenovo X300 ad takes the MacBook Air head-on (315)

**WEBLOGS, INC. NETWORK**

Autos

Technology

Lifestyle

Gaming

Entertainment

Finance

Also on AOL





Site Problems
Advertise

**SUBSCRIBE**

My AOL
MyYahoo
Google
Bloglines

POWERED BY
BLOGSMITH

**QuickBooks**

QuickBooks
Pro 2008

Get back
to business.

GET $20 OFF

Buy It Now

· Track Sales
· Pay Bills
· Create Invoices

concept is much much better than this.

Reply

**Loopy**    Neutral
@ Dec 29th 2007 5:27AM

Ahh dummy me, Forgot the link... http://logic-robotics.com/LisaServer.aspx

**Paul Reimann**    Neutral
@ Dec 29th 2007 8:29AM

Looks like another job oppurtunity for Trannies.

Reply

**Wwhat**    Highly Ranked
@ Dec 29th 2007 10:21AM

Wow, a doorman makes $684 a day? or $20,833 a month? who knew... apart from engadget staff that is.

Reply

**NovaLand**    Neutral
@ Dec 29th 2007 10:40AM

There's a huge difference between what one is making in salary and what the service costs the company. Not only should u pay for the equipment (uniform, etc), but also the need for the service 24h/day and a backup somehow, since humans tend to get sick and have vacation. If you have ever had a job, u know that labour is the most expensive costs in almost all cases, except perhaps in [insert any third world country here].

**BigD145**    Neutral
@ Dec 29th 2007 3:54PM

I foresee many layoffs and a steep decline in the pay of doormen to match these systems.

**Wwhat**    Neutral
@ Dec 29th 2007 6:24PM

20 grand a month... doorman..

**captainnoah**    Highly Ranked
@ Jan 11th 2008 9:36PM

Since reading about this in the NY Times, I actually met someone that lives in a building that has a Virtual Doorman. I also did some research on the two companies that were mentioned in the article and think I can explain what the product actually does.

Basically the service is aimed at smaller buildings. The engadget quote of 250k is for a full time doorman service, which probably consists of 4 doormen's salaries, plus the costs of their benefits. There's a doorman union (32BJ) that a lot of buildings have doormen from, so the pay is probably standardized to some level although I couldn't find numbers on it. My building is 220 units, so we can afford the cost of the full time doormen, live in super, and porters. Smaller buildings like the walk ups that are being converted to luxury condos only have 10 units or so. Take the 250k and divide by 10 and a doorman would cost each unit 25k a year on top of the other building maintenance charges. I guess the aim is to add doorman "services" to smaller buildings that would typically go doormanless simply because of their size. Additionally, residents save by not tipping their doormen during the holidays. I recently dropped close to $1000 on holiday tips for my building's staff of 8.

As far as the service goes, the building is always locked and residents use a card key system to get in. When they have a delivery, the delivery person uses the intercom and the tenant buzzes them in if they are home to do so. If they aren't home, the delivery person uses the virtual doorman buzzer and then interacts with a live person in a remote monitoring center who decides whether or not to let the person into the building. The guy I talked to seemed to like it and had said that he didn't have any problems getting furniture delivered when he moved in (the building was new so I imagine that it was common at the time to have furniture deliveries). He said his lobby has a big package room where the deliveries get placed and that the virtual doorman can unlock that door as well.

I guess the whole idea is pretty cool. It basically seems like a "doorman timeshare" sort of system where you're only paying for a doorman when you need one. I didn't ask how much the service cost or what the billing plan was like (whether it was a flat monthly fee, or incremental billing like cell phone minutes). I've came back late at night to catch my doorman asleep at the desk, so I'm not sure that he's the best security money can buy, but at the same time, I know that if I was in danger, I could run into the building and a live person would be there to assist me and call for help if necessary. In the end it all comes down to what you can afford and what you can live with (or can't live without).

Reply

**captainnoah**    Highly Ranked



@ Jan 11th 2008 9:47PM

I forgot to include the links to the two companies that provide virtual doorman service. They're both based in NYC. Looks like the Virtual Service one might be a bit more established, but their company website doesn't look as good as the virtual doorman one.

www.virtualdoorman.com
www.cyberdoorman.com

Reply

### ADD YOUR COMMENTS

Please keep your comments relevant to this blog entry. **Email addresses are never displayed, but they are required to confirm your comments.**

When you enter your name and email address, you'll be sent a link to confirm your comment, and a password. To leave another comment, just use that password.

To create a live link, simply type the URL (including http://) or email address and we will make it a live link for you. You can put up to 3 URLs in your comments. Line breaks and paragraphs are automatically converted — no need to use <p> or <br> tags.

Please note that gratuitous links to your site are viewed as spam and may result in removed comments. And yes, comments are moderated.

| New Users | Current Users |
|---|---|
| Name | E-mail: |
| E-mail | Password |

☑ Remember Me

☑ E-Mail me when someone replies to this comment

Add your comments:

Add Your Comments

All contents copyright © 2003-2008, Weblogs, Inc. All rights reserved

Engadget® is a member of the Weblogs, Inc. Network, Privacy Policy, Terms of Service, Notify AOL


GAMEFLY   FREE VIDEO GAME RENTALS   Join Now for a FREE TRIAL   Click Here

Other Weblogs Inc. Network blogs you might be interested in:



joystiq

- Enjoy your Prologue, Gran Turismo 5 'about a year away'
- PSN accounts possibly compromised, 'small percentage' affected
- Pachter: Take-Two's rejection of EA offer a mistake

downloadsquad

- ZipInstaller lets you install Windows apps without and installer
- Talking OpenSocial with Google's Kevin Marks
- Today is Document Freedom Day


tuaw.com
The Unofficial Apple Weblog

- Security Update 2008-002 v1.1
- SoundAsleep 1.0

BloggingStocks

- Consider U.S. Steel to strengthen your portfolio
- John McCain gets it right on the mortgage mess

Virtual doormen becoming more ubiquitous - Engadget
Case 1:08-cv-01997-GK   Document 1-41   Filed 05/07/2008   Page 6 of 6
3/26/2008

- RadTech ProCable iPhone headset
- Hitting the skids in Florida





- Move over, Opera Mini: TeaShark to offer desktop-quality browsing, too
- LG KF300: the Wine Phone goes global
- Windows Mobile 6.1 gets tweaked, mildly integrated into Windows Live

- VIDEO: Porsche GT3 Cup Car vs. Cayman GTR... on 11th Ave.
- Volkswagen may bid on Yugo, um, we mean Zastava
- Mosler announces MT900 Challenge spec race series in Europe

NN



# Marketing.fm

The Frequency of Change Marketing Blog -- Marketing and Advertising 2.0

| home | marketing network | links | about | podcast |

Looking for more about **VIRTUAL DOORMAN?**

From my content:
- Virtual doormen becoming more ubiquitous - Engadget
- Marketing.fm » 2008 » January
- More results for VIRTUAL DOORMAN...

powered by Goo

## Virtual Doorman – Better or Worse?   January 1, 2008

Posted by Eric in : Marketing.fm , trackback

Customer service is very important. Luxury buildings justify their prices by having superb concierge services   and tout massive staff on hand to help you at any request.

I recently read about Virtual Doormen becoming more of a reality, and it got me thinking about customer service.

Does this service justify a higher price tag due to the efficiency, safety, and high tech aspect to a building?

Does this service take away from the prestige of a real person and the value of having someone you "know" and them "knowing you"?

I think its an interested filter to look at this problem in two ways:

1. it adds value
2. it detracts value

I live in New York City where there are plenty of Doormen, all in unions I think, and it makes me feel safer. I also know that many buildings say they have a huge staff which is a draw to many people. As more high tech options become "better" I am wondering if people would tolerate this practice.

I think the answer is no for awhile. We may start seeing more oversight and integrated virtual doorman systems, but there will not be a mass exodus of these folks for some time.

I can however see new developments and areas that previously did not have such levels of service building these systems into their gatehouses, entryways, garages, etc... in hopes of charging more.

In a world where your company, service, or product is judged by every angle – it is important to think about how a "cool" or "high tech" option may not always be the best choice.



search [          ] go

Enter your email address:

[          ]

Subscribe

Delivered by FeedBurner

Subscribe to Marketing.fm

BY FEEDBURNER

B Bloglines

MY YAHOO!

Google

### Search Marketing.fm

VIRTUAL DOORMAN   search

**Popular Searches**

future of marketing   bebo
evangelism noo!   microsoft ethics...   itunes
radio...   ari-marketing...   www.chipotle.com
orbitz free 411   print media online...   you
tube   resume key words for...   video of
japanese...   flight   "waterfall...

Get this Wjit



Proud member of

**Marketing and Advertising**

a
FeedBurner
Network





Recent Posts

The Best & The Worst Airlines 2008

What is Next in Marketing Presentation

Logobama

Viral Marketing for Batman

A Slight Problem With Ad Exchanges... (warning NSFW)



Proud Member
**9rules** Network

**January 2008**

| M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |  |  |  |

« Dec                    Feb »

Archives

- March 2008
- February 2008
- January 2008
- December 2007
- November 2007
- October 2007
- September 2007
- August 2007
- July 2007
- June 2007
- May 2007
- April 2007

- March 2007
- February 2007
- January 2007
- December 2006
- November 2006
- October 2006
- September 2006
- August 2006
- July 2006
- June 2006
- May 2006
- April 2006
- March 2006
- February 2006

## Eric's Blog Reading

- Alley Insider
- Anil Dash
- AVC – Fred Wilson
- Burnham's Beat – Bill Burnham
- El Gaffney – Seth Gaffney
- Feld Thoughts – Brad Feld
- Greg Verdino
- Logic+Emotion – David Armano
- Marc Andreessen
- Mashable
- SearchViews.com
- Signal vs. Noise – 37Signals

## Translate Marketing.fm

- Translate to Chinese
- Translate to French
- Translate to German
- Translate to Italian
- Translate to Japanese
- Translate to Korean
- Translate to Portuguese
- Translate to Spanish

## Marketing.fm Pics

www.flickr.com

what is this?

## Links





## Categories

- Acquisitions
- Ad Networks
- Advertise Different
    - Advertising
- Advertising Agency
- Advertising Dollars
- Affiliate Marketing
    - blogs
    - Books
    - Brands
    - Business
    - Conferences
    - Consumers
- Cross Channel Marketing
    - Fake Advertising
        - funny
    - Globalization
    - Green Marketing
    - In Game Advertising
    - Interactive Advertising
        - Internet
        - Interviews
    - Links Roundup
        - Marketing
    - Marketing 101
    - Marketing 2.0
    - Marketing 2.0 101
- Marketing and Advertising Network

- Marketing Blogs
- Marketing Links
- Marketing Podcast
- Marketing Podcasts
- Marketing.fm
  - memes
  - messagine
  - Mobile
  - Movies
  - Music
- New Markets
- Out of Home
  - Podcast
  - Podcasts
    - Polls
    - PR
- Predictions
    - Print
- Public Relations
  - Radio
- Research Different
  - Reviews
    - RSS
  - Search
- Search Marketing
- Self-Marketing 2.0
  - Social Media
- Social Media Marketing
  - Social Networking
    - software
  - technology
  - Television
    - tv
- Vertical Search
  - Video
  - Viral
- Viral Marketing
  - Viral Video
    - VOIP
  - Wireless

FEED    FULL

8



# Professor John Illingworth



John Illingworth received a first class honours degree in Physics from Birmingham University in 1978 followed by a D.Phil in 1983 from Oxford for research into Elementary Particle Physics. He then worked for 4 years as a Senior Research Fellow at the Rutherford Appleton Laboratory, researching new algorithms for image processing.

He is married to Sarah and has two teenage step-children (Jeremy and Chloe) as well as a daughter, Sian . The family lives in Guildford in Surrey.

In 1986 he joined the Department of Electronic and Electrical Engineering at the University of Surrey as a lecturer. In 1999 he was promoted to a personal chair for his research contributions. His teaching duties have included lecturing on computer logic, computer architectures, sofware design, PASCAL programming, artifical intelligence and high school physics.

## Research Interests

He has been active in research in image processing and vision for over a decade. He has been involved in a large number of projects concerned with low level image processing, shape analysis, relaxation labelling, range or depth data analysis , industrial inspection and high level vision.

He is a former Chairman of the British Machine Vision Association. He was Chairman of the 1993 British Machine Vision Conference. He is a Fellow of the Institiution of Electrical Engineers, IEE, and is a co-editor of the IEE journal Vision, Image and Signal Processing . He has organised the first three EPSRC sponsored postgraduate Summer Schools in Computer Vision and He is a member of the EPSRC College of Peers in the area of Information Technology. He has over 130 conference and journal publications .

## Student Projects

If you are interested in my final year and MSc projects then please click here

## Teaching

EEM.MSP Maths of Signal Processing

EEM.ASP Advanced Signal Processing

*J.Illingworth@surrey.ac.uk*
*last revised June 1999*

PP

# John Illingworth's Current Project Suggestions

The suggestions offered below are a selection of possibilities in the general area of image processing, video commumication, computer vision, graphics, robotics and artificial intelligence. They are not an exhaustive list and I am willing to discuss other possibilities with students.

