Robert C. Faber (RF 7020)
Sean P. McMahon (SM 1202)
Ostrolenk, Faber, Gerb & Soffen, LLP
1180 Avenue of the Americas
New York, New York  10036
Phone:  (212) 382-0700
Fax:  (212) 382-0888
E-mail:  rfaber@ostrolenk.com

Attorneys for Defendants/Counterclaim-Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUTURE COMMUNICATIONS CORPORATION OF NEW YORK d/b/a VIRTUAL SERVICE,<br><br>        Plaintiff/Counterclaim-<br>        Defendant,<br><br>    vs.<br><br>AMERICAN SECURITY SYSTEMS, INC., and LAWRENCE T. DOLIN,<br><br>        Defendants/Counterclaim-<br>        Plaintiffs. | Case No.: Civil Action No. 08 CV 01997 (JGK) |

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT .................................................................................................... 1

I.    FINDINGS OF USPTO EXAMINING ATTORNEY ................................. 1
II.   PURCHASING PUBLIC .......................................................................... 2
III.  EVIDENCE DEMONSTRATES PRINCIPAL SIGNIFICANCE OF TERM VIRTUAL DOORMAN IS PRODUCT NAME ................................................................................. 3

    A.  *Evidence That Virtual Doorman Was Generic Prior to Plaintiff's Adoption* ........... 3
    B.  *Evidence That Virtual Doorman Has Become Generic* ........................................... 5
    C.  *That Defendants' Evidence Refers or Relates to Plaintiff is Irrelevant* ................... 5
    D.  *No Effort to Avoid Genericness* ............................................................................. 7
    E.  *No Substantial Trademark Use or Recognition* ..................................................... 8

CONCLUSION .............................................................................................. 10

## TABLE OF AUTHORITIES

**CASES**

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Group.*, 376 F.3d 8 (1st Cir. 2004)......................2

*D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261 (S.D.N.Y. 1970)..1

*Dan Robbins & Associates, Inc. v. Questor Corp.,* 599 F.2d 1009 (C.C.P.A. 1979)..........6

*EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.,*

   228 F.3d 56  (2d Cir. 2000)........................................................................................9

*Feathercombs, Inc. v. Solo Products Cop.,*

   306 F.2d 251 (2d Cir. 1962), cert. denied,  371 U.S. 910 (1962) ..................................8

*Genesee Brewing Co. v. Stroh Brewing Co.*, 127 F.3d 137 (2d Cir. 1997)........................1

*GMT Prod'ns, L.P. v. Cablevision of New York City, Inc.,*

   816 F.Supp. 207 (S.D.N.Y. 1976).................................................................................9

*Gruner + Jahr USA Publishing, Div. of Gruner + Jahr Printing & Publishing Co. v.*

   *Meredith Corp.,* 991 F.2d 1072 (2d Cir. 1993)..........................................................7, 8

*In re Abcor Development Corp.,* 588 F.2d 811 (C.C.P.A. 1978)........................................6

*In re Artic Electronics Co.,* 220 U.S.P.Q. 836 (T.T.A.B. 1983) ........................................3

*In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 828 F. 2d 1567 (Fed Cir. 1987)..........6

*In re Northland Aluminum Porducts,* 777 F.2d 1556 (Fed. Cir. 1985) ...............................6

*In re Thunderbird Products Corp.*, 406 F.2d 1389 (C.C.P.A. 1969) ..................................6

*Insty*Bit, Inc. v. Poly-Tech Indus.*, 95 F.3d 663, 672 (8th Cir. 1996) ...............................3

*Kellogg Co., v. National Biscuit Co.,* 305 U.S. 111 (1938) ...............................................8

*Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373 (2d Cir. 1997) ...............3

*Murphy Door Bed Co. v. Interior Sleep Sys., Inc.,* 874 F.2d 95 (2d Cir. 1989)..................8

*Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121 (4th Cir. 1990) ...................................... 3

*Reese Publ'g Co., Inc. v. Hampton Int'l Communications, Inc.*,

   620 F.2d 7 (2d Cir. 1980) ................................................................................................. 9

Statutes

   15 U.S.C. § 1125(a) ............................................................................................................. 3

## PRELIMINARY STATEMENT

This responds to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition") filed via ECF on June 16, 2008.