All the projects are primarily software or involve systems type integration with existing pieces of hardware (such as the RT100 robot arm, cameras and frame-grabbers, robot vehicles etc). The language for programming is either C or C++. Previous knowledge of this is not essential: it can be learnt as part of the project. There are no pre-requisites modules needed for any of the projects although some relevant material is likely to be covered in the Machine Intelligence final year module.

- Friend or Foe? - virtual doorman
- SLAM - Simultaneous Localisation and Modelling
- A Hand-Held 3D Scanner for Constructing Models of Objects
- Where Am I? - A Real-Time Object Recognition System
- A Stitch in Time: Building Video Mosaics
- Mixed Realities - integrating Computer Graphics and Computer Vision for Real-Time Terrain Generation
- What Really Matters? - Algorithms for Visual Saliency Estimation
- Its All Done With Mirrors - Building a Catadioptric Imaging System

## Friend or Foe? - a virtual doorman

Sick of having to remember your doorkeys or having to answer the door? The solution is to have a doorman. With digital video technology this can be done automatically. A small surveillance camera can be used to look at whoever approaches the door and analysis of the video can be used to recognise that person. If a freind then the computer can open the door and invite then in. If an unknown person then the computer can question them to determine who they are and whether they have a legitimate reason for accessing a building. The possibilities are endless! This project will look into the image processing challenges of this problem and integrate components to create a simple demonstrator.

return to top of page

## SLAM - Simultaneous Localisation and Modelling

This project concerns the ability of a mobile agent to simultaneously find where it is in an environment whilst also building up a model of that environment. This involves finding and tracking images feature in 2D and then inferring their 3D location. This is a challenging task for many reasons (data errors, changes in appearance of features with change in viewpoint etc) but if it can done in a tight control loop then it would enable a robot to formulate an awareness of its environment and enable it to begin planned

navigation of such an environment. This is a challenging project with much scope and would be well suited to a good student. then

return to top of page

# A Hand-Held 3D Scanner for Constructing Models of Objects

This is a challenging project which aims to build a hand held laser scanning device that can be used to construct graphical models of 3D objects. The basic principle of laser scanning is well established but such scanners are usually precision instruments in which the sensor location is accurately determined by mechanical means. The challenge of this project is to simultaneously estimate both the shape of the external object while at the same time measuring by visual means the position of the sensor. A recent article by a Canadian group has deminstrated the basic feasibility of this and would form a starting point for the project. The project is quite difficult and also involves a lot of work and therefore requires a first class student.

return to top of page

# Where Am I? - A Real-Time Object Recognition System

Wearable electronics is currently a topic of great interest. It is possible to incorporate small cameras into clothing and acquire real-time imagery of the world. This project will consider how specific objects can be recognised from such video data. Such objects could be signs on buildings which would allow a person to identify their location. A computer system with this capability could form the core for an automated tourist guide system that would recognise what the wearer was viewing and then provide the user with factual information about interesting sights. The project will focus on recognition of objects from contour information using techniques that are robust to affine effects that result from viewpoint changes.

return to top of page

# A Stitch in Time - Building Video Mosaics

A camera provides a spatially limited view of the world. However, if a camera is mobile, either by being on a moveable head or on a mobile platform, then it should be possible to combine the information from several images to construct a larger view of the world. Such capabilities is useful in many areas. This project will look at existing work on creation of large video mosaics and will implement and test one of the promising techiques.

return to top of page

# Mixed Realities - Integrating Computer Vision and Computer Graphics for Realistic Terrain Generation

An image is a 2D view of a 3D world. Teleoperation of a mobile vehicle involves using camera data to navigate across potentially difficult outdoor terrain. In addition to live camera data, a tele-operator may have other information about the region that is navigated. For example, the Ordanace Survey provide Digital Elevation Maps for most of the UK. This project considers how live image data and Ordanance Survey data can be used in co-operation to produce a better system for driving a tele-operated vehicle.

return to top of page

## What Really Matters - Algorithms for Visual Salience Estimation

Not all information in a an image is equally important. The human vision system extracts little information from individual images but manages to build a consistent and persistent model of the world. This project will explore ideas about how this is achieved and look to implement some algorithms that address this difficult but fundamenatal problem. The project will integrate work from Psychology, NeoroScience, Computer Science and Artifical Intelligence.

return to top of page

## Its All Done With Mirrors - Building a Catadioptic Imaging System

A single static camera provides limited information about the world. However, the addition of a set of mirrors (which may be able to rotate) allows a single camera to gather a set of views of a scene. This set of views can be used for tasks such as stereo vision. This project will involve a mix of hardware and software to construct a mirror based imaging system suitable for mounting on a modile vehicle. The system will be used to construct a 3D model of the world.

return to top of page

*Professor John Illingworth*
*Room 9AB05*
*email: J.Illingworth@surrey.ac.uk*
*September 2004*

QQ

32 of 43 DOCUMENTS

Copyright 1998 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

# Dow Jones Factiva

(Copyright (c) 1998, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

December 23, 1998 Wednesday

**SECTION:** Pg. B1

**LENGTH:** 1144 words

**HEADLINE:** Gifts: Masterminding the Mazes of Package Delivery

**BYLINE:** By Eleena de Lisser, Staff Reporter of The Wall Street Journal

**BODY:**

Catalog shopping has exploded in popularity. Internet shopping is expected to double to $2.3 billion this holiday season.

Just one question: Who's home during the day to receive all this stuff?

In many cases, no one. And that means a shopper has to go through some elaborate arrangements to ensure that the lovely cashmere sweater set from J. Crew or the basket of fresh fruit from Harry & David gets where it's supposed to go.

In the good old days, when people didn't lock their doors and everyone knew everyone else in the neighborhood, home delivery of groceries, laundry and other goods was an everyday part of life. And Mom was usually around to receive the parcel anyway.

Today, all that has changed, and customers are scrambling. In San Francisco, violinist Steven Miller and his wife, Jennifer Durand, a singer, used to have an informal arrangement with the bakery located downstairs from their apartment. So did a bunch of other people. In the mornings, "you'd see people going in to get their latte and their packages," says Ms. Durand.

But the bakery went out of business, so Mr. Miller and his wife have now turned the neighborhood dry cleaner into their personal package depot. They taped an index card to their apartment door, directing deliveries to the Golden Star Laundry shop two doors down. And how do Mr. Miller and Ms. Durand know when they have a package? "She just hollers to us" when we walk by, Ms. Durand says.

Anita Lionvale of Visalia, Calif., is often away during the day taking courses or running errands, and no one else is home to sign for packages. Since she and her husband almost always leave their house and return through the garage, deliveries left at their front door tend to go unnoticed, often for days. To keep that from happening, Ms. Lionvale puts a plastic bag outside and gives order takers detailed instructions that packages should be left "inside plastic bag by the gas

Gifts: Masterminding the Mazes of Package Delivery The Wall Street Journal December 23, 1998 Wednesday

meter by the gate."

In Salem, Ore., Mary Bigler relies on her neighbors to be her eyes and ears when she isn't home. A few years ago, a box of silverware was delivered to her house and left out front on the steps. Mrs. Bigler says a little boy, about eight years old, came to the house and knocked on the front door. When there was no answer, he walked off with the box. Fortunately, one of Mrs. Bigler's neighbors was watching and stopped the boy from carting off the merchandise.

The U.S. Postal Service and United Parcel Service of America Inc. -- the two biggest home package deliverers -- try hard to get the goods out of their hands and into yours, largely out of self-interest. "The last thing we want is to have that package held up in our system," says Glenn Mason, UPS's vice president of national accounts, noting that 295 million packages will flow through UPS's distribution system between Thanksgiving and Christmas. "We'd have a meltdown" if drivers didn't make a concerted effort to complete the delivery on the first attempt.

UPS says that if no one is home to sign for a shipment, the driver is instructed to try to leave it with a neighbor or place it in a somewhat secure, less visible area like on a back porch -- often a place suggested by the shopper. Lands' End Inc. says it gets reams of specialized instructions from customers asking for UPS to "put on boat trailer by gate" or "leave package in the old truck beside or behind the house."

Keith Milburn, president of Innovative Fulfillment Services Inc., Kansas City, Mo., which fills and sends out orders for other companies, says fear of theft is prompting some of his customers to ship merchandise through the U.S. Postal Service rather than a delivery company such as Federal Express Corp., a unit of FDX Corp. "It's a federal offense to steal something from the Post Office, but not from Fedex," Mr. Milburn says.

Elsewhere in Kansas City, dry cleaner David Porter is developing another theft-prevention idea. The Smart Box, as Mr. Porter calls it, is a climate-controlled delivery cabinet. In one prototype, the unit is mounted onto the side of a house and has two doors -- one outside for the delivery person and one inside through which the homeowner retrieves the items. The access would be through a keypad, and the code could be changed remotely. In another design, the box is collapsible, so it can be folded into a small space when not in use.

Meanwhile, Susan Rybak of Manhattan is developing what she calls a "virtual doorman." The device allows visitors to leave packages or pick up items from a locked box that the owner controls remotely by pressing a button on a "My Doorman" Web page on the Internet. The "doorman" alerts the away-from-home homeowner via e-mail, pager or cellular phone.

Even those who work from home have found themselves wrestling with delivery problems. For one thing, as Matt Heric puts it, they become the "neighborhood rep." Mr. Heric, a pharmaceuticals-industry consultant who works from home in Durham, N.C., obliges a handful of neighbors by accepting their deliveries.

But sometimes he isn't home to sign and muses that on these days the missed delivery is invariably his own order. "I'll see that little blue and orange tag on the door, and I know that it's going to be a long time before I get my stuff," he says ruefully.

Matt Burdetsky, a Falls Church, Va. meeting planner, can relate because he, too, works from home. Recently, while raking leaves in his front yard he spied a piece of paper fluttering in the grass. Initially, he thought it was just another flier from the local pizzeria. But something told him to check it out before raking it into the plastic bag.

It turns out the flier was really a delivery notice from Airborne Freight Corp. The notice, dated four days before, indicated there had been an attempt to deliver a piece of computer equipment Mr. Burdetsky needed to upgrade his personal computer.

"I had been home, but either they weren't ringing the doorbell or knocking loud enough," Mr. Burdetsky says. He eventually got the equipment, about a week later than he had anticipated.

Gifts: Masterminding the Mazes of Package Delivery The Wall Street Journal December 23, 1998 Wednesday

```
---
                    Special Delivery
Some unusual delivery instructions received by Lands' End:
 -- If no one home, please leave outside on the front porch behind the
bench, hidden as best as possible.
 -- Please leave inside storm door if no one home. If package is too
large, please put on back deck, under grill cover. Thank you.
 -- Please leave package in pickup truck.
 -- If no one home in Apt. 2C, please leave package with Apt. 1C.
 -- Please leave at convenience store next door.
 -- Honk -- Someone will come out for the package. (There are 2 dogs.)
 -- Please place boxes in barrel. If they (it) don't fit, put on top of
barrel -- Dogs will rip up if left on ground.
 -- Put next to the fern.
```

   (See related articles: "Cheap Things Can Come in Fancy Boxes" and "For Business, Gift-Giving is Year-Round" -- WSJ Dec. 23, 1998)

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

RR

Copyright 2006 N.Y.P. Holdings, Inc.
All Rights Reserved
The New York Post

August 31, 2006 Thursday

**SECTION:** All Editions; Pg. 51

**LENGTH:** 1170 words

**HEADLINE:** GIMME SHELTER

**BYLINE:** Braden Keil

**BODY:**

BLOWN AWAY

A MANHATTAN Supreme Court judge has issued an order prohibiting the sale of Dr. Nicholas Bartha's townhouse, or what's left of it, at 34 E. 62nd St.

The leveled property of the deceased doctor, who is believed to have blown up the mansion July 10 to keep it out of his ex-wife's hands - after he was served with eviction papers - was put on the market two weeks ago for $8 million.

The broker for the property issued the following statement: "A New York State Supreme Court Judge has issued a temporary "stay" of the sale of the 34 E. 62nd St. property. We will be advised when the stay is lifted. Brown Harris Stevens has no further comment." Formerly the site of a prewar four-story townhouse, the listing by the Brown Harris Stevens brokerage firm touted the 20-footby100-foot lot as an "opportunity to build your dream house" on a "quiet, lovely treelined street." At least it was, before a thunderous explosion rocked the exclusive block that morning, leaving the street littered with debris.

Bartha's daughter Maria is the executor and the defendant in the case. There's no word on who brought the suit. But there is a lawsuit pending by Jennifer Panicali, the Staten Island woman who was injured in the blast as she was walking by.

Panicali's suit seeks unspecified damages for the "severe and disfiguring physical" and "long-lasting emotional and psychological" injuries she suffered in the explosion.

The doctor died from his injuries several days later after vowing in an e-mail, "I will leave the house only if I am dead." Bartha blew up the house mistakenly believing that it would decrease the value of the property.

Eve's dropping

STING may want to take note, the duplex apartment located above the duplex he's selling on Central Park West has just sold below the musician's asking price.

The 5-bedroom, 6 1/2 bath apartment with 5,500 square feet at 88 Central Park West has had an asking price of $25 million since it was first listed last February. But sources say the recently renovated apartment owned by Eve

GIMME SHELTER The New York Post August 31, 2006 Thursday

Weinstein, the ex-wife of entertainment mogul Harvey Weinstein, has gone to contract for somewhere south of $23 million - at least a million dollars less than what Sting and Trudie Styler are asking for their similarly sized pad.