## ARGUMENT

Plaintiff's Opposition presents a number of arguments which lack substance. Defendants respond as follows:

## I.    Findings of USPTO Examining Attorney

Plaintiff seeks to rely on the initial findings of the United States Patent and Trademark Office Examining Attorney responsible for examination of Plaintiff's application for the generic term virtual doorman.  Plaintiff notes that the Examining Attorney did not object to registration on the basis that Plaintiff's purported mark was insufficiently distinctive, generic, or descriptive.  Plaintiff's Opposition at Page 3 and 15.  Of course, the Examining Attorney did not object.  Plaintiff withheld the evidence Defendants had found and supplied to Plaintiff months ago that the term was being used generically by several unrelated parties.  Such intentional withholding may be fraudulent under U.S. trademark practice.

Plaintiff cites two Court cases but ignores that a Court is not bound by a determination of the Patent and Trademark Office ("PTO").  *D.M. & Antique Import Corp. v. Royal Saxe Corp.,* 311 F.Supp. 1261, 1274 (S.D.N.Y. 1970).  And more importantly Plaintiff ignores that there has not yet been a PTO determination.

The initial *conclusions* of the Trademark Office may be "accorded weight." *Genessee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 148 n. 11 (2d Cir. 1997) (emphasis added).  Obviously, if a critical fact was withheld from the PTO, no weight should be accorded to the PTO's conclusions.  Furthermore, in *Genessee Brewing,* the

{00940716.1}                                            1

challenged mark had been accepted and passed to publication by the PTO and the Second Circuit drew inferences from the passage of the mark to publication based on the criteria for passage of a mark to publication in the Trademark Manual of Examining Procedure.

In this case, the Plaintiff's application for the generic term virtual doorman has not yet passed to publication and no conclusions can be drawn about the registrability of the mark. The Examining Attorney has required that Plaintiff submit a disclaimer of the word "virtual" and also submit specimens showing use of the mark. Declaration of Sean P. McMahon ("Decl. McMahon") ¶ 7, Exhibit E. Plaintiff has not satisfied either requirement. Maybe it is because Plaintiff fears that the specimens will make it clear to the Examining Attorney that the term virtual doorman is generic. Plaintiff has withheld information that will allow the Examining Attorney to make a correct determination on the registrability of the mark.

## II.    Purchasing Public

As to in whose purview genericness is seen, according to Plaintiff, the population at large is not the relevant "purchasing public" for purposes of genericness, but it is merely the prospective purchasers of the product. *See* Plaintiff's Opposition at Page 7.

In the present case, the relevant "purchasing public" is not composed merely of builders, developers, contractors and building owners as Plaintiff claims. *Id.* at Page 12. Residents, tenants or their agents are members of the "purchasing public" because their decision to purchase or lease a property may, among other things, be based upon whether the absence of a human doorman is adequately substituted by a virtual one. Excluding those users would be to exclude those who will form an opinion, generalization or impression of a virtual doorman. Non-purchasers' perceptions are relevant when their impression threatens the trademark owner's commercial interest in a mark. *Beacon Mut. Ins. Co. v. OneBeacon*

*Ins. Group*, 376 F.3d 8, 16 (1st Cir. 2004); *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382-83 (2d Cir. 1997) (the likelihood of confusion test concerns not only potential purchasers but also the general public); *Insty\*Bit, Inc. v. Poly-Tech Indus.*, 95 F.3d 663, 672 (8th Cir. 1996) (confusion under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "includes confusion of nonpurchasers as well as direct purchasers"); *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 128 (4th Cir. 1990) ("public confusion" among non-purchasers is actionable if it "will adversely affect the plaintiff's ability to control his reputation"); *In re Artic Electronics Co., 220 U.S.P.Q. 836, 838 (T.T.A.B. 1983)* ("The notion that likelihood of confusion is limited to purchaser confusion is simply not correct.").

## III.    Evidence Demonstrates Principal Significance of Term Virtual Doorman is Product Name

Defendants' evidence is overwhelmingly persuasive in demonstrating that Plaintiff's purported mark is a generic term.

### A.    *Evidence That Virtual Doorman Was Generic Prior to Plaintiff's Adoption*

The term virtual doorman was already generic when Plaintiff first used it. Plaintiff is trying to appropriate a generic term from the public domain.