But so far the musician and his wife are in no hurry to sell, since construction on their new $30 million place at 15 Central Park West won't be ready until next year.

Hall pass

THE PARK AVENUE apartment of the late Evelyn Annenberg Jaffe Hall, one of three daughters of publishing magnate Moses Annenberg, is in contract.

Hall, who died in April 2005 at age 93, lived with her staff in the full-floor, 16-room spread at 640 Park Ave. (at East 66th Street) that totaled nearly 6,500 square feet.

According to the Stribling & Associates listing, the apartment, with a last asking price of $23.75 million, features such details as prewar moldings, coffered ceilings and parquet de Versailles floors and five wood-burning fireplaces.

It is currently configured with four bedrooms, 5 1/2 baths, a library, woodburning fireplaces, a large windowed kitchen and adjacent family room, and six staff rooms.

Up the avenue, the two-bedroom duplex apartment of Hall's deceased sister, Enid Annenberg Haupt (who died last October at age 99), at 740 Park Ave., sold earlier this year for $27.5 million to New York Stock Exchange boss John Thain.

Onassis buyer still waiting for word

THE FORMER Fifth Avenue co-op apartment of Jacqueline Kennedy Onassis is, so far, a big Jackie No Deal.

As this column reported May 18, a buyer, described as a financial bigwig was going to contract back then, with back-up buyers ready to pay present owner David Koch's $32 million asking price.

The New York Observer even went as far as naming hedge-fund manager Glenn Dubin as the man who signed the contract more than a month later. Dubin had no comment at the time.

But as of now, the building's board still hasn't met to approve Dubin. (Guess everybody's been on a long summer vacation.) "We should have an answer [from the board[ by next week," says Corcoran Group broker Leighton Candler, who declined to name any potential buyer.

The historic 15th-floor residence at 1040 Fifth Ave., which Koch purchased from the Onassis estate for a then-staggering $9.5 million in 1995 - a year after the former First Lady died there at age 64 - was gut-renovated. Although the 12-room apartment is listed as having five bedrooms and 5 1/2 baths, two of the bedrooms were re-configured into a large master bedroom with two dressing rooms and two bathrooms. Also included is a library, dining room and living room - all with wood-burning fireplaces - a chef's kitchen, wine cellar, conservatory, gallery, multiple terraces and staff quarters.

It's in the swag bag

FLY fashion, hair products and beauty creams weren't the only stylish things stars were cramming into their swag bags at the MTV Video Music Award's Style Villa at the Bryant Park Hotel.

Celebs crowded around the model for Trump's newest project, the Trump Grande Ocean Resort & Residences, and grabbed brochures for the Sunny Isles Beach, Fla., property, which is scheduled for completion in 2008. The three luxury beachfront towers, with 813 units priced from $925,000 to over $4 million, got the attention of songstress

GIMME SHELTER The New York Post August 31, 2006 Thursday

Vanessa Carlton and Soprano Jamie Lynn Sigler, who wouldn't be such bad neighbors. But we hear shrill comedians Mario Cantone and Gilbert Gottfried were also eyeing brochures - so buyers beware!

Glassy chassis

PEOPLE who don't throw stones might consider checking out the Glass Townhouse on Charles Street, which is on the market for $5.995 million.

Touted as three townhouses within a townhouse, the triplestacked duplex units include four bedrooms and 31/2 baths with soaring ceilings, terraces, open river views, kitchens with Sub-Zero and Gaggenau appliances, and, our favorite: filtered bath water.

The building at 163 Charles St., with keyed elevator access, features a virtual doorman/ concierge, wine cellar, and JeanGeorge Vongerichten's Perry St. restaurant two doors down.

Darren Sukenik of Prudential Douglas Elliman is marketing the units.

The building should fit in quite well with Richard Meier's 165 Charles St. and twin glass buildings on Perry Street.

Heard any great gossip? Email: bkeil@nypost.com

---

NUMBERS GAME

$0 Price of the ride on the Staten Island Ferry that it'll take to get to the Pointe

15 Percentage increase in Wall Street bonuses predicted for this year by Johnson Associates, which, if conventional wisdom holds, would mean a strong market for Manhattan real estate

$48.33 Average price per square foot for a rental in Manhattans increasingly tight market, according to Citi Habitats

13.1 Percentage of homes that are severely overcrowded in Borough Park, Brooklyn, making it the most tightly packed neighborhood in the city

$500K Approximate price for a twobedroom at the Pointe, the first of a set of new luxury buildings rising in St. George, Staten Island

**GRAPHIC:** -Jamie Lynn Sigler checks out new Trump property. -And so did sultry songbird Vanessa Carlton. -GOOD EVE: Weinstein's ex sells at Sting's building. [Jennifer Weisbord] -ON PINS AND NEEDLES: Buyer waits to hear on 1040 Fifth Ave. [Rex Dittman; AP] -HOLEY MOLY: The sale of the land where Bartha's townhouse once stood is delayed.  -Jamie Lynn Sigler checks out new Trump property. -And so did sultry songbird Vanessa Carlton. -GOOD EVE: Weinstein's ex sells at Sting's building. [Jennifer Weisbord] -ON PINS AND NEEDLES: Buyer waits to hear on 1040 Fifth Ave. [Rex Dittman; AP]

**LOAD-DATE:** August 31, 2006

SS



# Features

Home

Features

Feasibility

Building Manual

Floor Plans

Estimate &
Schedule

Smart Home

Design & Build
Team

Location

Articles

Other

Gary's Page

Contact

Dramatic Entrance features a secure controlled virtual doorman: upon walking up to the building from the sidewalk a proximity sensor opens first the gate and then the front door to the building.

20' high ceilings in the lobby and a welcoming open staircase.

3 luxury apartment flats, one on each floor, featuring a separate entrance for a work at home office space.

Concrete Construction

Brick Cladding

Plaster Walls

European Windows

Air-Conditioning Heat Recovery Ventilation & Gas Fireplaces

Radiant Heat Floors

Other Features

Environmental Concern

## Introduction and Summary

Impluvium is a high quality apartment building consisting of three large flats of 1900 plus square feet and two small peid a terre's on the ground level. The entire building will be gated with secure parking for seven cars. Two of the larger units will feature separate entrances for office or "lock off" guest quarters. The penthouse unit will have access to a roof-top garden.
Impluvium House will be a gated, modern European style, brick town house. The building will be concrete and steel construction designed to withstand the heightened seismic standards recently adopted by the Seattle City Department of Planning and Development to address the newly discovered Nisqually Fault

Impluvium is urban, efficient and smart, and graceful.
Welcome home to optimal comfort, luxurious and convenient
living. Be greeted each day by high ceilings, craftsman
finishes and healthful living. Live in peace and security on a
quiet street just a ten-minute walk to the exciting Broadway
District full of restaurants, grocery stores, and theaters.

## Concrete construction

Insulated concrete formed walls make up the exterior wall
structure of the building. This is a relatively new form of
construction that delivers a warm, comfortable and secure
envelope. Seismically superior to wood frame and metal
frame construction concrete walls also deliver thermal mass
to keep interiors cool in summer and warm in winter.
Combined with the brick veneer they are acoustically
superior to any other wall system. More on ICF's. (top)

### Brick Cladding

In both style and function brick outlasts any other material.
Brick veneer never needs painting, is fireproof, reduces
exterior sound transmission, cannot be eaten by pests and
avoids warranty problems associated with stucco, or other
types of siding. Furthermore brick homes are preferred by
older homebuyers and appreciate faster than similar
structures of other materials. (top)

The Benefits of Real Plaster

I love plaster. When I pour hydrated lime putty onto a board,
gage it with aggregated gypsum, and mix it together with my
trowel and hawk I feel that I am participating in one of the
oldest building crafts still used by modern man. The first time
I saw it applied was in 1985 by Colm McGlynn who then
taught me how to work with it. The way he made wet mud
stick to a wall and then become as smooth, hard and shiny as
marble was like magic to me.

And since that day a drywalled house has seemed cheap to
me. Tradition lime plaster is stronger and more soundproof
than walls made of gypsum board or sheetrock. The
difference between plaster and wallboard is noticeable but
installing plaster requires skill, making it obsolete in newer
construction. Solid plaster provides a superior sound barrier
and is harder and stronger than what has all-but-replaced it,
which is drywall. Drywall became the modern homebuilders'
darling because it is manufactured in sheets that can be cut to
size, is easy to install and requires less talent. Drywall is then

covered with a sandable putty to create the interior cosmetic finish. Oftentimes the interior plaster is sprayed on and textured to hide some of the builders' inevitable flaws, such as uneven stud placement, inadequately countersunk nail heads and the like. Spray-on plaster can even be pre-mixed with paint to save considerable time and labor.

Even the preparation and maintenance of plaster hint at its lifespan. Wallboard can be painted in 30 minutes, while a 3-coat plaster job must cure for 30 days or more. In fact, homeowners used to be warned to wait an entire year before painting plaster walls. The year wait allowed the plaster to cure completely. Plaster walls in Seattle homes over a hundred years old are still as solid and smooth as the day they were finished.

Plaster of some sort has been used for hundreds of years. Before 1900, Lime-based plaster was mixed with animal hair and sand to give it stability and strength. After 1900, a gypsum based plaster was used. A three-coat system was used in either case

The oldest traces of plaster renders are 9,000 years old, and were found in Anatolia and Syria. We also know that 5,000 years ago, the Egyptians burnt gypsum in open-air fires, then crushed it into powder, and finally mixed this powder with water to make jointing material for the blocks of their monuments, such as the magnificent Cheops Pyramid for example. Ancient Egyptians used models of plaster taken directly from the human body.

The Greeks also used gypsum, in particular as window for their temples when it was of a transparent quality ("selenite gypsum"). The writer Theophraste (372-287 BC) described quite precisely the fabrication of plaster as it was done at that time in Syria and Phenicia. The Romans cast in plaster many thousands of copies of Greek statues.

Throughout the centuries, expertise was gained in many parts of the World with gypsum calcinations. After the Great Fire of London in 1666 the King of France by royal decree ordered that houses with wooden walls be covered with plaster. Large gypsum deposits near Paris have long been mined to manufacture… "Plaster of Paris".

Gypsum is a sedimentary rock, which settled through the evaporation of sea water trapped in lagoons. According to the nature of its impurities, gypsum can show various colors, ranging from white to brown, yellow, gray and pink .

In the natural state, gypsum contains two molecules of

chemically combined water. During calcination, the process of heating mined gypsum at temperatures exceeding 212° F, three-fourths of this water (one and one-half molecules) is driven off. The result is a hemi-hydrate of calcium sulfate commonly called Plaster of Paris, which after further processing is suitable for commercial applications.

When the Plaster of Paris is mixed with water to a pourable state and allowed to set, it reverts back to a solid mass. This process is called recrystallization. The material heats and expands until it reaches the chemical composition of natural gypsum-containing two molecules of water. Certain modifiers can be added to the plaster to accelerate or retard the setting process.

The chemical composition of gypsum is CaSO4-2H2O-calcium sulfate dihydrate. As calcium hydroxide (it's applicable state) it binds with CO2 for up to ten years until is has fully cured. It also readily absorbs additional H20 molecules which is why gypsum is frequently used as those little "Do Not Eat" packets shipped with food or electronics.

Plaster walls wick moisture out of the air. Serving as a natural dehumidifier by hydrating and absorbing extra moisture in the air on humid days and releasing it again when the air is dry. This is a natural process and is good. Wall board material (sheet rock, or gyp rock as it is called in Canada and the UK) also absorbs moisture on humid days but it is sandwiched between layers of paper. Paper is a food source for mold.

Some healthy building websites I have visited have called sheetrock "the asbestos of our generation". It is fine just as long as it does not come in contact with water but water is in the air, it leaks into the cavities of wall, in fact it can actually be sucked in through the equalization of relatively lower atmospheric pressures inside attempting to equalize with lower exterior temperatures (that is lower pressures). Like asbestos, wall board is used with glee by the modern construction industry. It is easier to use and far cheaper than traditional plaster to install. And, again, I repeat, it is fine just as long as it does not come in contact with water but even swimming pools leak and eventually sheet rock will fail somewhere.(top)

Euroline Windows

Window and patio door selection is a crucially important aspect of a successful building envelope. I have selected Euro-line brand windows because I believe them to be the

best. My choice reflects my travels. These type of windows are seen throughout Europe but seldom in the United States simply because they cost more. The dual action, tilt and glide hardware of Euro-line windows are superior to every other type of window on the market and the welded vinyl system, unlike wooden windows, is maintenance free.

An important point to be noted about windows is the manner in which they are installed. Most window installations are flashed from the exterior. Full window replacement of exterior flashed systems involves removing the exterior veneer. Because Impluvium is built with a 15" exterior wall system the windows can be installed inside the wall envelope assembly which means a full window system replacement can be accomplished from inside. This seemingly uninteresting detail is relevant for the following reason: no window manufacturer in the market today warrantee's windows for failure for longer than ten years. When (when and not if) window replacement becomes necessary it can be done simply by removing trim from the interior, and replacing the failed unit.(top)

## Air-Conditioning and Heat Recovery Ventilator

Air conditioning is not just about cooling the air, With a heat recovery ventilator, fresh air fireplace system there will be eight whole-house air exchanges every 24 hour period. The system efficiently regulates and balances a constant flow of fresh outdoor air while extracting stale air. Whole house fresh air ventilation is more comfortable and reduces moisture levels and chances of mold and mildew while recovering 50% more heat than a traditional exterior flue vent system. The fresh air fireplace system is complementary to the radiant floor heat system and most days may function as the exclusive heating system.