The Plaintiff argues that the generic descriptive use of the term virtual doorman by United Parcel Service ("UPS") and Mail Boxes Etc. ("MBE") prior to Plaintiff's use of that generic term should not be considered because the term was previously used in connection with package delivery services. Plaintiff's Opposition at Page 9. However, both UPS' and MBE's long prior virtual doorman services and Plaintiff's "state-of-the-art" alarm and security systems service both perform virtually at least part of

the services of a real doorman, such as identity verification, acceptance of deliveries, and delivery notification, tasks commonly requested by residents or tenants.

A doorman performs considerably different services depending upon the building of his employment, e.g., a residence building, retail store, industrial establishment, hotel, etc., and the needs of the employer. A computer or electronic substitute for a doorman and performing any doorman services is aptly described by the generic term virtual doorman, that is, not a real doorman there, but one who is virtually there. Because different users identify a doorman who is not physically present by the same encompassing description, virtual doorman, it is an apt generic description for all those services. There is no specification of services performed by a doorman. In each building, they do different things. So, an argument based on scope of services is irrelevant.

As Defendants' have pointed out, the services provided by UPS and MBE require a customer to specify the address of the UPS or MBE store as the delivery address, and UPS or MBE performs as a virtual doorman, accepting packages and notifying customers of the deliveries. Decl. McMahon ¶ 29, Exhibit AA. A New York Times article dated July 7, 1996 pointed out that UPS' virtual doorman service developed from the needs of customers who lived in non-doorman buildings, where packages could not be delivered except to their virtual doorman, UPS and MBE. Decl. McMahon ¶ 27, Exhibit Y.

Plaintiff boasts that one feature of its security system is that it can automatically manage entry, drop off and tenant notification of package delivery. Declaration of Zeynel Karcioglu ("Decl. Karcioglu") ¶ 3, Exhibit 3. To the extent that these services are identical to the services provided by UPS and MBE, the prior use by these companies of the term virtual doorman is relevant.

B.    *Evidence That Virtual Doorman Has Become Generic*

Plaintiff argues that Defendants have not proffered sufficient evidence that the term virtual doorman has become generic.   But Plaintiff has not offered contrary evidence. Rather, Plaintiff merely reargues that UPS' and MBE's use of the term virtual doorman is irrelevant.

In fact, Defendants have just become aware of additional generic use of the term virtual doorman within the security industry.   *See* Page 4 of Exhibit A attached hereto. The term virtual doorman is used generically to refer to a feature of an Elbex security system, in particular one pertaining to the acceptance of package deliveries.

Plaintiff argues that the small amount of evidence demonstrating generic use outside the United States is irrelevant.   Although the focus of determining genericness is consumer perception in the United States, the cited foreign references show that the term is so generic that it is also generic outside the United States in another English language country.   Plus, the evidence also shows use of the term in the United States and outside New York.

C.    *That Defendants' Evidence Refers or Relates to Plaintiff is Irrelevant*

Plaintiff states that the majority of Defendants' evidence refers to Plaintiff. The various cited literature shows each author's perception of and use of the term virtual doorman as a generic description, and a reader and the purchasing public are shown nothing in the publications to infer that the term is not generic.   That only one system is being described by its apt generic name is not relevant.

In each of the cited publications, virtual doorman was used as the name of a particular service.   That the service was supplied by Plaintiff does not diminish the fact that the writers used the term generically in the publications. The issue is not what the writer

meant or which system was being described. The issue is what the reader would perceive, and that would be only a generic description of a product, not a proprietary trademark.

Evidence of the public's use and its understanding of a term may be obtained from *any* competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications. *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 828 F.2d 1567, 1570 (Fed. Cir. 1987) (emphasis added). *See also In re Northland Aluminum Products*, 777 F.2d 1556, 1559 (Fed. Cir. 1985)*; Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 1014 (C.C.P.A. 1979); *In re Thunderbird Products Corp.*, 406 F.2d 1389, 1390-91, (C.C.P.A. 1969).