Air conditioning is also about cleaning the air. To really clean the air in a home, all the air in the home would have to get to the furnace air filter and that filter would then have to be able to remove all the dust and dirt particles. This is impractical with today's common building practices. The better way is to remove the sources of these indoor air pollutants. I use all low VOCs paints and finishes. These are now readily available and do not cost more than conventional finishes. Use natural materials whenever. Most of the dust and pollens a the home are found in the wall to wall carpet. By using hard surfaces such as tile and hardwood for flooring throughout the home, one can reduce significantly the amount of dust in the home being recirculated in the air.

What are the sources of indoor air pollution? They are off-gasing from building products and dust and pollens that accumulates in the home. Air filtration is a band aid solution to good indoor air quality. To really clean the air in a home, all the air in the home would have to get to the furnace air filter and that filter would then have to be able to remove all the dust and dirt particles. This is impractical. The better way is to remove the sources of these indoor air pollutants. We use all low VOCs paints and finishes. These are now readily available and do not cost more than conventional finishes. Colored plaster walls require no paint at all. Use natural materials whenever possible. Most of the dust and pollens in the home are found in the wall-to-wall carpet. By using hard surfaces such as tile and hardwood for flooring throughout the home, one can reduce the amount of dust that stays in the home that gets re-circulated into the air.

## Central Vacuum System

Air conditioning is also about how one cleans. Small air particulate mater is only stirred up with traditional vacuum cleaners. While vacuums suck up everything the finest particles pass right through the air filters and become airborne. In a tight, draft free, and energy efficient home these fine air mater can linger in the air longer and become lodged in occupant's lungs. People with asthma and other repertory conditions beware. This is why central vacuum systems with exterior dust storage tanks for modern homes. .(top)

## Radiant Floor Heat

Radiant Heat is quiet and out of sight, Warm water circulates through tubing beneath the floor. This turns the flooring into an efficient, low temperature radiator. Because this heat is evenly distributed throughout the mass of the floor the thermostat can be set up to 5 degrees less than with a forces air system and this can reduce energy costs by 40%. Radiant Floor Heat systems contribute to a healthy building system. While re-circulating forced Air systems are in operation they contribute to the spread of dust pollen and germs radiating floors don't. Also, radiant heat is less likely to dry out breathing passages and skin.(top)

## Other Features

Secure estate and garage for both cars and bicycles
Gated estates provide an added layer of security and sense of place and well-being . Impluvium House will feature an electronically controlled vehicle gate and garage door and

two pedestrian entrance "smart" gates that open by proximity sensors. The brick and wrought iron design will incorporate lighting, intercoms and mailboxes and be landscaped by boxwood hedges.

24-hour video monitoring—viewed from a secure internet page.

Forward thinking design in Healthy, Green, and High-tech design.

Conveniently placed bicycle parking to encourage bicycle use.

Elevator and other Barrier Free Living ammenities

Home Offices with separate entrances from the lobby.

Pre-wired media rooms for Dolby 7.1 surround sound.

Wifi throughout the building

Smart 12-volt wiring controls lighting and window shades

Stainless steel appliances selected as "Best Buy" by the Consumer's Union

Kitchen pantry and large closet spaces

Built-in bookshelves

Sound abatement designed walls and ceilings
(top)


## Environmental Concern

By beating current building codes Impluvium will be an ecological leader. Currently Buildings account for 30% of greenhouse gas emissions and 60% of total U.S. Electricity consumption. Building better and smarter homes can reduce these numbers and contribute to fewer CO emissions. I will be participating in "Construction Works," the King County program which encourages recycling the buiding materials of the old house to selection of ecological, locally available building materials choices. Additionaly I am working towards the goal of obtaining the United States Green Building Council's Residential LEED Gold Certification for Impluvium.

TT



*Other Editions*    *My Archive*    *Sign Up*

Search DailyCandy [Search]

**DAILYCANDY HOME**                                    TRAVEL   DEALS   KIDS



## About Us

**DailyCandy**, a free daily e-mail newsletter and website, is the insider's guide to what's hot, new, and undiscovered — from fashion and style to gadgets and travel. As useful as it is entertaining, it's like getting an e-mail from your clever, unpredictable, and totally in-the-know best friend. The one who knows about secret beauty treatments, must-have jeans, hot new restaurants — and always shares the scoop.

DailyCandy publishes thirteen daily editions, which are all delivered through e-mail: New York, Los Angeles, Chicago, San Francisco, Boston, Dallas, London, Washington, D.C., Atlanta, Philadelphia, Miami, and Seattle are devoted to those cities; Everywhere is national (style knows no boundaries). There are also eight weekly editions. Kids Everywhere (for busy and hip parents) is published on Thursday; local Kids editions are published on Monday in New York, Los Angeles, San Francisco, Boston, and Chicago; DailyCandy Travel is published on Wednesday; DailyCandy Deals (which features special sales and promotions) comes out on Tuesday.

Sign up for your free subscription, and you'll always be the first to get the latest.

For more information on DailyCandy's editorial and business policies, please see our Editorial Policy.





Job Opportunities | Who We Are

Contact Us

EVERYWHERE | ATLANTA | BOSTON | CHICAGO | DALLAS | LONDON | LOS ANGELES | MIAMI | NEW YORK | PHILADELPHIA
SAN FRANCISCO | SEATTLE | WASHINGTON, D.C. | TRAVEL | DEALS | KIDS

Sign Up | My Account | Unsubscribe | Media Kit | Mobile | RSS Feeds | Jobs | About Us | Contact Us | Help

© 2008 DailyCandy, Inc. All rights reserved. DailyCandy is strictly editorial. There is no pay for play.
Editorial Policy | Privacy Policy | Terms & Conditions | Artwork by Sujean

UU



Other Editions    My Archive    Sign Up

Search DailyCandy
◉ This Edition  ○ All DailyCandy

**HOME    FASHION    BEAUTY & FITNESS    LIFESTYLE    HOUSE & HOME    FOOD & DRINK    ARTS & CULTURE    TRAVEL    DEALS    KIDS**

Restaurant    Bar    Beverages    Services    Specialty Stores    Sweets    Snacks    Recipes    Gadgets

March 27, 2001

## All the World is Not a Stage
*Kareoke at Japas*



We know you sing in the shower, so before you roll your eyes, give karaoke a chance.

Last weekend we were taken—against our will—to a karaoke bar. And please, it wasn't Moomba. It wasn't the Elbow Room.

It was Japas, a sliver of a bar on St. Marks Place. They have a virtual-doorman thing going on. You ring a bell, smile pretty for the camera, and wait to be buzzed in. Once inside, the cave-like spot is jammed. We were especially pleased by those *so-bad-they're-good* videos. (Much cooler than the current underlined video monitors that flash arty images in all those supermodern bars.)

The best part? No stage! Bartenders pass around a wireless microphone to whoever requested the song. Sometimes you have the misfortune of actually hearing someone sing into it. The second-best part? It's not all about you, baby. The sing-along atmosphere drowns out any would-be performer, and rarely can you see where he or she is (sparing the rest of us the awkward visual of a drunk banker trying to keep up with Eminem and doing those stupid faux-ghetto moves.).

If you still wouldn't be caught dead warbling in public, check it out. It's one of the few spots in New York where the entire bar is basically a stage and no one seems to care. Order another martini and watch. Just maybe, before the night's over, you'll catch yourself humming along to ?I Will Survive.?

E-mail    Save    Print    Yahoo! Buzz



### Sign Up!
Sign up for your free daily e-mail about the latest in fashion, food, & fun.
*subscribe*


Your voice has power.
Make the pledge and spread the news about ways you can help protect yourself from cervical cancer.
start here
you don't need to be a doctor to help your friends fight cervical cancer
 

Did you miss DailyCandy's 2008 SPRING WEDDING GUIDE?
*Click here to review the '08 guide.*

*More In...*


**FASHION**
Little Deuce Coup
Coup de Coeur Shopping Tours


**BEAUTY & FITNESS**
Garden of Eva
Eva Scrivo Salon Opens


**LIFESTYLE**
The Weekend Guide
What to Do This Weekend


**HOUSE & HOME**
How I Met Your Mother
2008 Mother's Day Guide

EVERYWHERE | ATLANTA | BOSTON | CHICAGO | DALLAS | LONDON | LOS ANGELES | MIAMI | NEW YORK | PHILADELPHIA
SAN FRANCISCO | SEATTLE | WASHINGTON, D.C. | TRAVEL | DEALS | KIDS

Sign Up | My Account | Unsubscribe | Media Kit | Mobile | RSS Feeds | Jobs | About Us | Contact Us | Help

© 2008 DailyCandy, Inc. All rights reserved.  DailyCandy is strictly editorial. There is no pay for play.
Editorial Policy | Privacy Policy | Terms & Conditions | Artwork by Sujean

WW

Case 1:08-cv-01997-JGK   Document 14-50   Filed 05/07/2008   Page 2 of 7

Create an Account | Recover Your Password | Create a Forum Post

About | Submit a Tip | RSS | Advertise | Contact Us

Username:          Password:          Submit                    Topics          Neighborhoods          Search



« Development Watch: 200 Livingston Gets Its Siding On House of the Day: 49 Putnam Avenue »

October 2, 2007

### Condo of the Day: The Heritage at Park Slope



We know a heartwarming story when we come across it, and we're happy to share this one with you. It's called "History is a Simple Tale":

> Many, many years ago a man bought a building. He became a father. And then a grandfather. Down through each generation the building was passed. And today it is ready to be passed on once again. As a new building. A residential building. To you.

So goes the marketing lingo for The Heritage at Park Slope, a 21-unit condo on 2nd Street between 4th and 5th avenues. And guess what? People are buying it, for around $800 a square foot (NateFind even reported a price increase on a unit a few weeks ago). The pitch's nostalgia trip probably has a lot to do with the building's brick-face design, c/o Karl Fischer. Durukan Design took care of the interiors, which sport "custom Italian kitchens" and bathrooms with "soaking tubs and separate glass-enclosed shower stalls." History's not coming cheap here, but maybe the success of the non-newfangled design has a lesson to teach other condos?

Heritage at Park Slope Listings [Halstead] GMAP
Development Watch: The Heritage at Park Slope [Brownstoner]







Ads by Google

Posted by Gabby at 12:58 PM | Comments (37)
Categories: Condos, Park Slope

### TRACKBACK PINGS

**Luxury Brooklyn Condos**
Luxury Condos in Brooklyn
Heights. The Home You've
Always Wanted!
www.20Henry.com

TrackBack URL for this entry:
http://www.brownstoner.com/mte/mt-tb.cgi/2446

### COMMENTS

**Cyberdoorman**
Opening doors to the future!
Remote Security Services
www.cyberdoorman.com

Now with that Park Slope top 10 thing, I bet they will raise prices again.

Good to see all this stuff selling.

I actually heard The Vermeil was getting it together and started selling again.

They seem to be moving onb construction again after a few months of nothing. The cornice has been going up in recent weeks.

**Brooklyn Condos**
Search Condos for Sale/Rent in
Brooklyn. Listings Updated Daily.
www.BrownHarrisStevens.com

Posted by: guest at October 2, 2007 1:30 PM

Except this is NOT a Boylemgreen Condo - keep up the excellent research Gabby - you are quite the asset to Brownstoner

Posted by: guest at October 2, 2007 2:08 PM

**Brooklyn Ny Condo**
Search by Price, Area, Size &
Rooms Find a New Home in
Brooklyn Today.
www.Move.com/BrooklynNY

Hey Gabby - just a suggestion - how about you do some research? There's this wonderful little concept called checking your facts - how about you go up off your comfy chair and go down to the site and meet the builder rather than continuing to make incorrect statements. His name is Scott, I'm sure he'd love to speak to you.

Posted by: guest at October 2, 2007 2:19 PM

**Brooklyn Apartments**
Search detailed apartment
listings in The New York Times
realestate.nytimes.com

If this is true that it is indeed NOT a Boylemgreen Condo, you should update this thread.

You are doing a major dis-service to this developer by stating incorrect facts (if that's true). Not many people want to be associated with that guy, and it's your responsibility to check these things out.

This website has a lot of influence in the Brooklyn RE Market and it would be good to make sure things are as accurate as possible.

We still love you, though Gabs.

Posted by: guest at October 2, 2007 2:33 PM



**Find**
the perfect
**Brownstone**

Congratulations on another well researched and thought provoking article. As was stated on several other threads this is not a Boymelgreen property in any way, shape, or form.

The property IS selling well though.

Posted by: guest at October 2, 2007 3:15 PM

trulia
real estate search
Brooklyn Real Estate

Italian kitchen! Wasn't that the old tenement kitchen with the bathtub in it?

Posted by: guest at October 2, 2007 3:51 PM

RE Brokers
Brooklyn Blogs
Brooklyn Media
New York Blogs
New York Media
Monthly Archives

$800 a sq ft on that Block! No thanks - that block is disgusting - drug dealing all day and then drunks from the bar at night.