Whose system is installed in a building is irrelevant for purposes of determining genericness of the term virtual doorman.   In *Merrill Lynch* the evidence before the Trademark Trial and Appeal Board showed recognition in a substantial number of publications that the source of the CASH MANAGEMENT ACCOUNT was Merrill Lynch. *Merrill Lynch*, 828 F.2d at 1571.  Conversely, Defendants' evidence herein shows that the term virtual doorman was used in a substantial number of publications as a generic and apt name for the type of goods, not merely of Plaintiff's goods. A term that immediately and unequivocally describes the purpose and function of a party's goods is a name for those goods, for "that is what *names* do. They tell you what the thing *is*." *Id.* at 1571 (quoting *In re Abcor Development Corp.*, 588 F.2d 811, 816 (C.C.P.A. 1978).

Defendants respond to Plaintiffs observations regarding the evidence:

- Exhibit J:  There is only a single reference to Plaintiff's product as "Virtual Doorman."   There are many more uses of virtual doorman generically.

- Exhibits I, M, N, P, Q, R, U, , W, X and RR  all demonstrate non-trademark, generic use of the term virtual doorman and fail to associate the mark with the Plaintiff.

- Exhibit S:  demonstrates two separate non-trademark, generic, uses of the term virtual doorman with respect to the same property.

- Exhibit T: demonstrates a second instance of non-trademark generic use of virtual doorman with respect to the same property.

- Exhibit V:  It is irrelevant whether the Plaintiff installed the security system in the property. Virtual doorman was used as an apt name for those goods.  It is not who installed a system that determines if its apt name is generic.  The text writer expressed it generically.  The reader can only see it generically.  It was used generically.  It is generic.

### D.    *No Effort to Avoid Genericness*

The term virtual doorman was already in use generically by UPS and MBE before Plaintiff adopted it.  There can be no effort to stop UPS now.

There is no evidence that Plaintiff made any effort to police the use of the term virtual doorman or to stop their customers, or publications writing about their customers, or anyone else from using the term generically.   In the face of available evidence, at least from or describing Plaintiff's own customers, that the term was being used generically, Plaintiff took no affirmative steps to prevent or correct generic use of term.

With respect to a number of the generic use references identified by Defendants, Plaintiff admits that it did not install the systems identified or referred to in

those references and claims they belatedly have contacted the relevant parties to have the term removed or corrected. This admission of an *ex post facto* action taken in response to Defendants' evidence demonstrates that Plaintiff had not taken affirmative steps to police its purported trademark and allowed the term to remain the generic, apt description it was before Plaintiff tried to take the term out of the public domain. Since the term virtual doorman is already a generic term "policing is of no consequence to a resolution of whether a mark is generic." *Murphy Door Bed Co. v. Interior Sleep Systems, Inc. 874 F.2d 95* (2d Cir. 1989). For example, escalator, zipper, and cellophane were also marks that were not policed and became generic. But those did not start as an apt name for the product, unlike virtual doorman, which has always been an apt name for the product.

E.    *No Substantial Trademark Use or Recognition*

Plaintiff argues that the evidence, proffered by both Plaintiff and Defendants, demonstrates "substantial" proper trademark use and recognition of the term virtual doorman as Plaintiff's trademark. However, trademark significance of a term challenged as generic must be proven such that the "*primary* significance of the term in the minds of the consuming public is *not* the *product* but the *producer*." *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111 (1938). In other words, if the *principal* significance of the term is the name of a product, then the mark is generic, *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir. 1962), cert denied, 371 U.S. 910 (1962), regardless of any attempt to appropriate a public domain term by use of upper case letters.

Because Plaintiff's purported mark is unregistered, it has the burden of proving the mark is not generic. A plaintiff must "demonstrate that it has a valid mark entitled to protection" and only after a plaintiff has met this initial burden may a court consider whether the accused's use of the mark is "likely to cause confusion." *Gruner +*

*Jahr USA Publishing, Div. of Gruner + Jahr Printing & Publishing Co. v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir. 1993); *see also EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 62 (2d Cir. 2000) ("A plaintiff claiming unfair competition under § 43(a) must show that it owns a valid trademark eligible for protection"). The term virtual doorman is not registered and the Patent and Trademark Office was not informed of its widespread generic use. The burden is on Plaintiff to prove that its generic term is its exclusive, valid trademark. *Reese Publ'g Co., Inc. v. Hampton Int'l Communications, Inc.,* 620 F.2d 7, 11 (2d Cir. 1980); *GMT Prod'ns L.P. v. Cablevision of New York City, Inc.,* 816 F. Supp. 207, 210 (S.D.N.Y. 1976).