Posted by: guest at October 2, 2007 4:00 PM

poor, 4pm.

not really cut out for brooklyn, now are you?

drug dealing all day? teeney weeney exaggeration.

maybe when you move out of mommy's house, she can hold your hand to your new place on the upper east side.



Posted by: guest at October 2, 2007 4:05 PM

Please I live less than 2 blocks away for the last 20 years (and in Brooklyn my whole life)- I have to pass by there all the time...

What do you think all those people hanging out are meteorologists taking weather readings?

I think the person who has been sheltered under mommy's skirt is you. Wake up and open your eyes.

Posted by: guest at October 2, 2007 4:24 PM

Maybe I'll head there after work today.

Was wanting to score some weed.

Posted by: guest at October 2, 2007 4:30 PM

used to live near there. block is changing.

Posted by: guest at October 2, 2007 4:42 PM

My goodness, why all the venom? If I want this kind of carping I'll go read Curbed.

Posted by: guest at October 2, 2007 7:40 PM

Actually I heard sales were not going that well at all. I was introduced to this property 5 months ago and I know they have been too hard to sell, they came off desperate and wouldn't stop calling me, really turned me off. There are plenty of options for a 2BR without paying $850 a foot in this nabe!!!

Posted by: guest at October 2, 2007 9:15 PM

yes, and those other option are novo and the crest.

it's like apples and oranges.

these are actually nice places.

i think you heard wrong about sales. i heard that they were selling briskly.

Posted by: guest at October 2, 2007 9:21 PM

The nice 2br options are in brownstones and pre-war apartments, not these new condo crapfests.

Posted by: guest at October 2, 2007 9:41 PM

I was just reading the Halstead listings, and pardon my ignorance, but what exactly is a "Virtual Doorman?"

Posted by: guest at October 3, 2007 12:34 AM

I am one of seven in contract on this 21 unit building. I've checked out the other new developements north of 9th St. and find this the best. Baseboard hot water heat, central air with condensor on the roof so its part of your maintenance, and very nice sized rooms. My unit came in at under $825 per s.f. with no value attributed to the 100 s.f. balcony facing north which has a view (at least for now) of the Manhattan skyline. The developer is the owner of Bergen Tile who has had the property over 35 years. They are doing it with the own $ , no bank loan. Prices were raised once on some units. I suspect the duplex basement units are going to be a hard sell where prices have to come down. "Virtual doorman" is simply television intercom system. I'm a happily retired camper, have no affiliation with Halstead and am looking forward to moving in!
Marion

Posted by: guest at October 3, 2007 1:42 AM

congrats on the new place, marion!

Posted by: guest at October 3, 2007 10:48 AM

congrats, marion. hope you don't have to sell soon.

Posted by: guest at October 3, 2007 11:54 AM



**Condo profiles**

www.soldbvfranco.com                        Ads by Goooooogle

**Virtual Doorman**
All the perks and features of a doorman without the cost.
www.VirtualDoorman.com

**Brooklyn Apartments**
Search detailed apartment listings in The New York Times
realestate.nytimes.com

**Brooklyn Park New Homes**
Lennar homes in Brooklyn Park. Browse photos, tours & floor plans.
www.Lennar.com/Brooklyn_Park

**New York Condos**
Amazing Apartments for Sale Financial District, New York
www.Urban-Sanctuary.net

                        Ads by Google

## Monthly Archives

**2008**
May
April
March
February
January

**2007**
December
November
October
September
August
July
June
May
April
March
February
January

**2006**
December
November
October
September
August
July
June
May
April
March
February
January

**2005**
December
November
October
September
August
July
June
May
April
March
February
January

11:54...Yeah, with Park Slope being named one of the 10 best neighborhoods in the country, I'm sure prices will plummet.

Idiot.

Posted by: guest at October 3, 2007 12:18 PM

with that list and $5, you can get a starbucks.

Posted by: guest at October 3, 2007 12:30 PM

with your attitude, you'll get whole lot of nothing.

owait. too late.

Posted by: guest at October 3, 2007 12:41 PM

12:41.. I am also an owner at the Heritage which is the only reason I am interested in this blog. Seriously do you really not have anything better to do than to make up lies and put them on a blog about a building that you could probably never afford to live in. Park Slope is changing and sorry to say but you are getting a lot of Manhanites (like myself) who like new buildings and not falling apart old buildings. Maybe you should think about leaving..

Posted by: guest at October 3, 2007 12:54 PM

I'm curious where the lies are in 12:41's post.

He seemed to be defending the person who was making derrogatory comments about this place.

You have midread somewhere.

Posted by: guest at October 3, 2007 1:10 PM

Follow up
I won't have to sell no matter what! Being retired I am transferring equity from another apt. This will be my home, mortgage free with a monthly maintenance and taxes under $750. Bottom line try to plan for your future. I retired at 55, own my home free and clear and have no debt or worries. My kids are on their own and doing just fine. I'll be in my 80's when taxes become a burden and I suspect they'll carry me out before I move again; just want some luxury and convenience in my life in a great neighborhood. I am leaving a walk up on Lincoln Place - any one interested in a very efficient, small but legitimate, 3 bedroom on a second floor for 650k. If so write me at: marion11217@aol.com. Good luck to all,
Marion

Posted by: guest at October 3, 2007 1:17 PM

hey marion....

i think you can get more than 650K for a small 3 bedroom on lincoln...

just fyi...i'd say at least 750K without knowing anything about it...

the 3 bedrooms at the vermeil are going for 1.5 million or something...i'm sure they are much larger, and of course new, but still...

Posted by: guest at October 3, 2007 1:25 PM

i guess the foreigners really will save us: http://dublin.craigslist.org/rfs/414109761.html

Posted by: guest at October 3, 2007 1:53 PM

Aren't they bailing out over-leveraged banks in the UK?

Posted by: guest at October 3, 2007 2:00 PM

i have to say, the vermeil does seem to have gotten its act together.

they are building again, new website, etc.

i think prices are a little lower than when they were initially marketed by brown harris stevens.

Posted by: guest at October 3, 2007 2:10 PM

The building is great, the apartment layouts and descriptions look amazing and it is currently zoned 321

- the problem I see is who wants to spend $850sq ft on something that is "changing"?

Personally for $850 a sq ft I don't want to wait for the drug dealers, Ne'er-do-wells and graffiti to leave (and such problems are still fairly prevalent on this stretch of 2nd St); For $850 a sq ft I want to have already changed!

(and before this degenerates - this is not about getting poorer people or any racial group to leave - it is about crime, safety and filth)

Posted by: guest at October 3, 2007 2:17 PM

um, people pay 1 or 1.5 million dollars to live in bed stuy, crown heights, plg and those neighborhoods have just STARTED to change. they are still crime ridden and filthy in areas.

they aren't 2 blocks away from blue ribbon sushi. nor do they get to send their kids to one of the best schools in new york city for free.

this neighborhood has changed and is still changing, but it's far from unsafe or filthy.

these are something that in 5 years, you will reap the benefit of moving into a slighltly off the beaten path.

will be 1000-1200 psf in 5 years. guaranteed.

Posted by: guest at October 3, 2007 2:33 PM

"will be 1000-1200 psf in 5 years."

Which should work out to about $500 Canadian.

Posted by: guest at October 3, 2007 2:43 PM

People do not pay $850 a sq ft to live in Bed Stuy, CH or PLG - especially a condiminum. Also the housing in those neighborhoods are surrounded by historically protected and beautiful buildings - what is this condo surrounded by?

No one is saying that in 5yrs it won't be amazing, the issue is what it costs now (because you are buying now). This block may be "changing" but it isnt "changed" and they are pricing it as if it has already arrived. which it hasnt as evidenced by the drug dealing, graffiti, people "hanging out" and rats that I see virtually daily on my commute to and from work.

This condo may be close to Blue Ribbon but it is way closer to the 4th Ave McDonalds that is the victim of arm robberies on practically a monthly basis
(by the way I believe there was a drug related homicide at 2nd and 5th within the last yr or so - cant recall)

The issue here isn't that the place is "bad" - just that it is priced in a manner that doesnt reflect TODAY's reality.

Posted by: guest at October 3, 2007 3:01 PM

If it is selling (which it apparently is) then these ARE today's prices, 3:01.

I'm sorry that you haven't come to grips with it yet, but this is New York. Very expensive.

I sold a studio not far from here for 400K last year. These are the prices for the neighborhood.

You can continue to complain about them, but I highly doubt it will deter anyone from buying around here.

People love Park Slope. You seem to not like it so much. That's the way of the world.

If you think this is the only building in New York City trying to bank on the future gentrification of a neighborhood, you haven't really been around too much.

I'd feel tons safer buying something here than in Bushwick, Bed Stuy, Crown Heights, Clinton Hill or any number of neighborhoods that charge very high prices for very little in actual neighborhood

quality.

I think this is way ahead of the curve in comparison to those places.

Posted by: guest at October 3, 2007 3:11 PM

12:54 Maybe you should think about some assimilation into your new neighborhood. I am sure your building, I mean condo, is lovely, but telling someone to move becuase their house appears to falling apart just means you didn't get any love from your momma who had you tended to by some illegal nanny from the carribean becuase your momma didn't have the time or patience to teach you some manners.

Posted by: Handle at October 3, 2007 3:29 PM

3:01 here - I like Park Slope - its just that this stretch between 4th and 5th (barely considered Park Slope a few years ago) has alot more of the negatives found in Bushwick, Clinton Hill then Center Slope.

As for the units in contract reflecting a "new" market price - lets see - I dont consider 1/3 of the units going to contract to be the final arbiter on pricing.

Maybe if the builder gets the dealers off the stoop and cleans up some of the graffiti he'll sell the rest

Posted by: guest at October 3, 2007 4:11 PM

obviously if prices have been RAISED once already, they aren't doin too bad...

Posted by: guest at October 3, 2007 5:16 PM

## POST A COMMENT

**You must be logged in to comment.**
Sign in as a guest.

| Username: | |
| Password: | |

[ Submit ]



May 2008
Su M T W Th F S
              1 2 3
4  5  6  7  8  9 10
11 12 13 14 15 16 17
18 19 20 21 22 23 24
25 26 27 28 29 30 31

Wednesday, May 07, 2008
Last Update: 04:25 PM EDT

NYC Weather
71 ° SUNNY

Advertisement

Prudential Douglas Elliman
A COLLECTION OF PROPERTIES
Thousands of fine properties on the market in New York City, Long Island and the Hamptons

# NYP HOME: REAL ESTATE: ARCHIVES

« May 2007 | Blog Home | July 2007 »

### Archive: June 29, 2007

## Open season

Our favorite open houses this week

**310 E. 46th St.**, Turtle Bay, $625,000
*Sunday, 1 p.m. to 3 p.m.*
We gotta be honest, if we had 12-plus-foot ceilings in our apartment, we'd be more than a little tempted to install a trampoline in the living room. You, though, should feel free to follow your own vision. In addition to the high ceilings, this one-bedroom comes with walk-in closets, hardwood floors and use of the building's rooftop deck and exercise room.

**85 Adams St.**, DUMBO, $1,025,000
*Sunday, 1 p.m. to 4 p.m.*



Remember that great scene from "The Blues Brothers" with Jake and Elwood sitting in a fleabag apartment as the El rumbles past? "How often does the train go by?" Jake asks. "So often that you won't even notice," Elwood replies. That's what we've always imagined living in DUMBO would be like. Not this two-bedroom, though. The eight oversized, sound-absorbing windows keep things awful quiet. Stop by and have a listen for yourself.

**20 West St.**, Financial District, $2,800
*Sunday, 12:30 p.m to 1:30 p.m.*
"A full-service, white-glove, landmark building," says the description for this one-bedroom apartment. The place comes with a marble bath, a sleeping loft and a kitchen stacked with new stainless-steel appliances, but the real selling point is the building's history as the former home of college football's Heisman Trophy. Sleep where Gino Torretta once stood! Admit it – you're kinda into the idea.

**380 Riverside Drive**, Upper West Side, $3,500,000
*Sunday, 2 p.m. to 3:30 p.m.*
Given to gazing out the window? This two-bedroom ("easily convertible into a three," says the agent's write-up) comes with 42 feet of windows that offer expansive views of Riverside Park and the Hudson. Inside, the future owner will have run of a Russound home audio system, a six-burner Viking stove and a 96-bottle Sub-Zero wine refrigerator. "A residence that commands respect," says the description. And Lord knows we all could use a little more of that.

**61-55 98th St.**, Rego Park, $138,000
*Saturday, 1 p.m. to 3 p.m.*
$138,000 bucks? A person can drop that kind of money on a parking space in an upscale Manhattan building. In Queens, though, it can actually get you a real apartment. Who knew? This studio with a private balcony comes in a co-op building with a pool, laundry facilities and a garage. And it's all yours for a mere 10 percent down. — *Adam Bonislawski*

Advertisement
BUFFERING


ARCHIVES  **LAST 10**

- Open season
- This week's calendar
- Open season
- What's on sale
- Diary of a seller: Part 1
- Open season
- This week's calendar
- Open season
- This week's calendar
- Open season



**Sponsored Links**

Mortgage Rate Alert - Fed at 2%
$200,000 loan for $599/month. Free Quotes - No SSN Rqd. Save $1000s!
Mortgage.RefinanceFrontier.com

What's Your Credit Score?
View All 3 Credit Scores and Credit Reports Online Now. See it for $0.
FreeCreditReportsInstantly.com

Today's Mortgage Tip:
Refinance to a FIXED rate. No SSN required. LendingTree® QuickMatch
www.LendingTree.com

Buy a link here

Syndicate this site

Posted by Jennifer Ceaser on 12:30 PM | Comments (1)

Powered by: Movable Type 3.17
NEW YORK POST is a registered trademark of NYP Holdings, Inc.
NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.com
are trademarks of NYP Holdings, Inc.
Copyright 2008 NYP Holdings, Inc. All rights reserved.