Plaintiff has the burden of demonstrating that the purchasing public associates the term virtual doorman with the Plaintiff. That Plaintiff has devoted only two pages of its Memorandum to this point shows that it cannot demonstrate that the *primary* significance of the term virtual doorman in the minds of the consuming public is not the product, but the producer. Moreover, Plaintiff has not introduced any evidence of its own use of the term virtual doorman to demonstrate that the *primary* significance of the term functions as a trademark. It has not introduced any representative packaging, tags, labels, displays, brochures used in the sale, promotion or marketing of its flagship product to support the contention that it has properly used the term virtual doorman as a trademark.

Plaintiff has sought to discount Defendants' overwhelming evidence as having no relevance. Yet, the record contains no evidence of Plaintiff's own use of the term virtual doorman *as a trademark.* Plaintiff has only introduced a handful of publications, and a *single* Affidavit, in support of the argument that it has properly used the term virtual doorman as a trademark and that the purchasing public associates the term virtual doorman with the Plaintiff.

## CONCLUSION

Plaintiff's Opposition primarily rests upon the argument that the overwhelming evidence presented by the Defendants is irrelevant. Plaintiff's defenses are merely belated attempts to reverse the fact that there is widespread generic use of the generic term virtual doorman, which do not reverse the fact that those using the term virtual doorman use it generically, those seeing the term as used see it used generically, and that the term is an apt description of the service being performed Plaintiff and by others.

Dated:  June 30, 2008                    Respectfully submitted,
        New York, New York


_____
    Robert C. Faber (RF 7020)
    Sean P. McMahon (SM 1202)
    Ostrolenk, Faber, Gerb & Soffen, LLP
    1180 Avenue of the Americas
    New York, New York  10036
    Phone:  (212) 382-0700
    Fax:  (212) 382-0888
    E-mail:  rfaber@ostrolenk.com

    Attorneys for Defendants/Counterclaim-
    Plaintiffs

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing **DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was served upon counsel for Plaintiff/Counterclaim-Defendant by ECF and First Class mail, postage prepaid, on this 30th day of June, 2008, addressed as follows:

Zeynel Memed Karcioglu
Zeynel Karcioglu, Esq.
36 East 20th Street
New York, New York  10003

Robert C. Faber

# Exhibit A

Part I



# Homecierge ®

# DiViRA™ SYSTEM 5
## Digital Video interphone
## Residence Automation





# WELCOME TO ELBEX AUTOMATED RESIDENCE

## Elegant and luxuriously designed for convenience, security and peace of mind.

The **DiViRA™ SYSTEM 5** offers:

### Entrances and Building Controls
- Advanced digital video interphones for controlling all entrances, logging and recording all visitors.
- Concierge station for communicating with tenants and entrances, and for operating all common facilities.
- Controlled elevators operation/access for visitors.
- Controlled lockers for deliveries to absent residents.
- Integration with other security systems and facilities, alarm monitoring and virtual doorman.

### Residence's Security and Emergency
- Controlling each residence's security system.
- Wireless emergency (personal bracelet or pendant)
- Two way concierge - resident communications.

### The Automated Residence
- Switching and operating lights, air-conditioners, heaters, curtains and other electrical appliances.
- Audio, video and home theater control.
- Flexible controls via touch screen, IR remote control and automatic control via programmed menu.

### The Residence Communication
- Interconnecting with individual residence owner's PC for receiving statuses, messages and alarms.
- Communicating with visitors, commanding the alarm system and operating the appliances through PCs and PDA devices via the internet.
- Recording/retrieving voice and display messages.



See clearly who is at the door before you let him in, be it at the main entrance of your building or at your own residence door.

**safety first**





Main entrance panel

EDU5MG

Video interphone monitors

EVM5

EVM4

Individual door unit

EDU2S+

IR and wireless

EIRC5

ERC5B

2



*Homecierge*

# CONCIERGE AND VIRTUAL DOORMAN

## Future services are a reality
## with DiViRA® SYSTEM 5

### Local Concierge
- Controlling entrances, logging and recording all visitors.
- Communicating with tenants, entrances and operating all common facilities.
- Controlling elevators and access to visitors.
- Controlling lockers for deliveries to absent residents.
- Processing and transmitting voice and display messages to the residences.