Archive: June 27, 2007

## This week's calendar

**Thursday, June 28**
*Opening Reception for "Building Connections: 11th Annual Exhibition of K-12 Design Work"*
Ever look at one of those new buildings springing up all across the city and think: "Geez, who designed that -- a kid or a crazy person?" Well, probably the latter, but if you'd like to see what might be the future of New York architecture, check out this exhibit featuring models and drawings by kindergarten through 12th graders enrolled in the Learning by Design program. 4:30 p.m. to 7:30 p.m. The exhibit is on view through August 11. Judith and Walter Hunt Gallery, Center for Architecture, 536 LaGuardia Place.

**Saturday, June 30**
*A Practical Guide to Buying a Co-op, Condo or a House*
If you're ready to jump into this crazy New York City real-estate market, you might want a life preserver. May we suggest this seminar presented by Carmen Lee Shue of Lee Shue Realty, "A Practical Guide to Buying a Co-op, Condo or a House: Things you Should Know and Mistakes to Avoid." The talk is free; the advice is invaluable. 2 p.m. to 4 p.m., The New Public Library, Science, Industry & Business Library, 188 Madison Ave.

**Saturday, June 30**
*Halsey House Gala*
When was the last time you saw Colonial re-enactors giving military demonstrations and musicians playing period music? Well, that's too long. Experience this and more at the annual fundraiser for the Southampton Historical  Museum, an **1843 manor made up of 10 historic structures** including two barns, a paint shop, a one-room schoolhouse and a carpenter's shop. Enjoy drinks and hors d'oeuvres while checking out the 19th-century period rooms, antique toys and nifty old photographs. And don't forget ye olde gift bag on the way out. 6 p.m. to 8 p.m. 17 Meeting House Lane. $125 members, $140 non-members. (631) 283-2494.

**Thursday, July 5 to Sunday, July 8**
*Hamptons Modernism, Design & Art Show*
There's plenty of groovy summer fun to be had at this Bridgehampton event featuring **all things mod**. A benefit preview on Thursday night from 6 p.m. to 8 p.m. has proceeds going toward the East End Hospice. Bridgehampton Community House, Montauk Highway, Bridgehampton, (631) 537-0333.

## LAST CHANCE!
You have until this Saturday, the 30th, to check out the Norman Jaffe art house hosted by Janna Bullock, CEO of RIGroup. Artists featured include **Peter Beard, Andy Warhol, David Salle, Robert Indiana, Anselm Kiefer, Vanessa Beecroft, Yves Klein, George Nakashima** and **Jean Prouve**. The house, located at 210 Meadow Lane in Southampton, is open to the public and tours are available. For more information, call (212) 580-0835.

*If you'd like to have your event listed, please e-mail relevant information to jceaser@nypost.com.*

## WHAT'S ON SALE

**ABC CARPET & HOME**
888 Broadway, at 19th Street, (212) 473-3000
1055 Bronx River Ave., at Watson Avenue, The Bronx, (718) 842-8772
Sale: Through July 22
Open: Mon., Thu., 10 a.m. to 8 p.m.; Fri., 10 a.m. to 6:30 p.m.; Sat., 11 a.m. to 7 p.m.; Sun., noon to 6:30 p.m.
A summer clearance will mark down prices at their regular outpost, as well as their outlet store. Get up to 50 percent off on select bedding, 40 percent

off on select lighting and up to 20 percent off on **Mitchell Gold + Bob Williams** items including a French oak sideboard and hutch, $1,999 (reg. $5,995), an Italian walnut bookcase, $1,299 (reg. $3,015) and flower side tables, $79 (reg. $150).

**BO CONCEPT**
69 Greene St., between Spring and Broome streets, (212) 966-8188
Sale: Through June 30
Open: Mon. to Sat., 10 a.m. to 7 p.m.; Sun., noon to 6 p.m.
This summer sale offers select pieces for less. A black-stained oak veneer bed is now $579 (reg. $1289), Diva sofa, available in fabric or leather, now $1,646 (reg. $2,799) and a solo chaise lounge chair is $849 (reg. $1,499).

**CENTURY 21**
22 Cortlandt St., between Broadway and Church streets, (212) 227-9092
Sale: Through July 31
Open: Mon. to Fri., 7:45 a.m. to 8 p.m.; Sat., 10 a.m. to 8 p.m.; Sun., 11 a.m. to 7 p.m.
A summer clearance marks down already discounted prices up to 75 percent. **Nautica** twin-size comforters, now $34.99 (reg. $100), seven-piece crystal vodka set, $19.99 (reg. $99), eight-piece stainless-steel knife set, $24.99 (reg. $100).

**HASTENS**
80 Greene St., between Spring and Broome streets, (212) 219-8022
Sale: Through June 30
Open: Mon. to Sat., 11 a.m. to 7 p.m.; Sun., 11 a.m. to 6 p.m.
The Swedish bedding company, known for its handmade all-natural bedding, pillows, down comforters and accessories, will offer $1,000 of bedding and accessories with the purchase of any Hasten bed. Choose from the Continental bed, the Adjustable bed and the Frame beds, priced at $4,500 and up.

**ETHAN ALLEN**
192 Lexington Ave., at 32nd Street, (212) 213-0600
Sale: Through July 3
Open: Mon., Tue., Thu., Fri., 10 a.m.to 7 p.m.; Sat., 10 a.m. to 6 p.m.; Sun., 11 a.m. to 5 p.m.
Ethan Allen is closing its Murray Hill outpost and clearing out sleigh beds for $999, living-room chairs for $499, a wide range of sofas for $899 and more items for up to 70 percent off.

**SCANDINAVIA HOUSE**
58 Park Ave., at 38th Street, (212) 847-9737
Sale: Through June 30
Open: Mon. to Sat., noon to 6 p.m.; Wed., noon to 7 p.m.
Fine home-design items from Nordic designers from Stockholm, Copenhagen, Oslo, Helsinki, Reykjavik -- and points in between -- will be discounted by 20 to 60 percent. A vacuum jug by Danish designer **Erik Magnussen**, now $56 (reg. $80), **Ulrica Hydman-Vallien's** mouth-blown multi-color tumblers, $10.50 each (reg. $15 each) and **Oiva Toikka's** rainbow ceramic bird, $203 (reg. $290).

**SCALAMANDRE**
942 Third Ave., at 56th Street, (800) 508-0022
Sale: Through July 31
Open: Mon. to Sat., 10 a.m. to 6 p.m.
Renowned for their fabrics, wall coverings and fine silks, the showroom is emptying their stock at a discount. **Antique fabric dating back to the 19th century** will be $350 for 2 1/2 yards, silk drapery panels are $250 per pair, archival fabric originally created for bed dressings in the master bedroom at the **Vanderbilt's Hyde Park estate**, now $85 per yard.

*If you'd like to have sale information listed, please e-mail* *ctam@nypost.com.*

Posted by Jennifer Ceaser on 06:38 PM | Comments (0)

**Archive: June 22, 2007**

# Open season

Our favorite open houses this week

**116 Pinehurst Avenue, Upper West Side, $1,400,000**
*Sunday, 12:30 p.m to 3 p.m.*
We've always had a thing for Tudor homes. Here's a chance to buy two of them -- side-by-side apartments in what the descriptions bills as "one of Manhattan's oldest continous co-ops." Knock down a wall and you've got a five-bedroom spread with a large living room, a den, an office and a library. And if that's still not enough space, the building keeps an apartment open for renting to overnight guests.

**360 Furman St., Brooklyn Heights, $750,000**
*Saturday, 2 p.m. to 4 p.m.*
Sure, this one-bedroom sits right next to the new Brooklyn Bridge Park, but when your building already comes with music and game rooms, a yoga studio, a golf simulator and an outdoor putting green, do you really need even more options for recreation? Life's just one big carnival for you, isn't it? Fine, then -- live it up.

**473 FDR Drive, Lower East Side, $629,000**
*Sunday, 2 p.m. to 4 p.m.*



Admit it, you've always dreamed of having a swank FDR Drive address. OK, so maybe the location is a little odd (the more remote reaches of the Lower East Side), but a two-bedroom downtown for under $650,000 is worth a look. The apartment includes a private terrace in a building with a 24-hour attended lobby and fitness center.

**312 E. 89th St., Upper East Side, $1,625 a month**
*Saturday, 11 a.m. to noon*
"RENT REDUCED!!" "READY FOR OCCUPANCY" "Available immediately!!" says the notice for this Upper East Side one-bedroom. Sounds like someone is ready to make a deal. Head on over and see if you can talk them down just a little bit more. The apartment has exposed brick, courtyard views, lots of closet space and a fresh coat of paint, but you should act like you're not impressed just for the sake of negotiations.

**15 W. 17th St., Chelsea, $2,275,000**
*Sunday, 2 p.m. to 4 p.m.*

This condo-loft conversion will "need a little love," says the description for this Chelsea three-bedroom. More interesting, though, is the great doorman debate looming in the building's future. According to the write-up, once move-in is complete, the new owners will vote to decide if the building should have a full-time, part-time or "virtual" doorman. A "virtual" doorman? Fascinating. We can't wait to watch him hail a cab.

Posted by Andy Wang on 01:34 PM | Comments (0)

Archive: June 21, 2007
# What's on sale

**ABC CARPET & HOME**
888 Broadway, at 19th Street, (212) 473-3000

1055 Bronx River Ave., at Watson Avenue, The Bronx, (718) 842-8772
Sale: Through July 22
Open: Mon., Thu., 10 a.m. to 8 p.m.; Fri., 10 a.m. to 6:30 p.m.; Sat., 11
a.m. to 7 p.m.; Sun., noon to 6:30 p.m.
A summer clearance will mark down prices at their regular outpost, as well
as their outlet store. Get up to 50 percent off on select bedding, 40 percent
off on select lighting and up to 20 percent off on **Mitchell Gold + Bob
Williams** items including a French oak sideboard and hutch, $1,999 (reg.
$5,995), an Italian walnut bookcase, $1,299 (reg. $3,015) and flower side
tables, $79 (reg. $150).

**BO CONCEPT**
69 Greene St., between Spring and Broome streets, (212) 966-8188
Sale: Through June 30
Open: Mon. to Sat., 10 a.m. to 7 p.m.; Sun., noon to 6 p.m.
This summer sale offers select pieces for less. A black-stained oak veneer
bed is now $579 (reg. $1289), Diva sofa, available in fabric or leather, now
$1,646 (reg. $2,799) and a solo chaise lounge chair is $849 (reg. $1,499).

**HASTENS**
80 Greene St., between Spring and Broome streets,(212) 219-8022
Sale: Through June 30
Open: Mon. to Sat., 11 a.m. to 7 p.m.;Sun., 11 a.m. to 6 p.m.
The Swedish bedding company, known for its handmade all-natural
bedding, pillows, down comforters and accessories, will offer $1,000 of
bedding and accessories with the purchase of any Hasten bed. Choose
from the Continental bed, the Adjustable bed and the Frame beds, priced
at $4,500 and up.

**ETHAN ALLEN**
192 Lexington Ave., at 32nd Street, (212) 213-0600
Sale: Through July 3
Open: Mon., Tue., Thu., Fri., 10 a.m.to 7 p.m.; Sat., 10 a.m. to 6 p.m.;
Sun., 11 a.m. to 5 p.m.
Ethan Allen is closing its Murray Hill outpost and clearing out sleigh beds
for $999, living-room chairs for $499, a wide range of sofas for $899 and
more items for up to 70 percent off.

**JONATHAN ADLER**
72 Greene St., between Broome and Spring streets
Sale: Through June 24
Open: Fri., 10 a.m. to 7 p.m.; Sat., 10 a.m. to 6 p.m.; Sun., 10 a.m. to 2
p.m.
Select pieces will be reduced, including a three-seater sofa, now $2,250
(reg. $4,500) and a striped table lamp, $100 (reg. $300).

**SCANDINAVIA HOUSE**
58 Park Ave., at 38th Street, (212) 847-9737
Sale: Through June 30
Open: Mon. to Sat., noon to 6 p.m.; Wed., noon to 7 p.m.
Fine home-design items from Nordic designers from Stockholm,
Copenhagen, Oslo, Helsinki, Reykjavik — and any point in between — will
be discounted by 20 to 60 percent. A vacuum jug by Danish designer **Erik
Magnussen**, now $56 (reg. $80), **Ulrica Hydman-Vallien**'s mouth-blown
multi-color tumblers, $10.50 each (reg. $15 each) and **Oiva Toikka**'s
rainbow ceramic bird, $203 (reg. $290).