### Local Security and Emergency
- Monitoring each residence's security system and emergencies.
- Monitoring the entire building security systems.

### Virtual Doorman
- Controlling, logging and recording all delivery man at the entrances.
- Controlling, logging and recording deliveries into secured lockers for absent residents.

### *Homecierge* ®

- Infrastructure for ...a whole new world of *Homecierge* ® services via the internet are conveniently at your command including voice over IP, from your video interphone.
- Services to include the virtual doorman, emergency and medical alarms, building services and local shopping from neighborhood stores.


The local concierge


The *Homecierge* pizza menu




The delivery lockers

The local guardman and
the virtual doorman station

4



Case 1:08-cv-01997-JGK Document 25-2 Filed 06/30/2008 Page 8 of 11

**No U turn on your way to work or from your vacation just because you do not remember if you switched off the heater...**

The **DiViRA™ SYSTEM 5** offers:

### Remotely communicating with Visitors when you are out
• Switching over visitor calls from the building entrances to your PC or PDA devices.

### Residence's Security and Emergency
• Remotely receiving alarms and/or emergencies status, and remotely activating, deactivating the residence' security zones and system.

### The Automated Residence
• Remotely receiving on-off statuses of lighting and appliances.

• Remotely operating air-conditioners, heaters, lights, curtains and other electrical appliances.

### The Residence Communication
• Interconnecting with individual resident' PC for receiving statuses, messages and alarms.

• Communicating with visitors, commanding the alarm system and operating the appliances through PCs and PDA devices via the internet.





**Where there is internet...**

Use a secret password to retrieve appliances status, alarms, messages and/or switch on the boiler on your way home, or the air-conditioner if it is too hot...
Once on your way and if in doubt use your PDA device, or go to an internet café to...
**have your mind at ease.**



6



## Protecting your individual entrance and providing you the conveniences of automation in your day to day.

The **DiViRA™ SYSTEM5** offers:

### Programming the Residential Automation

- Interconnecting with your PC for statuses, messages and alarms.
- Programming the appliances operation, including automatic functions and scheduling via daily menus or for the whole season.

### The Automated Residence

- Remotely receiving lighting and appliances statuses of all the rooms and areas in your residence.
- Remotely operating lights, heaters, air-conditioners, curtains and other electrical appliances of all the rooms from anywhere inside the residence.

### Ceiling IR Repeater for your living room

- Commanding all the appliances including lighting, home theater, background music, and air-conditioners via handheld remote control, keypads and the touch screen of the video interphone monitor.

### Interfacing your Individual Entrance with the alarm system

- Sensor activated door status and individual door panel for visitors at your residence entrance.



See clearly who is at your own residence door before you let him in.

**safety first**



IR ceiling driver EIRD5C

Keypad

EKP5-9

EIRC5

8



9

# Exhibit A

Part II

## Use the keypad in the kitchen or the remote control in the dining room to switch on-off and operate any appliance in your residence.



The **DiViRA™** Touch Screen in the kitchen can be your Automation Center for:

- Displaying messages and playing back voice messages sent from the local concierge, the virtual doorman and the *Homecierge™*.

- Family members and roommates can record and playback voice messages to each other.

- Providing you with control and programming of your appliances, including automatic and manual setting and scheduling.

### The Remote Operation

- Receiving appliances statuses from the kitchen and all the other rooms of your residence.

- Operating lights, air-conditioners, heaters, curtains and other electrical appliances of all the rooms and areas in your residence.

Relax everywhere in your residence



The Ceiling IR Repeater - in the kitchen commands your kitchen appliances, including A/V, background music, air-conditioning and lighting via keypads and the touch screen.

The IR Repeater - in your dinning room commands your dining room appliances via handheld remote control.

The **DiViRA™** Touch Screen in the kitchen will monitor your Entrance and Alarms

- Responding to sensor activated door status and individual visitors at the door panel of your own residence' entrance.

- Monitoring fire, smoke and gas all year round via the installed detectors in your kitchen.