*If you'd like to have sale information listed, please e-mail*
*ctam@nypost.com.*

Posted by Andy Wang on 01:32 PM | Comments (0)

Archive: June 18, 2007
# Diary of a seller: Part 1

*Wendy Ilene Friedman is selling her Upper East Side co-op and will be*
*filing dispatches throughout the process.*

The decision has been made. I put my Upper East Side one-bedroom
apartment, which I've owned for 10 years, on the market last week with

Sotheby's International Realty.

The $825,000 price is more than reasonable at $758 per square foot. But I live in a co-op building, and from what I'm told about co-ops, property values are determined more by number of shares more than square footage. Either way, I think it's still a fair asking price for my nearly 1,100-square-foot unit on East 79th Street between First and Second avenues. Apartments between East 68th to 79th streets from the East River to Lexington Avenue are valued at a range of $800 to $1,000 per square foot.

I've heard that because my co-op board has a reputation as tough and unnecessarily conservative, it brings the building's property values down. Nevertheless, it's a beautiful building -- old, but well-maintained.

In my apartment, all the 1929 prewar details are intact and in good condition. This includes vintage doorknobs and ornate copper-pressed keyholes, a deep soaking tub that fits my 5-foot-10-inch frame nicely (I'm a big bath person), along with an antique double-basin kitchen sink you'd be hard-pressed to find anywhere.

When I originally bought the place, I looked at the apartment as an investment like a government bond (I might not make a fortune, but I knew my money was safe). That year, I had earned 36 percent on the sale of a little house I had owned for about two years in an area outside Detroit called Huntington Woods.

I wanted to hold on to my earnings. The Upper East Side building I bought into had decent financials and my 576 shares out of 73,294 in total afforded me manageable monthly costs. Back then, it was $720 per month; now it's nearly $1,150 per month (all tenants pay for their own utilities and most individual unit repair costs).

As for the dynamics of the building, at first it was 25-year-old city newcomer me, a couple of other singles, a few families and many old-timers (including my self-proclaimed surrogate grandparents Susi and Jack, who live next door and I love like family). Then slowly, other young couples and families began moving in, like Robin, who happened to be from my hometown in Michigan and became one of my dearest friends, and her husband Michael, who now have two incredible kids.

It was a tough decision to sell. I love the neighborhood, and it will be sad to leave my many friends and neighbors. But I'm ready for change. It was a wise decision to buy instead of rent when I did, and I'll make a nice profit. My original purchase price was around $230,000.

Once I sell, my plan is to rent a place in TriBeCa. Although I clearly will not have the same amount of space, downtown better suits my lifestyle as a 35-year-old single woman. And I love the idea of walking to the Financial District. I think the architecture there is as beautiful as the city gets.

As for whoever buys my apartment, I hope they appreciate its history and its architecture as well as all that's new and great about the area. The neighborhood now has places like Vinyl, a music-themed upscale diner, on 78th and Second Avenue, and Amber, a delicious Asian-fusion sushi place with a cool vibe, located on the corner of Third Ave and 80th Street. The Agata & Valentina gourmet market is nearby at First Avenue and 79th Street, and it's where I personally do the majority of my food shopping.

I also love Oh Mamma Mia on Second Avenue between 76th and 77th, an authentic and very festive Italian pizzeria, as well as Canyon Road on First Avenue near 76th, my favorite Southwestern haunt with its fine food and tequila.

It will definitely be an adjustment to move. -- *Wendy Ilene Friedman*

Posted by Andy Wang on 10:28 AM | Comments (1)

Archive: June 14, 2007
## Open season

Our favorite open houses this week.



**421 W. 54th St.**, Clinton, **$1,175,000**
*Sunday, noon to 2 p.m.*
Sitting atop the site formerly occupied by the legendary Hit Factory music studio, this is a one-bedroom spread for the musically inclined. Oak floors, Sub-Zero appliances, an on-site fitness center and the extra ambiance provided by the still-lurking spirits of stars like John Lennon and Luther Vandross. Of course, Matchbox Twenty recorded here, too, so it's kind of a mixed bag.

**4260 Broadway**, Washington Heights, **$460,000**
*Sunday, 3:30 p.m. to 4:30 p.m.*
Now, granted, Washington Heights is a bit of a hike -- but a four-bedroom Manhattan apartment for under half a million? There aren't many of those out there. In an elevator building with laundry facilities a block from the 1 and A trains, this one could be worth the trip to check it out. Just pretend you're going upstate for the weekend.

**118 E. 25th St.**, Flatiron, **$13,000 a month**
*Sunday, noon to 1 p.m.*
OK, so $13,000 a month is some serious scratch. But wait! "Can easily be converted to 3 or 4 bedroom," says the listing for this 4,200-square-foot two-bedroom. Just grab three friends, throw up a couple of partitions, and suddenly you're kicking it in style (the master bath comes with a flat-screen TV) for pretty much what you'd pay to live in one of those Murray Hill dorms. Or, of course, you could just be loaded.

**358 Grove St.**, Bushwick, **$472,472**
*Saturday, 1 p.m. to 5 p.m.*
Word on the street is that Bushwick is up-and-coming. Here's a chance to get in on the ground floor (or at least reasonably close to it). This two-bedroom blocks away from Maria Hernandez Park comes with granite countertops, cherrywood cabinets, custom windows and access to 3,000 square feet of common outdoor space.



**161 Duane St.**, TriBeCa, **$5,990,000**
*Sunday, 2 p.m. to 4 p.m.*
Have vision? This might be your place. "Bring your architect and build the home of your dreams," says the listing info for this three-bedroom loft penthouse. For six million bucks we'd kind of hope the home of our dreams would come already built for us -- but that's probably why hoi polloi like ourselves aren't in the market for this sort of space in the first place. Come, customize to your heart's content.

**323 E. 8th St.**, East Village, **$325,000**
*Sunday, 1 p.m. to 2:30 p.m.*
"A clean, well-lit space," says the Hemingwayesque description of this East Village one-bedroom. And if Big Ern were, in fact, to take up residence in New York, a fourth-floor walkup steps from Tompkins Square Park seems like just the sort of spot he might choose. "The Tenente walked to Niagara and drank a grappa with Jesse Malin. In the rain." *-- Adam Bonislawski*

Posted by Andy Wang on 02:56 PM | Comments (0)

 Archive: June 13, 2007
# This week's calendar

**Wednesday, June 27 and Thursday, June 28**
*BuildingsNY Expo*
If you're in the building biz, this is one can't-miss event. This annual two-day event features hundreds of exhibits of products and services for building maintenance, renovation and restoration. It includes information on the hottest topic in today's construction: green building. Get there by 9 a.m. on Wednesday to hear Donald Trump Jr. and Ivanka Trump deliver the keynote speeches. Jacob K. Javits Convention Center, 655 W. 34th St. Register at BuildingsNY.

**Thursday, June 28**
*Opening Reception for "Building Connections: 11th Annual Exhibition of K-12 Design Work"*
Ever look at one of those new buildings springing up all across the city and think: "Geez, who designed that -- a kid or a crazy person?" Well, probably the latter, but if you'd like to see what might be the future of New York



architecture, check out this exhibit featuring models and drawings by kindergarten through 12th graders enrolled in the Learning by Design program. 4:30 p.m. to 7:30 p.m. The exhibit is on view through August 11. Judith and Walter Hunt Gallery, Center for Architecture, 536 LaGuardia Place.

**Saturday, June 30**
*A Practical Guide to Buying a Co-op, Condo or a House*
If you're ready to jump into this crazy New York City real-estate market, you might want a life preserver. May we suggest this seminar presented by Carmen Lee Shue of Lee Shue Realty, "A Practical Guide to Buying a Co-op, Condo or a House: Things you Should Know and Mistakes to Avoid." The talk is free; the advice is invaluable. 2 p.m. to 4 p.m., The New Public Library, Science, Industry & Business Library, 188 Madison Ave.

*If you'd like to have your event listed, please e-mail relevant information to jceaser@nypost.com.*

## WHAT'S ON SALE

**ABC CARPET & HOME**
888 Broadway, at 19th Street, (212) 473-3000
1055 Bronx River Ave., at Watson Avenue, The Bronx, (718) 842-8772
Sale: Through July 22
Open: Mon., Thu., 10 a.m. to 8 p.m.; Fri., 10 a.m. to 6:30 p.m.; Sat., 11 a.m. to 7 p.m.; Sun., noon to 6:30 p.m.
A summer clearance will mark down prices at their regular outpost, as well as their outlet store. Get up to 50 percent off on select bedding, 40 percent off on select lighting and up to 20 percent off on **Mitchell Gold + Bob Williams** items including a French oak sideboard and hutch, $1,999 (reg. $5,995), an Italian walnut bookcase, $1,299 (reg. $3,015) and flower side tables, $79 (reg. $150).

**BO CONCEPT**
69 Greene St., between Spring and Broome streets, (212) 966-8188
Sale: Through June 30
Open: Mon. to Sat., 10 a.m. to 7 p.m.; Sun., noon to 6 p.m.
This summer sale offers select pieces for less. A black-stained oak veneer bed is now $579 (reg. $1289), Diva sofa, available in fabric or leather, now $1,646 (reg. $2,799) and a solo chaise lounge chair is $849 (reg. $1,499).

**HASTENS**
80 Greene St., between Spring and Broome streets,(212) 219-8022
Sale: Through June 30
Open: Mon. to Sat., 11 a.m. to 7 p.m.;Sun., 11 a.m. to 6 p.m.
The Swedish bedding company, known for its handmade all-natural bedding, pillows, down comforters and accessories, will offer $1,000 of bedding and accessories with the purchase of any Hasten bed. Choose from the Continental bed, the Adjustable bed and the Frame beds, priced at $4,500 and up.

**ETHAN ALLEN**

192 Lexington Ave., at 32nd Street, (212) 213-0600
Sale: Through July 3
Open: Mon., Tue., Thu., Fri., 10 a.m.to 7 p.m.; Sat., 10 a.m. to 6 p.m.;
Sun., 11 a.m. to 5 p.m.
Ethan Allen is closing its Murray Hill outpost and clearing out sleigh beds
for $999, living-room chairs for $499, a wide range of sofas for $899 and
more items for up to 70 percent off.

**JONATHAN ADLER**
72 Greene St., between Broome and Spring streets
Sale: Through June 24
Open: Fri., 10 a.m. to 7 p.m.; Sat., 10 a.m. to 6 p.m.; Sun., 10 a.m. to 2
p.m.
Select pieces will be reduced, including a three-seater sofa, now $2,250
(reg. $4,500) and a striped table lamp, $100 (reg. $300).

**SCANDINAVIA HOUSE**
58 Park Ave., at 38th Street, (212) 847-9737
Sale: Through June 30
Open: Mon. to Sat., noon to 6 p.m.; Wed., noon to 7 p.m.
Fine home-design items from Nordic designers from Stockholm,
Copenhagen, Oslo, Helsinki, Reykjavik — and any point in between — will
be discounted by 20 to 60 percent. A vacuum jug by Danish designer **Erik
Magnussen**, now $56 (reg. $80), **Ulrica Hydman-Vallien**'s mouth-blown
multi-color tumblers, $10.50 each (reg. $15 each) and **Oiva Toikka**'s
rainbow ceramic bird, $203 (reg. $290).

*If you'd like to have sale information listed, please e-mail
ctam@nypost.com.*

Posted by Jennifer Ceaser on 02:11 PM | Comments (0)

Archive: June 07, 2007
# Open season

Our favorite open houses

### 122 Utica Avenue, Crown Heights, $640,000
*Saturday, 1 p.m. to 3 p.m.*
*Broker: Josephine Liascas, Fillmore Real Estate, (718) 253-2500*
"Owner is anxious and willing to listen to all offers," says the listing for this
property. While this might strike a mischievous person as the chance to
take advantage of a somewhat neurotic owner — "Here's a chance to buy
a three-family for $300,000!" you may be thinking — perhaps you should
play this one straight. After all, the three-family with five bedrooms, three
baths, three dining rooms and an unfinished basement sounds like a pretty
good find. Be nice and make a fair offer — or, at least, give the seller a
Xanax.

### 415 E. 85th St., Upper East Side, $499,900
*Sunday, 12 p.m. to 1:30 p.m.*
*Broker: Dennis Riccio, Prudential Douglas Elliman, (212) 727-6182*
This 725-square-foot one-bedroom co-op is on a high floor, with a
renovated kitchen and bath. It has five closets and it's in a good
neighborhood and, oh yeah, there' s a garage in the building... What the
heck is wrong with this apartment? Well, it's "convenient to mass transit via
the 86th street corridor," according to the listing, which means you better
be up for hoofing three cross-town blocks to the Lexington Ave. subway
line, or get used to waiting for the M86 bus. And you'll need 25 percent
down. The apartment itself, though, looks pretty nice for the price.

### 20 West Street, Financial District, $2,800 a month
*Sunday, 12 p.m. to 1:30 p.m.*
*Brokers: Jackie Chan-Brown and Anthony DellaCave, Citi Habitats, (212)
619-1212*
You could say this rental casts a whole new meaning on the words "trophy
apartment." This studio is the "former home of the Heisman Trophy,"
according to the listing. Does this mean the trophy took advantage of the
"stand-up sleep loft" and enjoyed the apartment's "picturesque city views

by night?" Not exactly. The building is the former headquarters of the Downtown Athletic Club, which was the trophy's home for many years. The apartment also offers a "gourmet" island kitchen and a "stylish" marble bath, plus a membership to the 12,000-square-foot sports center.