Self adjusting is as simple as can be





**Touch the keypad on your bed side or aim your remote control to any of the automation devices to switch off or reduce your kid's high volume rock music.**



A keypad at bed side

The **DiViRA™ SYSTEM 5** makes it possible for: A Touch Screen, a Remote Control or a Keypad to command all your appliances from your bedroom

- Any and all of the bed rooms can be connected to the residential automation **DiViRA™ SYSTEM 5**.

- Open and close your shades or curtains in the morning or the evening.

- Stay in bed and operate your air-conditioner, switch on-off your lights, select your TV programs or fall asleep with the background music you like...

**Remotely operate the boiler to have hot water ready for your bath**

- Save on electricity bill by remotely operating the boiler on your way home (automatic control may not be as efficient in cutting bills).



Handheld remote control





A keypad in your bath is all you need to control your audio/video and appliances.



Switch the boiler remotely to your children delight



# IT TAKES ONE REMOTE CONTROL

## You need no wall mounted keypads or touch screens to operate your lighting and appliances.

Ergonomically structured remote with two way IR communications, the EIRC5 gives you an instant status indication, enabling you to operate lights and appliances from up to ten (or more) remotes and from anywhere within your residence - through:

- Self updating LEDs for indicating status of the selected room' light and each appliance.

- Keys for addressing up to eight rooms or areas of your residence.

- On-off keys for a selected light, air-conditioner, curtain, TV, music, iPod, DVD and AUX. (common keys used for each selected room).

- Master off key to switch off all lights and/or selected appliances as programmed.

- Keys for preset 1~4 recall.

- Keys for volume up-down, channel up-down, temperature up-down and level up-down (for all appliances as applicable).

- Keys for record, playback, pause and stop to operate CD, DVD, VCR and other playback/ record appliances.



EiRC5

Remote controlling of light, air-condition, curtain, TV, music, DVD and more.

14



15

**SYSTEM5 takes the securing of your family and your residence seriously,**



EGB5

it offers many accessories such as glass break sensor for detecting a break through your window.

The **DiViRA SYSTEM5** connects to a variety of alarm and emergency sensors, be it hard wired, wireless or IR device.

An activated alarm sensor will:

- Trigger alarm through your video interphone monitor.
- Transmit alarm message to the local concierge and (when applicable) to an alarm monitoring station or the *Homecierge®* alarm services.

An activated emergency sensor will:

- Trigger emergency call to the local concierge with automatic opening of the voice channel.
- Transmit a call to an emergency or medical monitoring station for registered residents (elderly and care needing).

The alarm/emergency provides:

- Logging of all alarm/emergency events.
- Arming, disarming of zones and the alarm system, manually or via automatic scheduling.
- Fire, gas and smoke detection 24hrs. all year round.



EPB5    ERC5B-W    ERC5K-W

Emergency sensors include water proof wireless bracelet, wireless pendant, pull and panic switch.



The wonderful life of being secured

EPIR5

The motion sensor will detect movements in your rear balcony if you are on the ground floor.





Emergency services for the elderly and the care needing.



16

# AUTOMATED RESIDENCE COMPONENTS

## SPDT/DPDT relays & Current sensor



ERL5-IR

ERL5+IR SPDT relay + IR
ERLL5+IR latching SPDT relay + IR
ERL5 SPDT relay
ERLL5 latching SPDT relay

ERL6-IR

ERL6+IR DPDT relay + IR
ERLL6+IR latching DPDT relay + IR
ERL6 DPDT relay
ERLL6 latching DPDT relay

EDM5-IR

EDM5+IR Dimmer control + IR
EDM5 Dimmer control

ECS5-IR

ECS5+IR current sensor + IR
ECS5 current sensor

## IR drivers



EIRD5C Ceiling mounted IR driver

EIRD5W Wall mounted IR driver

## Motion & glass break sensors



EPIR5 IR motion sensor

EGB5 Glass Break sensor

## IR remote control



EIRC5 IR remote control

## DiViRA distributors

ERAD5 Residential Automation
Distributor with power supply
ERAD6 Residential Automation
Distributor with power supply
and voice communication
ERAD7 Residential Automation
Distributor with power supply,
voice and image communication