**1200 Broadway, Gramercy, $1,795,000** *Sunday, 2 p.m. to 3:30 p.m. Broker: Gregory Hall, The Corcoran Group, (212) 848-0460*

The center island part of the "center island kitchen" in this two-bedroom, two-bath co-op is not bolted down, so don't be surprised if you find an enormous granite-topped slab inching its way into the living room should you buy this apartment. That, or you can hire a handyman and have it planted where you like. But the open kitchen with stainless-steel appliances, cherry cabinets and an Asko washer/dryer is only part of the fun in this 2,000-square-foot unit in the Gilsey House, a 19th century cast-iron building that was formerly a hotel. There are walk-in closets, double-paned windows and 10-foot ceilings. Oh, yeah — and a keyed elevator. Island living can be sweet.

Posted by Max Gross on 05:11 PM | Comments (0)

Archive: June 06, 2007
# This week's calendar

**Saturday, June 9 and Sunday, June 10**
*Parrish Art Museum: Landscape Pleasures*
This East End museum celebrates its beautiful gardens with a weekend-long fundraising event. Saturday morning at 8:30 a.m. is a breakfast symposium with noted landscape and design experts including Leslie Rose Close (good name for a garden expert!) and photographer Joel Meyerowitz. On Sunday from 10 a.m. to 3 p.m., take a self-guided tour the finest private East End gardens. Tickets start at $125. Call (631) 283-2118, ext. 41 or email specialevents@parrishart.org.

**Sunday, June 10**
*Mount Morris Park Home Tour* This self-guided tour takes you inside 12 brownstones, apartments and faith-based institutions; a guided tour gets you familiar with this Central Harlem historic district. The tour starts at Pelham Fritz Center in Marcus Garvey Park. 11 a.m. to 4 p.m. Tickets: $35 (advance), $40 (day of), $50 (includes post-event reception). For tickets, email mtmorrispa@aol.com.





**Through June 10**
*Exhibition of Works: Members of American Academy of Arts and Letters*

Whether your preference is painting, architecture, photographs or the written word, you'll get a taste of some of the finest at this exhibit of newly elected members and award recipients. On view are models and renderings from architects **Billie Tsien** and **Eric Owen Moss** (pictured, Moss' rendering of Republic Square, Kazakhstan), photographs from **Sally Mann** and original manuscript pages from **Annie Proulx**'s new work, "Bird Cloud." The gallery is located at Audubon Terrace, Broadway between 155th and 156th streets, Thursday through Sunday, 1 p.m. to 4 p.m. Free. (212) 368-5900.

**Monday, June 11**
*Five Visions for Governors Island Panel Discussion*
New York bought the island back from the Federal government in 2003 for one dollar, and we still haven't figured out how to develop it. But these five teams of architects and landscape architects just might. They were selected to present their concepts for the island, including developing the two-mile Great Promenade (which features amazing views of Lower Manhattan and New York Harbor) and a new park and restoring the historic district. 6 p.m. to 8 p.m. Center for Architecture, 536 LaGuardia Place. Free. RSVP through the AIANY site: AIANY.



**Tuesday, June 12**
*Cooper Union's Urban Visionaries Benefit Dinner*
The Cooper Union for the Advancement of Science and Art will honor such urban visionaries as artists, architects, scientists and citizens at its fifth annual benefit dinner. The evening starts with cocktails and a silent auction of works by renowned artists and architects, and is followed by a seated dinner. Honorees include Kara Walker for visual art and Santiago Calatrava for architecture. 7 World Trade Center, 250 Greenwich St. Tickets start at $500. Call (212) 353-4106 for tickets.

**Wednesday, June 13 through Sunday, June 17**
*Affordable Art Fair*
The fair kicks off with a benefit preview on Wednesday from 6 p.m. to 9 p.m for the AIDS Community Research Initiative of America. It will include a silent auction of work by Donald Sultan and Claes Oldenburg, among others. Tickets start at $50 (advance). The fair opens to the public on Thursday at noon, and later that evening, from 6 p.m. to 9 p.m., there will be a cocktail reception with



tickets priced at $25 (advance). The fair continues through the weekend, with more than 70 galleries showcasing artists from all over the world. All items will be priced under $10,000, most are under $5,000, so break out your piggy bank. Plus, a number of art-related programs will be going on throughout the fair, including a children's art workshop; visit the site for a full schedule: Affordable Art Fair. Metropolitan Pavilion and the Altman Building, 125 W. 18th St. General admission: $15. For benefit preview and cocktail party tickets, call (212) 255-2003.

*If you'd like to have your event listed, please e-mail relevant information to jceaser@nypost.com.*

## WHAT'S ON SALE

**BO CONCEPT**
69 Greene St., between Spring and Broome streets, (212) 966-8188
Sale: Through June 30
Open: Mon. to Sat., 10 a.m. to 7 p.m.; Sun., noon to 6 p.m.
This summer sale offers select pieces for less. A black-stained oak veneer bed is now $579 (reg. $1289), Diva sofa, available in fabric or leather, now

$1,646 (reg. $2,799) and a solo chaise lounge chair is $849 (reg. $1,499).

**BROADWAY PANHANDLER**
65 E. Eighth St., between Broadway and Mercer streets, (212) 966-3434
Sale: Through June 11
Open: Thu., Fri., 11 a.m. to 8 p.m.; Sat., 11 a.m. to 7 p.m.; Sun., Mon., 11 a.m. to 6 p.m.
Kitchenware and utensils will be marked down. **All-Clad** grill pans, $52 (reg. $130), **Wusthof** chef's knives, $50 (reg. $109)and **Le Creuset** stoneware baking dishes, $20 (reg. $35).

**FRETTE**
317 W. 33 St. at Eighth Avenue, (718) 747-1656
Sale: Through June 7
Hours: Sun. to Wed., 9 a.m. to 6:30 p.m.; Thurs., 9 a.m. to 5 p.m.



Summer afternoon: the two most beautiful words in the English language, according to Henry James. Our choice for third and fourth? Below wholesale. Which is what the prices are on these **chic Italian linens for bed, bath and home**, including bed linens, baby linens and table linens. Couture bedset or duvet set now $550 (reg. $950 to $2,400), light quilts and bed covers, $400 (reg. $875 to $2,000), terry robes, $50 to $100 (reg. $120 to $220). And a definite runner-up? No strollers. Also, no children under 12 and no cash, exchanges or returns at this sale.

**KARKULA**
68 Gansevoort St., between Washington and Greenwich streets, (212) 645-2216
Sale: Through June 7
Open: Mon. to Sat., 11 a.m. to 7 p.m.
Designer John Erik Karkula will discount prices at his flagship Meatpacking home furnishings shop. The Parsons-grad offers a hand-tufted wool rug, now $3,398 (reg. $5,227), an indoor/outdoor surf chair, now $629 (reg. $2,515) and a white marble lamp, now $248 (reg. $495).

**LENOX**
53 Commerce Drive, Route 535, Cranbury, N.J., (800) 587-7444
Sale: Through June 24
Open: Mon. to Sat., 9 a.m. to 8 p.m.; Sun., 11 a.m. to 6 p.m.
It's a bit of a trek to get there, but it's worth it for the prices. Get **discounts of up to 50 percent** on fine and casual dinnerware, crystal stemware, stainless flatware and gifts. There will also be selected seconds, overstock items and discontinued and irregular pieces.

**METROPOLITAN MUSEUM OF ART**
1000 Fifth Ave. at 82nd Street, (212) 570-3894
Sale: Through June 14
Open: Tue. to Thu., Sun., 9:30 a.m. to 5 p.m.; Fri., Sat., 9:30 a.m. to 9 p.m.

Gift shop items are on sale, including a Chinese floral patterned tray, $15 (reg. $20) and Chinese floral patterned plates, $6 each (reg. $8 each).

**PIERRE DEUX**
625 Madison Ave., between 58th and 59th streets, (212) 521-8012
Sale: Through June 9
Open: Mon. to Fri., 9 a.m. to 5 p.m.
Up to 20 percent off lamps, sconces, shades and chandeliers.

*If you'd like to have sale information listed, please e-mail ctam@nypost.com.*

Posted by Jennifer Ceaser on 05:31 PM | Comments (0)

Archive: June 01, 2007
# Open season

Our favorite open houses this week.

**124 East 13th St.**, Greenwich Village, **$8,000,000**
*Sunday, noon to 2 p.m.*
"Photographs cannot do this voluminous and spectacular penthouse justice," says the description for this Greenwich Village three-bedroom, which, we suppose, means you'll just have to go and check it out in person. A spa bath, 1,850 square feet of outdoor space, a wood-burning fireplace with limestone mantle -- all in all, it sounds like it could be worth a look.



**One Hanson Place**, Fort Greene, **$994,860**
*Sunday, 1 p.m. to 4 p.m.*
Here's your chance to live in the former Williamsburgh Savings Bank tower -- Brooklyn's tallest building at 512 feet and, perhaps even more significant, the world's most phallic building according to writer Jonathan Ames. Of course, if that's not enough of a selling point, there's always this two-bedroom's walk-in closet, chestnut flooring, Viking stove and oversized windows with harbor views.

**59 West 83rd St.**, **Upper West Side**, **$749,000**
*Sunday, 11:30 a.m. to 1 p.m.*
OK, we're gonna be honest with you. The thing that really attracted us to this listing for an Upper West Side one-bedroom was all the exclamation points -- 11 of them in a mere



five sentences by our count. What's the broker so excited about? Well, for starters -- exposed brick, a "top-of-the-line" kitchen, wood-burning fireplaces and space for a home office.

**60 Gramercy Park**, Gramercy, **$875,000**
*Sunday, 2 p.m. to 5 p.m.*
Plank-wood floors, 9-foot beamed ceilings, a fitness center, private storage, yadda, yadda, yadda... We know what you're really curious about -- does this Gramercy one-bedroom come with a key? As in a key to that famously private park right next door. You're in luck -- it does.

**250 W. 16th St.**, Chelsea, **$5,000 a month**
*Sunday, noon to 2 p.m.*
Like to cook? Here's one for you. The "master chef's kitchen" in this Chelsea two-bedroom is "larger than most 2nd bedrooms" according to the apartment's description. That means plenty of prep space as you work amidst the room's maple cabinetry, granite countertops and high-end appliances. Or, if you prefer to do your eating out, at least you'll know that your leftovers will have a comfortable home.

**519 E 5th St.**, East Village, **$3,500 a month**
*Saturday, 1 p.m. to 3 p.m.*
Ah, yes, the East Village, eternal home of the down-and-out artist-type, last bastion of the punk rock ethos ... Wait. What? What's that you say? A totally renovated two-bedroom apartment? With a spiral staircase? And a shared common garden? And a custom-designed bathroom with a "stunning vanity" and a Jacuzzi? Really? Ah, well ... never mind. *-- Adam Bonislawski*

Posted by Andy Wang on 11:15 AM | Comments (0)

**Sponsored Links**

**Mortgage Rate Alert - Fed at 2%**
$200,000 loan for $599/month. Free Quotes - No SSN Rqd. Save $1000s!
Mortgage.RefinanceFrontier.com

**What's Your Credit Score?**
View All 3 Credit Scores and Credit Reports Online Now. See it for $0.
FreeCreditReportsInstantly.com

**Today's Mortgage Tip:**
Refinance to a FIXED rate. No SSN required. LendingTree® QuickMatch
www.LendingTree.com

**What's your home worth?**
Before you make plans to sell, get a Free valuation online!
www.HouseValues.com

**Buy a link here**



Create an Account | Recover Your Password | Create a Forum Post

About | Submit a Tip | RSS | Advertise | Contact Us

Username: [          ]    Password: [          ]    [ Submit ]

Topics [      ]    Neighborhood [      ]    [          ]    [ Search ]

**About**

Brownstoner.com is a site about Brooklyn real estate and renovation, and all the tangential topics that impact life inside and outside the home in Brooklyn. Launched in October 2004 by Jonathan Butler, the site currently has about 100,000 unique visitors per month.

**Recent Forum Posts**

RE Agent in Crown Heights & Bed Sty by bayridgegirl

Paul's Salvage formerly on Bedford and Gates by brokestone

Custom Front Doors by mera

Plumber Needed by Oldlady

Excellent mover/storage experience by kiddo

Brooklyn Real Estate

| RE Brokers |
| Brooklyn Blogs |
| Brooklyn Media |
| New York Blogs |
| New York Media |
| Monthly Archives |

**Active Posts**

New Burg Condos Come to Market (8)

Wednesday Links (7)

Streetlevel: Franklin Park Already Packed (60)

Condos of the Day: Price Cuts, No Love for 45 3rd Place (33)

Foreclosure of the Week: 136 Underhill Avenue (57)

**Monthly Archives**

| **2008** | **2007** | **2006** |
|---|---|---|
| May | December | December |
| April | November | November |
| March | October | October |
| February | September | September |
| January | August | August |
| | July | July |
| | June | June |
| | May | May |
| | April | April |
| | March | March |
| | February | February |
| | January | January |

**2005**
December
November
October
September
August
July
June
May
April
March
February
January