## Keypads & indicators



EKP5-9+IR 9 button keypad + IR
EKP5-9 9 button keypad



EKP5-6+IR 6 button keypad + IR
EKP5-6 6 button keypad



EMK5-4+IR dimmer keypad + IR
EMK5-4 dimmer keypad



EKP5-3+IR 3 button keypad + IR
EKP5-3 3 button keypad

## Air-condition controller



EACC5+IR aircon controller
EACC5 aircon controller

## Curtain controller



ECC5+IR curtain controller
ECC5 curtain controller

## Panic button



EPB5 emergency/panic button

## Wireless personal emergency



ERC5B

ERC5B Bracelet

ERC5P Pendant

ERC5K

ERC5K Key holder

ERC5 Hand held

ERC5P   ERC5

Black   Magenta   Silver

17

**It takes only a twisted pair (non-polar) to connect the SYSTEM5 automated residence, be it in a cascade or in a star configuration.**

**DiViRA**™ provides for the simplest possible wiring, using up to 30m (100ft) non-polar AWG24/0.51mm ø (0.2mm$^2$) twisted pair, or one pair of a CAT5 cable for up to 5 cascading **DiViRA**™ devices and up to 60m (200ft) for one **DiViRA**™ device in star connection.





**ELBEX JAPAN LTD.**
Elbex Bldg. 1-11-5, Higashi-Gotanda
8-Chome, Shinagawa-ku Tokyo 141-0031, Japan
Tel:(03) 3779-5222 Fax:(03) 3779-5201

**ELBEX AMERICA INC.**
10761 Noel Street, Los Alamitos,
CA 90720, U.S.A.
Tel:(714) 761-8000/Fax:(714) 761-8400

**ELBEX AMERICA (N.Y.) INC.**
300, Corporate Drive, Suite 5, Blauvelt,
NY 10913, U.S.A
Tel:(845) 353-0600/Fax:(845) 353-0657

**ELBEX (DEUTSCHLAND) GMBH**
Arzberger Str. 2, D-93057
Regensburg, Germany
Tel:(0941) 69531-0 Fax:(0941) 68306

**ELBEX TECHNOLOGIES BVBA**
Katwilgweg 11, B-2050 Antwerpen, Belgium
Tel:(03) 254.09.54  Fax:(03) 254.03.23

**ELBEX FRANCE**
17 rue Casimir Perier,
F-95870 Bezons, France
Tel:01.34.23.59.00 Fax:01.30.76.16.13

**ELBEX VIDEO LTD. (ISRAEL)**
8, Kehilat Venezia St. Tel Aviv 69400, Israel
Tel:03-6494149 Fax:03-6494561

**ELBEX VIDEO (H.K.) LTD.**
Unit A, 1/F. On Fat Industrial Building,
12-18 Kwa  Wing Road, Kwai Chung,
N.T., Hong Kong
Tel:(852)2798 7608 Fax:(852)2798 7774

**ELBEX KOREA LTD.**
508, Jeil Bldg. 256-13, Gongduk-dong,
Mapo-gu, Seoul, 121-020, Korea
Tel:02-711-2180 Fax:02 711 2181

**ELBEX ACCESS & SECURITY PTY. LTD.**
**SYDNEY** Unit15, 20-30 Stubbs Street,
Silverwater, NSW 2128, Australia
Tel:(02) 9748 6377 Fax:(02) 9748 6090
**BRISBANE** Unit 1, 121 Newmarket Road,
Windsor. Qld. 4030, Australia
Tel:(07) 3857 6411 Fax:(07)3857 6445

**ELBEX SINGAPORE PTE. LTD.**
153 Kampong Ampat #05-03,
Junjie Industrial Bldg., Singapore 368326
Tel:6-285 6233 Fax:6-382 3978

# ELBEX

The DiViRA™ is a trade mark pending registration.

The *Homecierge*™, SHOPPING TERMINAL (SIGNAL VIDEO), COMPRESSED AUDIO,
FIBEX™, VIACOAX, & VIAFIBER, are registered trademarks.
The SYSTEM 4/SYSTEM 5 video interphone system and
the *Homecierge*™ are covered by the following patents
U.S. 5923363, 6603842, 6940957, 7290702, JP 3736757,
EP 1280355, CA 2449741, AU 774323 and many other